**Not for Publication**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| WILMINGTON TRUST, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE BENEFIT OF THE REGISTERED HOLDERS OF WELLS FARGO COMMERCIAL MORTGAGE TRUST 2019-C50, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2019-C50, acting by and through Rialto Capital Advisors, LLC, as Special Servicer under the Pooling and Servicing Agreement dated as of May 1, 2019, <br><br>*Plaintiff,*<br><br>v.<br><br>24 COMMERCE STREET LLC; M.P. MANAGEMENT LLC; BBF PARTNERS LLC; and "JOHN DOE" NO. 1 THROUGH "JOHN DOE" NO. 100<br><br>*Defendants.* | Civil Action No. 2:21-cv-05498<br><br>**OPINION** |

**John Michael Vazquez, U.S.D.J.**

This matter comes before the Court by way of Plaintiff's motion for the appointment of a receiver pursuant to Federal Rule of Civil Procedure 66. D.E. 13. Specifically, Plaintiff seeks the appointment of a receiver as to Defendant 24 Commerce Street LLC, who opposes the motion. The Court has reviewed the parties' submissions[1] in support of and in opposition to the motion and decided the motion without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b). For the reasons stated below, Plaintiff's motion is **GRANTED in**

---

[1] Plaintiff's memorandum of law in support of its motion, D.E. 13-9, will be referred to as "P. Br."; Defendants' opposition, D.E. 41, will be referred to as "D. Opp."; and Plaintiffs' reply brief, D.E. 43, will be referred to as "P. Reply".

**part and DENIED in part**. The Court grants Plaintiff's motion to the extent that it seeks the appointment of a receiver of rents but will not appoint a receiver to possess and manage the relevant property.

**I.     BACKGROUND**

   **A. Facts**

This case concerns a mortgage on real property in Newark, New Jersey (the "Property"). D.E. 3 ("Am. Compl.") ¶ 4.[2]  The Property is owned by Defendant 24 Commerce Street LLC ("Borrower"). Mignardi Decl. ¶ 2. On April 4, 2019, Borrower executed a loan agreement with Argentic Real Estate Finance LLC ("Original Lender"). Am. Compl. ¶ 10; D.E. 25 ("Borrower Answ.") ¶ 10. The loan was in the amount of $14,500,000. Am. Compl. ¶ 10; D. Opp. at 1. As collateral for the loan, "Borrower[] … granted Original Lender a security interest in" the Property. D.E. 13-1 ("Pastor Decl.") ¶ 8. The mortgage was duly recorded on April 15 of that year. *Id.* "As additional collateral security[,] … Borrower executed[] … an Assignment of Leases and Rents" ("ALR").[3]  *Id.* ¶ 9; *see also* D.E. 13-5. According to Plaintiff,

> [t]he ALR absolutely and unconditionally granted, transferred and assigned all right, title and interest in all current and future leases and rents in connection with the Property. Original Lender and Borrower intended for this assignment to constitute a present, absolute and unconditional assignment and not an assignment for additional security only.

Am. Compl. ¶ 16; *see also* D.E. 13-5 at 6. Yet, Plaintiff also filed UCC-1 forms in Essex County, New Jersey, and the Delaware Department of State. *Id.* ¶¶ 17-18.

---

[2] Plaintiff represents that the Property "includes, without limitation, certain real property and improvements located at 24-30 Commerce Street, Newark, New Jersey 07102, identifiable as Block 145, Lots 19 and 19-B01 on the tax map of the in the City of Newark, County of Essex, State of New Jersey[] …." D.E. 13-25 ("Mignardi Decl.") ¶ 2.

[3] An additional guaranty, not of apparent immediate relevance to the instant motion, was executed between the parties. *See id.* ¶ 19; Pastor Decl. ¶ 12.

Apparently unbeknownst to Plaintiff, Borrower had granted a mortgage to Defendant M.P. Management LLC on March 7, 2019, for a loan of $2,000,000, which was recorded on March 11, 2020, *id.* ¶ 22, despite Borrower's assurances that it had "marketable and indefeasible title in fee to the real property and good title to the balance of the Property," D.E. 13-2 ("Loan Agmt.") at 34, and that "[t]here is no indebtedness with respect to the Property . . . whether secured or unsecured," *id.* at 41. As a result, Plaintiff points to section 8.1(e) of the Loan Agreement, which provides as follows:

> An "Event of Default" shall exist with respect to the Loan if any of the following shall occur:
> …
> any certification, representation or warranty made by Borrower … herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished by Borrower … in connection with any Loan Document, shall be false or misleading in any material respect as of the date the representation or warranty was made[.]

*Id.* at 71. Additionally, Borrower granted another mortgage to Defendant BBF Partners LLC for a loan of $2,700,000 on July 9, 2019, which was recorded on December 20, 2019, Pastor Decl. ¶ 22, despite Borrower's promises that it would not take on any other but "Permitted Indebtedness." Loan Agmt. at 49 (Section 5.13 of the Loan Agreement), 102. The provision indicated that Borrower

> shall not directly or indirectly create, incur or assume any indebtedness other than (i) the Debt[4] and (ii) unsecured trade payables incurred in the ordinary course of business relating to the ownership and operation of the Property which in the case of such unsecured trade payables (A) are not evidenced by a note, (B) do not exceed, at any time, a maximum aggregate amount of one percent (1%) of the original amount of the Principal and (C) are paid within thirty (30) days of the date incurred[.]

---

[4] "The Debt" is defined by the Loan Agreement to "mean the unpaid Principal, all interest accrued and unpaid thereon, any Yield Maintenance Premium and all other sums due to Lender in respect of the Loan or under any Loan Document." Loan Agmt. at 4.

*Id.* at 50 (Section 5.22 of the Loan Agreement). Section 8.1(h) provides that an Event of Default shall occur if "Borrower breaches any covenant contained in Sections … 5.13[ or] 5.22[.]" *Id.* at 71 (emphasis removed).

On April 4, 2019, the same day that the Loan Agreement was executed between Borrower and Original Lender, Original Lender transferred to SPREF WH III LLC (the "Interim Holder") "all of its rights, title and interest in" the Property. Am. Compl. ¶¶ 20-24. The Interim Holder transferred the same back to Original Lender on May 14, 2019, *id.* ¶¶ 25-29, and Original Lender then transferred its rights, title, an interest in the Property to Plaintiff that same day. *Id.* ¶¶ 30-34.[5]

Several additional sections of the Loan Agreement are relevant. Section 2.2.1 obligates Borrower to make monthly payments on the interest accrued on the principal of the loan. Loan Agmt. at 21. Section 8.1(a) deems a missed payment an Event of Default. *Id.* at 71.

The third article of the Loan Agreement addresses "CASH MANAGEMENT AND RESERVES." *Id.* at 26. Pursuant to the mortgage recorded in Essex County, Borrower retains "a revocable license … to collect the Rents subject to the requirements of the Loan Agreement (including the deposit of Rents into the Clearing Account)." D.E. 13-4 ("Motrg.") at 8. Section 3.1 of the Loan Agreement requires Borrower to direct "non-residential tenants of the Property" to pay their rents into a "Clearing Account." Loan Agmt. at 26. For residential tenants, Borrower is to collect rents and deposit the funds into the Clearing Account within one day of receipt. *Id.* All rents are "deemed to be collateral for the Loan and shall be held in trust for the benefit, and as the property, of Lender[,]" and are "not [to] be commingled with any other funds or property of

---

[5] The security interests were also recorded following the assignments. *E.g.*, Am. Compl. ¶ 29. Plaintiff attaches what appear to be authentic documents evidencing those transfers.

Borrower[.]" *Id*. In the event of a "Cash Management Period,"[6] the funds are to be deposited into a "Cash Management Account" controlled by Lender. *Id*. Section 8.1(m) provides as follows:

> A default shall be continuing under any of the other terms, covenants or conditions of this Agreement or any other Loan Document not otherwise specified in this Section 8.1 for ten (10) days after notice to Borrower … from Lender, in the case of any default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other default[.]

*Id*. at 72.

Finally, Section 6.3 imposes certain reporting and bookkeeping obligations on Borrower. *Id*. at 61-64. In relevant part, Section 6.3.3 requires Borrower to "furnish" monthly or quarterly reports apprising the Lender of such information as the Property's expenses and income, a report on the Property's receivables, and "rent rolls[.]" *Id*. at 62-63. Section 6.3.5 requires Borrower to submit, on or before November 30, "a budget for the Property for the succeeding calendar year" for the Lender's approval. *Id*. at 63. Section 6.3.7 empowers the Lender to fine Borrower for failing to provide any of the relevant records. *Id*. at 64.

In addition, Section 8.2.1 of the Loan Agreement contains an acceleration clause, *id*. at 72, and section 10(a)(vii) of the Mortgage provides that

> [u]pon the occurrence of any Event of Default, Mortgagee may take such action, … as it deems advisable to protect and enforce its rights against Mortgagor and in and to the Mortgaged Property, including . . .
> . . .
> *apply for the appointment of a trustee, receiver, liquidator or conservator* of the Mortgaged Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of the Mortgagor or of any person, firm or other entity liable for the payment of the Debt[.]

---

[6] A "Cash Management Period" commences "upon Lender giving notice to the Clearing Bank of" one of several events, including a default as defined in the Loan Agreement. Loan Agmt. at 2.

5

Mortg. at 6-7 (emphasis added).  The next subsection then provides that, should a default occur, the mortgagee may

> *enforce Mortgagee's interest in the Leases and Rents* and enter into or upon the Mortgaged Property, either personally or by its agents, nominees or attorneys and dispossess Mortgagor and its agents and employees therefrom, and thereupon Mortgagee may (A) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with the Mortgaged Property and conduct the business thereat . . . (D) exercise all rights and powers of Mortgagor with respect to the Mortgaged Property, whether in the name of the Mortgagor or otherwise, including the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive Rents . . . .

*Id.* at 7 (emphasis added).

In a March 18, 2020 letter, D.E. 13-20 ("First Demand"), Plaintiff sent Borrower a notice of default, notifying Borrower that it had failed to make payments on the February and March 2020 payment dates and demanding that Borrower pay the amount due in addition to late fees. *Id.* at 2-3.  Plaintiff continued that Borrower was not living up to its "[c]ash [o]bligations[,]" "by failing to cause all Rents to be directly deposited, and otherwise failing to deposit or cause to be deposited all Rents, in the Clearing Account[.]"  *Id.* at 3.  Because events of default had happened, Plaintiff explained, a Cash Management Period had been instated; Plaintiff demanded that Borrower "establish a Cash Management Account."  *Id.*  Finally, Plaintiff notified Borrower that it had failed to furnish Plaintiff with "(i) a proposed 2020 Annual Budget, [and] (ii) the quarterly and year-to-date records, reports and rent rolls for the fourth quarter of 2019 required under Section 6.3.3 of the Loan Agreement."  *Id.* at 4.

On August 21, 2020, Plaintiff sent a second demand letter.  D.E. 13-21 ("Second Demand").  That letter referred to the First Demand, informing Borrower that "the Events of Default identified in the September 2019 Letter and March 20[20] Letter remain outstanding[,]"

*id.* at 2, and stating that Borrower had failed to make payments for March, April, May, June, July, and August of 2020, *id.* at 3.  Plaintiff revoked "Borrower's license to collect, use, and enjoy the rents[] … payable under . . . any Lease[.]" *Id.*  Finally, Plaintiff informed Borrower of its intention to "strictly enforce the Loan Documents in accordance with their respective terms, including[] … acceleration of the Debt, appointment of a receiver, and commencement of proceedings to foreclose the Security Instruments." *Id.*

Plaintiff then sent Borrower a notice of acceleration on December 22, 2020, indicating that Borrower had failed to remit all payments between March 2020 and the date of the letter, which represented a further default.  D.E. 13-22 at 1-3.  At some point between the sending of the notice of acceleration and the filing of the Complaint on March 17, 2021, Plaintiff conducted a title search discovered the existence of the two other security interests discussed above.  *See, e.g.*, D.E. 1 ¶¶ 5-6, 51-52, 57-58; P. Br. at 8.

### B. Procedural History

Plaintiff filed a Complaint on March 17, 2021, D.E. 1, and amended its Complaint that same day, D.E. 3 ("Am. Compl.")  The Amended Complaint brings four counts: mortgage foreclosure, *id.* ¶¶ 10- 66; appointment of a receiver, *id.* ¶¶ 67-73; security interest foreclosure, *id.* ¶¶ 74-78, and possession, *id.* ¶ 79.  Defendant M.P. Management LLC answered on June 1, 2021, D.E. 21, and Borrower answered on June 9, Borrower Answ.  Defendant BBF Partners LLC has not appeared.

Plaintiff later moved to "appoint[] G&E Real Estate Management Services, Inc., a Delaware corporation dba Newmark Knight Frank as receiver of the assets of defendant 24 Commerce Street LLC[.]"  D.E. 13 at 1-2.

### C. The Parties' Positions

Plaintiff argues that, pursuant to the ALR, "Plaintiff owns (and has always owned) equitable title to the Rents generated by the Property, for which Plaintiff seeks the appointment of a receiver." P. Br. at 4. The cornerstone of Plaintiff's position, however, is Section 10(a)(vii) of the Mortgage, which (according to Plaintiff) provides that "upon an Event of Default, Plaintiff would be entitled to apply for the appointment of a rent receiver - a remedy *to which Borrower expressly and irrevocably consented* - and to collect all Rents." *Id.* at 7 (emphasis in original). Plaintiff adds that equitable factors favor appointing a receiver, particularly "the continuation of Borrower's defaults, Borrower's unstable financial status of the mortgagor and Borrower's apparent misuse of project funds." *Id.* at 7-8. Plaintiff notes that Borrower has also "fail[ed] to provide or timely provide Plaintiff with true and complete financial disclosure regarding the Property's performance and Borrower's financial health further raises serious concerns regarding the stability of Borrower's financial status." *Id.* at 8. Plaintiff continues "that the Loan is tainted with fraud and defaults have occurred since the date of origination." *Id.* The need for additional financing, Plaintiff infers, raises "concerns that project funds are being misused and, consequently, that the Rents" are being used to pay off "other debts." *Id.* at 8-9.

Plaintiff also submitted a proposed order. D.E. 13-28. In addition to taking possession of the Property, carrying on the Property's business, paying its debts and obligations, *id.* at ¶¶ 1-17, the proposed order would empower the receiver "to sell … all or any portion of the Borrower's Assets … subject to [certain] conditions precedent[.]" *Id.* ¶ 22(a).

Borrower characterizes Plaintiff's motion as "a blatant attempt to bypass a foreclosure judgment by having the Court appoint a receiver to conduct a non-judicial sale of" the Property. D. Opp. at 1. As to Section 10(a)(vii) of the Mortgage, Borrower responds that the "provision

does not 'expressly and irrevocably' provide for Borrower's consent to the automatic appointment of a managing receiver for the Property." *Id.* at 6. Borrower then addresses multiple factors that courts consider when deciding whether to appoint a receiver. *See id.* at 7-11. Borrower emphasizes that "Plaintiff possesses a first mortgage on the Property, and is thus fully secured" in the absence of "any evidence, whatsoever, that the value of the Property is not sufficient to cover its Loan or that the Property is underwater." *Id.* at 7. Borrower says that Plaintiff's "refus[al] to engage in good-faith settlement discussions[]" is part of the reason for its continuing default. *Id.* at 8. Borrower indicates that "the gradual reopening of Courts and businesses following the COVID-19 pandemic weighs against the appointment of a receiver[,]" *id.* at 8, because "as businesses continue to reopen, and tenancy at the Property continues to improve, Borrower's financial status will only continue to recover, thus increasing the likelihood that the Loan will be resolved." *Id.* at 9. Borrower asserts that Plaintiff has not shown that Borrower misused funds or committed waste. *Id.* Borrower also maintains that Plaintiff has mischaracterized the MP mortgage as a fraud, and faults Plaintiff for its "inaction following the alleged default." *Id.*

Borrower next accuses Plaintiff of inequitable conduct. *Id.* at 12. Borrower claims that Plaintiff held off on seeking a timely remedy for the defaults until the worst of the COVID-19 pandemic was over and the lockdowns lifted. *Id.* at 14. Finally, Borrower protests that the proposed order is overly broad: "With the exception of the right to collect rents, none of the proposed powers afforded to the receiver are outlined in the terms of the Mortgage, and thus should not be permitted by the Court." *Id.* at 15.

Plaintiff replies that Borrower tacitly admits to the numerous alleged defaults. P. Reply at 1. Plaintiff reiterates that Sections 10(a)(vii)-(viii) of the Mortgage represent Borrower's "express[] and irrevocabl[e] consent to the automatic appointment of a managing receiver for the

9

Property[.]" *Id.* at 3. Plaintiff then analyzes several of the relevant equitable factors. Plaintiff further takes issue with Borrower's representation that the COVID-19 pandemic caused hardship to befall an innocent party—according to Plaintiff, this "is a scenario rife with fraud," *id.* at 6, and Plaintiff cites the M.P. and BBF mortgages as proof. *Id.* at 6-7. Plaintiff emphasizes "all of the Defaults, or the conduct giving rise thereto, occurred days, months or even years prior to the onset of the COVID-19 pandemic." *Id.* at 7 n.4. Plaintiff pins the failure of prior, good-faith settlement discussions on the "mounting defaults" of Borrower and related entities. *See id.* & n.5. If anything, in Plaintiff's view, these prior attempts at resolution are "a testament to the good faith that Plaintiff exhibited during the course of the parties' protracted settlement discussions as Plaintiff did not simply rush to the courthouse[.]" *Id.* at 9. Plaintiff believes that Borrower is misusing funds given its need for subordinate financing and its misrepresentations. *Id.* at 12.

As to the scope of the potential receiver's powers, Plaintiff says that "even if some of the powers of the proposed receiver candidate are not specifically delineated within the Mortgage document," the powers detailed in the proposed order do not contravene the document. *See id.* at 14. But "Plaintiff would alternatively welcome the appointment of a rent receiver for the Property as such an appointment would help alleviate many of the same concerns Plaintiff has articulated[.]" *Id.* at 15.

Finally on October 1, 2021, Plaintiff filed a letter on the docket, indicating that Borrower failed to "pay two (2) separate tax bills for the subject property[.]" D.E. 46 at 1. Because, according to Plaintiff, if those taxes were not paid, tax sale certificates with "super priority over Plaintiff's mortgage lien" could issue, Plaintiff paid the outstanding tax bills. *Id*. at 1-2. Plaintiff submits that this is further evidence of Borrower's bad faith, which "further underscore[s] the need

for the appointment of a receiver over Borrower's assets." *Id.* at 2. As of the date of this Opinion, Borrower has not responded.

## II. STANDARD OF REVIEW

"Federal Rule of Civil Procedure 66 empowers a federal court to appoint a receiver in a pending litigation." *Wells Fargo Bank, N.A. v. Lichter Gateway IV, LLC*, No. 17-2036, 2017 WL 5957072, at *5 (D.N.J. Dec. 1, 2017); *see also* 28 U.S.C. § 754. The parties appear to agree that "[t]he question of whether to appoint a receiver in a federal foreclosure action is to be determined under federal law." P. Br. at 3; D. Opp. at 3. Although this case is a diversity action and, in such cases, the Court must normally "apply the choice-of-law rules of the forum state[,]" *White v. Sunoco, Inc.*, 870 F.3d 257, 263 (3d Cir. 2017) (quoting *LeJeune v. Bliss-Salem, Inc.*, 85 F.3d 1069, 1071 (3d Cir. 1996)), "the weight of authority appears to favor federal law" in this context. *U.S. Bank Nat'l Ass'n v. FPG Bridgewater Owner One, LLC*, No. 17-5454, 2018 WL 2269248, at *2 n.2 (D.N.J. May 17, 2018); *see also Wells Fargo Bank, N.A. v. CCC Atl., LLC*, 905 F. Supp. 2d 604, 610 & n.8 (D.N.J. 2012) (collecting cases). Although a court can hold an evidentiary hearing before deciding whether to appoint a receiver, such a "hearing need not be held beforehand when the record discloses sufficient facts to warrant appointment of a receiver." *Leone Indus. v. Associated Packaging, Inc.*, 795 F. Supp. 117, 120 n.6 (D.N.J. 1992).[7]

Court have recognized that the appointment of a receiver is a "drastic" remedy, "and the power to [make such an appointment] is one that should be exercised with great caution." *Lichter Gateway IV*, 2017 WL 5957072, at *5; *see also Maxwell v. Enter. Wall Paper Mfg. Co.*, 131 F.2d 400, 403 (3d Cir. 1942) ("[I]t has been judicially noted almost innumerable times that the appointment of a receiver is an extraordinary, a drastic . . . remedy. It is not to be resorted to if

---

[7] Neither party requested an evidentiary hearing.

11

milder measures will give the plaintiff, whether creditor or shareholder, adequate protection for his rights.") (footnotes omitted).  The remedy should be granted "only where there is a showing of 'fraud, or [the] imminent danger of property being lost, injured, diminished in value, or squandered and where legal remedies . . .appear to be inadequate[.]'" *McDermott v. Russell*, 523 F. Supp. 347, 352 (E.D. Pa. 1981), *aff'd o.b.*, 722 F.2d 732 (3d Cir. 1983) (alterations in original) (quoting *Mintzer v. Arthur L. Wright & Co.*, 263 F.2d 823, 826 (3d Cir. 1959)).

District courts have "broad discretion in appointing a receiver," *CCC Atl.*, 905 F. Supp.2d at 614 (quoting *Can. Life Assurance Co. v. Alfred R. LaPeter*, 563 F.3d 837, 845 (9th Cir. 2009)), but that discretion is not plenary.  *See, e.g.*, *Lichter Gateway IV*, 2017 WL 5957072, at *6.  In exercising that discretion "in the context of a mortgage foreclosure," courts consider the following factors:

> "[T]he property is inadequate security for the loan; the mortgage contract contains a clause granting the mortgagee the right to a receiver; the continued default of the mortgagor; the probability that foreclosure will be delayed in the future; the unstable financial status of the mortgagor; [and] the misuse of project funds by the mortgagor."

*CCC Atl.,* 905 F. Supp. 2d at 614 (alteration in original) (quoting *United States v. Berk & Berk*, 767 F. Supp. 593, 597 (D.N.J. 1991)).  "The presence of a contractual stipulation to the appointment of a receiver is given considerable weight in the court's evaluation of whether a rent receiver should be appointed."  *Licther Gateway IV*, 2017 WL 5957072, at *6 (quoting *In re Inv'rs Warranty of Am., Inc. v. B.W.E. Dev., L.L.C.*, No. CIV.09-4490, 2010 WL 2557559, at *5 (D.N.J. June 23, 2010)).

The standard, however is heightened "[w]hen the moving party seeks a receiver who will not only collect rents and profits, but will also manage and operate the mortgaged property pending

foreclosure[.]" *CCC Atl.*, 905 F. Supp. 2d at 614.  In such a case, the court may consider the following additional factors:

> (1) the danger of waste; (2) delays in foreclosure; (3) the defendant's fraudulent conduct; (4) imminent danger that property will be lost, concealed, injured, diminished in value, or squandered; (5) the inadequacy of the available legal remedies; (6) the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and (7) the plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property.

*Lichter Gateway IV*, 2017 WL 5957072, at *7 (quoting *CCC Atl.*, 905 F. Supp. 2d at 614-145).

### III.  ANALYSIS

In analyzing and applying the relevant standard, the Court first considers the relevant contract provisions followed by a review of the equitable factors.

### A.  Contract Provisions

As noted, Plaintiff reads the mortgage documents as indicating Borrower's express and irrevocable consent to an appointment of a receiver, thereby entitling Plaintiff to such appointment. *E.g.*, P. Br. at 7.  However, in the Court's view, Plaintiff somewhat conflates Section 10(a)(viii) with Section 10(a)(vii) of the Mortgage.  Although Section 10(a)(viii) does empower Plaintiff, "either personally or by its agents, nominees or attorneys" to "enter into or upon the Mortgaged Property[] … and dispossess Mortgagor and its agents or employees therefrom," Mortg. at 7, that subsection does not mention receivers.  In addition, Plaintiff's authority indicates that a receiver is "an arm of the court" rather than a party's agent.  P. Reply at 13 (quoting *Equitable Life Assurance Soc'y of U.S. v. Patzowsky*, 6 A.2d 390, 391 (N.J. 1939) ("A rent receiver appointed in foreclosure proceedings holds the property as an arm of the court, and his possession is not that of the mortgagee."); *Kaplan v. Sleep E Hollow Motel Co.*, 271 A.2d 12, 16 (N.J. Super. Ct. App. Div.

1970) ("An operating receiver appointed in foreclosure proceedings holds the property as an arm of the court for the benefit of all parties to the action.")).

As to Section 10(a)(vii), the Court agrees with Borrower's reading that the Section provides that should an event of default occur, Plaintiff may "*apply for* the appointment of a . . . receiver[.]" Mortg. at 7 (emphasis added). This provision is akin to the provisions at issue in *U.S. Bank National Association* and *Lichter Gateway IV*. See *U.S. Bank Nat'l Ass'n*, 2018 WL 2269248, at *3 ("The mortgage contract provides that in the event of default, Plaintiff may 'apply for the appointment of a receiver.'"); *Lichter Gateway IV*, 2017 WL 5957072, at *7 ("Wells Fargo relies on Section 7.1(g) of the mortgage agreement, which provides that in the event of default, as defined by the loan agreement, Wells Fargo 'may ... (g) apply for the appointment of a receiver[]'") (footnote omitted). *Cf. CCC Atl.*, 905 F. Supp. 2d at 615 ("Article 11.02(d) of the Loan Agreement specifically provides that after an 'Event of Default,' Wells Fargo may apply for the appointment of a receiver to manage and operate the property, and that CCC Atlantic 'consents, to the extent permitted by applicable law, to the appointment of a receiver.'") (footnote omitted).

In those cases, the courts determined that those provisions "[fell] short of a full, self-executing consent to appointment of a receiver for any and all purposes upon default." *U.S. Bank Nat'l Ass'n*, 2018 WL 2269248, at *3 (quoting *Lichter Gateway IV*, 2017 WL 5957072, at *7). However, the courts also "eschew[ed]" an "excessively literal approach, which would reduce this [provision] to an illusory promise[.]" *Lichter Gateway IV*, 2017 WL 5957072, at *7; *see also U.S. Bank Nat'l Ass'n*, 2018 WL 2269248, at *3. The courts resolved the issue by "giv[ing] consideration to the parties' inclusion of this provision[,]" *U.S. Bank Nat'l Ass'n*, 2018 WL 2269248, at *3, and treating it as "relevant but not dispositive." *Lichter Gateway IV*, 2017 WL 5957072, at *7. The Court will also afford the provision some weight and give it consideration

14

but will not treat it as dispositive. In other words, the Court will not give Section 10(a)(vii) or Section 10(a)(viii), alone or in combination, the "considerable weight" that courts typically afford a contractual provision which expressly provides for the appointment of a receiver.

However, Original Lender and Borrower executed the ALR, which "absolutely and unconditionally granted, transferred and assigned all right, title and interest in all current and future leases and rents in connection with the Property." Am. Compl. ¶ 16; *see also* D.E. 13-5 at 6. The same provision of the ALR, Section 2(a), grants Borrower "a revocable license[] to otherwise deal with, and enjoy the rights of the lessor under, the Leases." D.E. 13-5 at 6. The following subsection, 2(b), provides for the immediate revocation of the license upon an event of default. *Id.*

The court in *CCC Atlantic* placed great importance on a contract provision that assigned to the plaintiff's predecessor in interest, among other things, "rents from the property, which … the lender then 'licensed' back to CCC Atlantic so long as no Event of Default occurred." 905 F. Supp. 2d at 615. The section further empowered the plaintiff to collect "all rents upon an Event of Default." *Id*. The *CCC Atlantic* court explained that "[t]he importance of these contractual provisions cannot be underestimated because they set apart this commercial foreclosure case from the traditional scenario in which a receiver is sought at equity and no such contractual provisions exist." *Id.* Given the presence and effects of those clauses, the court concluded that "appointment of a receiver is not such a drastic remedy." *Id.* at 916.

The Court finds that Section 2(a) in the ALR is sufficiently similar to the provision in *CCC Atlantic*. As a result, the Court will likewise, "[u]nder [these] circumstances," not regard the "appointment of a receiver [as] such a drastic remedy." *Id.* at 616. At the same time, the Court considers the appointment of a receiver to be somewhat more drastic than the court in *CCC Atlantic* because the mortgage at issue here is not as strongly worded as the one in *CCC Atlantic*.

### B. Equitable Factors & Affirmative Defenses

The Court next turns to the equitable factors. As to the first factor, whether the property is adequate security for the loan, the Court finds that it does not have enough information to adequately assess this factor. Defendant assures the Court that the Property is valuable enough to satisfy all liens, D. Opp. at 7, but, as Plaintiff points out, this statement is not supported by an appraisal or assessment, P. Reply at 5 n.2. Next, as to whether "the mortgage contract contains a clause granting the mortgagee a right to a receiver," the Court affords the provisions some weight and treats it as relevant to the inquiry but not dispositive for the reasons explained above. The Court also affords weight to the ALR.

Turning to the third factor, Borrower has been in default of its obligations for several years. In fact, the Court agrees with Plaintiff that Borrower has been in default of its obligations from the very beginning, failing to alert Plaintiff to the existence of the preexisting M.P. Management lien or the subsequent BBF Partners lien. And Plaintiff had to conduct a title search to uncover them— meaning that the Borrower never alerted Plaintiff to those liens' existence. In addition, Borrower has apparently not made any mortgage payments since early 2020, has not lived up to its cash management or financial disclosure obligations, and now is apparently falling behind on its taxes. The Court disagree with Borrower that those failures are Plaintiff's fault. Accordingly, the Court finds that this factor strongly favors Plaintiff.

As to the likelihood for further delays in the foreclosure process, the Borrower blames the pandemic for such delays and the backlog in the state-court system and New Jersey Office of Foreclosure, which Borrower posits "Plaintiff has likely strategically avoided" "by filing in … Federal Court." D. Opp. at 8-9. Plaintiff pins the fault on the Borrower's dilatoriness and requests for extensions and abeyances. P. Reply at 13. Further, while the Court would have wanted more

particular information from Borrower demonstrating specific reasons that the pandemic caused Borrower financial issues, the Court is also aware that the pandemic has had a tremendous detrimental impact on many businesses. The Court, therefore, determines that this factor favors neither party.

Next, it appears that the Borrower is in an unstable financial status. Although Plaintiff urges the Court to find that the Borrower's taking on of additional debt is evidence of fraud, P. Reply at 12-13,[8] the Court does not find that the additional debt itself was fraudulent. However, the need for additional financing does speak to the Borrower's unstable financial status. Accordingly, the Court find that this factor favors Plaintiff.

The final factor, the misuse of funds, is difficult to assess. Plaintiff has presented no concrete evidence of Borrower's misuse. And while Borrower strenuously denies an impropriety, the lack of supporting financial information prevents the Court from assessing the accuracy of Borrower's position.

As to the second set of equitable factors, the issue of waste and the delays in foreclosure were addressed above. There appears to have been culpable conduct by Borrower, and Borrower does not appear to offer any meritorious defense to the alleged defaults.[9] Moreover, Borrower has not provided the Court with its financial information so that the Court could adequately assess its economic stability. Thus, the Court finds that there would be meaningful, continuing harm if

---

[8] The Court acknowledges that Plaintiff characterizes the nondisclosure of the preexisting M.P. loan as fraudulent and the nondisclosure of the subsequent BBF loan as a violation of covenants. Thus, while the nondisclosures may have been improper, the Court's focus is on whether the obtaining of the additional funding was in and of itself fraudulent.

[9] The Court acknowledges that Plaintiff's mortgage, as the first recorded and without knowledge of the existence of the M.P. loan, retains priority, but this does not, in and of itself, excuse the Borrower's nondisclosure.

Plaintiff is not afforded access to the Borrower's records and if the Borrower continues to eschew its cash management responsibilities. On the other hand, there does not appear to be an imminent threat that property will be lost or squandered.

Finally, the parties also speak in broader, more traditional terms of equity, such as "fraud," "bad faith," and "estoppel." The Court is troubled by some of the Borrower's conduct. Although, as mentioned above, the Borrower attempts to deflect some of the blame for its defaults onto COVID-19 and New Jersey's measures to combat the virus, the Court agrees with Plaintiff that a substantial portion of the defaults, except for the missed payments from April of 2020 to the present, occurred before New Jersey was locked down. And even if Borrower could not make its payments because of the pandemic, it could have still complied with the cash management and financial disclosure obligations of the Loan Agreement.

In sum, the equitable factors weigh in favor of appointing a receiver, at least as to rents. This conclusion is buttressed by Section 10(a)(vii) of the Mortgage and the ALR.

### C. Receiver's Authority

The only remaining issue is the scope of the receiver's powers. The Court agrees with Borrower that Plaintiff calls for a receiver with broad powers, including the ability to sell the Property outright. This authority is not countenanced by the contractual language or the equitable factors. The Court finds that a rent receiver, with full access to Borrower's records that have been withheld from Plaintiff and the ability to implement the cash management practices called for in the Loan Agreement, is warranted.

### IV. CONCLUSION

For the reasons stated above, Plaintiff's motion is granted in part and denied in part. The Court will appoint a receiver but only with the authority delineated above. An appropriate Order accompanies this Opinion.

Dated: October 14, 2021

                                                          John Michael Vazquez, U.S.D.J.