# Holland & Knight

900 Third Avenue 20th Floor | New York, NY 10022 | T 212.751.3001 | F 212.751.3113
Holland & Knight LLP | www.hklaw.com

David V. Mignardi
212.751.3171
david.mignardi@hklaw.com

November 12, 2021

**VIA ECF:**
Honorable John Michael Vazquez, U.S.D.J.
Martin Luther King U.S. Court House Building
50 Walnut Street
Newark, New Jersey 07102

Re:   *Wilmington Trust, N.A., as Trustee, etc. v. 24 Commerce Street LLC, et al*;
Case No. 2:21-cv-05498

Dear Judge Vazquez:

Counsel for plaintiff Wilmington Trust, National Association, as Trustee for the Benefit of the Registered Holders of Wells Fargo Commercial Mortgage Trust 2019-C50, Commercial Mortgage Pass-Through Certificates, Series 2019-C50 ("Plaintiff" or "Lender") and defendant  24 Commerce LLC ("24LLC" of "Borrower") submit this joint letter pursuant to Your Honor's Text Order dated November 4, 2021. See ECF No. 62.  For the convenience of the Court, the parties are including: (a) as Exhibit 1, the Loan Agreement, dated as of April 4, 2019 between Argentic Real Estate Finance LLC, Plaintiff's predecessor in interest, and 24LLC (the "Loan Agreement"); (b) as Exhibt 2, the Mortgage, Assignment of Leases and Rents and Security Agreement dated as of April 4, 2019 and recorded in the Essex County Register of Deeds and Mortgages on April 15, 2019 as Instrument No. 2019034219 (the "Mortgage") and (c) relevant excerpts from the Pooling and Servicing Agreement dated as of May 1, 2019, which governs a securitized pool of loans that includes the subject loan (the "PSA").

**LATE FEES**:

24LLC's Position:

In its "Payoff Demand Statement", dated October 15, 2021 (the "Payoff"), Plaintiff seeks late fees in the amount of $131,884.60. Upon information and belief, these late fees were calculated as of the date of the Payoff. Pursuant to New Jersey law, late fees cannot be recovered after a loan 24 Commerce LLC November 3, 2021 Page 2 is accelerated. *See* Crest Sav. & Loan Ass'n v. Mason, 243 N.J. Super. 646, 649 (Ch. Div. 1990). Based on Plaintiff's complaint, the subject loan was accelerated on December 22, 2020. Thus, based on Plaintiff's representation that 24LLC failed to make payments beginning March, 2020, Plaintiff is only permitted to collect late fees for a ten (10) month period between March – December, 2020.

#152488755_v2 527548.00025

Honorable John Michael Vazquez, U.S.D.J.
November 12, 2021
Page 2

<u>Plaintiff's Position</u>: **The Lender is Entitled to Recover Late Fees through the Acceleration of the Loan.**

Section 2.5.3 of the Loan Agreement , Borrower is obliged to pay to Lender an amount equal to 5% of any unpaid principal, interest or other sum due under any of the Loan Documents.  While the amount of the accumulated late fees will be set forth in the forthcoming payoff statement, which may include Late Payment Charges that accrued prior to March 2020 due to Borrower's sporadic payment history, Lender agrees to only seek recovery of all Late Payment Charges incurred through December 22, 2020.

**PROTECTIVE ADVANCES AND INTEREST ON ADVANCES**:

<u>24LLC's Position</u>:

A.      **Interest on Advances**. Plaintiff seeks "interest on advances" in the sum of $48,221.88. The Loan Agreement does not provide for interest on advances. The Loan Agreement defines the "Principal" as the original principal amount of $14,500,000.00. Furthermore, "Debt" is defined as "the unpaid Principal, all interest accrued and unpaid thereon, any Yield Maintenance Premium and all other sums due to Lender in respect of the Loan or under any Loan Document."

Thus, the debt evidence by the Loan Agreement is confined to the principal balance, with interest to accrue thereon, and any additional fees and costs. By charging interest on advances, Plaintiff is effectively increasing the principal balance owed on the loan, which is not permissible under the loan documents, as demonstrated by paragraph 31 of the Mortgage which states: "The total amount of the indebtedness secured by this Mortgage may decrease or increase from time to time, but the total unpaid principal balance at any one time shall not exceed the maximum principal amount of the Obligations."

The only provision in the loan documents which could arguably grant Plaintiff the right to collect interest on advances, is Section 9 of the Mortgage which states:

> Mortgagee is authorized to enter upon the Mortgaged Property for such purposes or appear in, defend or bring any action or proceeding to protect its interest in the Mortgaged Property or foreclose this Mortgage or collect the Debt, and the cost and expense thereof (including as attorneys' fees and disbursements to the extent permitted by law), with interest thereon at the Default Rate for the period after notice from Mortgagee that such cost or expense was incurred to the date of payment to Mortgagee, shall constitute a portion of the Debt, shall be secured by this Mortgage and the other Loan Documents and shall be due and payable to Mortgagee upon demand."

Notably absent from Section 9 is any reference to Plaintiff's right to collect interest on advances.

B.      **Other Protective Advances.** Plaintiff's Payoff provides separate line items for tax and insurance advances. These are the only protective advances that could be associated with the property. However, Plaintiff seeks a "Other Protective Advances" of $152,169.39. Notably, the

Honorable John Michael Vazquez, U.S.D.J.
November 12, 2021
Page 3

payoff was issued a day after Your Honor's Receiver Order was issued. As such, the "other protective advances" cannot possibly include any costs associated with the court-appointed receiver. Without an itemization of the "other protective advances", 24LLC has no way of determining the validity of these charges. As of today's date, Plaintiff has not, and will not provide an itemization of the "other protective advances" set forth in the Payoff.

<u>Plaintiff's Position</u>: **The Loan Documents expressly permit Lender to recover amounts advanced for the protection of its interest in the Mortgaged Property as well as reasonable attorneys' fees. The Loan Documents further provide that Borrower shall be obliged to reimburse Lender for those protective advances with interest.**

At the time that Lender delivers its payoff statement, it shall provide a breakdown of all of the property protection advances is seeks to receive. Under Section 5.2 of the Loan Agreement, Lender is entitled to make advances for taxes, insurance and other charges. Section 9 of the Mortgage further permits Plaintiff to perform any of Borrower's obligations that have contributed to a Default "in such manner and to extent as [Plaintiff] may deem necessary to protect the security thereof."

Under Section 5.29(a)(ii) of the Loan Agreement, Borrower is obliged to reimburse Lender for reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender or Servicer in connection with the Loan, including "Borrower's and Lender's ongoing performance under and compliance with the Loan Documents, including confirming compliance with environmental and insurance requirements; . . . the creation, perfection or protection of Lender's Liens in the Property and the Cash Management Accounts (including fees and expenses for title and lien searches, intangibles taxes, personal property taxes, mortgage recording taxes, due diligence expenses, travel expenses, accounting firm fees, costs of appraisals, environmental reports and Lender's Consultant, surveys and engineering reports); . . . enforcing any obligations of or collecting any payments due from Borrower under any Loan Document or with respect to the Property or in connection with any refinancing or restructuring of the Loan in the nature of a "work-out", or any insolvency or bankruptcy proceedings." Moreover, Section 31 of the Mortgage makes clear that the Mortgage secures not only the "existing Debt, but also future advances, whether made before or after default or maturity . . . ."

Further pursuant to Section 31 of the Mortgage, among the future advances that will become part of the secured Debt are "disbursements and other advances for the payment of taxes, assessments, maintenance charges, insurance premiums or costs relating to the Mortgaged Property, for the discharge of liens having priority over the lien of this Mortgage, for the curing of waste of the Mortgaged Property and for the payment of service charges and expenses incurred by reason of default and including late charges, attorney's fees and court costs, **together with interest thereon**." (emphasis added). Moreover, Section 9 of the Mortgage expressly states that "the cost and expense [incurred by Plaintiff to protect its interest in the Mortgaged Property] (**including reasonable attorneys' fees and disbursements** to the extent permitted by law), **with interest thereon at the Default Rate** for the period after notice from [Plaintiff] that such cost or expense was incurred to the date of payment to [Plaintiff], shall constitute a portion of the Debt . . . ." (emphasis added).

Honorable John Michael Vazquez, U.S.D.J.
November 12, 2021
Page 4

**SPECIAL SERVICING FEES**:

24LLC's Position:

Plaintiff seeks a "Special Servicing Fee" of $60,516.13. Paragraph 10.3 of the Loan Agreement provides that:

> Borrower shall pay any reasonable fees and expenses of Servicer (i) in connection with a release of the Property ( or any portion thereof), (ii) from and after a transfer of the Loan to any "master servicer" or "special servicer" for any reason, including as a result of a decline in the occupancy level of the Property, (iii) in connection with an assumption or modification of the Loan, (iv) in connection with the enforcement of the Loan Documents or (v) in connection with any other action or approval taken by Servicer hereunder on behalf of Lender (*which shall not include ongoing regular servicing fees relating to the day-to-day servicing of the Loan, for which Borrower shall not be charged*).

At this time, 24LLC is unable to ascertain the purpose for the "Special Servicing Fee". Furthermore, paragraph 10.3 of the Loan Agreement is ambiguous as it does not differentiate between servicing fees related to "day-to-day" servicing, and those "special servicing fees" which would arguably be due and payable.

Plaintiff's Position: **The Loan Documents expressly provide that Borrower shall pay Rialto's fees and expenses as Special Servicer of the Loan.**

Pursuant to Section 9.1(a)(iii) of the Loan Agreement, Lender was empowered with "the right to securitize the Loan or any portion thereof in a single asset securitization or a pooled loan securitization." And, under Section 10.3 of the Loan Agreement, Lender has "the right to retain Servicer to act as its agent hereunder with such powers as are specifically delegated to Servicer by Lender, whether pursuant to the terms of this Agreement, any Pooling and Servicing Agreement, the Cash Management Agreement or otherwise, together with such other powers as are reasonably incidental thereto."

Section 10.3 of the Loan Agreement expressly states that "Borrower shall pay any reasonable fees and expenses of Servicer . . . (ii) from and after a transfer of the Loan to any "master servicer" or "special servicer" for any reason, including as a result of a decline in the occupancy level of the Property . . . . " Therefore, Borrower is obliged to pay Servicing Fees due and owing in connection with the Loan.

In its counsel's letter dated November 3, 2021 and above, Borrower contends that this "shall not include ongoing regular servicing fees relating to the day-to-day servicing of the Loan, for which Borrower shall not be charged)" both those parentheticals only qualify subsection (v) of Section 10.3 of the Loan Agreement and not subsection (ii) above. As such, that qualification is inapplicable.

Honorable John Michael Vazquez, U.S.D.J.
November 12, 2021
Page 5

**LIQUIDATION FEE**:

<u>24LLC's Position</u>:

Plaintiff seeks a "Liquidation Fee" of $170,417.90. However, no collateral for the loan has been liquidated. Notably, the Payoff fails to indicate how this liquidation fee was calculated or why Plaintiff is entitled to a liquidation fee prior to any liquidation of the loan collateral (*i.e.* the foreclosure sale of the mortgaged premises).

While Plaintiff maintains that it is entitled to a Liquidation Fee pursuant to the terms of the PSA, it bears repeating that 24 LLC is not a party to the PSA and cannot be held liable for fees and costs associated with a separate agreement between Plaintiff and its servicer, the terms of which were not disclosed to 24LLC at origination.

<u>Plaintiff's Position</u>: **The PSA provides that, if Borrower pays off the Loan, Lender will be obliged to pay Rialto a Liquidation Fee.  The Loan Documents provide that Borrower must reimburse Lender for the payment of, <u>inter alia</u>, this Liquidation Fee.**

Pursuant to Section 5.29(a)(viii) of the Loan Agreement, Borrower is obliged to "reimburse Lender upon receipt of notice from Lender for all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender or Servicer in connection with the Loan, including . . . fees charged by Servicer."

Borrower, recognized Original Lender's ability to securitize the Loan and appoint a Servicer to service it (as further set forth above), Section 3.11(c) of the PSA defines the compensation Rialto, as Special Servicer, is entitled to recover from Plaintiff.  Among other compensation, Section 3.11(c) provides that "[a] Liquidation Fee will be payable with respect to (a) each Specially Serviced Loan . . . as to which the Special Servicer receives any Liquidation Proceeds . . . ."

Article I of the PSA defines "Liquidation Proceeds" as "[c]ash amounts received by or paid to the Master Servicer or the Special Servicer in connection with: (i) the liquidation (**including a payment in full**) of a Mortgaged Property or other collateral constituting security for a Defaulted Loan or defaulted Companion Loan, if applicable, through a trustee's sale, foreclosure sale, REO Disposition **or otherwise** . . . ." (emphasis added).  Moreover, Article I defines a "Liquidation Event" as "[w]ith respect to any Mortgage Loan or with respect to any REO Property (and the related REO Loan), any of the following events: (i) **such Mortgage Loan is paid in full** . . . ." (emphasis added).

While Borrower is not liquidating the Mortgaged Property here, it is paying off the Loan in full.  And, should Borrower tender payoff proceeds as it claims it will, Rialto, as special servicer of the Loan, is entitled to the receipt of Liquidation Proceeds from the Trust.  While the forthcoming payoff statement will include the amount of the Liquidation Fee, the Liquidation Fee is computed pursuant to the "Liquidation Fee Rate", which Article I of the PSA defines as "[a] rate equal to 1.00% with respect to any Specially Serviced Loan (and each related Serviced Companion Loan) or REO Property or Loss of Value Payment or Purchase Price; provided that if such rate would result in an aggregate Liquidation Fee less than $25,000, then the

Honorable John Michael Vazquez, U.S.D.J.
November 12, 2021
Page 6

Liquidation Fee Rate will be equal to the lesser of (i) 3.00% and (ii) such lower rate as would result in an aggregate Liquidation Fee equal to $25,000."

It is also worth pointing out that Borrower and its Guarantor received the benefit of a securitized loan structure because they received a competitive interest rate and did not have to deliver an absolute personal guaranty and instead was required to deliver a Guaranty of Recourse Obligations. As a result, Borrower and Guarantor received adequate consideration for Borrower's obligation to reimburse the Trust for all of its costs, including the Liquidation Fee and Special Servicing Fee.

We thank Your Honor for your time and consideration with this matter and look forward to hearing from you soon.

Respectfully Submitted,

**HOLLAND & KNIGHT LLP**                           **MEYNER AND LANDIS LLP**

By:   */s/ David V. Mignardi*                        By:   */s/ Joseph R. McCarthy*
        David V. Mignardi, Esq.                                  Joseph R. McCarthy

Attachments

# LOAN AGREEMENT

**LOAN AGREEMENT**

Dated as of April 4, 2019

between

**24 COMMERCE STREET LLC**,
as Borrower

and

**ARGENTIC REAL ESTATE FINANCE LLC**,
as Lender

# TABLE OF CONTENTS

1. DEFINITIONS; PRINCIPLES OF CONSTRUCTION ...............................................1
   1.1   Specific Definitions ....................................................................1
   1.2   Index of Other Definitions...........................................................18
   1.3   Principles of Construction ...........................................................20

2. GENERAL LOAN TERMS......................................................................20
   2.1   The Loan .................................................................................20
   2.2   Interest; Monthly Payments..........................................................20
        2.2.1   Generally..................................................................21
        2.2.2   Default Rate .............................................................21
        2.2.3   Taxes ......................................................................21
        2.2.4   New Payment Date......................................................21
   2.3   Loan Repayment........................................................................21
        2.3.1   Repayment ...............................................................22
        2.3.2   Mandatory Prepayments................................................22
        2.3.3   Defeasance................................................................22
        2.3.4   Optional Prepayments..................................................24
   2.4   Release of Property....................................................................25
        2.4.1   Release on Defeasance .................................................25
        2.4.2   Release on Payment in Full ...........................................25
   2.5   Payments and Computations..........................................................25
        2.5.1   Making of Payments...................................................25
        2.5.2   Computations............................................................26
        2.5.3   Late Payment Charge...................................................26

3. CASH MANAGEMENT AND RESERVES ......................................................26
   3.1   Cash Management Arrangements.....................................................26
   3.2   Required Repairs.......................................................................26
        3.2.1   Completion of Required Repairs .....................................26
        3.2.2   Required Repairs Reserves............................................27
   3.3   Taxes and Insurance ...................................................................27
   3.4   Capital Expense Reserves.............................................................28
   3.5   Rollover Reserves......................................................................28
        3.5.1   Rollover Reserve .......................................................28
        3.5.2   Special Rollover Reserve..............................................29
   3.6   Casualty/Condemnation Subaccount................................................30
   3.7   Security Deposits.......................................................................30
   3.8   Cash Collateral Subaccount..........................................................31
   3.9   Grant of Security Interest; Application of Funds .................................31
   3.10   Property Cash Flow Allocation .....................................................32

4. REPRESENTATIONS AND WARRANTIES....................................................33
   4.1   Organization; Special Purpose.......................................................33
   4.2   Proceedings; Enforceability..........................................................33

i

137342639v7

confidential

confidential

| | | | |
|---|---|---|---|
| 4.3 | No Conflicts | | 34 |
| 4.4 | Litigation | | 34 |
| 4.5 | Agreements | | 34 |
| 4.6 | Title | | 34 |
| 4.7 | No Bankruptcy Filing | | 36 |
| 4.8 | Full and Accurate Disclosure | | 36 |
| 4.9 | Tax Filings | | 36 |
| 4.10 | ERISA; No Plan Assets | | 36 |
| 4.11 | Compliance | | 37 |
| 4.12 | Major Contracts | | 37 |
| 4.13 | Federal Reserve Regulations; Investment Company Act; Bank Holding Company | | 37 |
| 4.14 | Easements; Utilities and Public Access | | 38 |
| 4.15 | Physical Condition | | 38 |
| 4.16 | Leases | | 38 |
| 4.17 | Fraudulent Transfer | | 39 |
| 4.18 | Ownership of Borrower | | 39 |
| 4.19 | Purchase Options | | 40 |
| 4.20 | Management Agreement | | 40 |
| 4.21 | Hazardous Substances | | 40 |
| 4.22 | Name; Principal Place of Business | | 40 |
| 4.23 | Other Debt | | 41 |
| 4.24 | Assignment of Leases and Rents | | 41 |
| 4.25 | Insurance | | 41 |
| 4.26 | FIRPTA | | 41 |
| 4.27 | Fiscal Year | | 41 |
| 4.28 | Intellectual Property/Websites | | 41 |
| 4.29 | Operations Agreements | | 41 |
| 4.30 | Illegal Activity | | 41 |
| **5.** | **COVENANTS** | | **41** |
| 5.1 | Existence | | 42 |
| 5.2 | Taxes and Other Charges | | 42 |
| 5.3 | Access to Property | | 42 |
| 5.4 | Repairs; Maintenance and Compliance; Alterations | | 42 |
| | 5.4.1 | Repairs; Maintenance and Compliance | 42 |
| | 5.4.2 | Alterations | 43 |
| 5.5 | Performance of Other Agreements | | 43 |
| 5.6 | Cooperate in Legal Proceedings | | 43 |
| 5.7 | Further Assurances | | 43 |
| 5.8 | Environmental Matters | | 44 |
| | 5.8.1 | Hazardous Substances | 44 |
| | 5.8.2 | Environmental Monitoring | 44 |
| | 5.8.3 | O & M Program | 46 |
| 5.9 | Title to the Property | | 46 |
| 5.10 | Leases | | 46 |
| | 5.10.1 | Generally | 46 |

137342639v7

confidential

confidential

|  |  | 5.10.2 Material Leases | 46 |
|  |  | 5.10.3 Minor Leases | 47 |
|  |  | 5.10.4 Additional Covenants with respect to Leases | 47 |
|  | 5.11 | Estoppel Statement | 48 |
|  | 5.12 | Property Management | 48 |
|  |  | 5.12.1 Management Agreement | 48 |
|  |  | 5.12.2 Termination of Manager | 48 |
|  | 5.13 | Special Purpose Bankruptcy Remote Entity | 49 |
|  | 5.14 | Intentionally Deleted | 49 |
|  | 5.15 | Change in Business or Operation of Property | 49 |
|  | 5.16 | Debt Cancellation | 49 |
|  | 5.17 | Affiliate Transactions | 49 |
|  | 5.18 | Zoning | 49 |
|  | 5.19 | No Joint Assessment | 50 |
|  | 5.20 | Principal Place of Business | 50 |
|  | 5.21 | Change of Name, Identity or Structure | 50 |
|  | 5.22 | Indebtedness | 50 |
|  | 5.23 | License; Intellectual Property; Website | 50 |
|  |  | 5.23.1 License | 50 |
|  |  | 5.23.2 Intellectual Property | 50 |
|  |  | 5.23.3 Website | 50 |
|  | 5.24 | Compliance with Restrictive Covenants | 51 |
|  | 5.25 | ERISA | 51 |
|  | 5.26 | Prohibited Transfers | 51 |
|  |  | 5.26.1 Generally | 51 |
|  |  | 5.26.2 Transfer and Assumption | 52 |
|  | 5.27 | Liens | 54 |
|  | 5.28 | Dissolution | 54 |
|  | 5.29 | Expenses | 54 |
|  | 5.30 | Indemnity | 55 |
|  | 5.31 | Patriot Act Compliance | 56 |
|  | 5.32 | Approval of Major Contracts | 57 |
|  | 5.33 | Permitted Construction. | 57 |
|  | 5.34 | Permitted Future Mezzanine Debt | 59 |
| 6. | | NOTICES AND REPORTING | 60 |
|  | 6.1 | Notices | 60 |
|  | 6.2 | Borrower Notices and Deliveries | 61 |
|  | 6.3 | Financial Reporting | 61 |
|  |  | 6.3.1 Bookkeeping | 61 |
|  |  | 6.3.2 Annual Reports | 62 |
|  |  | 6.3.3 Monthly/Quarterly Reports | 62 |
|  |  | 6.3.4 Other Reports | 63 |
|  |  | 6.3.5 Annual Budget | 63 |
|  |  | 6.3.6 Additional Operating Expenses | 63 |
|  |  | 6.3.7 Breach | 64 |

confidential

confidential

| 7. | | **INSURANCE; CASUALTY; AND CONDEMNATION** | 64 |
|---|---|---|---|
| | 7.1 | Insurance | 64 |
| | | 7.1.1 Coverage | 64 |
| | | 7.1.2 Policies | 66 |
| | 7.2 | Casualty | 67 |
| | | 7.2.1 Notice; Restoration | 67 |
| | | 7.2.2 Settlement of Proceeds | 67 |
| | 7.3 | Condemnation | 68 |
| | | 7.3.1 Notice; Restoration | 68 |
| | | 7.3.2 Collection of Award | 68 |
| | 7.4 | Application of Proceeds or Award. | 69 |
| | | 7.4.1 Application to Restoration | 69 |
| | | 7.4.2 Application to Debt | 69 |
| | | 7.4.3 Procedure for Application to Restoration | 70 |
| **8.** | | **DEFAULTS** | 71 |
| | 8.1 | Events of Default | 71 |
| | 8.2 | Remedies | 72 |
| | | 8.2.1 Acceleration | 72 |
| | | 8.2.2 Remedies Cumulative | 72 |
| | | 8.2.3 Severance | 73 |
| | | 8.2.4 Delay | 73 |
| | | 8.2.5 Lender's Right to Perform | 74 |
| **9.** | | **SPECIAL PROVISIONS** | 74 |
| | 9.1 | Sale of Mortgage and Securitization | 74 |
| | 9.2 | Securitization Indemnification | 77 |
| | 9.3 | Severance of Loan | 80 |
| **10.** | | **MISCELLANEOUS** | 80 |
| | 10.1 | Exculpation | 80 |
| | 10.2 | Brokers and Financial Advisors | 84 |
| | 10.3 | Retention of Servicer | 84 |
| | 10.4 | Survival; Successors and Assigns | 84 |
| | 10.5 | Lender's Discretion; Rating Agency Review Waiver | 84 |
| | 10.6 | Governing Law | 85 |
| | 10.7 | Modification, Waiver in Writing | 86 |
| | 10.8 | Trial by Jury | 87 |
| | 10.9 | Headings/Schedules | 87 |
| | 10.10 | Severability | 87 |
| | 10.11 | Preferences | 87 |
| | 10.12 | Waiver of Notice | 87 |
| | 10.13 | Remedies of Borrower | 88 |
| | 10.14 | Prior Agreements | 88 |
| | 10.15 | Offsets, Counterclaims and Defenses | 88 |
| | 10.16 | Publicity | 88 |
| | 10.17 | No Usury | 88 |

iv

confidential

confidential

| | | |
|---|---|---|
| 10.18 | Conflict; Construction of Documents; Reliance | 89 |
| 10.19 | No Joint Venture or Partnership; No Third Party Beneficiaries | 89 |
| 10.20 | Yield Maintenance Premium | 90 |
| 10.21 | Assignments and Participations | 90 |
| 10.22 | Waiver of Marshalling of Assets | 90 |
| 10.23 | Joint and Several Liability | 91 |
| 10.24 | Certain Additional Rights of Lender | 91 |
| 10.25 | Acknowledgement and Consent to Bail-In of EEA Financial Institutions. | 92 |
| 10.26 | Set-Off | 93 |
| 10.27 | Counterparts | 93 |

| | |
|---|---|
| Schedule 1 | Required Repairs |
| Schedule 2 | Exceptions to Representations and Warranties |
| Schedule 3 | Rent Roll |
| Schedule 4 | Organization of Borrower |
| Schedule 5 | Definition of Special Purpose Bankruptcy Remote Entity |
| Schedule 6 | Secondary Market Transaction Information |
| Schedule 7 | Intellectual Property/Websites |
| Schedule 8 | REA |
| Schedule 9 | Project |

v

137342639v7

confidential

confidential

# LOAN AGREEMENT

**LOAN AGREEMENT** dated as of April 4, 2019 (as the same may be modified, supplemented, amended or otherwise changed, this "*Agreement*") between **24 COMMERCE STREET LLC**, a Delaware limited liability company (together with its permitted successors and assigns, "*Borrower*"), and **ARGENTIC REAL ESTATE FINANCE LLC**, (together with its successors and assigns, "*Lender*").

## 1.     DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**1.1 <u>Specific Definitions</u>.**  The following terms have the meanings set forth below:

"*Affiliate*" shall mean, as to any Person, any other Person (i) which directly or indirectly through one or more intermediaries Controls, or is Controlled by, or is under common Control with, such Person; or (ii) which, directly or indirectly, beneficially owns or holds ten percent (10%) or more of any class of stock or any other ownership interest in such Person; or (iii) ten percent (10%) or more of the direct or indirect ownership of which is beneficially owned or held by such Person; or (iv) is the spouse, issue or parent of such Person, or which is a trust or estate, the beneficial owners of which are the spouse, issue or parent of such Person; or (v) which directly or indirectly is a general partner, controlling shareholder, managing member, officer, director, trustee or employee of such Person.

"*Alteration Threshold*" shall mean $250,000.

"*Approved Capital Expenses*" shall mean the cost of Capital Expenses incurred by Borrower, which Capital Expenses shall either be (i) included in the Approved Capital Budget for the current calendar month (or for a prior calendar month to the extent not used for such prior calendar month), or (ii) approved by Lender, such approval not to be unreasonably withheld, conditioned or delayed.

"*Approved Leasing Expenses*" shall mean actual out-of-pocket expenses incurred by Borrower and payable to third parties that are not Affiliates of Borrower or Guarantor in leasing space at the Property pursuant to Leases entered into in accordance with the Loan Documents, including brokerage commissions and tenant improvements, which expenses are (A) specifically approved by Lender in connection with approving the applicable Lease, or (B) incurred in the ordinary course of business and on market terms and conditions in connection with Leases which do not require Lender's approval under the Loan Documents, and Lender shall have received (and approved, if applicable) a budget for such tenant improvement costs and a schedule of leasing commission payments payable in connection therewith, or (C) otherwise approved by Lender, which approval shall not be unreasonably withheld or delayed.  Approved Leasing Expenses shall be substantiated by executed documents and contracts evidencing the same, including Lease documents and brokerage agreements.

"*Approved Major Lease Leasing Expenses*" shall mean actual out-of-pocket expenses incurred by Borrower and payable to third parties that are not Affiliates of Borrower or Guarantor in re-leasing space demised under a Major Lease or a Combined Tenant Lease, as applicable, at the Property pursuant to replacement Leases entered into in accordance with the Loan Documents, including brokerage commissions and tenant improvements, which expenses

137342639v7

confidential

are (A) specifically approved by Lender in connection with approving the applicable Lease or (B) otherwise approved by Lender, which approval shall not be unreasonably withheld or delayed.   Approved Major Lease Leasing Expenses shall be substantiated by executed documents and contracts evidencing the same, including Lease documents and brokerage agreements.

"***Approved Operating Expenses***" shall mean during a Cash Management Period operating expenses incurred by Borrower that (i) are included in the Approved Operating Budget for the current calendar month, (ii) are for real estate taxes, insurance premiums, electric, gas, oil, water, sewer or other utility service to the Property, (iii) are other similar operating expenses that are non-discretionary in nature, (iv) are Emergency Expenditures or (v) are approved by Lender.

"***Available Cash***" shall mean as of each Payment Date during the continuance of a Cash Management Period, the amount of Rents, if any, remaining in the Deposit Account after the application of all of the payments required under clauses (i) through (viii) of Section 3.10(a) hereof.

"***Bankruptcy Code***" shall mean Title 11 of the United States Code entitled "Bankruptcy", as amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights.

"***Business Day***" shall mean any day other than a Saturday, Sunday or any day on which commercial banks in New York, New York are authorized or required to close.

"***Calculation Date***" shall mean the last day of each calendar quarter during the Term.

"***Capital Expenses***" shall mean expenses that are capital in nature or required under GAAP to be capitalized.

"***Cash Management Period***" shall mean a period which shall commence upon Lender giving notice to the Clearing Bank of the occurrence of any of the following: (i) the Stated Maturity Date, (ii) a Default or an Event of Default, (iii) if, as of any Calculation Date, the Debt Service Coverage Ratio is less than 1.30:1.00 (assuming for the purpose of this calculation a loan constant of 6.77%)  (a "***DSCR Cash Management Period***"), (iv) if, as of any Calculation Date, the Debt Yield is less than 10.5% (a "***Debt Yield Cash Management Period***") or (v) the commencement of a Lease Sweep Period; and shall end upon Lender giving notice to the Clearing Bank that the sweeping of funds into the Deposit Account may cease, which notice Lender shall only be required to give if (1) the Loan and all other obligations under the Loan Documents have been repaid in full or (2) the Stated Maturity Date has not occurred and (A) with respect to the matters described in clause (ii) above, such Default or Event of Default has been cured and no other Default or Event of Default has occurred and is continuing, or (B) with respect to the matter described in clause (iii) above, Lender has determined that the Property has achieved a Debt Service Coverage Ratio of at least 1.35:1.00 for two (2) consecutive Calculation Dates (assuming for the purpose of this calculation a loan constant of 6.77%), or (C) with respect

2

confidential

to the matter described in clause (iv) above, Lender has determined that the Property has achieved a Debt Yield of at least 11.0% for two (2) consecutive Calculation Dates or (D) with respect to the matter described in clause (v) above, such Lease Sweep Period has ended.

"*Code*" shall mean the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"*Combined Tenant*" shall mean, collectively, those tenants under any Combined Tenant Lease.

"*Combined Tenant Guarantor*" shall mean the lease guarantor under any Combined Tenant Lease.

"*Combined Tenant Insolvency Proceeding*" shall mean (A) the admission in writing by any Combined Tenant or Combined Tenant Guarantor of its inability to pay its debts generally, or the making of a general assignment for the benefit of creditors, or the instituting by any Combined Tenant or Combined Tenant Guarantor of any proceeding seeking to adjudicate it insolvent or seeking a liquidation or dissolution, or the taking advantage by any Combined Tenant or Combined Tenant Guarantor of any Insolvency Law, or the commencement by any Combined Tenant of a case or other proceeding naming it as debtor under any Insolvency Law or the instituting of a case or other proceeding against or with respect to any Combined Tenant or Combined Tenant Guarantor under any Insolvency Law or (B) the instituting of any proceeding against or with respect to any Combined Tenant or Combined Tenant Guarantor seeking liquidation of its assets or the appointment of (or if any Combined Tenant or Combined Tenant Guarantor shall consent to or acquiesce in the appointment of) a receiver, liquidator, conservator, trustee or similar official in respect of it or the whole or any substantial part of its properties or assets or the taking of any corporate, partnership or limited liability company action in furtherance of any of the foregoing.

"*Combined Tenant Lease*" shall mean Leases which in the aggregate and for a period of at least three (3) months (i) cover fifteen percent (15%) or more of the rentable square feet of the Improvements, or (ii) have a gross annual rent of fifteen percent (15%) or more of the total annual Rents of the Property.

"*Condominium Conditions*" shall mean (i) the creation of a condominium regime at the Property, including the Project, in accordance with all Legal Requirements and otherwise reasonably acceptable to Lender, (ii) Borrower's delivery to Lender, in a form reasonably satisfactory to Lender, of all condominium documents, including without limitation, the declaration and bylaws of the condominium regime, which condominium documents shall contain mortgagee protections acceptable to Lender in its sole discretion, (iii) the creation of a condominium association owned and controlled by Borrower, (iv) the creation of multiple condominium units, with those condominium units containing the Improvements at the Property as of the Closing Date separate and distinct from the condominium unit or units containing the Project, (v) Borrower's irrevocable nomination and appointment of Lender as Borrower's proxy to vote and as Borrower's agent to act with respect to all of Borrower rights under the

3

137342639v7

confidential

condominium regime for so long as the Debt remains outstanding, and (vi) any other documentation or other deliveries that Lender reasonably requires.

"*Control*" shall mean, with respect to any Person, either (i) ownership directly or indirectly of forty-nine percent (49%) or more of all equity interests in such Person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, through the ownership of voting securities, by contract or otherwise, and the terms Controlled, Controlling and Common Control shall have correlative meanings.

"*Debt*" shall mean the unpaid Principal, all interest accrued and unpaid thereon, any Yield Maintenance Premium and all other sums due to Lender in respect of the Loan or under any Loan Document.

"*Debt Service*" shall mean, with respect to any particular period, the sum of scheduled Principal and interest payments due under the Note in such period.

"*Debt Service Coverage Ratio*" shall mean, as of any date, the ratio calculated by Lender of (i) the Net Operating Income for the twelve (12)-month period ending with the most recently completed calendar month to (ii) the Debt Service with respect to such period.

"*Debt Yield*" shall mean, as of any date, the ratio (expressed as a percentage) calculated by Lender of (i) the Net Operating Income for the twelve (12)-month period ending with the most recently completed calendar month to (ii) the unpaid Principal as of such date.

"*Default*" shall mean the occurrence of any event under any Loan Document which, with the giving of notice or passage of time, or both, would be an Event of Default.

"*Default Rate*" shall mean a rate per annum equal to the lesser of (i) the maximum rate permitted by applicable law, or (ii) five percent (5%) above the Interest Rate, compounded monthly.

"*Defeasance Collateral*" shall mean U.S. Obligations, which provide payments (i) on or prior to, but as close as possible to, all Payment Dates and other scheduled payment dates, if any, under the Note after the Defeasance Date and up to and including the Stated Maturity Date, and (ii) in amounts equal to or greater than the Scheduled Defeasance Payments.

"*Deposit Bank*" shall mean any bank or depository selected by Lender in its discretion.

"*Eligible Account*" shall mean a separate and identifiable account from all other funds held by the holding institution that is either (i) an account or accounts (or subaccounts thereof) (A) maintained with a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (B) if a Securitization has occurred, as to which Lender has received a Rating Comfort Letter from each of the applicable Rating Agencies with respect to holding funds in such account, or (ii) a segregated trust account or accounts (or subaccounts thereof) maintained with the corporate trust department of a federal depository institution or state chartered depository institution subject to regulations regarding fiduciary funds on deposit similar to Title 12 of the Code of Federal Regulations §9.10(b),

4

137342639v7

confidential

having in either case corporate trust powers, acting in its fiduciary capacity, and a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal and state authorities. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"***Eligible Institution***" shall mean a depository institution insured by the Federal Deposit Insurance Corporation the short term unsecured debt obligations or commercial paper of which are rated at least A-1 by S&P, P-1 by Moody's and F-1+ by Fitch, in the case of accounts in which funds are held for thirty (30) days or less or, in the case of Letters of Credit or accounts in which funds are held for more than thirty (30) days, the long term unsecured debt obligations of which are rated at least (i) "AA" by S&P, (ii) "AA" and/or "F1+" (for securities) and/or "AAAmmf" (for money market funds), by Fitch and (iii) "Aa2" by Moody's; provided, however, for purposes of the Deposit Bank, the definition of Eligible Institution shall have the meaning set forth in the Cash Management Agreement.

"***Emergency Expenditures***" shall mean the incurrence of expenses that were necessary in order to (A) avoid imminent bodily injury, harm or damage to individuals or the Property, (B) avoid the suspension of any necessary service to the Property, or (C) comply with Legal Requirements, and, in each such case, with respect to which it would be impractical, in Borrower's reasonable judgment, under the circumstances, to obtain Lender's prior written consent; provided that Borrower shall give Lender notice of such Emergency Expenditures as soon as practicable.

"***ERISA***" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"***ERISA Affiliate***" shall mean any trade or business (whether or not incorporated) which is a member of the same controlled group of corporations or group of trades or businesses under common control with Borrower or Guarantor, or is treated as a single employer together with Borrower or Guarantor under Section 414 of the Code or Title IV of ERISA.

"***Expansion Construction Conditions***": shall mean satisfaction in Lender's discretion, of each of the following:

(i)       The plans and specifications, architecture contract, construction contract, completion schedule and budget (which includes a breakdown of all hard costs and soft costs on a line-item basis together with a draw schedule and a reasonable contingency) for the Project, and the identity of the architect and general contractor for the Project, shall all be reasonably acceptable to Lender and any construction or other consultant retained by Lender;

(ii)       Each architect, engineer and general contractor shall have entered into an agreement for the benefit of Lender confirming that in the event Borrower loses its interest in the Property (whether by foreclosure (or deed-in-lieu thereof) of the Mortgage, or otherwise), Lender shall be entitled to require continued performance under any architecture contract (including the plans and specifications), engineering contract and/or general contract, as applicable;

5

confidential

confidential

(iii)     Delivery of a construction schedule for the Project, in detail reasonably acceptable to Lender, indicating that the Project will be completed no later than twelve (12) months prior to the Stated Maturity Date (or such later date as may be approved by Lender);

(iv)     Evidence reasonably acceptable to Lender confirming that all necessary consents, approvals and permits with respect to the Project pursuant to all applicable Legal Requirements and (if applicable) Operations Agreements, have been issued by the related Governmental Authorities or parties to such Operations Agreements, as applicable;

(v)     Evidence reasonably acceptable to Lender confirming that the Project will not impair the ingress to or egress from the remaining portions of the Property, or cause a breach of the obligations of Borrower under any Lease then in effect with respect to the Property, or result in any Tenant having the right to exercise any abatement or offset of rent under its Lease, or to convert base rent to percentage rent or any alternative rent computation or terminate its Lease;

(vi)     Evidence reasonably acceptable to Lender confirming that, prior to, during and upon completion of the Project, both the Property (after giving effect to the Project) and the Project itself will comply with all applicable Legal Requirements (including, without limitation, all applicable zoning laws, ordinances, land use and other rules and regulations), and that same has parking sufficient both for its current use and operation and for compliance with all applicable parking requirements (such evidence to include, without limitation, approvals from the applicable Governmental Authorities and/or, at Lender's option, a zoning consultant's report or, if reasonably required, an opinion of counsel)

(vii)     In addition to any insurance required under this Agreement, Borrower shall have provided or cause to be provided workers' compensation, builder's risk, and public hazard and liability insurance and other insurance required under applicable Legal Requirements in connection with the construction of the Project, and (if applicable thereunder) caused all insurance required pursuant to Section 7.1.1 to be in effect with respect thereto; all the related Policies shall satisfy the requirements of Section 7.1.2 of this Agreement, and Lender shall be named an additional insured thereunder and a mortgagee (pursuant to a standard non-contributing mortgagee clause) and loss payee), and Lender shall have received certificates thereof satisfactory to Lender.

"**_Expansion Economic Conditions_**" as of the commencement of construction of the Project: (a) the Project will be accretive to the value of the Property both as of the completion thereof and for the period through at least the date that is two (2) years after the Stated Maturity Date; (b) the Debt Yield, both for the trailing twelve (12)-month period and the projected twelve (12)-month period (giving effect to any projected Lease expirations during such period), shall be not less than 11.22%; (c) the Debt Service Coverage Ratio, both for the trailing twelve (12)-month period and the projected twelve (12)-month period (giving effect to any projected Lease expirations during such period), shall be not less than 1.66:1.00; (d) the Loan to Value Ratio of

6

confidential

the Property (as such value is determined by Lender based upon any commercially reasonable valuation method permitted to a REMIC, which shall be obtained by Lender at the sole cost of by Borrower) shall be not greater than 58.0%; (e) the Net Operating Income shall not be less than $1,626,421.00; and (f) Mezzanine Borrower shall have paid the Mezzanine Loan in full and provided evidence of the same to Lender.

"***FDF Holdings***" shall mean FHF Holdings LLC.

"***FDF Holdings Lease***" shall mean that certain Lease Agreement dated January 1, 2019, between FDH Holdings, as tenant, and Borrower, as landlord, as amended by that certain Lease Addendum #1 dated January 29, 2019, and as it may be further amended from time to time.

"***Fiscal Year***" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during each year of the Term.

"***GAAP***" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

"***Governmental Authority***" shall mean any court, board, agency, commission, office or authority of any nature whatsoever for any governmental unit (federal, state, commonwealth, county, district, municipal, city or otherwise) now or hereafter in existence.

"***Guarantor***" shall mean Yanki Tauber, an individual, or any other Person that now or hereafter guarantees any of Borrower's obligations hereunder or any other Loan Document.

"***Interest Period***" shall mean (i) the period from the date hereof through the first day thereafter that is the fifth (5th) day of a calendar month, and (ii) each period thereafter from the sixth (6th) day of each calendar month through the fifth (5th) day of the following calendar month; except that the Interest Period, if any, that would otherwise commence before and end after the Maturity Date shall end on the Maturity Date. Notwithstanding the foregoing, if Lender exercises its right to change the Payment Date to a New Payment Date in accordance with Section 2.2.4 hereof, then from and after such election, each Interest Period shall be the period from the New Payment Date in each calendar month through the day in the next succeeding calendar month immediately preceding the New Payment Date in such calendar month.

"***Interest Rate***" shall mean a rate of interest equal to 5.44% per annum (or, when applicable pursuant to this Agreement or any other Loan Document, the Default Rate).

"***Insolvency Law***" shall mean Title 11 of the United States Code (11 U.S.C. §§ 101 et seq.) as the same has been or may be amended or superseded from time to time, or any other applicable domestic or foreign liquidation, conservatorship, bankruptcy, receivership, insolvency, reorganization, or any similar debtor relief laws affecting the rights, remedies, powers, privileges and benefits of creditors generally.

"***Key Principal(s)***" shall mean Guarantor.

7

137342639v7

confidential

"***Lease Termination Payments***" shall mean (i) all fees, penalties, commissions or other payments made to Borrower in connection with or relating to the rejection, buy-out, termination, surrender or cancellation of any Lease (including in connection with any bankruptcy proceeding), (ii) any security deposits or proceeds of letters of credit held by Borrower in lieu of cash security deposits, which Borrower is permitted to retain pursuant to the applicable provisions of any Lease and (iii) any payments made to Borrower relating to unamortized tenant improvements and leasing commissions under any Lease.

"***Leases***" shall mean all leases and other agreements or arrangements heretofore or hereafter entered into affecting the use, enjoyment or occupancy of, or the conduct of any activity upon or in, the Property or the Improvements, including any guarantees, extensions, renewals, modifications or amendments thereof and all additional remainders, reversions and other rights and estates appurtenant thereunder.

"***Lease Sweep Period***" shall mean the period which shall commence and end as hereinafter provided.

A "***Lease Sweep Period***" shall commence upon the occurrence of any of the following:

(i)      the date that is twelve (12) months prior to the end of the term of any Major Lease (including any renewal terms) or any Combined Tenant Lease (including any renewal terms), or

(ii)      the earlier of (a) the date required under a Major Lease or Combined Tenant Lease by which the applicable Major Tenant or applicable Combined Tenant is required to give notice of its exercise of a renewal option thereunder (and such renewal has not been so exercised); or (b) the date the applicable Major Tenant or applicable Combined Tenant actually gives such notice of its intention not to renew or extend; or

(iii)      any Major Lease (or any material portion thereof) or any Combined Tenant Lease (or any material portion thereof) is surrendered, cancelled or terminated prior to its then current expiration date; or

(iv)      any Major Tenant or any Combined Tenant shall discontinue its business at its premises (i.e., "goes dark") or give notice that it intends to discontinue its business; or

(v)      the occurrence and continuance (beyond any applicable notice and cure periods) of a default under any Major Lease or any Combined Tenant Lease by the applicable Major Tenant or applicable Combined Tenants thereunder; or

(vi)      the occurrence of a Major Tenant Insolvency Proceeding or a Combined Tenant Insolvency Proceeding.

A "***Lease Sweep Period***" shall end upon the occurrence of any of the following:

137342639v7

confidential

(1)     with respect to a Lease Sweep Period caused by a matter described in clauses (i), (ii), (iii) or (iv) above, upon the earlier to occur of (A) the date on which the subject Major Tenant or Combined Tenant, as applicable, irrevocably exercises its renewal or extension option (or otherwise enters into an extension agreement with Borrower and acceptable to Lender) with respect to all of the space demised under its Major Lease or Combined Tenant Lease, as applicable, and in Lender's judgment, sufficient funds have been accumulated in the Special Rollover Reserve Subaccount (during the continuance of the subject Lease Sweep Period) to pay for all anticipated Approved Major Lease Leasing Expenses for such Major Lease or Combined Tenant Lease, as applicable,  and any other anticipated expenses in connection with such renewal or extension, or (B) the date on which all of the space demised under the subject Major Lease (or portion thereof) or Combined Tenant Lease (or portion thereof), as applicable, that gave rise to the subject Lease Sweep Period has been fully leased pursuant to a replacement Lease or replacement Leases approved by Lender, and entered into in accordance with <u>Section 5.10</u> hereof, and all Approved Major Lease Leasing Expenses (and any other expenses in connection with the re-tenanting of such space) have been paid in full;

(2)     with respect to a Lease Sweep Period caused by a matter described in clause (v) above, if the subject Major Tenant or Combined Tenant, as applicable, default has been cured, and no other Major Tenant or Combined Tenant, as applicable, default has occurred for a period of six (6) consecutive months following such cure; or

(3)     with respect to a Lease Sweep Period caused by a matter described in clause (vi) above, if the applicable Major Tenant Insolvency Proceeding or applicable Combined Tenant Solvency Proceeding has terminated and the applicable Major Lease or applicable Combined Tenant Lease has been affirmed, assumed or assigned in a manner satisfactory to Lender.

"***Legal Requirements***" shall mean statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities (including those regarding fire, health, handicapped access, sanitation, ecological, historic, zoning, environmental protection, wetlands and building laws and the Americans with Disabilities Act of 1990, Pub. L. No. 89-670, 104 Stat. 327 (1990), as amended, and all regulations promulgated pursuant thereto) affecting Borrower, any Loan Document or all or part of the Property or the construction, ownership, use, alteration or operation thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instrument, either of record or known to Borrower, at any time in force affecting all or part of the Property.

"***Lien***" shall mean any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, easement, restrictive covenant, preference, assignment, security interest, PACE Loan or any other encumbrance, charge or transfer of, or any agreement to enter into or create any of the foregoing, on or affecting all or any part of the Property or any interest therein, or any direct or indirect interest in Borrower or Sole Member, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic

137342639v7

confidential

effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"*Loan Documents*" shall mean this Agreement and all other documents, agreements and instruments now or hereafter evidencing, securing or delivered to Lender in connection with the Loan, including the following, each of which is dated as of the date hereof: (i) the Promissory Note or Promissory Notes made by Borrower to Lender in the aggregate principal amount equal to the Loan (the "*Note*"), (ii) the Mortgage, Assignment of Leases and Rents and Security Agreement made by Borrower (or the Deed of Trust, Assignment of Leases and Rents and Security Agreement made by Borrower to a trustee, as the case may be) in favor of Lender which covers the Property (the "*Mortgage*"), (iii) the Assignment of Leases and Rents from Borrower to Lender (the "*Assignment of Leases and Rents*"), (iv) the Assignment of Agreements, Licenses, Permits and Contracts from Borrower to Lender, (v) the Deposit Account Control Agreement (the "*Clearing Account Agreement*") among Borrower, Lender and the Clearing Bank, (vi) the Cash Management Agreement (the "*Cash Management Agreement*") among Borrower, Lender and the Deposit Bank and (vii) the Guaranty of Recourse Obligations made by Guarantor (the "*Guaranty*"); as each of the foregoing may be (and each of the foregoing defined terms shall refer to such documents as they may be) amended, restated, replaced, severed, split, supplemented or otherwise modified from time to time (including pursuant to Section 9.3 hereof).

"*Major Contract*" shall mean (i) any management, brokerage or leasing agreement or (ii) any cleaning, maintenance, service or other contract or agreement of any kind (other than Leases) of a material nature (materiality for these purposes to include, without limitation, contracts which extend beyond one year (unless cancelable on thirty (30) days or less notice without requiring the payment of termination fees or payments of any kind)), in either case relating to the ownership, leasing, management, use, operation, maintenance, repair or restoration of the Property, whether written or oral.

"*Major Lease*" shall mean (i) the FDF Holdings Lease, or (ii) any Lease (A) which covers ten percent (10%) or more rentable square feet of the Improvements. (B) which has a gross annual rent ten percent (10%) or more of the total annual Rents of the Property, or (C) which demises at least one (1) full floor of the Improvements.

"*Major Tenant*" shall mean any tenant under either a Major Lease, or under one or more Leases (leased by such tenant and/or its Affiliates), which when taken together cover in the aggregate ten percent (10%) or more rentable square feet of the Improvements.

"*Major Tenant Guarantor*" shall mean the lease guarantor under any Major Lease.

"*Major Tenant Insolvency Proceeding*" shall mean (A) the admission in writing by any Major Tenant or Major Tenant Guarantor of its inability to pay its debts generally, or the making of a general assignment for the benefit of creditors, or the instituting by any Major Tenant or Major Tenant Guarantor of any proceeding seeking to adjudicate it insolvent or seeking a liquidation or dissolution, or the taking advantage by any Major Tenant or Major Tenant Guarantor of any Insolvency Law, or the commencement by any Major Tenant of a case

or other proceeding naming it as debtor under any Insolvency Law or the instituting of a case or other proceeding against or with respect to any Major Tenant or Major Tenant Guarantor under any Insolvency Law or (B) the instituting of any proceeding against or with respect to any Major Tenant or Major Tenant Guarantor seeking liquidation of its assets or the appointment of (or if any Major Tenant or Major Tenant Guarantor shall consent to or acquiesce in the appointment of) a receiver, liquidator, conservator, trustee or similar official in respect of it or the whole or any substantial part of its properties or assets or the taking of any corporate, partnership or limited liability company action in furtherance of any of the foregoing.

"***Management Agreement***" shall mean the management agreement between Borrower and Manager, pursuant to which Manager is to manage the Property, as same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with Section 5.12 hereof.

"***Manager***" shall mean Vivo Management, LLC, a New Jersey limited liability company, or any successor, assignee or replacement manager appointed by Borrower in accordance with Section 5.12 hereof.

"***Material Alteration***" shall mean any (i) individual alteration affecting (A) structural elements of the Property, (B) a roof of the Property or (C) any building system of the Property or (ii) non-structural alteration the cost of which exceeds the Alteration Threshold; provided, however, that in no event shall any of the following constitute a Material Alteration: (a) any Required Repairs, (b) any tenant improvement work performed pursuant to any Lease existing on the date hereof or entered into hereafter in accordance with the provisions of this Agreement, or (c) alterations performed as part of a Restoration.

"***Material Lease***" shall mean all Leases which (A) individually or in the aggregate with respect to the same tenant and its Affiliates (i) cover more than ten percent (10%) of the square feet of the Improvements, (ii) have a gross annual rent of more than five percent (5%) of the total annual Rents of the Property, (iii) demise at least one (1) full floor of the Improvements, (B) provide the tenant thereunder with an option or other preferential right to purchase all or any portion of the Property, or (C) are entered into with a tenant who is an Affiliate of Borrower, or (iv) the FDF Holdings Lease.

"***Maturity Date***" shall mean the date on which the final payment of principal of the Note becomes due and payable as therein provided, whether at the Stated Maturity Date, by declaration of acceleration, or otherwise.

"***Mezzanine Debt Service***" shall mean, with respect to any particular period of time, principal (if applicable) and interest payments due under the Mezzanine Loan Documents.

"***Mezzanine Loan***" shall mean that certain mezzanine loan in the principal amount of $4,000,000.00 made on the date hereof by Mezzanine Loan Lender to Mezzanine Loan Borrower, and evidenced and secured by the Mezzanine Loan Documents.

"***Mezzanine Loan Borrower***" shall mean 24 Commerce Holdings LLC, a Delaware limited liability company.

11

confidential

"*Mezzanine Loan Documents*" shall mean (i) that certain Mezzanine Loan Agreement of even date herewith between Mezzanine Loan Lender and Mezzanine Loan Borrower, (ii) that certain Promissory Note of even date herewith in the original principal amount of the Mezzanine Loan made by Mezzanine Loan Borrower and payable to Mezzanine Loan Lender, (iii) that certain Pledge and Security Agreement of even date herewith made by Mezzanine Loan Borrower in favor of Mezzanine Loan Lender, (iv) each UCC Financing Statement filed in connection with the foregoing and (v) any other "Loan Document," as defined in the Mezzanine Loan Agreement referred to in <u>clause (i)</u> above, as each of the foregoing may be modified, amended and restated from time to time in accordance with the terms and provisions of the Intercreditor Agreement of even date herewith between Lender and Mezzanine Loan Lender (the "*Intercreditor Agreement*").

"*Mezzanine Loan Lender*" shall mean Argentic Real Estate Finance LLC, and any subsequent holder of the Mezzanine Loan to whom the Mezzanine Loan has been assigned pursuant to the terms of the Intercreditor Agreement.

"*Mezzanine Loan Liens*" shall mean the Liens in favor of Mezzanine Loan Lender created pursuant to the Mezzanine Loan Documents.

"*Monthly Mezzanine Debt Service Payment*" shall mean, as to each Payment Date, an amount equal to the scheduled payment of principal and interest payable by Mezzanine Loan Borrower pursuant to the terms of the Mezzanine Loan Documents.

"*Minor Lease*" shall mean any Lease that is not a Material Lease.

"*Monthly Operating Expense Budgeted Amount*" shall mean the monthly amount set forth in the Approved Operating Budget incurred or to be incurred for or as of the calendar month in which such Payment Date occurs.

"*New Intercreditor Agreement*" shall have the meaning ascribed to such term in <u>Section 5.34</u> hereof.

"*New Mezzanine Debt*" shall have the meaning ascribed to such term in <u>Section 5.34</u> hereof.

"*New Mezzanine Debt Liens*" shall mean any Liens in favor of New Mezzanine Debt lender created pursuant to the New Mezzanine Debt loan documents.

"*Net Operating Income*" shall mean, for any period, the underwritten net cash flow of the Property for such period determined by Lender in its sole and absolute discretion in accordance with Lender's then current underwriting standards for loans of this type and the then current underwriting standards of the Rating Agencies (including adjustments for market vacancy, bankrupt tenants, leasing costs and capital items).

"*NRSRO*" shall mean any credit rating agency that has elected to be treated as a nationally recognized statistical rating organization for purposes of Section 15E of the Exchange Act, without regard to whether or not such credit rating agency has been engaged by Lender or its designees in connection with, or in anticipation of, a Securitization.

12

confidential

confidential

"***Officer's Certificate***" shall mean a certificate delivered to Lender by Borrower which is signed by a senior executive officer of Borrower.

"***Operations Agreements***" shall mean the REA, and any other covenants, restrictions, easements, declarations or agreements of record relating to the construction, operation or use of the Property, together with all amendments, modifications or supplements thereto.

"***Other Charges***" shall mean all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"***PACE Loan***" shall mean (x) any "Property-Assessed Clean Energy loan" or (y) any other indebtedness, without regard to the name given to such indebtedness, which is (i) incurred for improvements to the Property for the purpose of increasing energy efficiency, increasing use of renewable energy sources, resource conservation, or a combination of the foregoing, and (ii) repaid through multi-year assessments against the Property.

"***Payment Date***" shall mean the sixth (6th) day of each calendar month or, upon Lender's exercise of its right to change the Payment Date in accordance with <u>Section 2.2.4</u> hereof, the New Payment Date (in either case, if such day is not a Business Day, the immediately preceding Business Day). The first Payment Date hereunder shall be May 6, 2019.

"***Payment Guaranty Amount***" shall mean an amount equal to $1,450,000.00.

"***Payment Guaranty Obligation***" shall have the meaning ascribed to such term in <u>Section 10.1</u> hereof.

"***Permitted Encumbrances***" shall mean (i) the Liens created by the Loan Documents, (ii) all Liens and other matters disclosed in the Title Insurance Policy, (iii) Liens, if any, for Taxes or Other Charges not yet due and payable and not delinquent, (iv) any workers', mechanics' or other similar Liens on the Property provided that any such Lien is bonded or discharged within thirty (30) days after Borrower first receives notice of such Lien, (v) such other title and survey exceptions as Lender approves in writing in Lender's discretion, (vi) the Mezzanine Loan Liens, and (vii) the New Mezzanine Debt.

"***Permitted Prepayment Date***" shall mean December 6, 2023.

"***Permitted Transfers***" shall mean:

> (i)        a Lease entered into in accordance with the Loan Documents;

> (ii)       a Permitted Encumbrance;

> (iii)      Mezzanine Loan Liens and any mezzanine enforcement action, including, but not limited to, a foreclosure of the Mezzanine Loan collateral;

13

confidential

(iv)      New Mezzanine Debt Liens and any mezzanine enforcement action, including, but not limited to, a foreclosure of the New Mezzanine Debt collateral;

(v)       a Transfer and Assumption pursuant to <u>Section 5.26.2</u> hereof; or

(vi)      provided that no Default or Event of Default shall then exist, a Transfer of an interest Sole Member to any Person provided that:

(A)      such Transfer shall not (x) cause the transferee (other than Key Principal), together with its Affiliates, to acquire Control of Borrower or Sole Member or to increase its direct or indirect interest in Borrower or in Sole Member to an amount which equals or exceeds forty-nine percent (49%) or (y) result in Borrower or Sole Member no longer being Controlled by Key Principal;

(B)      after giving effect to such Transfer, Key Principal(s) shall continue to Control the day to day operations of Borrower and shall continue to own at least fifty-one percent (51%) of all equity interests (direct or indirect) of Borrower;

(C)      if such Transfer would cause the transferee to increase its direct or indirect interest in Borrower or in Sole Member to an amount which equals or exceeds ten percent (10%), Lender shall have approved in its reasonable discretion such proposed transferee, which approval shall be based upon Lender's satisfactory determination as to the reputable character and creditworthiness of such proposed transferee, as evidenced by credit and background checks performed by Lender and such other financial statements and other information reasonably requested by Lender;

(D)      the legal and financial structure of Borrower and its members and the single purpose nature and bankruptcy remoteness of Borrower and its members after such Transfer, shall satisfy Lender's then current applicable underwriting criteria and requirements;

(E)      such Transfer is permitted under the Mezzanine Loan; and

(F)      Borrower shall give Lender notice of such Transfer together with copies of all instruments effecting such Transfer not less than twenty (20) days prior to the date of such Transfer.

"***Person***" shall mean any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any other person or entity, and any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"***Physical Conditions Report***" shall mean that certain Property Condition Report, prepared by AEI Consultants and dated as of January 9, 2019.

137342639v7

confidential

confidential

"***Plan***" shall mean (i) an employee benefit or other plan established or maintained by Borrower or any ERISA Affiliate or to which Borrower or any ERISA Affiliate makes or is obligated to make contributions and (ii) which is subject to Title IV of ERISA or Section 302 of ERISA or Section 412 of the Code.

"***Pooling and Servicing Agreement***" shall mean any pooling and servicing agreement or similar agreement entered into as a result of a Secondary Market Transaction.

"***Project***" shall mean additional Improvements which, subject to the terms of this Agreement, may be constructed by Borrower on that portion of Property more particularly identified on <u>Schedule 9</u> attached hereto and made a part hereof.

"***Project Reserve Deposit***" shall have the meaning ascribed to such term in <u>Section 5.33</u> hereof.

"***Project Reserve Subaccount***" shall have the meaning ascribed to such term in <u>Section 5.33</u> hereof.

"***Property***" shall mean the parcel of real property and Improvements thereon owned by Borrower and encumbered by the Mortgage; together with all rights pertaining to such real property and Improvements, and all other collateral for the Loan as more particularly described in the Granting Clauses of the Mortgage and referred to therein as the Mortgaged Property.  The Property is located in Newark, New Jersey.

"***Rating Agency***" shall mean prior to the final Securitization of the Loan (or if a Securitization has not occurred), each of Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ("***S&P***"), Moody's Investors Service, Inc. ("***Moody's***"), Fitch, Inc., a division of Fitch Ratings Ltd. ("***Fitch***"), DBRS, Inc., Morningstar, Inc., Kroll Bond Rating Agency or any other nationally-recognized statistical rating organization which has been designated by Lender, and after the final Securitization of the Loan, any of the foregoing that have rated any of the securities issued in connection with the Securitization.

"***Rating Comfort Letter***" shall mean a letter issued by each of the applicable Rating Agencies which confirms that the taking of the action referenced to therein will not result in any qualification, withdrawal or downgrading of any existing ratings of Securities created in a Secondary Market Transaction.

"***REA***" shall mean collectively, those certain agreements more particularly described on <u>Schedule 8</u> attached hereto and made a part hereof, as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement.

"***Regulation AB***" shall mean Regulation AB under the Securities Act and the Exchange Act, as such Regulation may be amended from time to time.

"***Regulation S-K***" shall mean Regulation S-K of the Securities Act, as such regulation may be amended from time to time.

confidential

confidential

"**Regulation S-X**" shall mean Regulation S-X of the Securities Act, as such regulation may be amended from time to time.

"**Related Loan**" shall mean a loan to an Affiliate of Borrower or Guarantor or secured by a Related Property, that is included in a Securitization with the Loan, and any other loan that is cross-collateralized with the Loan.

"**Related Property**" shall mean a parcel of real property, together with improvements thereon and personal property related thereto, that is "related" (within the meaning of the definition of Significant Obligor) to the Property.

"**Release Date**" shall mean the earlier to occur of (i) the fourth (4th) anniversary of the date hereof and (ii) the date that is two (2) years from the "startup day" (within the meaning of Section 860G(a)(9) of the Code) of the REMIC Trust established in connection with the final Secondary Market Transaction involving the Loan.

"**REMIC Trust**" shall mean a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code that holds the Note.

"**Rents**" shall mean all rents, rent equivalents, moneys payable as damages (including payments by reason of the rejection of a Lease in a Bankruptcy Proceeding) or in lieu of rent or rent equivalents, royalties (including all oil and gas or other mineral royalties and bonuses), income, fees, receivables, receipts, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other payment and consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower, Manager or any of their agents or employees from any and all sources arising from or attributable to the Property and the Improvements, including all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of the Property or rendering of services by Borrower, Manager or any of their agents or employees and proceeds, if any, from business interruption or other loss of income insurance.

"**Restoration Threshold**" shall mean $250,000.

"**Scheduled Defeasance Payments**" shall mean the Monthly Interest Payment Amount required under the Note for all Payment Dates occurring after the Defeasance Date together with payment in full of the outstanding Principal balance on the Note on the Stated Maturity Date.

"**Security Agreement**" shall mean a security agreement in form and substance that would be satisfactory to Lender (in Lender's sole but good faith discretion) pursuant to which Borrower grants Lender a perfected, first priority security interest in the Defeasance Collateral Account and the Defeasance Collateral.

"**Servicer**" shall mean a servicer selected by Lender to service the Loan, including any "master servicer" or "special servicer" appointed under the terms of any Pooling and Servicing Agreement.

137342639v7

confidential

confidential

"**Significant Obligor**" shall mean has the meaning set forth in Item 1101(k) of Regulation AB under the Securities Act.

"**Sole Member**" shall mean 24 Commerce Holdings LLC, a Delaware limited liability company, the sole member of Borrower.

"**State**" shall mean the state in which the Property is located.

"**Stated Maturity Date**" shall mean April 6, 2024, as such date may be changed in accordance with <u>Section 2.2.4</u> hereof.

"**Survey**" shall mean a survey of the Property prepared by a surveyor licensed in the State and satisfactory to Lender and the company or companies issuing the Title Insurance Policy, and containing a certification of such surveyor satisfactory to Lender.

"**Taxes**" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, maintenance charges, impositions, vault charges and license fees, now or hereafter levied or assessed or imposed against all or part of the Property.  In no event shall any PACE Loan be considered a Tax for purposes of this Agreement.

"**Term**" shall mean the entire term of this Agreement, which shall expire upon repayment in full of the Debt and full performance of each and every obligation to be performed by Borrower pursuant to the Loan Documents.

"**Title Insurance Policy**" shall mean the ALTA mortgagee title insurance policy in the form acceptable to Lender issued with respect to the Property and insuring the Lien of the Mortgage.

"**Transfer**" shall mean (i) any sale, conveyance, transfer, encumbrance, pledge, lease or assignment, or the entry into any agreement to sell, convey, transfer, encumber, pledge, lease or assign, whether by law or otherwise, of, on, in or affecting (x) all or part of the Property (including any legal or beneficial direct or indirect interest therein), (y) any direct or indirect interest in Borrower (including any profit interest), or (z) any direct or indirect interest in Sole Member, (ii) enter into or subject the Property to a PACE Loan, (iii) with respect to Borrower, Sole Member or any Person that has any direct or indirect interest in Borrower or Sole Member, the division of any assets and liabilities of such entity amongst one or more new or existing entities or (iv) any change of Control of Borrower or Sole Member.

"**UCC**" shall mean the Uniform Commercial Code as in effect in the State or the state in which any of the Cash Management Accounts are located, as the case may be.

"**U.S. Obligations**" shall mean obligations that are "government securities" within the meaning of Section 2(a)(16) of the Investment Company Act of 1940, as amended that are not subject to prepayment, call or early redemption and that are acceptable to the applicable Rating Agencies.

"**Welfare Plan**" shall mean an employee welfare benefit plan, as defined in Section 3(1) of ERISA.

17

confidential

confidential

"*Yield Maintenance Premium*" shall mean an amount equal to the greater of (i) five percent (5%) of any applicable prepayment, or (ii) an amount which, when added to the outstanding Principal, would be sufficient to purchase U.S. Obligations which provide payments (a) on or prior to, but as close as possible to, all successive scheduled payment dates under this Agreement through the Stated Maturity Date and (b) in amounts equal to the Monthly Interest Payment Amount required under this Agreement through the Stated Maturity Date together with the outstanding principal balance of the Note as of the Stated Maturity Date assuming all such Monthly Interest Payment Amounts are made (including any servicing costs associated therewith).  In no event shall the Yield Maintenance Premium be less than zero.

**1.2** **Index of Other Definitions**.  The following terms are defined in the sections or Loan Documents indicated below:

"*Additional Operating Expense*" - 6.3.6
"*Annual Budget*" - 6.3.5
"*Applicable Taxes*" - 2.2.3
"*Approved Additional Operating Expense*" - 6.3.6
"*Approved Annual Budget*" - 6.3.5
"*Approved Capital Budget*" - 6.3.5
"*Approved Operating Budget*" - 6.3.5
"*Assignment of Leases and Rents*" - 1.1 (Definition of Loan Documents)
"*Award*" - 7.3.2
"*Bankruptcy Proceeding*" - 4.7
"*Borrower's Recourse Liabilities*" - 10.1
"*Broker*" - 10.2
"*Capital Reserve Subaccount*" - 3.4
"*Cash Collateral Subaccount*" - 3.8
"*Cash Management Accounts*" - 3.9
"*Cash Management Agreement*" - 1.1 (Definition of Loan Documents)
"*Casualty*" - 7.2.1
"*Casualty/Condemnation Prepayment*" - 2.3.2
"*Casualty/Condemnation Subaccount*" - 3.6
"*Cause*" - Schedule 5
"*Clearing Account*" - 3.1
"*Clearing Account Agreement*" - 1.1 (Definition of Loan Documents)
"*Clearing Bank*" - 3.1
"*Condemnation*" - 7.3.1
"*Defeasance Collateral Account*" - 2.3.3
"*Defeasance Date*" - 2.3.3
"*Defeasance Event*" - 2.3.3
"*Delaware Act*" - Schedule 5
"*Deposit Account*" - 3.1
"*Disclosure Document*" - 9.2(a)
"*DSCR Cash Management Period*" - 1.1 (Definition of Cash Management Period)
"*Easements*" - 4.14
"*Embargoed Person*" - 5.31(c)
"*Endorsement*" - 5.26.2

137342639v7

confidential

"*Environmental Laws*" - 4.21
"*Equipment*" - Mortgage
"*Event of Default*" - 8.1
"*Exchange Act*" - 9.2(a)
"*Exchange Act Filing*" - 9.1(d)
"*Fitch*" - 1.1 (Definition of Rating Agency)
"*Government Lists*" - 5.31
"*Guaranty*" - 1.1 (Definition of Loan Documents)
"*Hazardous Substances*" - 4.21
"*Improvements*" - Mortgage
"*Indemnified Liabilities*" - 5.30
"*Indemnified Party*" - 5.30
"*Independent Director*" - Schedule 5
"*Insolvency Law*" - 1.1 (Definition of Major Tenant Insolvency Proceeding)
"*Insurance Premiums*" - 7.1.2
"*Insured Casualty*" - 7.2.2
"*Intellectual Property*" - 4.28
"*Intercreditor Agreement*" - 1.1 (Definition of Mezzanine Loan Documents)
"*Issuer*" - 9.2(b)
"*Late Payment Charge*" - 2.5.3
"*Lender's Consultant*" - 5.8.1
"*Lender Group*" - 9.2(b)
"*Liabilities*" - 9.2(b)
"*Licenses*" - 4.11
"*Loan*" - 2.1
"*Monthly Interest Payment Amount*" - 2.2.1
"*Moody's*" - 1.1 (Definition of Rating Agency)
"*Mortgage*" - 1.1 (Definition of Loan Documents)
"*Nationally Recognized Service Company*" - Schedule 5
"*New Payment Date*" - 2.2.4
"*Note*" - 1.1 (Definition of Loan Documents)
"*Notice*" - 6.1
"*O & M Program*" - 5.8.3
"*OFAC*" - 5.31
"*Patriot Act*" - 5.31
"*Patriot Act Offense*" - 5.31
"*Permitted Indebtedness*" - 5.22
"*Permitted Investments*" - Cash Management Agreement
"*Policies*" - 7.1.2
"*Principal*" - 2.1
"*Proceeds*" - 7.2.2
"*Proposed Material Lease*" - 5.10.2
"*Qualified Carrier*" - 7.1.1(j)
"*Remedial Work*" - 5.8.2
"*Rent Roll*" - 4.16
"*Required Records*" - 6.3.7

19

confidential

"*Required Repairs*" - 3.2.1
"*Required Repairs Subaccount*" - 3.2.2
"*Restoration*" - 7.4.1
"*Review Waiver*" - 10.5
"*Rollover Reserve Subaccount*" - 3.5.1
"*S&P*" - 1.1 (Definition of Rating Agency)
"*Secondary Market Transaction*" - 9.1(a)
"*Securities*" - 9.1(a)
"*Securities Act*" - 9.2(a)
"*Securitization*" - 9.1(a)
"*Security Deposit Subaccount*" - 3.7
"*Significant Casualty*" - 7.2.2
"*Single Member Bankruptcy Remote LLC*" - Schedule 5
"*Special Member*" - Schedule 5
"*Special Purpose Bankruptcy Remote Entity*" - 5.13
"*Special Rollover Reserve Subaccount*" - 3.5.2
"*Springing Recourse Event*" - 10.1
"*Subaccounts*" - 3.1
"*Successor Borrower*" - 2.3.3(c)
"*Tax and Insurance Subaccount*" - 3.3
"*Toxic Mold*" - 4.21
"*Transfer and Assumption*" - 5.26.2
"*Transferee Borrower*" - 5.26.2
"*Underwriter Group*" - 9.2(b)
"*Updated Information*" - 9.1(b)(i)

**1.3 Principles of Construction**.  Unless otherwise specified, (i) all references to sections and schedules are to those in this Agreement, (ii) the words "hereof," "herein" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision, (iii) all definitions are equally applicable to the singular and plural forms of the terms defined, (iv) the word "including" means "including but not limited to," and (v) accounting terms not specifically defined herein shall be construed in accordance with GAAP.

## 2.  GENERAL LOAN TERMS

**2.1 The Loan**.  Subject to and upon the terms and conditions set forth herein, Lender is making a loan (the "***Loan***") to Borrower on the date hereof, in the original principal amount (the "***Principal***") of $14,500,000.00, which shall mature on the Stated Maturity Date.  Borrower acknowledges receipt of the Loan, the proceeds of which are being and shall be used to (i) repay and discharge existing loans relating to the Property, (ii) fund certain of the Subaccounts, and (iii) pay transaction costs.  Any excess proceeds may be used for any lawful purpose. Borrower shall receive only one borrowing hereunder in respect of the Loan and no amount repaid in respect of the Loan may be reborrowed.  The Loan shall be evidenced by the Note and shall be repaid in accordance with the terms of this Agreement, the Note and the other Loan Documents.

**2.2 Interest; Monthly Payments**.

confidential

confidential

**2.2.1  Generally**.  From and after the date hereof, interest on the unpaid Principal shall accrue at the Interest Rate and be payable as hereinafter provided.  On the date hereof, Borrower shall pay interest on the unpaid Principal from the date hereof through and including May 5, 2019.  On May 6, 2019 and each Payment Date thereafter for the remainder of the Term, Borrower shall pay interest on the unpaid Principal accrued at the Interest Rate (the "***Monthly Interest Payment Amount***").  Provided that no Event of Default has occurred and is continuing, the Monthly Interest Payment Amount due on any Payment Date shall be applied to the payment of interest accrued during the preceding Interest Period.  All accrued and unpaid interest and unpaid Principal shall be due and payable on the Maturity Date.  If the Loan is repaid on any date other than on a Payment Date (whether prior to or after the Stated Maturity Date), Borrower shall also pay interest that would have accrued on such repaid Principal to but not including the next Payment Date.

**2.2.2  Default Rate**.  After the occurrence and during the continuance of an Event of Default, the entire unpaid Debt shall bear interest at the Default Rate, calculated from the date such payment was due or such underlying Default shall have occurred without regard to any grace or cure periods contained herein, and shall be payable upon demand from time to time, to the extent permitted by applicable law.

**2.2.3  Taxes**.  Any and all payments by Borrower hereunder and under the other Loan Documents shall be made free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding taxes imposed on Lender's income, and franchise taxes imposed on Lender by the law or regulation of any Governmental Authority (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being hereinafter referred to in this Section 2.2.3 as "***Applicable Taxes***").  If Borrower shall be required by law to deduct any Applicable Taxes from or in respect of any sum payable hereunder to Lender, the following shall apply:  (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.2.3), Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) Borrower shall make such deductions and (iii) Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.  Payments pursuant to this Section 2.2.3 shall be made within ten (10) days after the date Lender makes written demand therefor.

**2.2.4  New Payment Date**.  Lender shall have the right, to be exercised not more than once during the term of the Loan, to change the Payment Date to a date other than the sixth day of each month (a "***New Payment Date***"), on thirty (30) days' written notice to Borrower; provided, however, that any such change in the Payment Date: (i) shall not modify the amount of regularly scheduled monthly principal and interest payments, except that the first payment of principal and interest payable on the New Payment Date shall be accompanied by interest at the interest rate herein provided for the period from the Payment Date in the month in which the New Payment Date first occurs to the New Payment Date and (ii) shall change the Stated Maturity Date to the New Payment Date occurring in the month set forth in the definition of Stated Maturity Date.

**2.3 Loan Repayment**.

137342639v7

confidential

confidential

**2.3.1   Repayment**.   Borrower shall repay the entire outstanding principal balance of the Note in full on the Maturity Date, together with interest thereon to (but excluding) the date of repayment and any other amounts due and owing under the Loan Documents. Borrower shall have no right to prepay or defease all or any portion of the Principal except in accordance with Section 2.3.2 below, Section 2.3.3 below and Section 2.3.4 below.   Except during the continuance of an Event of Default, all proceeds of any repayment, including any prepayments of the Loan, shall be applied by Lender as follows in the following order of priority:   *First*, accrued and unpaid interest at the Interest Rate; *Second*, to Principal; and *Third,* to any other amounts then due and owing under the Loan Documents.   If prior to the Stated Maturity Date the Debt is accelerated by reason of an Event of Default, then Lender shall be entitled to receive, in addition to the unpaid Principal and accrued interest and other sums due under the Loan Documents, an amount equal to the Yield Maintenance Premium applicable to such Principal so accelerated.   During the continuance of an Event of Default, all proceeds of repayment, including any payment or recovery on the Property (whether through foreclosure, deed-in-lieu of foreclosure, or otherwise) shall, unless otherwise provided in the Loan Documents, be applied in such order and in such manner as Lender shall elect in Lender's discretion.

**2.3.2   Mandatory Prepayments**.   The Loan is subject to mandatory prepayment in certain instances of Insured Casualty or Condemnation (each a "***Casualty/Condemnation Prepayment***"), in the manner and to the extent set forth in Section 7.4.2 hereof.   Each Casualty/Condemnation Prepayment, after deducting Lender's costs and expenses (including reasonable attorneys' fees and expenses) in connection with the settlement or collection of the Proceeds or Award, shall be applied in the same manner as repayments under Section 2.3.1 above, and if such Casualty/Condemnation Prepayment is made on any date other than a Payment Date, then such Casualty/Condemnation Prepayment shall include interest that would have accrued on the Principal prepaid to but not including the next Payment Date.   Provided that no Event of Default is continuing, any such mandatory prepayment under this Section 2.3.2 shall be without the payment of the Yield Maintenance Premium.   Notwithstanding anything to the contrary contained herein, each Casualty/Condemnation Prepayment shall be applied in inverse order of maturity and shall not extend or postpone the due dates of the monthly installments due under the Note or this Agreement, or change the amounts of such installments.

**2.3.3   Defeasance.**

(a) **Conditions to Defeasance**. Provided no Event of Default shall be continuing, Borrower shall have the right after the Release Date and prior to the Permitted Prepayment Date to voluntarily defease the entire amount of the Principal and obtain a release of the Lien of the Mortgage by providing Lender with the Defeasance Collateral (a "***Defeasance Event***"), subject to the satisfaction of the following conditions precedent:

(i)   Borrower shall give Lender not less than thirty (30) days prior written notice specifying a date (the "***Defeasance Date***") on which the Defeasance Event is to occur.

(ii)   Borrower shall pay to Lender (A) all payments of Principal and interest due on the Loan to and including the Defeasance Date and (B) all other sums, then due under the Note, this Agreement and the other Loan Documents;

137342639v7

confidential

confidential

(iii)    Borrower shall deposit the Defeasance Collateral into the Defeasance Collateral Account and otherwise comply with the provisions of subsections (b) and (c) of this Section 2.3.3;

(iv)    Borrower shall execute and deliver to Lender a Security Agreement in respect of the Defeasance Collateral Account and the Defeasance Collateral;

(v)    Borrower shall deliver to Lender an opinion of counsel for Borrower that is standard in commercial lending transactions and subject only to customary qualifications, assumptions and exceptions opining, among other things, that (A) Lender has a legal and valid perfected first priority security interest in the Defeasance Collateral Account and the Defeasance Collateral, (B) if a Securitization has occurred, the REMIC Trust formed pursuant to such Securitization will not fail to maintain its status as a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code as a result of a Defeasance Event pursuant to this Section 2.3.3, and (C) a non-consolidation opinion with respect to the Successor Borrower;

(vi)    Borrower shall deliver to Lender and the Rating Agencies a Rating Comfort Letter as to the Defeasance Event (if required pursuant to a Pooling and Servicing Agreement from and after the occurrence of a Secondary Market Transaction);

(vii)    Borrower shall deliver an Officer's Certificate certifying that the requirements set forth in this Section 2.3.3 have been satisfied;

(viii)    Borrower shall deliver a certificate of a nationally recognized public accounting firm acceptable to Lender certifying that (A) the Defeasance Collateral will generate monthly amounts equal to or greater than the Scheduled Defeasance Payments, (B) the revenue from the Defeasance Collateral will be applied within four (4) months of receipt towards payments of Debt Service (excluding Mezzanine Debt Service), (C) the securities that comprise the Defeasance Collateral are not subject to prepayment, call or early redemption and (D) the interest income to Borrower (or the Successor Borrower, if applicable) from the Defeasance Collateral will not in any tax year exceed the interest expense associated with the defeased Loan;

(ix)    Borrower shall deliver such other certificates, opinions, documents and instruments as Lender may reasonably request;

(x)    Borrower shall pay all costs and expenses of Lender incurred in connection with the Defeasance Event, including Lender's reasonable attorneys' fees and expenses and Rating Agency fees and expenses; and

(xi)    All conditions with respect to the defeasance of the Mezzanine Loan (as set forth in the Mezzanine Loan Documents) shall have been satisfied.

(b)    **Defeasance Collateral Account**.  On or before the date on which Borrower delivers the Defeasance Collateral, Borrower shall open at any Eligible Institution the defeasance collateral account (the "*Defeasance Collateral Account*") which shall at all times be an Eligible Account.  The Defeasance Collateral Account shall contain only (i) Defeasance Collateral, and (ii) cash from interest and principal paid on the Defeasance Collateral.  All cash from interest and principal payments paid on the Defeasance Collateral shall be paid over to Lender on each

23

confidential

confidential

Payment Date and applied first to accrued and unpaid interest and then to Principal.  Any cash from interest and principal paid on the Defeasance Collateral not needed to pay accrued and unpaid interest or Principal shall be retained in the Defeasance Collateral Account as additional collateral for the Loan.  Borrower shall cause the Eligible Institution at which the Defeasance Collateral is deposited to enter an agreement with Borrower and Lender, satisfactory to Lender in its sole discretion, pursuant to which such Eligible Institution shall agree to hold and distribute the Defeasance Collateral in accordance with this Agreement.  The Successor Borrower shall be the owner of the Defeasance Collateral Account and shall report all income accrued on Defeasance Collateral for federal, state and local income tax purposes in its income tax return. Borrower shall prepay all cost and expenses associated with opening and maintaining the Defeasance Collateral Account.   Lender shall not in any way be liable by reason of any insufficiency in the Defeasance Collateral Account.

(c)  **Successor Borrower**.   In connection with a Defeasance Event under this Section 2.3.3, Borrower shall designate an Affiliate of Lender as a successor entity (the "**Successor Borrower**") which shall be a Special Purpose Bankruptcy Remote Entity.  Pursuant to an assumption agreement in form and substance satisfactory to Lender in its sole discretion, Borrower shall transfer and assign all obligations, rights and duties under and to the defeased Note, together with the Defeasance Collateral to such Successor Borrower.   Such Successor Borrower shall assume the obligations under the Note and the Security Agreement and Borrower shall be relieved of its obligations under such documents.  Borrower shall pay a minimum of $1,000 to any such Successor Borrower as consideration for assuming the obligations under the Note and the Security Agreement.  As a condition to such assignment and assumption, Borrower shall deliver to Lender an opinion of counsel in form and substance and delivered by counsel satisfactory to Lender in its sole discretion stating, among other things, that such assumption agreement is enforceable against Borrower and such successor entity in accordance with its terms and that the Note and the Security Agreement, as so assumed, are enforceable against such successor entity in accordance with their respective terms.  Borrower shall pay all costs and expenses incurred by Lender, including Lender's attorney's fees and expenses, incurred in connection therewith.

(d)  **Appointment as Attorney in Fact**.   Upon the defeasance of the Loan in accordance with clauses (a), (b) and (c) of this Section 2.3.3, Borrower shall have no further right to prepay the Note pursuant to the other provisions of this Section 2.3.3 or otherwise.  In connection with the conditions set forth in this Section 2.3.3, Borrower hereby appoints Lender as its agent and attorney-in-fact for the purpose of purchasing the Defeasance Collateral with funds provided by Borrower.  Borrower shall pay any and all expenses incurred in the purchase of the Defeasance Collateral and any revenue, documentary stamp or intangible taxes or any other tax or charge due in connection with the transfer of the Note or otherwise required to accomplish the agreements of this Section 2.3.3.

2.3.4  **Optional Prepayments**.  From and after the Permitted Prepayment Date, Borrower shall have the right to prepay the Loan in whole (but not in part), provided that Borrower gives Lender at least fifteen (15) days' prior written notice thereof.  If any such prepayment is not made on a Payment Date, Borrower shall also pay interest that would have accrued on such prepaid Principal to, but not including, the next Payment Date.  Any such prepayment shall be made without payment of the Yield Maintenance Premium.

24

confidential

confidential

**2.4 <u>Release of Property</u>**.

**2.4.1  <u>Release on Defeasance</u>**.  If Borrower has elected to defease the Note and the requirements of <u>Section 2.3.3</u> above and this <u>Section 2.4</u> have been satisfied, the Property shall be released from the Lien of the Mortgage and the Defeasance Collateral pledged pursuant to the Security Agreement shall be the sole source of collateral securing the Note.  In connection with the release of the Lien, Borrower shall submit to Lender, not less than thirty (30) days prior to the Defeasance Date (or such shorter time as is acceptable to Lender in its sole discretion), a release of Lien (and related Loan Documents) for execution by Lender.  Such release shall be in a form appropriate in the jurisdiction in which the Property is located and contain standard provisions protecting the rights of the releasing lender.  In addition, Borrower shall provide all other documentation Lender reasonably requires to be delivered by Borrower in connection with such release, together with an Officer's Certificate certifying that such documentation (i) is in compliance with all Legal Requirements, and (ii) will effect such release in accordance with the terms of this Agreement.  Borrower shall pay all costs, taxes and expenses associated with the release of the Lien of the Mortgage, including Lender's reasonable attorneys' fees.  Borrower, pursuant to the Security Agreement, shall authorize and direct that the payments received from Defeasance Collateral be made directly to Lender and applied to satisfy the obligations under the Loan Documents, including payment in full of the unpaid Principal as of the Stated Maturity Date.

**2.4.2  <u>Release on Payment in Full</u>**.  Lender shall, upon the written request and at the expense of Borrower, upon payment in full of the Debt in accordance herewith, release or, if requested by Borrower, assign to Borrower's designee (without any representation or warranty by and without any recourse against Lender whatsoever), the Lien of the Loan Documents if not theretofore released.  In connection with the release of the Lien, Borrower shall submit to Lender, not less than thirty (30) days prior to the date of repayment (or such shorter time as is acceptable to Lender in its sole discretion), a release of Lien (and related Loan Documents) for execution by Lender.  Such release shall be in a form appropriate in the jurisdiction in which the Property is located and contain standard provisions protecting the rights of the releasing lender.  In addition, Borrower shall provide all other documentation Lender reasonably requires to be delivered by Borrower in connection with such release, together with an Officer's Certificate certifying that such documentation (i) is in compliance with all Legal Requirements, and (ii) will effect such release in accordance with the terms of this Agreement.  Borrower shall pay all costs, taxes and expenses associated with the release of the Lien of the Mortgage, including Lender's reasonable attorneys' fees.

**2.5 <u>Payments and Computations</u>**.

**2.5.1  <u>Making of Payments</u>**.  Each payment by Borrower shall be made in funds settled through the New York Clearing House Interbank Payments System or other funds immediately available to Lender by 11:00 a.m., New York City time, on the date such payment is due, to Lender by deposit to such account as Lender may designate by written notice to Borrower.  Whenever any such payment shall be stated to be due on a day that is not a Business Day, such payment shall be made on the first Business Day that is immediately preceding such due date (notwithstanding such adjustment of due dates, Borrower shall not be entitled to any deduction of interest due under this Agreement, the Note or any of the other Loan Documents).

25

confidential

confidential

All such payments shall be made irrespective of, and without any deduction, set-off or counterclaim whatsoever and are payable without relief from valuation and appraisement laws and with all costs and charges incurred in the collection or enforcement thereof, including attorneys' fees and court costs.

> **2.5.2   Computations**.   Interest payable under the Loan Documents shall be computed on the basis of the actual number of days elapsed over a 360-day year.

> **2.5.3   Late Payment Charge**.   If any Principal, interest or other sum due under any Loan Document is not paid by Borrower on the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by applicable law (the "***Late Payment Charge***"), in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment.   Such amount shall be secured by the Loan Documents.

## 3.   CASH MANAGEMENT AND RESERVES

> **3.1 Cash Management Arrangements**.   Borrower shall at all times cause all Rents to be transmitted directly by non-residential tenants of the Property into an Eligible Account (the "***Clearing Account***") established and maintained by Borrower at a local bank selected by Borrower and reasonably approved by Lender, which shall at all times be an Eligible Institution (the "***Clearing Bank***") as more fully described in the Clearing Account Agreement.   Without in any way limiting the foregoing, if Borrower or Manager receive any Rents, then (i) such amounts shall be deemed to be collateral for the Loan and shall be held in trust for the benefit, and as the property, of Lender, (ii) such amounts shall not be commingled with any other funds or property of Borrower or Manager, and (iii) Borrower or Manager shall deposit such amounts into the Clearing Account within one (1) Business Day of receipt.   Funds deposited into the Clearing Account shall be swept by the Clearing Bank on a daily basis into Borrower's operating account, unless a Cash Management Period is continuing, in which event such funds shall be swept on a daily basis into an Eligible Account at the Deposit Bank controlled by Lender (the "***Deposit Account***") and applied and disbursed in accordance with this Agreement. Funds in the Deposit Account shall be invested at Lender's discretion only in Permitted Investments.   Lender will also establish subaccounts of the Deposit Account which shall at all times be Eligible Accounts (and may be ledger or book entry accounts and not actual accounts) (such subaccounts are referred to herein as "***Subaccounts***").   The Deposit Account and any Subaccount will be under the sole control and dominion of Lender, and Borrower shall have no right of withdrawal therefrom. Borrower shall pay for all expenses of opening and maintaining all of the above accounts.

> **3.2 Required Repairs**.

> **3.2.1   Completion of Required Repairs**.   Borrower shall perform and complete each item of the repairs and environmental remedial work at the Property described on <u>Schedule 1</u> hereto (the "***Required Repairs***") within three (3) months of the date hereof or such shorter period of time for such item set forth on <u>Schedule 1</u> hereto.

`

137342639v7

confidential

**3.2.2   Required Repairs Reserves**.  On the date hereof, Borrower shall deposit with Lender the aggregate amount set forth on Schedule 1 hereto, and Lender shall cause such amount to be transferred to a Subaccount (the "***Required Repairs Subaccount***").  Provided no Default or Event of Default shall have occurred and is continuing, Lender shall disburse funds held in the Required Repairs Subaccount to Borrower, within fifteen (15) days after the delivery by Borrower to Lender of a request therefor (but not more often than once per month), in increments of at least $5,000, and, with respect to any particular disbursement for any portion of the Required Repairs, in an amount not to exceed the amount set forth on Schedule 1 with respect to such particular portion or item of the Required Repairs, accompanied by the following items (which items shall be in form and substance satisfactory to Lender): (i) an Officer's Certificate (A) certifying that the Required Repairs or any portion thereof which are the subject of the requested disbursement have been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, (B) identifying each Person that supplied materials or labor in connection with such Required Repairs or any portion thereof and (C) stating that each such Person has been or, upon receipt of the requested disbursement, will be paid in full with respect to the portion of the Required Repairs which is the subject of the requested disbursement; (ii) copies of appropriate Lien waivers or other evidence of payment satisfactory to Lender; (iii) at Lender's option, a title search for the Property indicating that it is free from all Liens not previously approved by Lender; (iv) a copy of each License required to be obtained with respect to the portion of the Required Repairs which is the subject of the requested disbursement; and (v) such other evidence as Lender shall reasonably request that the Required Repairs which are the subject of the requested disbursement have been completed and paid for. Provided no Default or Event of Default shall have occurred and is continuing, upon Borrower's completion of all Required Repairs in accordance with this Section 3.2, Lender shall release any funds remaining in the Required Repairs Subaccount, if any, to Borrower.

**3.3 Taxes and Insurance**.  Borrower shall pay to Lender (i) $33,293.17 on the date hereof on account of Taxes, (ii) $38,948.67 on the date hereof on account of Insurance Premiums, and (iii) on each Payment Date, (x) one-twelfth (1/12) of the Taxes that Lender estimates will be payable during the next twelve (12) months (initially $33,293.17 per month) in order to accumulate with Lender sufficient funds to pay all such Taxes at least thirty (30) days prior to their respective due dates and (y) one-twelfth (1/12) of the Insurance Premiums that Lender estimates will be payable (initially $4,868.58 per month) for the renewal of the coverage afforded by the Policies upon the expiration thereof in order to accumulate with Lender sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies.   Such amounts will be transferred by Lender to a Subaccount (the "***Tax and Insurance Subaccount***").  Provided that no Default or Event of Default has occurred and is continuing, Lender will (a) apply funds in the Tax and Insurance Subaccount to payments of Taxes and Insurance Premiums required to be made by Borrower pursuant to Section 5.2 hereof and Section 7.1 hereof, provided that Borrower has promptly supplied Lender with notices of all Taxes and Insurance Premiums due, or (b) reimburse Borrower for such amounts upon presentation of evidence of payment; subject, however, to Borrower's right to contest Taxes in accordance with Section 5.2 hereof.  In making any payment relating to Taxes and Insurance Premiums, Lender may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) or insurer or agent (with respect to Insurance Premiums), without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof.  If Lender determines in its

27

confidential

confidential

reasonable judgment that the funds in the Tax and Insurance Subaccount will be insufficient to pay (or in excess of) the Taxes or Insurance Premiums next coming due, Lender may increase (or decrease) the monthly contribution required to be made by Borrower to the Tax and Insurance Subaccount.

**3.4 <u>Capital Expense Reserves</u>.**

(a) Borrower shall pay to Lender on each Payment Date an amount initially equal to one-twelfth (1/12) of the product obtained by multiplying $0.20 by the aggregate number of rentable square feet of space in the Property (initially $2,864.87 per month).  Lender will transfer such amounts into a Subaccount (the "***Capital Reserve Subaccount***").  Additionally, upon thirty (30) days' prior notice to Borrower, Lender may reassess the amount of the monthly payment required under this <u>Section 3.4</u> from time to time in its reasonable discretion (based upon its then current underwriting standards).

(b) Provided that no Default or Event of Default has occurred and is continuing, Lender shall disburse funds held in the Capital Reserve Subaccount to Borrower, within fifteen (15) days after the delivery by Borrower to Lender of a request therefor (but not more often than once per month), in increments of at least $5,000 provided that (i) such disbursement is for an Approved Capital Expense; (ii) Lender shall have (if it desires) verified (by an inspection conducted at Borrower's expense) performance of the work associated with such Approved Capital Expense; and (iii) the request for disbursement is accompanied by (A) an Officer's Certificate certifying (1) that such funds will be used to pay or reimburse Borrower for Approved Capital Expenses and a description thereof, (2) that all outstanding trade payables (other than those to be paid from the requested disbursement or those constituting Permitted Indebtedness) have been paid in full, (3) that the same has not been the subject of a previous disbursement, and (4) that all previous disbursements have been used to pay the previously identified Approved Capital Expenses, and (B) lien waivers or other evidence of payment satisfactory to Lender, (C) at Lender's option, a title search for the Property indicating that the Property is free from all Liens, claims and other encumbrances not previously approved by Lender and (D) such other evidence as Lender shall reasonably request that the Approved Capital Expenses at the Property to be funded by the requested disbursement have been completed and are paid for or will be paid upon such disbursement to Borrower.  Any such disbursement of more than $10,000 to pay (rather than reimburse) Approved Capital Expenses may, at Lender's option, be made by direct check payable to the payee on such Approved Capital Expenses.

**3.5 <u>Rollover Reserves</u>.**

**3.5.1   <u>Rollover Reserve</u>.**

(a) Borrower shall pay to Lender on each Payment Date an amount initially equal to one-twelfth (1/12) of the product obtained by multiplying $1.25 by the aggregate number of rentable square feet of space in the Property (initially $17,905.42 per month).  Lender will transfer such amount into a Subaccount (the "***Rollover Reserve Subaccount***").  Borrower shall also pay to Lender for transfer into the Rollover Reserve Subaccount all Lease Termination Payments received by Borrower.  If Lender determines in its reasonable judgment that the funds

28

confidential

confidential

in the Rollover Reserve Subaccount will be insufficient to pay (or in excess of) the amounts due or to become due for Approved Leasing Expenses, Lender may increase (or decrease) the monthly contribution required to be made by Borrower to the Rollover Reserve Subaccount.

(b) Provided that no Default or Event of Default has occurred and is continuing, Lender shall disburse funds held in the Rollover Reserve Subaccount to Borrower, within fifteen (15) days after the delivery by Borrower to Lender of a request therefor (but not more often than once per month), in increments of at least $5,000, provided (i) such disbursement is for an Approved Leasing Expense; (ii) Lender shall have (if it desires) verified (by an inspection conducted at Borrower's expense) performance of any construction work associated with such Approved Leasing Expense; and (iii) the request for disbursement is accompanied by (A) an Officer's Certificate certifying (1) that such funds will be used only to pay (or reimburse Borrower for) Approved Leasing Expenses and a description thereof, (2) that all outstanding trade payables (other than those to be paid from the requested disbursement or those constituting Permitted Indebtedness) have been paid in full, (3) that the same has not been the subject of a previous disbursement, and (4) that all previous disbursements have been used only to pay (or reimburse Borrower for) the previously identified Approved Leasing Expenses, and (B) reasonably detailed supporting documentation as to the amount, necessity and purpose therefor.  Any such disbursement of more than $10,000 to pay (rather than reimburse) Approved Leasing Expenses may, at Lender's option, be made by direct check payable to the payee of such Approved Leasing Expenses.

(c) Any Lease Termination Payments and any other funds deposited into the Rollover Reserve Subaccount from the Security Deposit Subaccount in accordance with Section 3.7 hereof shall be applied, at Lender's election, towards either (i) subject to the rights of Borrower under the applicable Lease, rent arrearages under such Lease (or to cure any other tenant default under such Lease), (ii) debt service shortfalls that may arise as a result of a termination of such Lease (and Borrower hereby authorizes Lender to disburse to itself any such amounts without any request therefor by Borrower) or (iii) funding any Approved Leasing Expenses (or Approved Major Lease Leasing Expenses, if applicable) which are anticipated to occur in connection with the re-tenanting of the space under the Lease that was the subject of such termination (in accordance with the terms and conditions of Section 3.5(b) above or Section 3.5.2 below, if applicable).

### 3.5.2   Special Rollover Reserve.

(a) On each Payment Date occurring during the continuance of a Lease Sweep Period (provided no Cash Management Period is then continuing (other than a Cash Management Period triggered solely as a result of a Lease Sweep Period)), all Available Cash (or such portion of Available Cash that shall be allocated by Lender for deposit into the Special Rollover Reserve Subaccount) shall be paid to Lender.  Lender will transfer such amount into a Subaccount (the "*Special Rollover Reserve Subaccount*").  Borrower shall also pay to Lender for transfer into the Special Rollover Reserve Subaccount any Lease Termination Payments received from any Major Tenant or Combined Tenant.

(b) Provided that no Default or Event of Default has occurred and is continuing, Lender shall disburse funds held in the Special Rollover Reserve Subaccount to Borrower, within

137342639v7

confidential

confidential

fifteen (15) days after the delivery by Borrower to Lender of a request therefor (but not more often than once per month), in increments of at least $5,000, provided (i) such disbursement is for an Approved Major Lease Leasing Expense; (ii) Lender shall have (if it desires) verified (by an inspection conducted at Borrower's expense) performance of any construction work associated with such Approved Major Lease Leasing Expense; and (iii) the request for disbursement is accompanied by (A) an Officer's Certificate certifying (1) that such funds will be used only to pay (or reimburse Borrower for) Approved Major Lease Leasing Expenses and a description thereof, (2) that all outstanding trade payables (other than those to be paid from the requested disbursement or those constituting Permitted Indebtedness) have been paid in full, (3) that the same has not been the subject of a previous disbursement, and (4) that all previous disbursements have been used only to pay (or reimburse Borrower for) the previously identified Approved Major Lease Leasing Expenses, and (B) reasonably detailed supporting documentation as to the amount, necessity and purpose therefor.  Any such disbursement of more than $10,000 to pay (rather than reimburse) Approved Major Lease Leasing Expenses may, at Lender's option, be made by direct check payable to the payee of such Approved Major Lease Leasing Expenses.  Provided no Default or Event of Default is continuing, upon the termination of the subject Lease Sweep Period, and Lender's receipt of satisfactory evidence that all Approved Major Lease Leasing Expenses incurred in connection therewith (and any other expenses in connection with the re-tenanting of the applicable space) have been paid in full (which evidence may include (i) a letter or certification from the applicable broker, if any, that all brokerage commissions payable in connection therewith have been paid and (ii) an estoppel certificate executed by each applicable tenant which certifies that all contingencies under such Lease to the payment of full rent (including Borrower's contribution to the cost of any tenant improvement work) have been satisfied), any funds (if any) remaining in the Special Rollover Reserve Subaccount that have been deposited therein as a result of such Lease Sweep Period shall, provided that no other Lease Sweep Period shall then be continuing, be disbursed to Borrowers; *provided*, *however*, (a) if a Cash Management Period is then continuing, then no such funds shall be disbursed to Borrower, and all such funds shall instead be deposited into the Cash Collateral Subaccount, to be applied in accordance with <u>Section 3.8</u> hereof and (b) if a Lease Sweep Period is then continuing (provided no Cash Management Period is then continuing (other than a Cash Management Period triggered solely as a result of a Lease Sweep Period)), then no such funds shall be disbursed to Borrower, and all such funds shall remain in the Special Rollover Reserve Subaccount, to be applied in accordance with this <u>Section 3.5.2(b)</u>.

   **3.6 <u>Casualty/Condemnation Subaccount</u>**.  Borrower shall pay, or cause to be paid, to Lender all Proceeds or Awards due to any Casualty or Condemnation to be transferred to a Subaccount (the "***Casualty/Condemnation Subaccount***") in accordance with the provisions of <u>Article 7</u> hereof.  All amounts in the Casualty/Condemnation Subaccount shall be disbursed in accordance with the provisions of <u>Article 7</u> hereof.

   **3.7 <u>Security Deposits</u>**.  Borrower shall keep and hold all security deposits under Leases in accordance with applicable Legal Requirements and at a separately designated account under Borrower's control at the Clearing Bank (and in the case of a letter of credit, assigned with full power of attorney and executed sight drafts to Lender) so that the security deposits shall not be commingled with any other funds of Borrower.  During a Cash Management Period, Borrower shall, upon Lender's request, if permitted by applicable Legal Requirements, turn over to Lender the security deposits (and any interest theretofore earned thereon) under Leases, to be held by

137342639v7

confidential

confidential

Lender in a Subaccount (the "*Security Deposit Subaccount*") subject to the terms of the Leases. Security deposits held in the Security Deposit Subaccount will be released by Lender upon notice from Borrower together with such evidence as Lender may reasonably request that such security deposit is required to be returned to a tenant pursuant to the terms of a Lease or may be applied as Rent pursuant to the rights of Borrower under the applicable Lease.  Any letter of credit or other instrument that Borrower receives in lieu of a cash security deposit under any Lease entered into after the date hereof shall (i) be maintained in full force and effect in the full amount unless replaced by a cash deposit as hereinabove described and (ii) if permitted pursuant to any Legal Requirements, name Lender as payee or mortgagee thereunder (or at Lender's option, be fully assignable to Lender).

  **3.8** **Cash Collateral Subaccount**.  If a Cash Management Period shall have commenced (other than a Cash Management Period triggered solely as a result of a Lease Sweep Period), then on the immediately succeeding Payment Date and on each Payment Date thereafter during the continuance of such Cash Management Period, all Available Cash shall be paid to Lender, which amounts shall be transferred by Lender into a Subaccount (the "*Cash Collateral Subaccount*") as cash collateral for the Debt.  Notwithstanding the foregoing, if a Lease Sweep Period has occurred and is then continuing during the continuance of any Cash Management Period (other than a Cash Management Period triggered solely as a result of a Lease Sweep Period), Lender shall have the right (but not the obligation) to allocate any funds in the Cash Collateral Subaccount to the Special Rollover Reserve Subaccount to be held and disbursed in accordance with the terms and conditions of <u>Section 3.5.2</u> hereof.  Any funds in the Cash Collateral Subaccount and not previously disbursed or applied shall be disbursed to Borrower upon the termination of such Cash Management Period. Lender shall have the right, but not the obligation, at any time during the continuance of an Event of Default, in its sole and absolute discretion to apply all sums then on deposit in the Cash Collateral Subaccount to the Debt, in such order and in such manner as Lender shall elect in its sole and absolute discretion, including to make a prepayment of Principal (together with the applicable Yield Maintenance Premium applicable thereto).

  **3.9** **Grant of Security Interest; Application of Funds**.  As security for payment of the Debt and the performance by Borrower of all other terms, conditions and provisions of the Loan Documents, Borrower hereby pledges and assigns to Lender, and grants to Lender a security interest in, all Borrower's right, title and interest in and to all Rents and in and to all payments to or monies held in the Clearing Account, the Deposit Account and all Subaccounts created pursuant to this Agreement (collectively, the "*Cash Management Accounts*").  Borrower hereby grants to Lender a continuing security interest in, and agrees to hold in trust for the benefit of Lender, all Rents in its possession prior to the (i) payment of such Rents to Lender or (ii) deposit of such Rents into the Deposit Account.  Borrower shall not, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in any Cash Management Account, or permit any Lien to attach thereto, or any levy to be made thereon, or any UCC Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto.  This Agreement is, among other things, intended by the parties to be a security agreement for purposes of the UCC.  Upon the occurrence and during the continuance of an Event of Default, Lender may apply any sums in any Cash Management Account in any order and in any manner as Lender shall elect in Lender's discretion without seeking the appointment of a receiver and without adversely affecting the rights of Lender to foreclose the Lien of the

137342639v7

confidential

confidential

Mortgage or exercise its other rights under the Loan Documents.  Cash Management Accounts shall not constitute trust funds and may be commingled with other monies held by Lender.  All interest which accrues on the funds in any Cash Management Account shall not be added to or become a part thereof and shall be the sole property of and shall be paid to Lender. Upon repayment in full of the Debt, all remaining funds in the Subaccounts, if any, shall be promptly disbursed to Borrower.

**3.10**     **Property Cash Flow Allocation**.

(a) During any Cash Management Period, all Rents deposited into the Deposit Account during the immediately preceding Interest Period shall be applied on each Payment Date as follows in the following order of priority:

(i)       First, to make payments into the Tax and Insurance Subaccount as required under <u>Section 3.3</u> hereof;

(ii)      Second, to pay the monthly portion of the fees charged by the Deposit Bank in accordance with the Cash Management Agreement;

(iii)     Third, to Lender to pay the Monthly Interest Payment Amount due on such Payment Date (plus, if applicable, interest at the Default Rate and all other amounts, other than those described under other clauses of this <u>Section 3.10(a)</u>, then due to Lender under the Loan Documents);

(iv)     Fourth, to make payments into the Capital Reserve Subaccount as required under <u>Section 3.4</u> hereof;

(v)      Fifth, to make payments into the Rollover Reserve Subaccount as required under <u>Section 3.5.1(a)</u> hereof;

(vi)     Sixth, funds in an amount equal to the Monthly Operating Expense Budgeted Amount (including, without limitation, an amount for the payment of management fees to Manager in an amount not to exceed 3.0% of Rents received for the subject month) and any then-current Approved Additional Operating Expenses shall be disbursed to Borrower (or to an account designated by Borrower);

(vii)    Seventh, while a Cash Management Period is continuing (other than a Cash Management Period continuing solely because the Mezzanine Loan is outstanding) if the Mezzanine Loan (or any portion thereof) is outstanding, to make payments in the amount of the Monthly Mezzanine Debt Service Payment into the subordinate deposit account established under the Mezzanine Loan; and

(viii)   Lastly, to make payments in an amount equal to all Available Cash on such Payment Date:

(A)      during the continuance of a Cash Management Period continuing solely as a result of a Lease Sweep Period, into the Special Rollover Reserve Subaccount in accordance with <u>Section 3.5.2</u> hereof;

32

confidential

confidential

          (B)      during the continuance of a Cash Management Period continuing solely because the Mezzanine Loan (or any portion thereof) is outstanding, so long as no Lease Sweep Period is then continuing, into the subordinate deposit account established under the Mezzanine Loan; or

          (C)      otherwise, into the Cash Collateral Subaccount in accordance with <u>Section 3.8</u> hereof

      (b) The failure of Borrower to make all of the payments required under clauses <u>(i)</u> through <u>(vii)</u> of <u>Section 3.10(a)</u> above in full on each Payment Date shall constitute an Event of Default under this Agreement; <u>provided</u>, <u>however</u>, if adequate funds are available in the Deposit Account for such payments, the failure by the Deposit Bank to allocate such funds into the appropriate Subaccounts shall not constitute an Event of Default.

      (c) Notwithstanding anything to the contrary contained in this <u>Section 3.10</u> or elsewhere in the Loan Documents, after the occurrence of a Default or an Event of Default, Lender may apply all Rents deposited into the Deposit Account and other proceeds of repayment in such order and in such manner as Lender shall elect.  Lender's right to withdraw and apply any of the foregoing funds shall be in addition to all other rights and remedies provided to Lender under the Loan Documents.

## 4.     REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender as of the date hereof that, except to the extent (if any) disclosed on <u>Schedule 2</u> hereto with reference to a specific Section of this <u>Article 4</u>:

### 4.1 Organization; Special Purpose.

      (a) Each of Borrower and Sole Member is duly organized, validly existing and in good standing under the laws of the state of its formation, with requisite power and authority, and all rights, licenses, permits and authorizations, governmental or otherwise, necessary to own its properties and to transact the business in which it is now engaged.  Borrower is duly qualified to do business and is in good standing in the jurisdiction in which the Property is located and in each other jurisdiction where it is required to be so qualified in connection with its properties, business and operations.

      (b) Borrower has at all times since its formation been, and as of the date hereof is, a Special Purpose Bankruptcy Remote Entity.

### 4.2 Proceedings; Enforceability.  Borrower has taken all necessary action to authorize the execution, delivery and performance of the Loan Documents by it, and has the power and authority to execute, deliver and perform under the Loan Documents and all the transactions contemplated thereby.  The Loan Documents have been duly authorized, executed and delivered by Borrower and constitute legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, and general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).  The Loan

137342639v7

confidential

confidential

Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower or Guarantor including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable, and none of Borrower or Guarantor have asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

     **4.3 <u>No Conflicts</u>**.  The execution, delivery and performance of the Loan Documents by Borrower and the transactions contemplated hereby will not conflict with any provision of any law or regulation to which Borrower is subject, or conflict with, or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien (other than pursuant to the Loan Documents) upon any of the property of Borrower pursuant to the terms of, any agreement or instrument to which Borrower is a party or by which its property is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any Governmental Authority having jurisdiction over Borrower or any of its properties.  Borrower's rights under the Licenses and the Management Agreement will not be adversely affected by the execution and delivery of the Loan Documents, Borrower's performance thereunder, the recordation of the Mortgage, or the exercise of any remedies by Lender.  Any consent, approval, authorization, order, registration or qualification of or with any Governmental Authority required for the execution, delivery and performance by Borrower of, or compliance by Borrower with, the Loan Documents or the consummation of the transactions contemplated hereby, has been obtained and is in full force and effect.

     **4.4 <u>Litigation</u>**.  There are no actions, suits or other proceedings at law or in equity by or before any Governmental Authority now pending or threatened against or affecting Borrower, Sole Member, Guarantor, Key Principal, Manager or the Property, in any court or by or before any other Governmental Authority, which, if adversely determined, might materially and adversely affect the condition (financial or otherwise) or business of Borrower (including the ability of Borrower to carry out its obligations under the Loan Documents), Sole Member, Guarantor, Key Principal, Manager or the use, value, condition or ownership of the Property.

     **4.5 <u>Agreements</u>**.  Borrower is not a party to any agreement or instrument or subject to any restriction which might materially or adversely affect Borrower or the Property, or Borrower's business, properties or assets, operations or condition, financial or otherwise. Borrower is not in default with respect to any order or decree of any court or any order, regulation or demand of any Governmental Authority, which default might have consequences that would materially or adversely affect the condition (financial or other) or operations of Borrower or its properties or might have consequences that would adversely affect its performance hereunder.  Borrower is not in default, and has not received notice of any event or condition that with the giving of notice or the passage of time would constitute a default, in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any Permitted Encumbrance or any other agreement or instrument to which it is a party or by which it or the Property is bound, and to Borrower's knowledge, there are no defaults under any such agreement by any other party thereto.

     **4.6 <u>Title</u>**.  Borrower has good, marketable and indefeasible title in fee to the real property and good title to the balance of the Property, free and clear of all Liens except the Permitted Encumbrances.  All transfer taxes, deed stamps, intangible taxes or other amounts in the nature

confidential

confidential

of transfer taxes required to be paid by any Person under applicable Legal Requirements in connection with the transfer of the Property to Borrower have been paid or are being paid simultaneously herewith.  The Mortgage when properly recorded in the appropriate records, together with any UCC Financing Statements required to be filed in connection therewith, will create (i) a valid, perfected first priority lien on Borrower's interest in the Property and (ii) valid and perfected first priority security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances.  All mortgage, mortgage recording, stamp, intangible or other similar taxes required to be paid by any Person under applicable Legal Requirements in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including the Mortgage, have been paid or are being paid simultaneously herewith.  All taxes and governmental assessments due and owing in respect of the Property have been paid, or an escrow of funds in an amount sufficient to cover such payments has been established hereunder or are insured against by the Title Insurance Policy.  The Permitted Encumbrances, individually or in the aggregate, do not (a) materially interfere with the benefits of the security intended to be provided by the Mortgage and this Agreement, (b) materially and adversely affect the value, operation or use of the Property, or (c) impair Borrower's ability to repay the Loan.  No Condemnation or other proceeding has been commenced or, to Borrower's best knowledge, is contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.  There are no mechanics', materialman's or other similar Liens or claims which have been filed for work, labor or materials affecting the Property which are or may become a Lien on the Property.  There are no outstanding options to purchase or rights of first refusal affecting all or any portion of the Property.  The Survey does not fail to reflect any material matter affecting the Property or the title thereto.  All of the Improvements which were included in determining the appraised value of the Property lie wholly within the boundaries and building restriction lines of the Property, and no improvements on adjoining properties encroach upon the Property, and no easements or other encumbrances affecting the Property encroach upon any of the Improvements, so as to affect the value or marketability of the Property, except those which are set forth on the Survey and insured against by the Title Insurance Policy.  Each parcel comprising the Property is a separate tax lot and is not a portion of any other tax lot that is not a part of the Property.  There are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.  With respect to the Title Insurance Policy, (i) the Title Insurance Policy is in full force and effect, (ii) the Title Insurance Policy is freely assignable by Lender to and will inure to the benefit of the transferee (subject to recordation of an assignment of mortgage) without the consent or any notification to the insurer, (iii) the premium with respect thereto has been paid in full (or will be paid in full with a portion of the proceeds of the Loan), (iv) the Title Insurance Policy is issued by a title insurance company licensed to issue policies in the State, (v) no claims have been made under the Title Insurance Policy and no other action has been taken that would materially impair the Title Insurance Policy and (vi) the Title Insurance Policy contains no exclusions for any of the following circumstances, or it affirmatively insures Lender against losses relating to any of the following circumstances (unless the Property is located in a jurisdiction where such affirmative insurance is not available): (a) that the Property has access to a public road and (b) that the area shown on the Survey is the same as the property legally described in the Mortgage.

35

confidential

confidential

**4.7 <u>No Bankruptcy Filing</u>**.  Neither Borrower nor any of its constituent Persons are contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency law or the liquidation of all or a major portion of Borrower's assets or properties (a "***Bankruptcy Proceeding***"), and Borrower has no knowledge of any Person contemplating the filing of any such petition against it or such constituent Persons.  In addition, neither Borrower nor Sole Member nor any principal nor Affiliate of Borrower or Sole Member has been a party to, or the subject of a Bankruptcy Proceeding for the past ten (10) years.

**4.8 <u>Full and Accurate Disclosure</u>**.  No statement of fact made by Borrower in any Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained therein not misleading.  There is no material fact presently known to Borrower that has not been disclosed to Lender which adversely affects, or, as far as Borrower can foresee, might adversely affect, the Property or the business, operations or condition (financial or otherwise) of Borrower or Guarantor.  All financial data, including the statements of cash flow and income and operating expense, that have been delivered to Lender in respect of Borrower, Guarantor and the Property (i) are true, complete and correct in all material respects, (ii) accurately represent the financial condition of Borrower, Guarantor and the Property as of the date of such reports, and (iii) to the extent prepared by an independent certified public accounting firm, have been prepared in accordance with GAAP consistently applied throughout the periods covered, except as disclosed therein.  Borrower has no contingent liabilities, liabilities for taxes, unusual forward or long-term commitments, unrealized or anticipated losses from any unfavorable commitments or any liabilities or obligations not expressly permitted by this Agreement.  Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of Borrower or the Property from that set forth in said financial statements.

**4.9 <u>Tax Filings</u>**.  To the extent required, Borrower has filed (or has obtained effective extensions for filing) all federal, state, commonwealth, district and local tax returns required to be filed and has paid or made adequate provision for the payment of all federal, state, commonwealth, district and local taxes, charges and assessments payable by Borrower.  Borrower's tax returns (if any) properly reflect the income and taxes of Borrower for the periods covered thereby, subject only to reasonable adjustments required by the Internal Revenue Service or other applicable tax authority upon audit.

**4.10 <u>ERISA; No Plan Assets</u>**.  As of the date hereof and throughout the Term (i) Borrower, Guarantor or any ERISA Affiliate do not sponsor, are not obligated to contribute to, and are not themselves an "employee benefit plan," as defined in Section 3(3) of ERISA or Section 4975 of the Code, (ii) none of the assets of Borrower or Guarantor constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101, as modified in application by Section 3(42) of ERISA, (iii) Borrower and Guarantor are not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA, and (iv) transactions by or with Borrower or Guarantor are not and will not be subject to state statutes regulating investment of, and fiduciary obligations with respect to, governmental plans.  As of the date hereof, neither Borrower, Guarantor nor any ERISA Affiliate maintains, sponsors or contributes to, or has any obligations with respect to, a "defined benefit plan" (within the meaning of Section 3(35) of ERISA) or a "multiemployer pension plan" (within the meaning of Section 3(37)(A) of ERISA).  Neither Borrower nor Guarantor has engaged in any transaction

36

confidential

confidential

in connection with which it could be subject to either a material civil penalty assessed pursuant to the provisions of Section 502 of ERISA or a material tax imposed under the provisions of Section 4975 of the Code.

**4.11** __Compliance__.  Borrower and the Property (including the Improvements) and the use thereof comply in all material respects with all applicable Legal Requirements (including with respect to parking, building and applicable zoning and land use laws, codes, regulations and ordinances).  Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority, the violation of which might materially adversely affect the condition (financial or otherwise) or business of Borrower.  Borrower has not committed any act which may give any Governmental Authority the right to cause Borrower to forfeit the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.  The Property is used exclusively for office use and other appurtenant and related uses.  In the event that all or any part of the Improvements are destroyed or damaged, said Improvements can be legally reconstructed to their condition prior to such damage or destruction, and thereafter exist for the same use without violating any zoning or other ordinances applicable thereto and without the necessity of obtaining any variances or special permits.  No legal proceedings are pending or, to the knowledge of Borrower, threatened with respect to the zoning of the Property.  Neither the zoning nor any other right to construct, use or operate the Property is in any way dependent upon or related to any property other than the Property. All certifications, permits, licenses and approvals, including certificates of completion and occupancy permits required of Borrower for the legal use, occupancy and operation of the Property for its current use (collectively, the "*Licenses*"), have been obtained and are in full force and effect.  The use being made of the Property is in conformity with the certificate of occupancy issued for the Property and all other restrictions, covenants and conditions affecting the Property.

**4.12** __Major Contracts__.  Borrower has not entered into, nor is bound by, any Major Contract which continues in existence, except those previously disclosed in writing to Lender. Each of the Major Contracts is in full force and effect, there are no monetary or other material defaults by Borrower thereunder and, to the best knowledge of Borrower, there are no monetary or other material defaults thereunder by any other party thereto.  None of Borrower, Manager or any other Person acting on Borrower's behalf has given or received any notice of default under any of the Major Contracts that remains uncured or in dispute.  Borrower has delivered true, correct and complete copies of the Major Contracts (including all amendments and supplements thereto) to Lender.  Except for Manager under the Management Agreement, no Major Contract has as a party an Affiliate of Borrower.

**4.13** __Federal Reserve Regulations; Investment Company Act; Bank Holding Company__.  No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose that would be inconsistent with such Regulation U or any other regulation of such Board of Governors, or for any purpose prohibited by Legal Requirements or any Loan Document.  Borrower is not (i) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; or (ii) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.  Borrower is not a "bank

37

confidential

confidential

holding company" or a direct or indirect subsidiary of a "bank holding company" as defined in the Bank Holding Company Act of 1956, as amended, and Regulation Y thereunder of the Board of Governors of the Federal Reserve System.

**4.14   Easements; Utilities and Public Access**.   All easements, cross easements, licenses, air rights and rights-of-way or other similar property interests (collectively, "***Easements***"), if any, necessary for the full utilization of the Improvements for their intended purposes have been obtained, are described in the Title Insurance Policy and are in full force and effect without default thereunder.  The Property has rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate to service the Property for its intended uses.  All public utilities necessary or convenient to the full use and enjoyment of the Property are located in the public right-of-way abutting the Property, and all such utilities are connected so as to serve the Property without passing over other property absent a valid irrevocable easement.  All roads necessary for the use of the Property for its current purpose have been completed and dedicated to public use and accepted by all Governmental Authorities.

**4.15   Physical Condition**.   Except as may be expressly set forth in the Physical Conditions Report, the Property, including all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components, are in good condition, order and repair in all material respects; there exists no structural or other material defects or damages to the Property, whether latent or otherwise.  Borrower has not received notice from any insurance company or bonding company of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or any termination or threatened termination of any policy of insurance or bond.  No portion of the Property is located in an area as identified by the Federal Emergency Management Agency as an area having special flood hazards, or, if so located the flood insurance required pursuant to Section 7.1.1 hereof is in full force and effect with respect to the Property.  The Improvements have suffered no material casualty or damage which has not been fully repaired and the cost thereof fully paid.

**4.16   Leases**.   The rent roll attached hereto as Schedule 3 (the "***Rent Roll***") is true, complete and correct and the Property is not subject to any Leases other than the Leases described in the Rent Roll.    Except as set forth on the Rent Roll: (i) each Lease is in full force and effect; (ii) the tenants under the Leases have accepted possession of and are in occupancy of all of their respective demised premises, have commenced the payment of rent under the Leases, and there are no offsets, claims or defenses to the enforcement thereof; (iii) all rents due and payable under the Leases have been paid and no portion thereof has been paid for any period more than thirty (30) days in advance; (iv) the rent payable under each Lease is the amount of fixed rent set forth in the Rent Roll, and there is no claim or basis for a claim by the tenant thereunder for an adjustment to the rent; (v) no tenant has made any claim against the landlord under any Lease which remains outstanding, there are no defaults on the part of the landlord under any Lease, and no event has occurred which, with the giving of notice or passage of time, or both, would constitute such a default; (vi) to Borrower's best knowledge, there is no present material default by the tenant under any Lease; (vii) all security deposits under Leases are as set forth on the Rent Roll and are held consistent with Section 3.7 hereof; (viii) Borrower is the sole

137342639v7

confidential

confidential

owner of the entire lessor's interest in each Lease; (ix) each Lease is the valid, binding and enforceable obligation of Borrower and the applicable tenant thereunder; (x) no Person has any possessory interest in, or right to occupy, the Property except under the terms of the Leases; (xi) each Lease is subordinate to the Loan Documents, either pursuant to its terms or pursuant to a subordination and attornment agreement; (xii) all work to be performed by Borrower under each Lease has been performed as required and has been accepted by the applicable tenant under such Lease; (xiii) any payments, free rent, partial rent, rebate of rent or other payments, credits, allowances or abatements required to be given by Borrower to any tenant under any Lease has already been received by such tenant; (xiv) no Tenant under any Lease (or any sublease) is an Affiliate of Borrower; (xv) all tenants under the Leases are open for business and paying full, unabated rent; (xvi) there are no brokerage fees or commissions due and payable in connection with the leasing of space at the Property, and no such fees or commissions will become due and payable in the future in connection with the Leases, including by reason of any extension of such Lease or expansion of the space leased thereunder; (xvii) no tenant under any Lease has assigned its Lease or sublet all or any portion of the premises demised thereby, no such tenant holds its leased premises under assignment or sublease, nor does anyone except such tenant and its employees occupy such leased premises; (xviii) no tenant under any Lease has any right or option for additional space in the Improvements; and (xix) each Tenant is free from bankruptcy or reorganization proceedings.  The copies of the Leases delivered to Lender are true and complete, and there are no oral agreements with respect thereto.  None of the Leases contains any option to purchase or right of first refusal to purchase the Property or any part thereof. Neither the Leases nor the Rents have been assigned or pledged except to Lender, and no other Person has any interest therein except the tenants thereunder.

**4.17    Fraudulent Transfer**.  Borrower has not entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor, and Borrower has received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the transactions contemplated by the Loan Documents, the fair saleable value of Borrower's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, exceed Borrower's total probable liabilities, including subordinated, unliquidated, disputed or contingent liabilities.  The fair saleable value of Borrower's assets is, and immediately following the making of the Loan, will be, greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities on its debts as such debts become absolute and matured.  Borrower's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted.  Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of the obligations of Borrower).

**4.18    Ownership of Borrower**.  Borrower's exact legal name is: 24 Commerce Street LLC.  Borrower is of the following organizational type (e.g., corporation, limited liability company): limited liability company, and the jurisdiction in which Borrower is organized is: Delaware.  Borrower's Tax I.D. number is 83-4259100 and Borrower's Delaware Organizational I.D. number is 7348359.  The sole managing member of Borrower is Sole Member.  The only other members of Borrower are as set forth on the organizational chart attached hereto as

39

137342639v7

Schedule 4.   The membership interests in Borrower are owned free and clear of all Liens, warrants, options and rights to purchase.  Borrower has no obligation to any Person to purchase, repurchase or issue any ownership interest in it.  The organizational chart attached hereto as Schedule 4 is true, complete and accurate and illustrates all Persons who have a direct or indirect ownership interest in Borrower.

      **4.19**   **Purchase Options**.  Neither the Property nor any part thereof is subject to any purchase options, rights of first refusal, rights of first offer or other similar rights in favor of third parties.

      **4.20**   **Management Agreement**.   The Management Agreement is in full force and effect.  There is no default, breach or violation existing thereunder, and no event has occurred (other than payments due but not yet delinquent) that, with the passage of time or the giving of notice, or both, would constitute a default, breach or violation thereunder, by either party thereto.

      **4.21**   **Hazardous Substances**.   (i) The Property is not in violation of any Legal Requirement pertaining to or imposing liability or standards of conduct concerning environmental regulation, contamination or clean-up, including the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recovery Act, the Emergency Planning and Community Right-to-Know Act of 1986, the Hazardous Substances Transportation Act, the Solid Waste Disposal Act, the Clean Water Act, the Clean Air Act, the Toxic Substance Control Act, the Safe Drinking Water Act, the Occupational Safety and Health Act, any state super-lien and environmental clean-up statutes (including with respect to Toxic Mold), any local law requiring related permits and licenses and all amendments to and regulations in respect of the foregoing laws (collectively, "***Environmental Laws***"); (ii) the Property is not subject to any private or governmental Lien or judicial or administrative notice or action or inquiry, investigation or claim relating to hazardous, toxic and/or dangerous substances, toxic mold or fungus of a type that may pose a risk to human health or the environment or would negatively impact the value of the Property ("***Toxic Mold***") or any other substances or materials which are included under or regulated by Environmental Laws (collectively, "***Hazardous Substances***"); (iii) to the best of Borrower's knowledge, after due inquiry, no Hazardous Substances are or have been (including the period prior to Borrower's acquisition of the Property), discharged, generated, treated, disposed of or stored on, incorporated in, or removed or transported from the Property other than in compliance with all Environmental Laws; (iv) to the best of Borrower's knowledge, after due inquiry, no Hazardous Substances are present in, on or under any nearby real property which could migrate to or otherwise affect the Property; (v) to the best of Borrower's knowledge, after due inquiry, no Toxic Mold is on or about the Property which requires remediation; (vi) no underground storage tanks exist on the Property and the Property has never been used as a landfill; and (vii) there have been no environmental investigations, studies, audits, reviews or other analyses conducted by or on behalf of Borrower or which are in Borrower's possession which have not been provided to Lender.

      **4.22**   **Name; Principal Place of Business**.  Borrower does not use and will not use any trade name and has not done and will not do business under any name other than its actual name set forth herein.  The principal place of business of Borrower is its primary address for notices as set forth in Section 6.1 hereof, and Borrower has no other place of business.

confidential

**4.23    Other Debt**.  There is no indebtedness with respect to the Property or any excess cash flow or any residual interest therein, whether secured or unsecured, other than Permitted Encumbrances and Permitted Indebtedness.

**4.24    Assignment of Leases and Rents**.  The Assignment of Leases and Rents creates a valid assignment of, or a valid security interest in, certain rights under the Leases, subject only to a license granted to Borrower to exercise certain rights and to perform certain obligations of the lessor under the Leases, including the right to operate the Property.  No Person other than Lender has any interest in or assignment of the Leases or any portion of the Rents due and payable or to become due and payable thereunder.

**4.25    Insurance**.  Borrower has obtained and has delivered to Lender certificates of all of the Policies, with all premiums prepaid thereunder, reflecting the insurance coverages, amounts and other requirements set forth in this Agreement.  No claims have been made under any of the Policies, and no Person, including Borrower, has done, by act or omission, anything which would impair the coverage of any of the Policies.

**4.26    FIRPTA**.  Borrower is not a "foreign person" within the meaning of Sections 1445 or 7701 of the Code.

**4.27    Fiscal Year**.  Each fiscal year of Borrower commences on January 1.

**4.28    Intellectual Property/Websites**.  Other than as set forth on Schedule 7, neither Borrower nor any Affiliate (i) has or holds any tradenames, trademarks, servicemarks, logos, copyrights, patents or other intellectual property (collectively, "***Intellectual Property***") with respect to the Property or the use or operations thereof or (ii) is the registered holder of any website with respect to the Property (other than Tenant websites).

**4.29    Operations Agreements**.  Each Operations Agreement is in full force and effect and neither Borrower nor, to Borrower's knowledge, any other party to any Operations Agreement, is in default thereunder, and to the best of Borrower's knowledge, there are no conditions which, with the passage of time or the giving of notice, or both, would constitute a default thereunder.  Except as described herein, the REA has not been modified, amended or supplemented.

**4.30    Illegal Activity**.  No portion of the Property has been or will be purchased with proceeds of any illegal activity.

All of the representations and warranties in this Article 4 and elsewhere in the Loan Documents (i) shall survive for so long as any portion of the Debt remains owing to Lender and (ii) shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf, provided, however, that the representations, warranties and covenants set forth in Section 4.21 above shall survive in perpetuity.

**5.    COVENANTS**

Until the end of the Term, Borrower hereby covenants and agrees with Lender that:

41

137342639v7

confidential

**5.1 Existence**.  Each of Borrower and Sole Member shall (i) do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, and franchises, (ii) continue to engage in the business presently conducted by it, (iii) obtain and maintain all Licenses and all applicable governmental authorizations, and (iv) qualify to do business and remain in good standing under the laws of each jurisdiction, in each case as and to the extent required for the ownership, maintenance, management and operation of the Property.

**5.2 Taxes and Other Charges**.  Borrower shall pay all Taxes and Other Charges as the same become due and payable, and deliver to Lender receipts for payment or other evidence satisfactory to Lender that the Taxes and the Other Charges have been so paid no later than thirty (30) days before they would be delinquent if not paid (provided, however, that Borrower need not pay such Taxes nor furnish such receipts for payment of Taxes paid by Lender pursuant to Section 3.3 hereof).  Borrower shall not suffer and shall promptly cause to be paid and discharged any Lien or charge against the Property, and shall promptly pay for all utility services provided to the Property.  After prior notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application of any Taxes or Other Charges, provided that (i) no Default or Event of Default has occurred and is continuing, (ii) such proceeding shall be permitted under and be conducted in accordance with all applicable statutes, laws and ordinances, (iii) such proceeding shall suspend the collection of the Taxes or such Other Charges, (iv) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder, (v) no part of or interest in the Property will be in danger of being sold, forfeited, terminated, canceled or lost, (vi) Borrower shall have furnished such security as may be required in the proceeding, or as may be requested by Lender, to insure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon, which shall not be less than 125% of the Taxes and Other Charges being contested, (vii) Borrower shall promptly upon final determination thereof pay the amount of such Taxes or Other Charges, together with all costs, interest and penalties, (viii) such contest shall not affect the ownership, use or occupancy of the Property, and (ix) Borrower shall, upon request by Lender, give Lender prompt notice of the status of such proceedings and/or confirmation of the continuing satisfaction of the conditions set forth in clauses (i) through (viii) of this Section 5.2.  Lender may pay over any such security or part thereof held by Lender to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established or the Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost or there shall be any danger of the Lien of the Mortgage being primed by any related Lien.

**5.3 Access to Property**.  Borrower shall permit agents, representatives, consultants and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice (which may be given verbally).  Lender or its agents, representatives, consultants and employees as part of any inspection may take soil, air, water, building material and other samples from the Property, subject to the rights of tenants under Leases.

**5.4 Repairs; Maintenance and Compliance; Alterations**.

**5.4.1   Repairs; Maintenance and Compliance**.  Borrower shall at all times maintain, preserve and protect all franchises and trade names, and Borrower shall cause the

137342639v7

confidential

confidential

Property to be maintained in a good and safe condition and repair and shall not remove, demolish or alter the Improvements or Equipment (except for alterations performed in accordance with Section 5.4.2 below and normal replacement of Equipment with Equipment of equivalent value and functionality).   Borrower shall promptly comply with all Legal Requirements and immediately cure properly any violation of a Legal Requirement.  Borrower shall notify Lender in writing within one (1) Business Day after Borrower first receives notice of any such non-compliance.  Borrower shall promptly repair, replace or rebuild any part of the Property that becomes damaged, worn or dilapidated and shall complete and pay for any Improvements at any time in the process of construction or repair.

**5.4.2   Alterations**.  Lender's prior approval shall be required in connection with (a) any alterations to the Property which (i) constitute a Material Alteration or (ii) adversely affect Borrower's financial condition or the value or Net Operating Income of the Property or (b) any alterations to the Property during the continuation of any Event of Default, which approval, in each case under the foregoing clause (a)(ii) or (b), may be granted or withheld in Lender's sole discretion.  Lender may, as a condition to giving its consent to a Material Alteration, require that Borrower deliver to Lender security for payment of the cost of such Material Alteration in an amount equal to 125% of the cost of the Material Alteration as estimated by Lender.  Upon substantial completion of the Material Alteration, Borrower shall provide evidence satisfactory to Lender that (i) the Material Alteration was constructed in accordance with applicable Legal Requirements and substantially in accordance with plans and specifications approved by Lender (which approval shall not be unreasonably withheld or delayed), (ii) all contractors, subcontractors, materialmen and professionals who provided work, materials or services in connection with the Material Alteration have been paid in full and have delivered unconditional releases of liens and (iii) all material Licenses necessary for the use, operation and occupancy of the Material Alteration (other than those which depend on the performance of tenant improvement work) have been issued.  Borrower shall reimburse Lender upon demand for all out-of-pocket costs and expenses (including the reasonable fees of any architect, engineer or other professional engaged by Lender) incurred by Lender in reviewing plans and specifications or in making any determinations necessary to implement the provisions of this Section 5.4.2.

**5.5 Performance of Other Agreements**.  Borrower shall observe and perform each and every term to be observed or performed by it pursuant to the terms of any agreement or instrument affecting or pertaining to the Property, including the Loan Documents.

**5.6 Cooperate in Legal Proceedings**.  Borrower shall cooperate fully with Lender with respect to, and permit Lender, at its option, to participate in, any proceedings before any Governmental Authority which may in any way affect the rights of Lender under any Loan Document.

**5.7 Further Assurances**.   Borrower shall, at Borrower's sole cost and expense, (i) execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the Debt and/or for the better and more effective carrying out of the intents and purposes of the Loan Documents, as Lender may reasonably require from time to time; (ii) provide all such information as Lender may reasonably require to ensure Borrower's ongoing compliance with Sections 5.26 and 5.31, including

43

confidential

confidential

ensuring compliance with all "know your customer" procedures as Lender may from time-to-time institute with respect to loans that are of a similar size and nature as the Loan; and (iii) upon Lender's request therefor given from time to time after the occurrence of any Default or Event of Default pay for (a) reports of UCC, federal tax lien, state tax lien, judgment and pending litigation searches with respect to Borrower and Sole Member and (b) searches of title to the Property, each such search to be conducted by search firms reasonably designated by Lender in each of the locations reasonably designated by Lender.

**5.8 Environmental Matters**.

       **5.8.1   Hazardous Substances**.  So long as Borrower owns or is in possession of the Property, Borrower shall (i) keep the Property free from Hazardous Substances and in compliance with all Environmental Laws, (ii) promptly notify Lender if Borrower shall become aware that (A) any Hazardous Substance is on or near the Property, (B) the Property is in violation of any Environmental Laws or (C) any condition on or near the Property shall pose a threat to the health, safety or welfare of humans and (iii) remove such Hazardous Substances and/or cure such violations and/or remove such threats, as applicable, as required by law (or as shall be required by Lender in the case of removal which is not required by law, but in response to the opinion of a licensed hydrogeologist, licensed environmental engineer or other qualified environmental consulting firm engaged by Lender ("***Lender's Consultant***")), promptly after Borrower becomes aware of same, at Borrower's sole expense.  Nothing herein shall prevent Borrower from recovering such expenses from any other party that may be liable for such removal or cure.

       **5.8.2   Environmental Monitoring**.

       (a) Borrower shall give prompt written notice to Lender of (i) any proceeding or inquiry by any party (including any Governmental Authority) with respect to the presence of any Hazardous Substance on, under, from or about the Property, (ii) all claims made or threatened by any third party (including any Governmental Authority) against Borrower or the Property or any party occupying the Property relating to any loss or injury resulting from any Hazardous Substance, and (iii) Borrower's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Property that could cause the Property to be subject to any investigation or cleanup pursuant to any Environmental Law.  Upon becoming aware of the presence of mold or fungus at the Property, Borrower shall (i) undertake an investigation to identify the source(s) of such mold or fungus and shall develop and implement an appropriate remediation plan to eliminate the presence of any Toxic Mold, (ii) perform or cause to be performed all acts reasonably necessary for the remediation of any Toxic Mold (including taking any action necessary to clean and disinfect any portions of the Property affected by Toxic Mold, including providing any necessary moisture control systems at the Property), and (iii) provide evidence reasonably satisfactory to Lender of the foregoing.  Borrower shall permit Lender to join and participate in, as a party if it so elects, any legal or administrative proceedings or other actions initiated with respect to the Property in connection with any Environmental Law or Hazardous Substance, and Borrower shall pay all reasonable attorneys' fees and disbursements incurred by Lender in connection therewith.

.

44

confidential

confidential

(b) Upon Lender's request, at any time and from time to time, Borrower shall provide an inspection or audit of the Property prepared by a licensed hydrogeologist, licensed environmental engineer or qualified environmental consulting firm approved by Lender assessing the presence or absence of Hazardous Substances on, in or near the Property, and if a Default or Event of Default has occurred and is continuing, or if Lender in its good faith judgment determines that reasonable cause exists for the performance of such environmental inspection or audit, then the cost and expense of such audit or inspection shall be paid by Borrower. Such inspections and audit may include soil borings and ground water monitoring. If Borrower fails to provide any such inspection or audit within thirty (30) days after such request, Lender may order same, and Borrower hereby grants to Lender and its employees and agents access to the Property and a license to undertake such inspection or audit.

(c) If any environmental site assessment report prepared in connection with such inspection or audit recommends that an operations and maintenance plan be implemented for any Hazardous Substance, whether such Hazardous Substance existed prior to the ownership of the Property by Borrower, or presently exists or is reasonably suspected of existing, Borrower shall cause such operations and maintenance plan to be prepared and implemented at its expense, and with respect to any Toxic Mold, Borrower shall take all action necessary to clean and disinfect any portions of the Improvements affected by Toxic Mold in or about the Improvements, including providing any necessary moisture control systems at the Property. If any investigation, site monitoring, containment, cleanup, removal, restoration or other work of any kind is reasonably necessary under an applicable Environmental Law ("*Remedial Work*"), Borrower shall commence all such Remedial Work within thirty (30) days after becoming aware of the same and thereafter diligently prosecute to completion all such Remedial Work within such period of time as may be required under applicable law. All Remedial Work shall be performed by licensed contractors approved in advance by Lender and under the supervision of a consulting engineer approved by Lender. All costs of such Remedial Work shall be paid by Borrower, including Lender's reasonable attorneys' fees and disbursements incurred in connection with the monitoring or review of such Remedial Work. If Borrower does not timely commence and diligently prosecute to completion the Remedial Work, Lender may (but shall not be obligated to) cause such Remedial Work to be performed at Borrower's expense. Notwithstanding the foregoing, Borrower shall not be required to commence such Remedial Work within the above specified time period: (x) if prevented from doing so by any Governmental Authority, (y) if commencing such Remedial Work within such time period would result in Borrower or such Remedial Work violating any Environmental Law, or (z) if Borrower, at its expense and after prior written notice to Lender, is contesting by appropriate legal, administrative or other proceedings, conducted in good faith and with due diligence, the need to perform Remedial Work. Borrower shall have the right to contest the need to perform such Remedial Work, provided that, (1) Borrower is permitted by the applicable Environmental Laws to delay performance of the Remedial Work pending such proceedings, (2) neither the Property nor any part thereof or interest therein will be sold, forfeited or lost if Borrower fails to promptly perform the Remedial Work being contested, and if Borrower fails to prevail in such contest, Borrower would thereafter have the opportunity to perform such Remedial Work, (3) Lender would not, by virtue of such permitted contest, be exposed to any risk of any civil liability for which Borrower has not furnished additional security as provided in clause (4) below, or to any risk of criminal liability, and neither the Property nor any interest therein would be subject to the imposition of any Lien for which Borrower has not furnished additional security as provided in clause

45

confidential

confidential

(4) below, as a result of the failure to perform such Remedial Work and (4) Borrower shall have furnished to Lender additional security in respect of the Remedial Work being contested and the loss or damage that may result from Borrower's failure to prevail in such contest in such amount as may be reasonably requested by Lender but in no event less than 125% of the cost of such Remedial Work as estimated by Lender or Lender's Consultant and any loss or damage that may result from Borrower's failure to prevail in such contest.

(d) Borrower shall not install or permit to be installed on the Property any underground storage tank.

**5.8.3   O & M Program**.   In the event any environmental report delivered to Lender in connection with the Loan recommends the development of or continued compliance with an operation and maintenance program for the Property (including with respect to the presence of asbestos and/or lead-based paint) ("***O & M Program***"), Borrower shall develop (or continue to comply with, as the case may be) such O & M Program and shall, during the term of the Loan, including any extension or renewal thereof, comply in all material respects with the terms and conditions of the O & M Program.

**5.9 Title to the Property**.   Borrower will warrant and defend the title to the Property, and the validity and priority of all Liens granted or otherwise given to Lender under the Loan Documents, subject only to Permitted Encumbrances, against the claims of all Persons.

**5.10   Leases**.

**5.10.1   Generally**.   Upon request, Borrower shall furnish Lender with executed copies of all Leases then in effect.   All renewals of Leases and all proposed leases shall provide for rental rates and terms comparable to existing local market rates and shall be arm's length transactions with bona fide, independent third-party tenants.

**5.10.2   Material Leases**.   Borrower shall not enter into a proposed Material Lease or a proposed renewal, extension or modification of an existing Material Lease without the prior written consent of Lender, which consent shall not, so long as no Event of Default is continuing, be unreasonably withheld or delayed.   Prior to seeking Lender's consent to any Material Lease, Borrower shall deliver to Lender a copy of such proposed lease (a "***Proposed Material Lease***"), together with any information reasonably requested by Lender relating to the proposed tenant and lease guarantor (if applicable), including any credit and background checks performed by Borrower relating to such tenant and lease guarantor.   Lender shall approve or disapprove each Proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease for which Lender's approval is required under this Agreement within fifteen (15) Business Days of the submission by Borrower to Lender of a written request for such approval, accompanied by a final copy of the Proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease.   If requested by Borrower, Lender will grant conditional approvals of Proposed Material Leases or proposed renewals, extensions or modifications of existing Material Leases at any stage of the leasing process, from initial "term sheet" through negotiated lease drafts, provided that Lender shall retain the right to disapprove any such Proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease, if subsequent to any preliminary approval material changes are made to the

46

confidential

terms previously approved by Lender, or additional material terms are added that had not previously been considered and approved by Lender in connection with such Proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease.

        **5.10.3 <u>Minor Leases</u>**.  Notwithstanding the provisions of <u>Section 5.10.2</u> above, provided that no Event of Default is continuing, renewals, amendments and modifications of existing Leases and proposed leases shall not be subject to the prior approval of Lender provided (i) the proposed lease would be a Minor Lease or the existing Lease as amended or modified or the renewal Lease is a Minor Lease, (ii) the proposed lease shall be written substantially in accordance with the standard form of Lease which shall have been approved by Lender, (iii) the proposed Lease shall be with a tenant that is creditworthy, as reasonably determined by Borrower, (iv) the Lease as amended or modified or the renewal Lease or series of leases or proposed lease or series of leases: (a) shall provide for net effective rental rates comparable to existing local market rates, (b) shall have an initial term (together with all renewal options) of not less than three (3) years or greater than ten (10) years, (c) shall provide for automatic self-operative subordination to the Mortgage and, at Lender's option, (x) attornment to Lender and (y) the unilateral right by Lender, at the option of Lender, to subordinate the Lien of the Mortgage to the Lease, and (d) shall not contain any option to purchase, any right of first refusal to purchase, any right to terminate (except in the event of the destruction or condemnation of substantially all of the Property), any requirement for a non-disturbance or recognition agreement, or any other provision which might adversely affect the rights of Lender under the Loan Documents in any material respect.  Borrower shall deliver to Lender copies of all Leases which are entered into pursuant to the preceding sentence together with Borrower's certification that it has satisfied all of the conditions of the preceding sentence within ten (10) days after the execution of the Lease.

        **5.10.4 <u>Additional Covenants with respect to Leases</u>**.   Borrower  (i) shall observe and perform the material obligations imposed upon the lessor under the Leases and shall not do or permit anything to impair the value of the Leases as security for the Debt;  (ii) shall promptly send copies to Lender of all notices of default that Borrower shall send or receive under any Lease; (iii) shall enforce, in accordance with commercially reasonable practices for properties similar to the Property, the terms, covenants and conditions in the Leases to be observed or performed by the lessees, short of termination thereof; (iv) shall not collect any of the Rents more than one (1) month in advance (other than security deposits); (v) shall not execute any other assignment of lessor's interest in the Leases or the Rents (except as contemplated by the Loan Documents); (vi) shall not modify any Lease in a manner inconsistent with the Loan Documents; (vii) shall not convey or transfer or suffer or permit a conveyance or transfer of the Property so as to effect a merger of the estates and rights of, or a termination or diminution of the obligations of, lessees under Leases; (viii) shall not consent to any assignment of or subletting under any Material Lease unless required in accordance with its terms without the prior consent of Lender, which, with respect to a subletting, may not, so long as no Event of Default is continuing,  be unreasonably withheld or delayed; and (ix) shall not cancel or terminate any Lease or accept a surrender thereof (except in the exercise of Borrower's commercially reasonable judgment in connection with a tenant default under a Minor Lease) without the prior consent of Lender, which consent shall not, so long as no Event of Default is continuing, be  unreasonably withheld or delayed.

<div align="center">47</div>

confidential

**5.11** **Estoppel Statement**. (a) After request by Lender, Borrower shall within ten (10) days furnish Lender with a statement addressed to Lender, its successors and assigns, duly acknowledged and certified, setting forth (i) the unpaid Principal, (ii) the Interest Rate, (iii) the date installments of interest and/or Principal were last paid, (iv) any offsets or defenses to the payment of the Debt, and (v) that the Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification.

(b)      Borrower shall deliver to Lender, upon request, estoppel certificates from each party under any Operations Agreement, in form and substance reasonably satisfactory to Lender; provided, that Borrower shall not be required to deliver such certificates more than three (3) times during the Term and not more frequently than once per calendar year (or twice during any calendar year in which a Securitization occurs).

**5.12** **Property Management**.

**5.12.1 Management Agreement**.  Borrower shall (i) cause the Property to be managed pursuant to the Management Agreement; (ii) promptly perform and observe all of the covenants required to be performed and observed by it under the Management Agreement and do all things necessary to preserve and to keep unimpaired its rights thereunder; (iii) promptly notify Lender of any default under the Management Agreement of which it is aware; (iv) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditure plan, and property improvement plan and any other notice, report and estimate received by Borrower under the Management Agreement; and (v) promptly enforce the performance and observance of all of the covenants required to be performed and observed by Manager under the Management Agreement.  If Borrower shall default in the performance or observance of any material term, covenant or condition of the Management Agreement on the part of Borrower to be performed or observed, then, without limiting Lender's other rights or remedies under this Agreement or the other Loan Documents, and without waiving or releasing Borrower from any of its obligations hereunder or under the Management Agreement, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act as may be appropriate to cause all the material terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed or observed.  Without Lender's prior written consent, Borrower shall not (a) surrender, terminate, cancel, extend or renew the Management Agreement or otherwise replace Manager or enter into any other management agreement (except pursuant to Section 5.12.2 below); (b) reduce or consent to the reduction of the term of the Management Agreement; (c) increase or consent to the increase of the amount of any charges under the Management Agreement; (d) otherwise modify, change, supplement, alter or amend in any material respect, or waive or release any of its rights and remedies under, the Management Agreement; or (e) suffer or permit the occurrence and continuance of a default beyond any applicable cure period under the Management Agreement (or any successor management agreement) if such default permits Manager to terminate the Management Agreement (or such successor management agreement).

**5.12.2 Termination of Manager**.  If (i) an Event of Default shall be continuing, (ii) Manager is in default under the Management Agreement, (iii) Manager shall become a debtor in any bankruptcy or insolvency proceeding or (iv) upon the gross negligence, malfeasance or willful misconduct of Manager, Borrower shall, at the request of Lender, terminate the

48

confidential

confidential

Management Agreement and replace Manager with a replacement manager acceptable to Lender in Lender's discretion and, if a Securitization has occurred, the applicable Rating Agencies, on terms and conditions satisfactory to Lender and, if a Securitization has occurred, the applicable Rating Agencies.  Borrower's failure to appoint an acceptable manager within thirty (30) days after Lender's request of Borrower to terminate the Management Agreement shall constitute an immediate Event of Default.  Borrower may from time to time appoint a successor manager to manage the Property, provided that such successor manager and Management Agreement shall be approved in writing by Lender in Lender's discretion and, if a Securitization has occurred, the applicable Rating Agencies (and Lender's approval may be conditioned upon Borrower delivering a Rating Comfort Letter if the Loan, by itself or together with other loans, has been the subject of a Secondary Market Transaction, and if required pursuant to a Pooling and Servicing Agreement from and after the occurrence of a Secondary Market Transaction as to such successor manager and Management Agreement).  If at any time Lender consents to the appointment of a new manager, such new manager and Borrower shall, as a condition of Lender's consent, execute a consent and subordination of management agreement substantially in the form of the Consent and Subordination of Manager of even date herewith executed and delivered by Manager to Lender.

**5.13    Special Purpose Bankruptcy Remote Entity**.  Borrower shall at all times be a Special Purpose Bankruptcy Remote Entity.  Borrower shall not directly or indirectly make any change, amendment or modification to its or SPE Party's organizational documents, or otherwise take any action which could result in Borrower not being a Special Purpose Bankruptcy Remote Entity.  A "*Special Purpose Bankruptcy Remote Entity*" shall have the meaning set forth on Schedule 5 hereto.

**5.14    Intentionally Deleted**.

**5.15    Change in Business or Operation of Property**.  Borrower shall not purchase or own any real property other than the Property and shall not enter into any line of business other than the ownership and operation of the Property, or make any material change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business or otherwise cease to operate the Property as an office property or terminate such business for any reason whatsoever (other than temporary cessation in connection with renovations to the Property).

**5.16    Debt Cancellation**.  Borrower shall not cancel or otherwise forgive or release any claim or debt (other than termination of Leases in accordance herewith) owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business.

**5.17    Affiliate Transactions**.  Borrower shall not enter into, or be a party to, any transaction with an Affiliate of Borrower or any of the members of Borrower without the prior written consent of Lender, which consent shall not be unreasonably withheld, provided that the terms are no less favorable to Borrower or such Affiliate than would be obtained in a comparable arm's-length transaction with an unrelated third party.

**5.18    Zoning**.  Borrower shall not initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance or use or

137342639v7

confidential

permit the use of any portion of the Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, without the prior consent of Lender.

5.19   **No Joint Assessment**.  Borrower shall not suffer, permit or initiate the joint assessment of the Property (i) with any other real property constituting a tax lot separate from the Property, and (ii) with any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

5.20   **Principal Place of Business**.  Borrower shall not change its principal place of business or chief executive office from the address set forth in <u>Section 6.1</u> hereof without first giving Lender thirty (30) days' prior written notice.

5.21   **Change of Name, Identity or Structure**.  Borrower shall not change its name, identity (including its trade name or names) or Borrower's corporate, partnership or other structure without notifying Lender of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's structure, without first obtaining the prior written consent of Lender, which consent, may be conditioned upon receipt of an updated substantive non-consolidation opinion (if Lender reasonably determines that the same is necessary as a result of Borrower's new structure).  Borrower shall execute and deliver to Lender, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement change required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein.  At the request of Lender, Borrower shall execute a certificate in form satisfactory to Lender listing the trade names under which Borrower intends to operate the Property, and representing and warranting that Borrower does business under no other trade name with respect to the Property.

5.22   **Indebtedness**.  Borrower shall not directly or indirectly create, incur or assume any indebtedness other than (i) the Debt and (ii) unsecured trade payables incurred in the ordinary course of business relating to the ownership and operation of the Property  which in the case of such unsecured trade payables (A) are not evidenced by a note, (B) do not exceed, at any time, a maximum aggregate amount of one percent (1%) of the original amount of the Principal and (C) are paid within thirty (30) days of the date incurred (collectively, "***Permitted Indebtedness***").

5.23   **License; Intellectual Property; Website**.

5.23.1   **License**.  Borrower shall not Transfer any License required for the operation of the Property.

5.23.2   **Intellectual Property**.  Borrower shall keep and maintain all Intellectual Property relating to the use or operation of the Property and all Intellectual Property shall be held by and (if applicable) registered in the name of Borrower.  Borrower shall not Transfer or let lapse any Intellectual Property without Lender's prior consent.

5.23.3   **Website**.  Any website with respect to the Property (other than Tenant websites) shall be maintained by or on behalf of Borrower and any such website shall be

50

confidential

confidential

registered in the name of Borrower. Borrower shall not Transfer any such website without Lender's prior consent.

**5.24    Compliance with Restrictive Covenants**.  Borrower shall at all times comply in all material respects with all Operations Agreements.  Borrower will not enter into, modify, waive in any material respect or release any Easements, Operations Agreements or other Permitted Encumbrances, or suffer, consent to or permit the foregoing, without Lender's prior written consent, which consent may be granted or denied in Lender's sole discretion.

**5.25    ERISA**.

(a) Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender or any successor or assignee of any of its rights under the Note, this Agreement or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA or Section 4975 of the Code.  Borrower's covenant in this clause (a) is based on the assumption that no portion of the assets used by Lender in connection with the transactions contemplated under this Agreement and the other Loan Documents constitutes assets of a "benefit plan investor" as defined in Section 3(42) of ERISA and with respect to which Borrower is a party in interest (as defined in Section 3(14) of ERISA) or a disqualified person (as defined in Section 4975 of the Code) unless the conditions are satisfied.

(b) Borrower shall not maintain, sponsor, contribute to or become obligated to contribute to, or suffer or permit any ERISA Affiliate of Borrower to, maintain, sponsor, contribute to or become obligated to contribute to, any Plan or any Welfare Plan or permit the assets of Borrower to become "plan assets" within the meaning of 29 C.F.R. 2510.3-101, as modified in application by Section 3(42) of ERISA.

(c) Borrower shall deliver to Lender such certifications or other evidence from time to time throughout the Term, as requested by Lender in its sole discretion, that (i) Borrower and Guarantor are not and do not maintain an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (ii) Borrower and Guarantor are not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (iii) the assets of Borrower and Guarantor do not constitute "plan assets" within the meaning of 29 C.F.R. Section 2510.3-101, as modified in application by Section 3(42) of ERISA, and any "benefit plan investor" as defined in Section 3(42) of ERISA.

**5.26    Prohibited Transfers**.

**5.26.1    Generally**.  Borrower shall not directly or indirectly make, suffer or permit the occurrence of any Transfer other than a Permitted Transfer.  Borrower shall provide Lender with copies of all organizational documents (if any) relating to any Permitted Transfer. Borrower shall pay on demand all of the reasonable costs and expenses incurred by Lender, including reasonable attorneys' fees and expenses, and, if a Securitization has occurred, including the fees and expenses of Rating Agencies and other outside entities, in connection with considering any proposed Transfer, whether or not the same is permitted or occurs.

51

confidential

confidential

### 5.26.2  **Transfer and Assumption**.

(a) Notwithstanding the foregoing and subject to the terms and satisfaction of all the conditions precedent set forth in this <u>Section 5.26.2</u>, Borrower shall have the right to Transfer the Property to another party (the "***Transferee Borrower***") and have the Transferee Borrower assume all of Borrower's obligations under the Loan Documents, and have replacement guarantors and indemnitors assume all of the obligations of the indemnitors and guarantors of the Loan Documents (collectively, a "***Transfer and Assumption***"). Borrower may make a written application to Lender for Lender's consent to the Transfer and Assumption, subject to the conditions set forth in paragraphs (b) and (c) of this <u>Section 5.26.2</u>.  Together with such written application, Borrower will pay to Lender the reasonable review fee then required by Lender. Borrower also shall pay on demand all of the reasonable costs and expenses incurred by Lender, including reasonable attorneys' fees and expenses, and, if a Securitization has occurred, including the fees and expenses of Rating Agencies and other outside entities, in connection with considering any proposed Transfer and Assumption, whether or not the same is permitted or occurs.

(b) Lender's consent, which may be withheld in Lender's sole and absolute discretion, to a Transfer and Assumption shall be subject to the following conditions:

(i)  Borrower has provided Lender with not less than sixty (60) days prior written notice, which notice shall contain sufficient detail to enable Lender to determine that the Transferee Borrower complies with the requirements set forth herein;

(ii)  No Default or Event of Default has occurred and is continuing;

(iii)  Borrower has submitted to Lender true, correct and complete copies of any and all information and documents of any kind requested by Lender concerning the Property, the Transferee Borrower, replacement guarantors and indemnitors and Borrower;

(iv)  Evidence satisfactory to Lender has been provided showing that the Transferee Borrower and such of its Affiliates as shall be designated by Lender comply and will comply with <u>Section 5.13</u> hereof, as those provisions may be modified by Lender taking into account the ownership structure of the Transferee Borrower and its Affiliates;

(v)  If the Loan, by itself or together with other loans, has been the subject of a Secondary Market Transaction, then Lender shall have received a Rating Comfort Letter from the applicable Rating Agencies (if required pursuant to a Pooling and Servicing Agreement from and after the occurrence of a Secondary Market Transaction);

(vi)  Borrower shall have paid all of Lender's reasonable costs and expenses in connection with considering the Transfer and Assumption, and shall have paid the amount requested by Lender as a deposit against Lender's costs and expenses in connection with effecting the Transfer and Assumption;

(vii)  Borrower, the Transferee Borrower, and the replacement guarantors and indemnitors shall have indicated in writing in form and substance reasonably satisfactory to Lender their readiness and ability to satisfy the conditions set forth in subsection (c) below;

confidential

(viii)   Satisfactory Patriot Act, OFAC and similar searches shall have been received by Lender with respect to (A) the Transferee Borrower, (B) any Person that Controls Transferee Borrower or owns an equity interest in the Transferee Borrower which equals or exceeds ten percent (10%) and (C) any other Person reasonably required by Lender in order for Lender to fulfill its then-current Patriot Act compliance guidelines;

(ix)   The identity, experience, financial condition and creditworthiness of the Transferee Borrower and the replacement guarantors and indemnitors shall be satisfactory to Lender;

(x)   The proposed property manager and proposed Management Agreement shall be satisfactory to Lender and, if a Securitization has occurred, the applicable Rating Agencies;

(xi)   If all or any portion of the Loan is the subject of a co-lender, participation, syndication or other similar agreement and the consent or approval of one or more of the co-lenders, participants, syndicate lenders or other similar parties is required thereunder with respect to the proposed Transfer and Assumption, all such required consents or approvals have been obtained;

(xii)   If the Mezzanine Loan is outstanding at the time of the Transfer and Assumption, the proposed Transfer and Assumption shall not constitute or cause a default under the Mezzanine Loan Documents.

(c) If Lender consents to the Transfer and Assumption, the Transferee Borrower and/or Borrower as the case may be, shall immediately deliver the following to Lender:

(i)   Borrower shall deliver to Lender an assumption fee in the amount of one percent (1.0%) of the then unpaid Principal;

(ii)   Borrower, the Transferee Borrower and the original and replacement guarantors and indemnitors shall execute and deliver to Lender any and all documents required by Lender, in form and substance required by Lender, in Lender's sole discretion;

(iii)   Counsel to the Transferee Borrower and replacement guarantors and indemnitors shall deliver to Lender opinions in form and substance satisfactory to Lender as to such matters as Lender shall require, which may include opinions as to substantially the same matters and were required in connection with the origination of the Loan (including a new substantive non-consolidation opinion with respect to the Transferee Borrower);

(iv)   Borrower shall cause to be delivered to Lender, an endorsement (relating to the change in the identity of the vestee and execution and delivery of the Transfer and Assumption documents) to the Title Insurance Policy in form and substance acceptable to Lender, in Lender's reasonable discretion (the "*Endorsement*"); and

(v)   Borrower shall deliver to Lender a payment in the amount of all remaining unpaid costs incurred by Lender in connection with the Transfer and Assumption,

53

including but not limited to, Lender's reasonable attorneys fees and expenses, all recording fees, and all fees payable to the title company for the delivery to Lender of the Endorsement.

(d)     Notwithstanding anything to the contrary set forth in this Agreement, upon the closing of a Transfer and Assumption and execution of a replacement guaranty in accordance with the terms of this <u>Section 5.26.2</u>, Lender shall release Borrower and Guarantor from all obligations under the Loan Documents arising from and after the date of the Transfer and Assumption.

**5.27    Liens**.  Without Lender's prior written consent, Borrower shall not create, incur, assume, permit or suffer to exist any Lien on all or any portion of the Property or any direct or indirect legal or beneficial ownership interest in Borrower or Sole Member, except Liens in favor of Lender and Permitted Encumbrances, unless such Lien is bonded or discharged within thirty (30) days after Borrower first receives notice of such Lien.

**5.28    Dissolution**.  Borrower shall not (i) engage in any dissolution, liquidation or consolidation, division or merger with or into any one or more other business entities, (ii) engage in any business activity not related to the ownership and operation of the Property, or (iii) transfer, lease or sell, in one transaction or any combination of transactions, all or substantially all of the property or assets of Borrower except to the extent expressly permitted by the Loan Documents.

**5.29    Expenses**.

(a)  Borrower shall pay or, if Borrower fails to pay, reimburse Lender upon receipt of notice from Lender for all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender or Servicer in connection with the Loan, including (i) the preparation, negotiation, execution and delivery of the Loan Documents and the consummation of the transactions contemplated thereby and all the costs of furnishing all opinions by counsel for Borrower; (ii) Borrower's and Lender's ongoing performance under and compliance with the Loan Documents, including confirming compliance with environmental and insurance requirements; (iii) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications of or under any Loan Document and any other documents or matters requested by Borrower or required of Borrower under the terms of any Loan Document; (iv) filing and recording of any Loan Documents; (v) title insurance, surveys, inspections and appraisals; (vi) the creation, perfection or protection of Lender's Liens in the Property and the Cash Management Accounts (including fees and expenses for title and lien searches, intangibles taxes, personal property taxes, mortgage recording taxes, due diligence expenses, travel expenses, accounting firm fees, costs of appraisals, environmental reports and Lender's Consultant, surveys and engineering reports); (vii) enforcing or preserving any rights in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, the Loan Documents, the Property, or any other security given for the Loan; (viii) fees charged by Servicer and, if a Securitization has occurred, the Rating Agencies in connection with the Loan or any modification thereof and (ix) enforcing any obligations of or collecting any payments due from Borrower under any Loan Document or with respect to the Property or in connection with

137342639v7

confidential

any refinancing or restructuring of the Loan in the nature of a "work-out", or any insolvency or bankruptcy proceedings.

(b) In addition, in connection with any Rating Comfort Letter, Review Waiver or other Rating Agency consent, approval or review requested or required hereunder (other than the initial review of the Loan by the Rating Agencies in connection with a Securitization), Borrower shall pay all of the reasonable costs and expenses of Lender and Servicer and the costs and expenses of each Rating Agency in connection therewith, and, if applicable, shall pay any fees imposed by any Rating Agency in connection therewith.

(c) Any costs and expenses due and payable by Borrower hereunder which are not paid by Borrower within ten (10) days after demand may be paid from any amounts in the Deposit Account, with notice thereof to Borrower. The obligations and liabilities of Borrower under this Section 5.29 shall survive the Term and the exercise by Lender of any of its rights or remedies under the Loan Documents, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure.

**5.30   Indemnity**. Borrower shall defend, indemnify and hold harmless Lender and each of its Affiliates and their respective successors and assigns, including the directors, officers, partners, members, shareholders, participants, employees, professionals and agents of any of the foregoing (including any Servicer) and each other Person, if any, who Controls Lender, its Affiliates or any of the foregoing (each, an "***Indemnified Party***"), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for an Indemnified Party in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not Lender shall be designated a party thereto, court costs and costs of appeal at all appellate levels, investigation and laboratory fees, consultant fees and litigation expenses), that may be imposed on, incurred by, or asserted against any Indemnified Party (collectively, the "***Indemnified Liabilities***") in any manner, relating to or arising out of or by reason of the Loan, including: (i) any breach by Borrower of its obligations under, or any misrepresentation by Borrower contained in, any Loan Document; (ii) the use or intended use of the proceeds of the Loan; (iii) any information provided by or on behalf of Borrower, or contained in any documentation approved by Borrower; (iv) ownership of the Mortgage, the Property or any interest therein, or receipt of any Rents; (v) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vi) any use, nonuse or condition in, on or about the Property or on adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vii) performance of any labor or services or the furnishing of any materials or other property in respect of the Property; (viii) the presence, disposal, escape, seepage, leakage, spillage, discharge, emission, release, or threatened release of any Hazardous Substance on, from or affecting the Property; (ix) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to such Hazardous Substance; (x) any lawsuit brought or threatened, settlement reached, or government order relating to such Hazardous Substance; (xi) any violation of the Environmental Laws which is based upon or in any way related to such Hazardous Substance, including the costs and expenses of any Remedial Work; (xii) any failure of the Property to comply with any Legal Requirement; (xiii) any claim by brokers, finders or

55

confidential

confidential

similar persons claiming to be entitled to a commission in connection with any Lease or other transaction involving the Property or any part thereof, or any liability asserted against Lender with respect thereto; and (xiv) the claims of any lessee of any portion of the Property or any Person acting through or under any lessee or otherwise arising under or as a consequence of any Lease; provided, however, that Borrower shall not have any obligation to any Indemnified Party hereunder to the extent that it is finally judicially determined that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of such Indemnified Party.   Any amounts payable to any Indemnified Party by reason of the application of this paragraph shall be payable on demand and shall bear interest at the Default Rate from the date loss or damage is sustained by any Indemnified Party until paid.   The obligations and liabilities of Borrower under this Section 5.30 shall survive the Term and the exercise by Lender of any of its rights or remedies under the Loan Documents, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure.

**5.31    Patriot Act Compliance.**

(a) Borrower will use its good faith and commercially reasonable efforts to comply with the Patriot Act (as defined below) and all applicable requirements of Governmental Authorities having jurisdiction over Borrower and/or the Property, including those relating to money laundering and terrorism.   Lender shall have the right, from time-to-time, to audit Borrower's compliance with the Patriot Act and all applicable requirements of Governmental Authorities having jurisdiction over Borrower and/or the Property, including those relating to money laundering and terrorism.   In the event that Borrower fails to comply with the Patriot Act or any such requirements of Governmental Authorities, then Lender may, at its option, cause Borrower to comply therewith and any and all reasonable costs and expenses incurred by Lender in connection therewith shall be secured by the Mortgage and the other Loan Documents and shall be immediately due and payable.   For purposes hereof, the term "***Patriot Act***" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT ACT) of 2001, as the same was restored and amended by Uniting and Strengthening America by Fulfilling Rights and Ensuring Effective Discipline Over Monitoring Act (USA FREEDOM Act) of 2015 and as the same may be further amended, extended, replaced or otherwise modified from time to time, and any corresponding provisions of future laws.

(b) Neither Borrower nor any partner in Borrower or member of such partner nor any owner of a direct or indirect interest in Borrower (a) is listed on any Government Lists (as defined below), (b) is a person who has been determined by competent authority to be subject to the prohibitions contained in Presidential Executive Order No. 13224 (Sept. 23, 2001) or any other similar prohibitions contained in the rules and regulations of OFAC (as defined below) or in any enabling legislation or other Presidential Executive Orders in respect thereof, (c) has been previously indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any Patriot Act Offense (as defined below), or (d) is currently under investigation by any Governmental Authority for alleged criminal activity.   For purposes hereof, the term "***Patriot Act Offense***" means any violation of the criminal laws of the United States of America or of any of the several states, or that would be a criminal violation if committed within the jurisdiction of the United States of America or any of the several states, relating to terrorism or the laundering of monetary instruments, including any offense under (a) the criminal laws against terrorism; (b)

56

confidential

confidential

the criminal laws against money laundering, (c) the Bank Secrecy Act, as amended, (d) the Money Laundering Control Act of 1986, as amended, or the (e) Patriot Act. "Patriot Act Offense" also includes the crimes of conspiracy to commit, or aiding and abetting another to commit, a Patriot Act Offense. For purposes hereof, the term "*Government Lists*" means (i) the Specially Designated Nationals and Blocked Persons Lists maintained by the Office of Foreign Assets Control ("*OFAC*"), (ii) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC that Lender notified Borrower in writing is now included in "Government Lists", or (iii) any similar lists maintained by the United States Department of State, the United States Department of Commerce or any other government authority or pursuant to any Executive Order of the President of the United States of America that Lender notified Borrower in writing is now included in "Government Lists".

(c) At all times throughout the term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (a) none of the funds or other assets of Borrower, Key Principal or Guarantor shall constitute property of, or shall be beneficially owned, directly or indirectly, by any Person subject to trade restrictions under United States law, including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder, with the result that the investment in Borrower, Key Principal or Guarantor, as applicable (whether directly or indirectly), would be prohibited by law (each, an "*Embargoed Person*"), or the Loan made by Lender would be in violation of law, (b) no Embargoed Person shall have any interest of any nature whatsoever in Borrower, Key Principal or Guarantor, as applicable, with the result that the investment in Borrower, Key Principal or Guarantor, as applicable (whether directly or indirectly), would be prohibited by law or the Loan would be in violation of law, and (c) none of the funds of Borrower, Key Principal or Guarantor, as applicable, shall be derived from any unlawful activity with the result that the investment in Borrower, Key Principal or Guarantor, as applicable (whether directly or indirectly), would be prohibited by law or the Loan would be in violation of law.

**5.32** **Approval of Major Contracts**.  Borrower shall not, without Lender's prior consent: (a) enter into, surrender or terminate any Major Contract to which it is a party or to which Borrower or the Property is subject (unless the other party thereto is in material default and the termination of such agreement would be commercially reasonable), (b) increase or consent to the increase of the amount of any charges under any Major Contract to which it is a party or to which Borrower or the Property is subject, except as provided therein or on an arm's-length basis and commercially reasonable terms; or (c) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under any Major Contract to which it is a party or to which Borrower or the Property is subject in any material respect, except on an arm's-length basis and commercially reasonable terms.

**5.33** **Permitted Construction**.

(a) Notwithstanding anything to the contrary contained herein and subject to the terms and satisfaction of all the conditions precedent set forth in this Section 5.33, Borrower shall have the right to cause the construction of the Project. Borrower may make a written application to Lender for Lender's consent at least one hundred twenty (120) days prior to the

137342639v7

confidential

confidential

date its seeks to begin construction on the Project, subject to the conditions set forth in this <u>Section 5.33</u>.

(b) Lender's consent to the Project, which may be withheld in Lender's reasonable discretion, shall be subject to the following conditions:

(i)     No Event of Default shall have occurred and be continuing as of the date of Borrower's request to Lender and as of the date Borrower commences construction on the Project;

(ii)    Borrower shall have delivered to Lender evidence reasonably satisfactory to Lender that each of the (i) Expansion Construction Conditions, (ii) Expansion Economic Conditions, and (iii) Condominium Conditions have been satisfied;

(iii)   Borrower shall have delivered to Lender evidence reasonably satisfactory to Lender that each tenant has approved the Project in writing;

(iv)    Lender shall have determined in its reasonable discretion that the Project will not have (A) have a material adverse effect on the use and operation of the Property, (B) have a material adverse effect on any of the then-existing Tenants on the Property, or (C) render any of the existing Improvements unusable during the completion of the Project;

(v)     Guarantor shall execute and deliver to Lender a completion guaranty with respect to the Project in form and substance acceptable to Lender whereby Guarantor guarantees to Lender the lien-free completion of, and the payment of all costs for, the Project in accordance with the terms and provisions hereof;

(vi)    If requested by Lender, Borrower shall deliver a Rating Comfort Letter and deliver customary legal opinions, which evidence that the Project will not cause adverse REMIC consequences to Lender;

(vii)   (i) In the event that Borrower does not incur the New Mezzanine Debt in accordance with <u>Section 5.34</u> of this Agreement in order to finance the construction of the Project, and (b) if requested by Lender, Borrower shall deposit with Lender an amount equal to one hundred twenty-five percent (125%) of the estimated costs of the Project (the "***Project Reserve Deposit***"), together with evidence that Borrower made the Project Reserve Deposit without violating the prohibition against additional indebtedness set forth in the Loan Documents. In the event Borrower is required to make the Project Reserve Deposit, Lender shall cause the Project Reserve Deposit to be transferred to a Subaccount under the sole control and dominion of Lender (the "***Project Reserve Subaccount***"), and the costs for the Project will be disbursed from the Project Reserve Subaccount not more often than monthly in accordance with customary construction lending disbursement conditions;

(viii)  Borrower shall pay all of Lender's reasonable out-of-pocket costs and expenses incurred in reviewing the Project (including reasonable attorneys' fees and the fees and costs of a construction/engineering consultant for Lender) in connection with the Project; and

137342639v7

confidential

confidential

(ix)    For so long as any portion of the Debt remains outstanding, Borrower covenants and agrees that neither Borrower nor Guarantor, nor any of their Affiliates, agents (including Manager and any employees) acting at the direction of Borrower or Guarantor, nor any other party acting on behalf of or at the direction of any of the foregoing, shall: (a) directly or indirectly solicit any existing Tenant to relocate from the Property to the Project, whether or not such relocation is permitted pursuant to the provisions of the applicable Lease, (b) directly or indirectly solicit any potential tenants to execute leases for space in the Project instead of the Property and/or (c) execute any lease for space in the Project to a tenant whose primary business activities either (1) violate any restrictions in the Lease of any then-existing Tenants of the Property or any REA or (2) directly compete with the primary business activities of any then-existing Tenants of the Property to the extent such competition would be reasonably likely to result in a material adverse effect on the operations of the Property or Borrower's ability to perform its obligations under the Loan Documents; and

(x)    Borrower shall execute and deliver to Lender such modifications to and reaffirmations of the Loan Documents as Lender may reasonably request confirming that the lien of the Mortgage and the other Loan Documents includes any new Improvements constructed in connection with the Project.

(c) In the event that Lender reasonably determines that all conditions precedent to the Project are satisfied in accordance with this Section 5.33, Lender shall give notice thereof to Borrower. Upon such notice, Borrower may proceed to promptly commence the Project, diligently pursue the same, and shall cause the completion thereof in accordance with the plans and specifications and the completion schedule approved by Lender, in compliance with all Legal Requirements, and free of any liens. During the course of the completion of the Project, Borrower shall deliver to Lender monthly monitoring reports in form and substance reasonably acceptable to Lender.

**5.34    Permitted Future Mezzanine Debt.**  Notwithstanding anything to the contrary contained in this Agreement, in connection with the construction of the Project as set forth in Section 5.33 of this Agreement, a direct or indirect constituent owner of Borrower may incur indebtedness ("New Mezzanine Debt") secured by its ownership interest in Borrower, provided all of the following conditions have been satisfied: (a) no Event of Default shall have occurred and be continuing; (b) the Mezzanine Loan shall be paid in full in accordance with the terms of the Mezzanine Loan Documents; (c) Lender receives not less than sixty (60) days' prior written notice of the intention to incur New Mezzanine Debt; (d) the security granted in connection with such New Mezzanine Debt shall consist only of a pledge of all ownership interests in Borrower; (e) the Loan to Value Ratio of the Property (as such value is determined by Lender based upon any commercially reasonable valuation method permitted to a REMIC, which shall be obtained by Lender at the sole cost of by Borrower) shall be not greater than 58.0%; (f) the Debt Yield, both for the trailing twelve (12)-month period and the projected twelve (12)-month period (giving effect to any projected Lease expirations during such period), shall be not less than 11.22%; (g) the Debt Service Coverage Ratio, both for the trailing twelve (12)-month period and the projected twelve (12)-month period (giving effect to any projected Lease expirations during such period), shall be not less than 1.66:1.00; (h) the Net Operating Income shall not be less than $1,626,421.00; (i) the lender of the New Mezzanine Debt is acceptable to Lender in Lender's reasonable discretion; (j) the lender of the New Mezzanine Debt executes and delivers an

confidential

confidential

intercreditor and/or standstill agreement (the "New Intercreditor Agreement") with Lender in form and substance acceptable to Lender and any applicable Rating Agency; (k) the New Mezzanine Debt is subordinate in all respects to the Debt pursuant to the New Intercreditor Agreement; (l) the New Mezzanine Debt is not cross-defaulted or cross-collateralized with any other properties or loans and is co-terminous with, or has a further maturity date than, the Loan; (m) the terms, conditions and structure of, and documentation for, the New Mezzanine Debt are approved by Lender and any applicable Rating Agency; (n) Lender has received a Rating Comfort Letter as to the implementation of the New Mezzanine Debt; (o) Borrower shall execute and/or deliver any documents, instruments, agreements or customary opinions (including, without limitation, a customary non-consolidation opinion) or any amendments to the Loan Documents as requested by Lender in connection with the New Mezzanine Debt; (p) Borrower executes such documentation as may be required by Lender to institute a hard cash management system under the Loan; and (q) Borrower pays all of Lender's costs and expenses incurred in connection with the exercise of the rights contained in this Section 5.34 (including, without limitation, reasonable attorneys' fees). If the New Mezzanine Debt is incurred in accordance with the terms of this Agreement, Borrower shall not be required to make the Project Reserve Deposit set forth in Section 5.33(b)(vii).

## 6.    **NOTICES AND REPORTING**

**6.1 Notices.**    All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document (a "*Notice*") shall be given in writing and shall be effective for all purposes if either hand delivered with receipt acknowledged, or by a nationally recognized overnight delivery service (such as Federal Express), or by certified or registered United States mail, return receipt requested, postage prepaid, or by facsimile and confirmed by facsimile answer back, in each case addressed as follows (or to such other address or Person as a party shall designate from time to time by notice to the other party):

If to Lender:

        Argentic Real Estate Finance LLC
        40 West 57th Street, 29th Floor
        New York, New York 10019
        Attention:  Ryan Supple
        Facsimile No. (646) 560-1713

with a copy to:

        Katten Muchin Rosenman LLP
        550 South Tryon Street, Suite 2900
        Charlotte, North Carolina 28202
        Attention: Karen M. Nelson, Esq.
        Facsimile No. (704) 444-2050

137342639v7

confidential

confidential

If to Borrower:

>   24 Commerce Street LLC
>   24 Commerce Street, Suite 101
>   Newark, New Jersey 07102
>   Attention: Jacob Tauber

with a copy to:

>   Law Offices of David Fleischmann P.C.
>   2233 Nostrand Avenue, 3rd Floor
>   Brooklyn, New York 11210
>   Attention: David Fleischmann
>   Facsimile No. (716) 242-1897

A notice shall be deemed to have been given: in the case of hand delivery, at the time of delivery; in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; in the case of overnight delivery, upon the first attempted delivery on a Business Day; or in the case of facsimile, upon the confirmation of such facsimile transmission.

**6.2 Borrower Notices and Deliveries.** Borrower shall (a) give prompt written notice to Lender of: (i) any litigation, governmental proceedings or claims or investigations pending or threatened against Borrower or Sole Member which might materially adversely affect Borrower's or Sole Member's condition (financial or otherwise) or business or the Property; (ii) any material adverse change in Borrower's or Sole Member's condition, financial or otherwise, or of the occurrence of any Default or Event of Default of which Borrower has knowledge; and (b) furnish and provide to Lender: (i) any Securities and Exchange Commission or other public filings, if any, of Borrower, Sole Member, Manager, or any Affiliate of any of the foregoing within two (2) Business Days of such filing and (ii) all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, reasonably requested, from time to time, by Lender. In addition, after request by Lender (but no more frequently than twice in any year), Borrower shall furnish to Lender (x) within ten (10) days, a certificate addressed to Lender, its successors and assigns reaffirming all representations and warranties of Borrower set forth in the Loan Documents as of the date requested by Lender or, to the extent of any changes to any such representations and warranties, so stating such changes, and (y) within thirty (30) days, tenant estoppel certificates addressed to Lender, its successors and assigns from each tenant at the Property in form and substance reasonably satisfactory to Lender.

**6.3 Financial Reporting.**

**6.3.1 Bookkeeping.** Borrower shall keep on a calendar year basis, in accordance with GAAP, and, to the extent required under Section 9.1 hereof, the requirements of Regulation AB, proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and all items of income and expense and any services, Equipment or furnishings provided in connection with the operation of the Property, whether such income or

137342639v7

confidential

expense is realized by Borrower, Manager or any Affiliate of Borrower. Lender shall have the right from time to time during normal business hours upon reasonable notice to examine such books, records and accounts at the office of Borrower or other Person maintaining them, and to make such copies or extracts thereof as Lender shall desire. After an Event of Default, Borrower shall pay any costs incurred by Lender to examine such books, records and accounts, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

      **6.3.2**   **Annual Reports**. Borrower shall furnish to Lender annually, within 120 days after each calendar year, a complete copy of Borrower's annual financial statements audited by a "big four" accounting firm or another independent certified public accountant (accompanied by an unqualified opinion from such accounting firm or other independent certified public accountant) reasonably acceptable to Lender, each in accordance with GAAP, and, to the extent required under Section 9.1 hereof, the requirements of Regulation AB, and containing balance sheets and statements of profit and loss for Borrower and the Property in such detail as Lender may request. Such financial statements (x) shall be in form and substance satisfactory to Lender, (y) shall set forth the financial condition and the income and expenses for the Property for the immediately preceding calendar year, including statements of annual Net Operating Income as well as (1) a list of tenants, if any, occupying more than twenty percent (20%) of the rentable space of the Property, (2) a breakdown showing (a) the year in which each Lease then in effect expires, (b) the percentage of rentable space covered by such Lease, (c) the percentage of base rent with respect to which Leases shall expire in each such year, expressed both on a per year and a cumulative basis and (z) shall be accompanied by an Officer's Certificate certifying (1) that such statement is true, correct, complete and accurate and presents fairly the financial condition of the Property and has been prepared in accordance with GAAP, and, to the extent required under Section 9.1 hereof, the requirements of Regulation AB, (2) whether there exists a Default or Event of Default, and if so, the nature thereof, the period of time it has existed and the action then being taken to remedy it, (3) that as of the date of such Officer's Certificate, no litigation exists involving Borrower or the Property in which all or substantially all of the potential liability is not covered by insurance, or, if so, specifying such litigation and the actions being taken in relation thereto and (4) the amount by which operating expenses incurred by Borrower for such period were greater than or less than the operating expenses reflected in the applicable Annual Budget.

      **6.3.3**   **Monthly/Quarterly Reports**. Borrower shall furnish the following items to Lender within fifteen (15) days after (x) prior to a Securitization, the end of each calendar month or (y) from and after a Securitization, the end of each calendar quarter: (i) monthly and year-to-date operating statements, noting Net Operating Income and other information necessary and sufficient under GAAP to fairly represent the financial position and results of operation of the Property during such calendar month or quarter (as applicable), all in form satisfactory to Lender; (ii) a balance sheet for such calendar month or quarter (as applicable); (iii) a comparison of the budgeted income and expenses and the actual income and expenses for each month and year-to-date for the Property, together with a detailed explanation of any variances of ten percent (10%) or more between budgeted and actual amounts for such period and year-to-date; (iv) a statement of the actual Capital Expenses made by Borrower during each calendar month or quarter (as applicable) as of the last day of such calendar month or quarter (as applicable); (v) a statement that Borrower has not incurred any indebtedness other than Permitted Indebtedness; (vi) an aged receivables report and (vii) rent rolls identifying the leased premises, names of all

62

confidential

confidential

tenants, units leased, monthly rental and all other charges payable under each Lease, date to which paid, term of Lease, date of occupancy, date of expiration, material special provisions, concessions or inducements granted to tenants, and a year-by-year schedule showing by percentage the rentable area of the Improvements and the total base rent attributable to Leases expiring each year) and a delinquency report for the Property.  Each such statement shall be accompanied by an Officer's Certificate certifying, to the best of the signer's knowledge, (1) that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower and the Property in accordance with GAAP (subject to normal year-end adjustments), and, to the extent required under Section 9.1 hereof, the requirements of Regulation AB, (2) whether there exists a Default or Event of Default, and if so, the nature thereof, the period of time it has existed and the action then being taken to remedy it, (3) that as of the date of such Officer's Certificate, no litigation exists involving Borrower or the Property in which all or substantially all of the potential liability is not covered by insurance, or, if so, specifying such litigation and the actions being taken in relation thereto and (4) the amount by which operating expenses incurred by Borrower for such period were greater than or less than the operating expenses reflected in the applicable Annual Budget.  Such financial statements shall contain such other information as shall be reasonably requested by Lender for purposes of calculations to be made by Lender pursuant to the terms hereof.

   **6.3.4 Other Reports**. Borrower shall furnish to Lender, within ten (10) Business Days after request, such further detailed information with respect to the operation of the Property and the financial affairs of Borrower, Sole Member or Manager as may be reasonably requested by Lender or any applicable Rating Agency.  Borrower shall submit to Lender the financial data and financial statements required, and within the time periods required, under clauses (f) and (g) of Section 9.1, if and when available.

   **6.3.5 Annual Budget**. Borrower shall prepare and submit (or shall cause Manager to prepare and submit) to Lender, by November 30th of each year during the Term, a budget for the Property for the succeeding calendar year and, promptly after preparation thereof, any revisions to such Annual Budget (such budget and any revisions being the "***Annual Budget***").  Such Annual Budget shall be subject to the approval of Lender, which approval shall not (provided no Event of Default is continuing) be unreasonably withheld or delayed.  Each Annual Budget submitted by Borrower and approved by Lender is referred to herein as the "***Approved Annual Budget***".  The Annual Budget shall consist of (i) an operating expense budget showing, on a month-by-month basis, in reasonable detail, each line item of Borrower's anticipated operating income and operating expenses (on a cash and accrual basis), including amounts required to establish, maintain and/or increase any monthly payments required hereunder (and once such Annual Budget has been approved by Lender, such operating expense budget shall be referred to herein as the "***Approved Operating Budget***"), and (ii) a Capital Expense budget showing, on a month-by-month basis, in reasonable detail, each line item of anticipated Capital Expenses (and once such Annual Budget has been approved by Lender, such Capital Expense budget shall be referred to herein as the "***Approved Capital Budget***").  Until such time that any Annual Budget has been approved by Lender, the prior Approved Annual Budget shall apply for all purposes hereunder (with such adjustments as reasonably determined by Lender (including increases for any non-discretionary expenses)).

   **6.3.6 Additional Operating Expenses**.

137342639v7

confidential

confidential

(a) During a Cash Management Period, in the event that Borrower incurs or will incur any operating expense, including Emergency Expenditures, that is not in the Approved Annual Budget but is otherwise an Approved Operating Expense (each an "***Additional Operating Expense***"), then Borrower shall promptly (but in no event shall Borrower be required to do so more frequently than monthly) deliver to Lender a reasonably detailed explanation of such Additional Operating Expense(s) or, with respect to any such item that is subject to Lender's approval, such proposed Additional Operating Expense. Any Additional Operating Expense submitted to Lender (and, if required, approved by Lender) in accordance with this Agreement is referred to herein as an "***Approved Additional Operating Expense***".

(b) Any funds distributed to Borrower for the payment of Approved Additional Operating Expenses (including any distribution to Borrower pursuant to Section 3.10(a)(vi)) shall be used by Borrower only to pay for Approved Additional Operating Expenses or reimburse Borrower for Approved Additional Operating Expenses, as applicable.

**6.3.7** **Breach**. If Borrower fails to provide to Lender or its designee any of the financial statements, certificates, reports or information (the "***Required Records***") required by this Article 6 within thirty (30) days after the date upon which such Required Record is due, Borrower shall pay to Lender, at Lender's option and in its discretion (and without limiting any other rights or remedies if Lender hereunder), an amount equal to $10,000 for each Required Record that is not delivered; provided Lender has given Borrower at least fifteen (15) days prior notice of such failure. In addition, thirty (30) days after Borrower's failure to deliver any Required Records, Lender shall have the option (and without limiting any other rights or remedies of Lender hereunder), upon fifteen (15) days' notice to Borrower to gain access to Borrower's books and records and prepare or have prepared at Borrower's expense, any Required Records not delivered by Borrower.

## 7.   **INSURANCE; CASUALTY; AND CONDEMNATION**

### 7.1 **Insurance**.

**7.1.1** **Coverage**. Borrower, at its sole cost, for the mutual benefit of Borrower and Lender, shall obtain and maintain during the Term the following policies of insurance:

(a) Property insurance insuring against loss or damage customarily included under so called "all risk" or "special form" policies including but not limited to: fire, lightning, windstorm (including named storm), vandalism, malicious mischief, and subject to subsection (j) below, coverage for damage or destruction caused by the acts of "Terrorists" (or such policies shall have no exclusion from coverage with respect thereto) and such other insurable hazards as, under good insurance practices for this loan type, from time to time are insured against for other property and buildings similar to the premises in nature, use, location, height, and type of construction. Each such insurance policy shall (i) be in an amount equal to 100% full replacement cost of the Improvements without deduction for depreciation, (ii) have deductibles no greater than $25,000, except for windstorm/named storm and earthquake insurance which may have deductibles of no more than five percent (5%) of the total insurable value of the Property, (iii) be paid annually in advance and (iv) be issued on a replacement cost basis containing either no coinsurance or an agreed amount endorsement waiving any coinsurance

64

137342639v7

confidential

provision, and shall cover, without limitation, all tenant improvements and betterments that Borrower is required to insure.  Lender shall be named Mortgagee and Loss Payee under a Standard Mortgagee Clause.

(b) Flood insurance if any part of the Improvements and personal property (if applicable) is located in an area now or hereafter designated by the Federal Emergency Management Agency as a Special Hazard Area or such other zone if Lender so requires in its sole discretion.  Such coverage shall (i) be in an amount equal to the maximum limit available through the National Flood Insurance Program, (ii) plus such excess limits in an amount equal to (A) 100% of the full replacement cost of the Improvements on the Property (without any deduction for depreciation) plus the loss of rents or business income exposure of the Improvements or (B) such other amount as agreed to by Lender, and (iii) have deductibles acceptable to Lender.

(c) Commercial general liability insurance including coverage for personal injury, bodily injury, death, accident and property damage (and liquor liability insurance, if the Property is a hotel and liquor is sold anywhere on the premises) and (iii) excess liability/umbrella liability insurance.  Such liability insurance shall provide minimum limits of $1,000,000 per occurrence and $2,000,000 in the aggregate (on a "per location" basis) for each policy year, with a maximum deductible or self-insured retention of $25,000; with at least $10,000,000 excess liability/umbrella insurance for any and all covered claims.  The policies described in this subsection shall include coverage for "Personal and Advertising Injury," "Contractual Liability" for insured contracts (covering, to the maximum extent permitted by law, Borrower's obligation to indemnify Lender as required under this Agreement and the other Loan Documents), and "Products and Completed Operations."  All liability policies shall name Lender as Additional Insured.

(d) Loss of rents and/or business income insurance (i) with loss payable to Lender, (ii) in an amount equal to 100% of the projected gross revenues and/or Rents (less any non-continuing expenses) for a period of at least eighteen (18) months for the initial period of restoration, plus a six (6) month Extended Period of Indemnity which provides that after the physical loss to the Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or until the limit for such coverage as required above is exhausted, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period.  The amount of such loss of rents and/or business income insurance shall be increased each year at renewal during the Term, as and when the estimated or actual gross revenue and/or Rents increases.

(e) If applicable, equipment breakdown insurance, also known as boiler and machinery insurance, covering all pressure vessels, underground piping, mechanical and electrical equipment against physical damage, as well as any resulting physical damage to the building improvements, including all tenant improvements and betterments and loss of rents or business income that Borrower is required to insure pursuant to the lease, on a replacement cost basis and in an amount acceptable to Lender.

(f)  Worker's compensation coverage for any employees of Borrower, as required by any Legal Requirement.

65

confidential

confidential

(g) During any period of restoration, renovation or construction, and if such work is excluded under the "all risk" or "special form", excess/umbrella liability and/or general liability insurance policies, (A) commercial general liability and excess/umbrella liability insurance covering claims related to the repairs or restoration at the Property that are not covered by or under the terms or provisions of the insurance provided for in Section 7.1.1(c) and (B) the insurance provided for in Section 7.1.1(a), which shall, in addition to the requirements set forth in such Section, (1) be written on a builder's "all risk" insurance on a so called completed value non-reporting form, in an amount equal to not less than 100% of the full replacement cost of the Property, against such risks, including collapse, as Lender may require, in form and substance acceptable to Lender and against all risks insured against pursuant to clauses (a), (b), (d), (e), (h), and (j) of Section 7.1.1 and (2) include permission to occupy the Property.

(h) Ordinance and law coverage, if at any time during the loan term the Property is deemed to be a legal non-conforming use or structure, covering the value of the undamaged portion, demolition and debris removal and the increased cost of construction in amounts satisfactory to Lender.

(i) Such other insurance (including but not limited to pollution legal liability insurance, earthquake insurance, mine subsidence insurance, and windstorm insurance if windstorm insurance is excluded under the "all risk" or "special form" policy) as may from time to time be reasonably required by Lender in order to protect its interests.

(j) Notwithstanding anything in subsections (a) and (d) above to the contrary, Borrower shall be required to obtain and maintain coverage as part of its property insurance Policy (or by a separate Policy) against loss or damage by terrorist acts, both foreign and domestic, in an amount equal to 100% of the "Full Replacement Cost" of the Property plus loss of rents and/or business income insurance required in subsection (d); provided that such coverage is available. There shall also be no exclusion for acts of terrorism under the general liability and excess liability/umbrella Policies. In the event that such coverage with respect to terrorist acts is not included as part of the policies required by subsections (a) and (d) above and/or the general liability and excess liability/umbrella Policies required by subsection (c) above, Borrower shall, nevertheless be required to obtain coverage for terrorism (as stand-alone coverage) in an amount equal to 100% of the "Full Replacement Cost" of the Property under subsection (a) above, the loss of rents and/or business income coverage under subsection (d) and general liability and excess liability/umbrella coverage under subsection (c) above; provided that such coverage is available. Borrower shall obtain the coverage required under this subsection (j) from a carrier which otherwise satisfies the rating criteria specified in Section 7.1.2 below (a "*Qualified Carrier*") or in the event that such coverage is not available from a Qualified Carrier, Borrower shall obtain such coverage from the highest rated insurance company providing such coverage.

**7.1.2   Policies**.  All policies of insurance (the "*Policies*") required pursuant to Section 7.1.1 above shall (i) be issued by companies approved by Lender and authorized to do business in the State, with a claims paying ability rating of "A-" or better by S&P and a rating of "A:X" or better in the current Best's Insurance Reports; (ii) name Lender and its successors and/or assigns as their interest may appear as the mortgagee/lender's loss payable (in the case of property insurance) and an additional insured (in the case of liability insurance); (iii) contain (in

66

confidential

confidential

the case of property insurance) a Non-Contributory Standard Mortgagee Clause and a Lender's Loss Payable Endorsement, or their equivalents, naming Lender as the person to which all payments made by such insurance company shall be paid; (iv) with respect to property (including business income/loss of rents), general liability and excess/umbrella liability Policies, contain a waiver of subrogation in favor of Lender; (v) contain such provisions as Lender deems reasonably necessary or desirable to protect its interest, including (A) endorsements providing that neither Borrower, Lender nor any other party shall be a co-insurer under the Policies, (B) that Lender shall receive at least thirty (30) days' prior written notice of cancellation of the property Policies, and Borrower or its management company as first named insured shall receive at least thirty (30) days' prior written notice of cancellation of liability Policies, and (C) providing that Lender is permitted to make payments to effect the continuation of such policies upon notice of cancellation due to non-payment of premiums; (vi) in the event any property insurance policy shall contain breach of warranty provisions, such policy shall provide that with respect to the interest of Lender, such insurance policy shall not be invalidated by and shall insure Lender regardless of (A) any act, failure to act or negligence of or violation of warranties, declarations or conditions contained in such policy by any named insured, (B) the occupancy or use of the premises for purposes more hazardous than permitted by the terms thereof, or (C) any foreclosure or other action or proceeding taken by Lender pursuant to any provision of the Loan Documents; and (vii) be satisfactory in form and substance to Lender and approved by Lender as to amounts, form, risk coverage, deductibles, loss payees and insureds and complete copies thereof delivered to Lender.  Borrower shall pay the premiums for such Policies (the "*Insurance Premiums*") as the same become due and payable and furnish to Lender evidence of the renewal of each of the Policies together with (unless such Insurance Premiums have been paid by Lender pursuant to Section 3.3 hereof) receipts for or other evidence of the payment of the Insurance Premiums reasonably satisfactory to Lender.  If Borrower does not furnish such evidence and receipts at least ten (10) days prior to the expiration of any expiring Policy, then Lender may, but shall not be obligated to, procure such insurance and pay the Insurance Premiums therefor, and Borrower shall reimburse Lender for the cost of such Insurance Premiums promptly on demand, with interest accruing at the Default Rate.  Borrower shall deliver to Lender a complete copy of each Policy within ten (10) days after request by Lender.  Within thirty (30) days after request by Lender, Borrower shall obtain such increases in the amounts of coverage required hereunder as may be reasonably requested by Lender, taking into consideration changes in the value of money over time, changes in liability laws, changes in prudent customs and practices, and the like.

**7.2 Casualty**.

      **7.2.1   Notice; Restoration**.  If the Property is damaged or destroyed, in whole or in part, by fire or other casualty (a "*Casualty*"), Borrower shall give prompt notice thereof to Lender.  Following the occurrence of a Casualty, Borrower, regardless of whether insurance proceeds are available, shall promptly proceed to restore, repair, replace or rebuild the Property in accordance with Legal Requirements to be of at least equal value and of substantially the same character as prior to such damage or destruction.

      **7.2.2   Settlement of Proceeds**.  If a Casualty covered by any of the Policies (an "*Insured Casualty*") occurs where the loss does not exceed the Restoration Threshold, provided no Default or Event of Default has occurred and is continuing, Borrower may settle and adjust any claim without the prior consent of Lender; provided such adjustment is carried out in a

137342639v7

confidential

confidential

competent and timely manner, and Borrower is hereby authorized to collect and receipt for the insurance proceeds (the "*Proceeds*").  In the event of an Insured Casualty where the loss equals or exceeds the Restoration Threshold (a "*Significant Casualty*"), Lender may, in its sole discretion, settle and adjust any claim without the consent of Borrower and agree with the insurer(s) on the amount to be paid on the loss, and the Proceeds shall be due and payable solely to Lender and held by Lender in the Casualty/Condemnation Subaccount and disbursed in accordance herewith.  If Borrower or any party other than Lender is a payee on any check representing Proceeds with respect to a Significant Casualty, Borrower shall immediately endorse, and cause all such third parties to endorse, such check payable to the order of Lender.  Borrower hereby irrevocably appoints Lender as its attorney-in-fact, coupled with an interest, to endorse such check payable to the order of Lender.   The expenses incurred by Lender in the settlement, adjustment and collection of the Proceeds shall become part of the Debt and shall be reimbursed by Borrower to Lender upon demand.  Notwithstanding anything to the contrary contained herein, if in connection with a Casualty any insurance carrier makes a payment under a property insurance Policy that Borrower proposes be treated as business or rental interruption insurance, then, notwithstanding any designation (or lack of designation) by the insurance carrier as to the purpose of such payment, as between Lender and Borrower, such payment shall not be treated as business or rental interruption insurance proceeds unless Borrower has demonstrated to Lender's satisfaction that the remaining net Proceeds that will be received from the property insurance carriers are sufficient to pay 100% of the cost of fully restoring the Improvements or, if such net Proceeds are to be applied to repay the Debt in accordance with the terms hereof, that such remaining net Proceeds will be sufficient to pay the Debt in full.

7.3 **Condemnation**.

7.3.1   **Notice; Restoration**.  Borrower shall promptly give Lender notice of the actual or threatened commencement of any condemnation or eminent domain proceeding affecting the Property (a "*Condemnation*") and shall deliver to Lender copies of any and all papers served in connection with such Condemnation.   Following the occurrence of a Condemnation, Borrower, regardless of whether an Award is available, shall promptly proceed to restore, repair, replace or rebuild the Property in accordance with Legal Requirements to the extent practicable to be of at least equal value and of substantially the same character (and to have the same utility) as prior to such Condemnation.

7.3.2   **Collection of Award**.   Lender is hereby irrevocably appointed as Borrower's attorney-in-fact, coupled with an interest, with exclusive power to collect, receive and retain any award or payment in respect of a Condemnation (an "*Award*") and to make any compromise, adjustment or settlement in connection with such Condemnation.  Notwithstanding any Condemnation (or any transfer made in lieu of or in anticipation of such Condemnation), Borrower shall continue to pay the Debt at the time and in the manner provided for in the Loan Documents, and the Debt shall not be reduced unless and until any Award shall have been actually received and applied by Lender to expenses of collecting the Award and to discharge of the Debt. Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided in the Note.  If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of such Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall be recoverable or shall have been sought, recovered or denied, to receive all or a portion of

68

confidential

confidential

the Award sufficient to pay the Debt. Borrower shall cause any Award that is payable to Borrower to be paid directly to Lender. Lender shall hold such Award in the Casualty/Condemnation Subaccount and disburse such Award in accordance with the terms hereof.

**7.4** **Application of Proceeds or Award.**

**7.4.1** **Application to Restoration**. If an Insured Casualty or Condemnation occurs where (i) the loss is in an aggregate amount less than fifteen percent (15%) of the unpaid Principal; (ii) in the reasonable judgment of Lender, the Property can be restored within six (6) months, and prior to six (6) months before the Stated Maturity Date and prior to the expiration of the rental or business interruption insurance with respect thereto, to the Property's pre-existing condition and utility as existed immediately prior to such Insured Casualty or Condemnation and to an economic unit not less valuable and not less useful than the same was immediately prior to the Insured Casualty or Condemnation, and after such restoration will adequately secure the Debt; (iii) less than (x) thirty percent (30%), in the case of an Insured Casualty or (y) fifteen percent (15%), in the case of a Condemnation, of the rentable area of the Improvements has been damaged, destroyed or rendered unusable as a result of such Insured Casualty or Condemnation; (iv) Leases demising in the aggregate at least sixty-five percent (65%) of the total rentable space in the Property and in effect as of the date of the occurrence of such Insured Casualty or Condemnation remain in full force and effect during and after the completion of the Restoration (hereinafter defined); and (v) no Default or Event of Default shall have occurred and be then continuing, then the Proceeds or the Award, as the case may be (after reimbursement of any expenses incurred by Lender), shall be applied to reimburse Borrower for the cost of restoring, repairing, replacing or rebuilding the Property (the "*Restoration*"), in the manner set forth herein. Borrower shall commence and diligently prosecute such Restoration. Notwithstanding the foregoing, in no event shall Lender be obligated to apply the Proceeds or Award to reimburse Borrower for the cost of Restoration unless, in addition to satisfaction of the foregoing conditions, both (x) Borrower shall pay (and if required by Lender, Borrower shall deposit with Lender in advance) all costs of such Restoration in excess of the net amount of the Proceeds or the Award made available pursuant to the terms hereof; and (y) Lender shall have received evidence reasonably satisfactory to it that during the period of the Restoration, the Rents will be at least equal to the sum of the operating expenses and Debt Service and other reserve payments required hereunder, as reasonably determined by Lender.

**7.4.2** **Application to Debt**. Except as provided in Section 7.4.1 above, any Proceeds and/or Award may, at the option of Lender in its discretion, be applied to the payment of (i) accrued but unpaid interest on the Note, (ii) the unpaid Principal and (iii) other charges due under the Note and/or any of the other Loan Documents, or applied to reimburse Borrower for the cost of any Restoration, in the manner set forth in Section 7.4.3 below. Any prepayment of the Loan made pursuant to this Section 7.4.2 shall be without any Yield Maintenance Premium, unless an Event of Default has occurred and is continuing at the time the Proceeds are received from the insurance company or the Award is received from the condemning authority, as the case may be, in which event Borrower shall pay to Lender an additional amount equal to the Yield Maintenance Premium, if any, that may be required with respect to the amount of the Proceeds or Award applied to the unpaid Principal.

137342639v7

confidential

confidential

Notwithstanding the foregoing provisions of this Section 7.4, if the Loan is included in a REMIC Trust and, immediately following a release of any portion of the Lien of the Mortgage following a Casualty or Condemnation (but taking into account any proposed Restoration of the remaining Property), the ratio of the unpaid principal balance of the Loan to the value of the remaining Property is greater than 125% (such value to be determined, in Lender's sole discretion, by any commercially reasonable method permitted to a REMIC Trust; and which shall exclude the value of personal property or going concern value, if any), the principal balance of the Loan must be paid down by an amount equal to the least of the following amounts: (i) the net Award (after payment of Lender's costs and expenses and any other fees and expenses that have been approved by Lender), (ii) the fair market value of the released property at the time of the release, or (iii) an amount such that the loan-to-value ratio of the Loan (as so determined by Lender) does not increase after the release, unless Lender receives an opinion of counsel that if such amount is not paid, the applicable Securitization will not fail to maintain its status as a REMIC Trust as a result of the related release of such portion of the Lien of the Mortgage.  If and to the extent the preceding sentence applies, only such amount of the net Award, if any, in excess of the amount required to pay down the principal balance of the Loan may be released for purposes of Restoration or released to Borrower or Mezzanine Lender as otherwise expressly provided in this Section 7.4.

        **7.4.3**   **Procedure for Application to Restoration**.  If Borrower is entitled to reimbursement out of the Proceeds or an Award held by Lender, such Proceeds or Award shall be disbursed from time to time from the Casualty/Condemnation Subaccount upon Lender being furnished with (i) evidence satisfactory to Lender of the estimated cost of completion of the Restoration, (ii) a fixed price or guaranteed maximum cost construction contract for Restoration satisfactory to Lender, (iii) prior to the commencement of Restoration, all immediately available funds in addition to the Proceeds or Award that in Lender's judgment are required to complete the proposed Restoration, (iv) such architect's certificates, waivers of lien, contractor's sworn statements, title insurance endorsements, bonds, plats of survey, permits, approvals, licenses and such other documents and items as Lender may reasonably require and approve in Lender's discretion, and (v) all plans and specifications for such Restoration, such plans and specifications to be approved by Lender prior to commencement of any work.  Lender may, at Borrower's expense, retain a consultant to review and approve all requests for disbursements, which approval shall also be a condition precedent to any disbursement.  No payment made prior to the final completion of the Restoration shall exceed ninety percent (90%) of the value of the work performed from time to time; funds other than the Proceeds or Award shall be disbursed prior to disbursement of such Proceeds or Award; and at all times, the undisbursed balance of such Proceeds or Award remaining in the hands of Lender, together with funds deposited for that purpose or irrevocably committed to the satisfaction of Lender by or on behalf of Borrower for that purpose, shall be at least sufficient in the reasonable judgment of Lender to pay for the cost of completion of the Restoration, free and clear of all Liens or claims for Lien.  Provided no Default or Event of Default then exists, any surplus that remains out of the Proceeds held by Lender after payment of such costs of Restoration shall be paid to Borrower.  Any surplus that remains out of the Award received by Lender after payment of such costs of Restoration shall, in the discretion of Lender, be retained by Lender and applied to payment of the Debt, disbursed to Mezzanine Lender if a Mezzanine Event of Default exists or returned to Borrower.

confidential

confidential

## 8.    DEFAULTS

   **8.1 Events of Default**.  An "***Event of Default***" shall exist with respect to the Loan if any of the following shall occur:

      (a) any portion of the Debt is not paid when due or Borrower shall fail to pay when due any payment required under Sections 3.3, 3.4, 3.5, 3.6 or 3.8 hereof;

      (b) any of the Taxes are not paid when due (unless Lender is paying such Taxes pursuant to Section 3.3 hereof), subject to Borrower's right to contest Taxes in accordance with Section 5.2 hereof;

      (c) the Policies are not kept in full force and effect, or are not delivered to Lender upon request;

      (d) a Transfer other than a Permitted Transfer occurs;

      (e) any certification, representation or warranty made by Borrower or Guarantor herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished by Borrower or Guarantor in connection with any Loan Document, shall be false or misleading in any material respect as of the date the representation or warranty was made;

      (f) Borrower, Sole Member or Guarantor shall make an assignment for the benefit of creditors, or shall generally not be paying its debts as they become due;

      (g) a receiver, liquidator or trustee shall be appointed for Borrower, Sole Member or Guarantor; or Borrower, Sole Member or Guarantor shall be adjudicated a bankrupt or insolvent; or any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Borrower, Sole Member or Guarantor, as the case may be; or any proceeding for the dissolution or liquidation of Borrower, Sole Member or Guarantor shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower, Sole Member or Guarantor, as the case may be, only upon the same not being discharged, stayed or dismissed within sixty (60) days;

      (h) Borrower breaches any covenant contained in Sections 5.12.1(a) - (e), 5.13, 5.15, 5.22, 5.25 or 5.28 hereof;

      (i) except as expressly permitted hereunder, the actual or threatened alteration, improvement, demolition or removal of all or any portion of the Improvements without the prior written consent of Lender;

      (j) an Event of Default as defined or described elsewhere in this Agreement or in any other Loan Document occurs; or any other event shall occur or condition shall exist, if the effect of such event or condition is to accelerate or to permit Lender to accelerate the maturity of any portion of the Debt;

71

137342639v7

confidential

(k) a default occurs under any term, covenant or provision set forth herein or in any other Loan Document which specifically contains a notice requirement or grace period and such notice has been given and such grace period has expired;

(l) any of the assumptions contained in any substantive non-consolidation opinion, delivered to Lender by Borrower's counsel in connection with the Loan or otherwise hereunder, were not true and correct as of the date of such opinion or thereafter became untrue or incorrect; or

(m) a default shall be continuing under any of the other terms, covenants or conditions of this Agreement or any other Loan Document not otherwise specified in this Section 8.1, for ten (10) days after notice to Borrower (and Guarantor, if applicable) from Lender, in the case of any default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other default; provided, however, that if such non-monetary default is susceptible of cure but cannot reasonably be cured within such thirty (30)-day period, and Borrower (or Guarantor, if applicable) shall have commenced to cure such default within such thirty (30)-day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30)-day period shall be extended for an additional period of time as is reasonably necessary for Borrower (or Guarantor, if applicable) in the exercise of due diligence to cure such default, such additional period not to exceed sixty (60) days.

**8.2 Remedies**.

  **8.2.1**  **Acceleration**.  Upon the occurrence of an Event of Default (other than an Event of Default described in paragraph (f) or (g) of Section 8.1 above) and at any time and from time to time thereafter, in addition to any other rights or remedies available to it pursuant to the Loan Documents or at law or in equity, Lender may take such action, without notice or demand (and Borrower hereby expressly waives any such notice or demand), that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Property; including declaring the Debt to be immediately due and payable (including unpaid interest, Default Rate interest, Late Payment Charges, Yield Maintenance Premium and any other amounts owing by Borrower), without notice or demand; and upon any Event of Default described in paragraph (f) or (g) of Section 8.1 above, the Debt (including unpaid interest, Default Rate interest, Late Payment Charges, Yield Maintenance Premium and any other amounts owing by Borrower) shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained in any Loan Document to the contrary notwithstanding.

  **8.2.2**  **Remedies Cumulative**.  Upon the occurrence of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under the Loan Documents or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared, or be automatically, due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents.  Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its discretion, to the fullest extent permitted by law,

137342639v7

confidential

without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth in the Loan Documents.  Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing, (i) to the extent permitted by applicable law, Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property, the Mortgage has been foreclosed, the Property has been sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.  To the extent permitted by applicable law, nothing contained in any Loan Document shall be construed as requiring Lender to resort to any portion of the Property for the satisfaction of any of the Debt in preference or priority to any other portion, and Lender may seek satisfaction out of the entire Property or any part thereof, in its discretion.

### 8.2.3   **Severance**.

(a) During the continuance of an Event of Default, Lender shall have the right from time to time to partially foreclose the Mortgage in any manner and for any amounts secured by the Mortgage then due and payable as determined by Lender in its sole discretion, including the following circumstances: (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of Principal and interest, Lender may foreclose the Mortgage to recover such delinquent payments, or (ii) in the event Lender elects to accelerate less than the entire outstanding principal balance of the Loan, Lender may foreclose the Mortgage to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by the Mortgage as Lender may elect.  Notwithstanding one or more partial foreclosures, the Property shall remain subject to the Mortgage to secure payment of the sums secured by the Mortgage and not previously recovered.

(b) During the continuance of an Event of Default, Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, mortgages and other security documents in such denominations and priorities of payment and liens as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder.  Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender.  Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such severance, Borrower ratifying all that such attorney shall do by virtue thereof.

### 8.2.4   **Delay**.   No delay or omission to exercise any remedy, right or power accruing upon an Event of Default, or the granting of any indulgence or compromise by Lender shall impair any such remedy, right or power hereunder or be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of one Default or Event of Default shall not be construed to be a waiver of any subsequent Default or Event of Default or to impair any remedy, right or power consequent thereon. Notwithstanding any other provision of this Agreement, Lender reserves the right to seek a deficiency judgment or preserve a deficiency claim in connection with the

73

confidential

confidential

foreclosure of the Mortgage to the extent necessary to foreclose on all or any portion of the Property, the Rents, the Cash Management Accounts or any other collateral.

      8.2.5   **Lender's Right to Perform**.  If Borrower fails to perform any covenant or obligation contained herein and such failure shall continue for a period of five (5) Business Days after Borrower's receipt of written notice thereof from Lender, without in any way limiting Lender's right to exercise any of its rights, powers or remedies as provided hereunder, or under any of the other Loan Documents, Lender may, but shall have no obligation to, perform, or cause performance of, such covenant or obligation, and all costs, expenses, liabilities, penalties and fines of Lender incurred or paid in connection therewith shall be payable by Borrower to Lender upon demand and if not paid shall be added to the Debt (and to the extent permitted under applicable laws, secured by the Mortgage and other Loan Documents) and shall bear interest thereafter at the Default Rate.  Notwithstanding the foregoing, Lender shall have no obligation to send notice to Borrower of any such failure.

# 9.   **SPECIAL PROVISIONS**

      9.1 **Sale of Mortgage and Securitization**.  Subject to the limitations set forth in <u>Section 9.3</u> hereof:

      (a) Lender shall have the right (i) to sell or otherwise transfer the Loan or any portion thereof as a whole loan, (ii) to sell participation interests in the Loan, or (iii) to securitize the Loan or any portion thereof in a single asset securitization or a pooled loan securitization.  (The transactions referred to in clauses (i), (ii) and (iii) are each hereinafter referred to as a "***Secondary Market Transaction***" and the transactions referred to in clause (iii) shall hereinafter be referred to as a "***Securitization***".  Any certificates, notes or other securities issued in connection with a Securitization are hereinafter referred to as "***Securities***").  At Lender's election, each note and/or component comprising the Loan may be subject to one or more Secondary Market Transactions.

      (b) If requested by Lender, Borrower shall assist Lender in satisfying the market standards to which Lender customarily adheres or which may be required in the marketplace, by prospective investors, the Rating Agencies, applicable Legal Requirements and/or otherwise in the marketplace in connection with any Secondary Market Transactions, including to:

      (i)    (A) provide updated financial and other information with respect to the Property, the business operated at the Property, Borrower and Manager, including the information set forth on <u>Schedule 6</u> attached hereto, (B) provide updated budgets and rent rolls (including itemized percentage of floor area occupied and percentage of aggregate base rent for each Tenant) relating to the Property, and (C) provide updated appraisals, market studies, environmental reviews and reports (Phase I's and, if appropriate, Phase II's), property condition reports and other due diligence investigations of the Property (collectively, the "***Updated Information***"), together, if customary, with appropriate verification of the Updated Information through letters of auditors or opinions of counsel acceptable to Lender and the Rating Agencies;

confidential

confidential

(ii)      provide opinions of counsel, which may be relied upon by Lender, the trustee in any Securitization, underwriters, NRSROs and their respective counsel, agents and representatives, as to non-consolidation, fraudulent conveyance and true sale or any other opinion customary in Secondary Market Transactions or required by the Rating Agencies with respect to the Property, the Loan Documents, and Borrower and its Affiliates, which counsel and opinions shall be satisfactory to Lender and the Rating Agencies; and

(iii)      provide updated, as of the closing date of any Secondary Market Transaction, representations and warranties made in the Loan Documents and such additional representations and warranties as the Rating Agencies may require.

(c) If, at the time a Disclosure Document is being prepared for a Securitization, Lender expects that Borrower alone or Borrower and one or more Affiliates of Borrower (including any guarantor or other Person that is directly or indirectly committed by contract or otherwise to make payments on all or a part of the Loan) collectively, or the Property alone or the Property and Related Properties collectively, will be a Significant Obligor, Borrower shall furnish to Lender upon request the following financial information:

(i)      if Lender expects that the principal amount of the Loan together with any Related Loans, as of the cut-off date for such Securitization, may equal or exceed ten percent (10%) (but less than twenty percent (20%)) of the aggregate principal amount of all mortgage loans included or expected to be included in the Securitization, net operating income for the Property and the Related Properties for the most recent Fiscal Year and interim period as required under Item 1112(b)(1) of Regulation AB (or, if the Loan is not treated as a non-recourse loan under Instruction 3 for Item 1101(k) of Regulation AB, selected financial data meeting the requirements and covering the time periods specified in Item 301 of Regulation S-K and Item 1112(b)(1) of Regulation AB), or

(ii)      if Lender expects that the principal amount of the Loan together with any Related Loans, as of the cut-off date for such Securitization, may equal or exceed twenty percent (20%) of the aggregate principal amount of all mortgage loans included or expected to be included in the Securitization, the financial statements required under Item 1112(b)(2) of Regulation AB (which includes, but may not be limited to, a balance sheet with respect to the entity that Lender determines to be a Significant Obligor for the two most recent Fiscal Years and applicable interim periods, meeting the requirements of Rule 3-01 of Regulation S-X, and statements of income and statements of cash flows with respect to the Property for the three most recent Fiscal Years and applicable interim periods, meeting the requirements of Rule 3-02 of Regulation S-X (or if Lender determines that the Property is the Significant Obligor and the Property (other than properties that are hotels, nursing homes, or other properties that would be deemed to constitute a business and not real estate under Regulation S-X or other legal requirements) was acquired from an unaffiliated third party and the other conditions set forth in Rule 3-14 of Regulation S-X have been met, the financial statements required by Rule 3-14 of Regulation S-X)).

(d) Further, if requested by Lender, Borrower shall, promptly upon Lender's request, furnish to Lender financial data or financial statements meeting the requirements of Item

75

confidential

confidential

1112(b)(1) or (2) of Regulation AB, as specified by Lender, for any tenant of the Property if, in connection with a Securitization, Lender expects there to be, as of the cut-off date for such Securitization , a concentration with respect to such tenant or group of Affiliated tenants within all of the mortgage loans included or expected to be included in the Securitization such that such tenant or group of Affiliated tenants would constitute a Significant Obligor. Borrower shall furnish to Lender, in connection with the preparation of the Disclosure Documents and on an ongoing basis, financial data and/or financial statements with respect to such tenants meeting the requirements of Item 1112(b)(1) or (2) of Regulation AB, as specified by Lender, but only for so long as such entity or entities are a Significant Obligor and either (x) filings pursuant to the Exchange Act in connection with or relating to the Securitization (an "***Exchange Act Filing***") are required to be made under applicable Legal Requirements or (y) comparable information is required to otherwise be "available" to holders of the Securities under Regulation AB or applicable Legal Requirements.

(e) If Lender determines that Borrower alone or Borrower and one or more Affiliates of Borrower collectively, or the Property alone or the Property and Related Properties collectively, are a Significant Obligor, then Borrower shall furnish to Lender, on an ongoing basis, selected financial data or financial statements meeting the requirements of Item 1112(b)(1) or (2) of Regulation AB, as specified by Lender, but only for so long as such entity or entities are a Significant Obligor and either (x) Exchange Act Filings are required to be made under applicable Legal Requirements or (y) comparable information is required to otherwise be "available" to holders of the Securities under Regulation AB or applicable Legal Requirements.

(f) Any financial data or financial statements provided pursuant to this <u>Section 9.1</u> shall be furnished to Lender within the following time periods:

(i)    with respect to information requested in connection with the preparation of Disclosure Documents for a Securitization, within ten (10) Business Days after notice from Lender; and

(ii)    with respect to ongoing information required under <u>Section 9.1(d)</u> and <u>(e)</u> above, (1) not later than thirty (30) days after the end of each fiscal quarter of Borrower and (2) not later than seventy-five (75) days after the end of each Fiscal Year of Borrower.

(g) If requested by Lender, Borrower shall provide Lender, promptly, and in any event within five (5) Business Days following Lender's request therefor, with any other or additional financial statements, or financial, statistical or operating information, as Lender shall reasonably determine to be required pursuant to Regulation S-K or Regulation S-X, as applicable, Regulation AB, or any amendment, modification or replacement thereto or other Legal Requirements relating to a Securitization or as shall otherwise be reasonably requested by Lender.

(h) If requested by Lender, whether in connection with a Securitization or at any time thereafter during which the Loan and any Related Loans are included in a Securitization, Borrower shall provide Lender, promptly upon request, a list of tenants of the Property (including all affiliates of such tenants) that in the aggregate (1) occupy 10% or more (but less than 20%) of the total floor area of the improvements or represent 10% or more (but less than

137342639v7

confidential

confidential

20%) of aggregate base rent, and (2) occupy 20% or more of the total floor area of the improvements or represent 20% or more of aggregate base.

(i) All financial statements provided by Borrower pursuant to this Section 9.1(c), (d), (e) or (f) shall be prepared in accordance with GAAP, and shall meet the requirements of Regulation S-K or Regulation S-X, as applicable, Regulation AB, and other applicable Legal Requirements. All financial statements relating to a Fiscal Year shall be audited by independent accountants in accordance with generally accepted auditing standards, Regulation S-X or Regulation S-K, as applicable, Regulation AB, and all other applicable Legal Requirements, shall be accompanied by the manually executed report of the independent accountants thereon, which report shall meet the requirements of Regulation S-K or Regulation S-X, as applicable, Regulation AB, and all other applicable Legal Requirements, and shall be further accompanied by a manually executed written consent of the independent accountants, in form and substance acceptable to Lender, to the inclusion of such financial statements in any Disclosure Document and any Exchange Act Filing and to the use of the name of such independent accountants and the reference to such independent accountants as "experts" in any Disclosure Document and Exchange Act Filing (or comparable information is required to otherwise be available to holders of the Securities under Regulation AB or applicable Legal Requirements), all of which shall be provided at the same time as the related financial statements are required to be provided. All other financial statements shall be certified by the chief financial officer of Borrower, which certification shall state that such financial statements meet the requirements set forth in the first sentence of this paragraph.

**9.2 Securitization Indemnification**.

(a) Borrower understands that information provided to Lender by Borrower and its agents, counsel and representatives may be included in preliminary and final disclosure documents in connection with any Secondary Market Transaction, including a Securitization, including an offering circular, a prospectus, prospectus supplement, private placement memorandum or other offering document (each, a "***Disclosure Document***") and may also be included in filings with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the "***Securities Act***"), or the Securities and Exchange Act of 1934, as amended (the "***Exchange Act***"), and may be made available to investors or prospective investors in the Securities, investment banking firms, NRSROs, accounting firms, law firms and other third-party advisory and service providers relating to any Secondary Market Transaction, including a Securitization. Borrower also understands that the findings and conclusions of any third-party due diligence report obtained by Lender, the Issuer or the Securitization placement agent or underwriter may be made publicly available if required, and in the manner prescribed, by Section 15E(s)(4)(A) of the Exchange Act and any rules promulgated thereunder.

(b) Borrower hereby agrees to indemnify Lender, any Affiliate of Lender that has filed any registration statement relating to the Securitization or has acted as the sponsor or depositor in connection with the Securitization, any Affiliate of Lender that acts as an underwriter, placement agent or initial purchaser of Securities issued in the Securitization, Lender (and for purposes of this Section 9.2, Lender shall include its officers and directors) and each Person who controls Lender within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "***Lender Group***"), the issuer of the Securities

confidential

confidential

(the "*Issuer*" and for purposes of this Section 9.2, Issuer shall include its officers, director and each Person who controls the Issuer within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act), and any placement agent or underwriter with respect to the Securitization, each of their respective officers and directors and each Person who controls the placement agent or underwriter within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "*Underwriter Group*") for any losses, claims, damages or liabilities (collectively, the "*Liabilities*") to which Lender, the Lender Group, the Issuer or the Underwriter Group may become subject insofar as the Liabilities arise out of, or are based upon, (A) any untrue statement or alleged untrue statement of any material fact contained in the information provided to Lender by Borrower and its agents, counsel and representatives, (B) the omission or alleged omission to state therein a material fact required to be stated in such information or necessary in order to make the statements in such information, in light of the circumstances under which they were made, not misleading, or (C) a breach of the representations and warranties made by Borrower in Section 4.8 of this Agreement.  Borrower also agrees to reimburse Lender, the Lender Group, the Issuer and/or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the Lender Group, the Issuer and/or the Underwriter Group in connection with investigating or defending the Liabilities.  Borrower's liability under this paragraph will be limited to Liability that arises out of, or is based upon, an untrue statement or omission made in reliance upon, and in conformity with, information furnished to Lender by or on behalf of Borrower in connection with the preparation of the Disclosure Document or in connection with the underwriting or closing of the Loan, including financial statements of Borrower, operating statements and rent rolls with respect to the Property.  This indemnification provision will be in addition to any liability which Borrower may otherwise have.

(c) In connection with any Exchange Act Filing or other reports containing comparable information that is required to be made "available" to holders of the Securities under Regulation AB or applicable Legal Requirements, Borrower agrees to (i) indemnify Lender, the Lender Group, the Issuer and the Underwriter Group for Liabilities to which Lender, the Lender Group, the Issuer and/or the Underwriter Group may become subject insofar as the Liabilities arise out of, or are based upon, an alleged untrue statement or alleged omission or an untrue statement or omission made in reliance upon, and in conformity with, information furnished to Lender by or on behalf of Borrower in connection with the preparation of the Disclosure Document or in connection with the underwriting or closing of the Loan, including financial statements of Borrower, operating statements and rent rolls with respect to the Property, and (ii) reimburse Lender, the Lender Group, the Issuer and/or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the Lender Group, the Issuer and/or the Underwriter Group in connection with defending or investigating the Liabilities.

(d) Promptly after receipt by an indemnified party under this Section 9.2 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 9.2, notify the indemnifying party in writing of the commencement thereof, but the omission to so notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any indemnified party hereunder except to the extent that failure to notify causes prejudice to the indemnifying party.  In the event that any action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will

78

confidential

confidential

be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof with counsel satisfactory to such indemnified party.  After notice from the indemnifying party to such indemnified party that the indemnifying party has assumed the defense, as provided in the immediately preceding sentence, such indemnified party shall pay for any additional legal or other expenses subsequently incurred in connection with the defense thereof, if the indemnified party has engaged separate legal counsel therefor; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there are any legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party at the cost of the indemnifying party.  The indemnifying party shall not be liable for the expenses of more than one separate counsel unless an indemnified party shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to the indemnifying party.  Without the prior written consent of Lender (which consent shall not be unreasonably withheld or delayed), no indemnifying party shall settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder (whether or not any indemnified party is an actual or potential party to such claim, action, suit or proceeding) unless the indemnifying party shall have given Lender reasonable prior written notice thereof and shall have obtained an unconditional release of each indemnified party hereunder from all liability arising out of such claim, action, suit or proceedings.

(e) In order to provide for just and equitable contribution in circumstances in which the indemnity agreement provided for in Section 9.2(b) or (c) is for any reason held to be unenforceable as to an indemnified party in respect of any Liabilities (or action in respect thereof) referred to therein which would otherwise be indemnifiable under Section 9.2(b) or (c), the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such Liabilities (or action in respect thereof); provided, however, that no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.  In determining the amount of contribution to which the respective parties are entitled, the following factors shall be considered: (i) the Issuer's and Borrower's relative knowledge and access to information concerning the matter with respect to which the claim was asserted; (ii) the opportunity to correct and prevent any statement or omission; and (iii) any other equitable considerations appropriate in the circumstances.  Lender and Borrower hereby agree that it would not be equitable if the amount of such contribution were determined by pro rata or per capita allocation.

(f) The liabilities and obligations of both Borrower and Lender under this Section 9.2 shall survive the termination of this Agreement and the satisfaction and discharge of the Debt.

.

confidential

confidential

**9.3 Severance of Loan**.   Lender, without in any way limiting Lender's other rights hereunder, in its sole and absolute discretion, shall have the right, at any time (whether prior to, in connection with, or after any Secondary Market Transaction), with respect to all or any portion of the Loan, to modify, split and/or sever all or any portion of the Loan as hereinafter provided.  Without limiting the foregoing, Lender may (i) cause the Note and the Mortgage to be split into a first and second mortgage loan, (ii) create one or more senior and subordinate notes (*i.e.*, an A/B or A/B/C structure), (iii) create multiple components of the Note or Notes (and allocate or reallocate the principal balance of the Loan among such components), (iv) otherwise sever the Loan into two (2) or more loans secured by mortgages and by a pledge of partnership or membership interests (directly or indirectly) in Borrower (*i.e.,* a senior loan/mezzanine loan structure), in each such case described in clauses (i) through (iv) above, in whatever proportion and whatever priority Lender determines, and (v) modify the Loan Documents with respect to the newly created Notes or components of the Note or Notes such that the pricing and marketability of the Securities and the size of each class of Securities and the rating assigned to each such class by the Rating Agencies shall provide the most favorable rating levels and achieve the optimum rating levels for the Loan.   Notwithstanding the foregoing, no such amendment described above shall (i) modify or amend any material economic term of the Loan, or (ii) materially increase the obligations, or decrease the rights, of Borrower under the Loan Documents; provided, however, in each such instance the outstanding principal balance of all the Notes evidencing the Loan (or components of such Notes) immediately after the effective date of such modification equals the outstanding principal balance of the Loan immediately prior to such modification and the weighted average of the interest rates for all such Notes (or components of such Notes) immediately after the effective date of such modification equals the interest rate of the original Note immediately prior to such modification.  If requested by Lender, Borrower (and Borrower's constituent members, if applicable, and Guarantor) shall execute within two (2) Business Days after such request, such documentation as Lender may reasonably request to evidence and/or effectuate any such modification or severance.  At Lender's election, each note comprising the Loan may be subject to one or more Securitizations.  Lender shall have the right to modify the Note and/or Notes and any components in accordance with this Section 9.3 and, provided that such modification shall comply with the terms of this Section 9.3, it shall become immediately effective.

## 10.   MISCELLANEOUS

**10.1   Exculpation**.  Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest and rights under the Loan Documents, or in the Property, the Rents or any other collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender, and Lender shall not sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding under or by reason of or under or in connection with any Loan Document.  The provisions of this Section 10.1 shall not, however,

137342639v7

confidential

confidential

(i) constitute a waiver, release or impairment of any obligation evidenced or secured by any Loan Document; (ii) impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and sale under the Mortgage; (iii) affect the validity or enforceability of any of the Loan Documents or any guaranty made in connection with the Loan or any of the rights and remedies of Lender thereunder; (iv) impair the right of Lender to obtain the appointment of a receiver; (v) impair the enforcement of the Assignment of Leases and Rents; (vi) constitute a prohibition against Lender to commence any other appropriate action or proceeding in order for Lender to fully realize the security granted by the Mortgage or to exercise its remedies against the Property; or (vii) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any loss, damage, cost, expense, liability, claim or other obligation incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the following (all such liability and obligation of Borrower for any or all of the following being referred to herein as "***Borrower's Recourse Liabilities***"):

        (a)      fraud, willful misconduct, misrepresentation or failure to disclose a material fact by or on behalf of Borrower, Guarantor, any Affiliate of Borrower or Guarantor, or any of their respective agents or representatives in connection with the Loan, including by reason of any claim under the Racketeer Influenced and Corrupt Organizations Act (RICO);

        (b)      the forfeiture by Borrower of the Property, or any portion thereof, because of the conduct or purported conduct of criminal activity by Borrower or Guarantor or any of their respective agents or representatives in connection therewith;

        (c)      physical waste of the Property or any portion thereof, or after an Event of Default the removal or disposal of any portion of the Property;

        (d)      any Proceeds paid by reason of any Insured Casualty or any Award received in connection with a Condemnation or other sums or payments attributable to the Property not applied in accordance with the provisions of the Loan Documents (except to the extent that Borrower did not have the legal right, because of a bankruptcy, receivership or similar judicial proceeding, to direct disbursement of such sums or payments);

        (e)      all Rents of the Property received or collected by or on behalf of Borrower after an Event of Default and not applied to payment of Principal and interest due under the Note, and to the payment of actual and reasonable operating expenses of the Property, as they become due or payable (except to the extent that such application of such funds is prevented by bankruptcy, receivership, or similar judicial proceeding in which Borrower is legally prevented from directing the disbursement of such sums);

        (f)      misappropriation or conversion by or on behalf of Borrower (including failure to turn over to Lender on demand following an Event of Default) of any gross revenues (including Rents, advance deposits, any other deposits, rents collected in advance, funds held by Borrower for the benefit of another party and Lease Termination Payments);

137342639v7

confidential

confidential

(g)      the failure to pay Taxes, provided Borrower shall not be liable to the extent funds to pay such amounts are available in the Tax and Insurance Subaccount and Lender failed to pay same;

(h)      the breach of any representation, warranty, covenant or indemnification in any Loan Document concerning Environmental Laws or Hazardous Substances, including Section 4.21 hereof and Section 5.8 hereof, and clauses (viii) through (xi) of Section 5.30 hereof;

(i)      the failure to pay charges for labor or materials or other charges that can create Liens on any portion of the Property;

(j)      any security deposits, advance deposits or any other deposits collected with respect to the Property which are not delivered to Lender in accordance with the provisions of the Loan Documents;

(k)      failure to obtain and maintain the fully paid for Policies in accordance with Section 7.1.1 hereof;

(l)      Borrower's indemnification of Lender set forth in Section 9.2 hereof;

(m)      any cost or expense incurred by Lender in connection with the enforcement of its rights and remedies hereunder or any other Loan Document;

(n)      any noncompliance or nonconformity (legal or otherwise) of the Property and/or the use thereof with any applicable zoning, building and/or land use laws, rules or regulations (including, without limitation, any applicable area, density, setback, parking and/or use requirements), and/or any requirement to obtain, reinstate and/or maintain any conditional use permit under applicable Legal Requirements; and/or

(o)      the failure to comply with the terms and conditions set forth in Section 5.33 of this Agreement.

Notwithstanding anything to the contrary in this Agreement or any of the Loan Documents, (A) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt in accordance with the Loan Documents, and (B) Lender's agreement not to pursue personal liability of Borrower as set forth above SHALL BECOME NULL AND VOID and shall be of no further force and effect, and the Debt shall be fully recourse to Borrower in the event that one or more of the following occurs (each, a "***Springing Recourse Event***"):

(i)      an Event of Default described in Section 8.1(d) hereof shall have occurred;

confidential

confidential

(ii)    a breach of any of the representations set forth in the "Recycled SPE Certificate" delivered to Lender in connection with the Loan or a breach of the representation set forth in Section 4.1(b) hereof or a breach of the covenants set forth in Section 5.13 hereof;

(iii)    Borrower files a voluntary petition under the Bankruptcy Code or files a petition for bankruptcy, reorganization or similar proceeding pursuant to any other Federal or state bankruptcy, insolvency or similar law;

(iv)    Borrower is substantively consolidated with any other Person; unless such consolidation was involuntary and not consented to by Borrower or Guarantor and is discharged, stayed or dismissed within thirty (30) days following the occurrence of such consolidation;

(v)    the filing of an involuntary petition against Borrower under the Bankruptcy Code or an involuntary petition for bankruptcy, reorganization or similar proceeding pursuant to any other Federal or state bankruptcy, insolvency or similar law by any other Person in which (x) Borrower or any Affiliate, officer, director or representative which, directly or indirectly, Controls Borrower colludes with or otherwise assists such Person, and/or (y) Borrower or any Affiliate, officer, director or representative which, directly or indirectly, Controls Borrower solicits or causes to be solicited petitioning creditors for any involuntary petition against Borrower by any Person;

(vi)    Borrower or any Affiliate, officer, director or representative which, directly or indirectly, Controls Borrower files an answer consenting to, or otherwise acquiescing in, or joining in, any involuntary petition filed against it by any other Person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law;

(vii)    Borrower or any Affiliate, officer, director or representative which, directly or indirectly, Controls Borrower consents to, or acquiesces in, or joins in, an application for the appointment of a custodian, receiver, liquidator, trustee or examiner for Borrower or any portion of the Property;

(viii)    Borrower makes an assignment for the benefit of creditors or admits, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due;

(ix)    if Guarantor, Borrower or any Affiliate of any of the foregoing, in connection with any enforcement action or exercise or assertion of any right or remedy by or on behalf of Lender under or in connection with the Note, the Mortgage or any other Loan Document, seeks a defense, judicial intervention or injunctive or other equitable relief of any kind or asserts in a pleading filed in connection with a judicial proceeding any defense against Lender or any right in connection with any security for the Loan; and/or

(x)    the failure to establish the Clearing Account and/or Cash Management Account in accordance with the terms of the Loan Documents.

In addition to, and without limiting the generality of, the foregoing clauses of this Section 10.1, and notwithstanding anything to the contrary set forth in this Agreement or in any

83

137342639v7

confidential

of the other Loan Documents, Borrower guarantees the prompt payment of the Payment Guaranty Amount upon the occurrence of an Event of Default and written demand by Lender therefor (the "**Payment Guaranty Obligation**").

**10.2** **Brokers and Financial Advisors**.  Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the Loan other than RYMS Realty Group ("*Broker*") whose fees shall be paid by Borrower pursuant to a separate agreement.  Borrower shall indemnify and hold Lender harmless from and against any and all claims, liabilities, costs and expenses (including attorneys' fees, whether incurred in connection with enforcing this indemnity or defending claims of third parties) of any kind in any way relating to or arising from a claim by any Person (including Broker) that such Person acted on behalf of Borrower in connection with the transactions contemplated herein.  The provisions of this Section 10.2 shall survive the expiration and termination of this Agreement and the repayment of the Debt.

**10.3** **Retention of Servicer**.  Lender reserves the right to retain Servicer to act as its agent hereunder with such powers as are specifically delegated to Servicer by Lender, whether pursuant to the terms of this Agreement, any Pooling and Servicing Agreement, the Cash Management Agreement or otherwise, together with such other powers as are reasonably incidental thereto.  Borrower shall pay any reasonable fees and expenses of Servicer (i) in connection with a release of the Property (or any portion thereof), (ii) from and after a transfer of the Loan to any "master servicer" or "special servicer" for any reason, including as a result of a decline in the occupancy level of the Property, (iii) in connection with an assumption or modification of the Loan, (iv) in connection with the enforcement of the Loan Documents or (v) in connection with any other action or approval taken by Servicer hereunder on behalf of Lender (which shall not include ongoing regular servicing fees relating to the day-to-day servicing of the Loan, for which Borrower shall not be charged).

**10.4** **Survival; Successors and Assigns**.  This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as any of the Debt is unpaid or such longer period if expressly set forth in this Agreement.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party.  All of Borrower's covenants and agreements in this Agreement shall inure to the benefit of the respective legal representatives, successors and assigns of Lender.

**10.5** **Lender's Discretion; Rating Agency Review Waiver**.

(a)  Whenever pursuant to this Agreement or any other Loan Document, Lender exercises any right given to it to approve or disapprove, or consent or withhold consent, or any arrangement or term is to be satisfactory to Lender or is to be in Lender's discretion, the decision of Lender to approve or disapprove, to consent or withhold consent, or to decide whether arrangements or terms are satisfactory or not satisfactory, or acceptable or unacceptable or in Lender's discretion shall (except as is otherwise specifically herein provided) be in the sole and absolute discretion of Lender and shall be final and conclusive.  Additionally, whenever in this

84

confidential

confidential

Agreement or any other Loan Document, Lender exercises any right given to it to approve or disapprove, or consent or withhold consent, or any arrangement or term is to be satisfactory to Lender in Lender's reasonable discretion, or Lender agrees to not withhold, condition or delay its consent, the decision of Lender to approve or disapprove, to consent, condition, delay or withhold consent, or to decide whether arrangements or terms are satisfactory or not satisfactory, or acceptable or unacceptable or in Lender's discretion shall (except as is otherwise specifically herein provided) be in the sole and absolute discretion of Lender while an Event of Default is continuing unless otherwise specifically herein provided.

(b) Whenever, pursuant to this Agreement or any other Loan Documents, a Rating Comfort Letter is required from each applicable Rating Agency, in the event that any applicable Rating Agency "declines review", "waives review" or otherwise indicates in writing or otherwise to Lender's or Servicer's satisfaction that no Rating Comfort Letter will or needs to be issued with respect to the matter in question (each, a "*Review Waiver*"), then the Rating Comfort Letter requirement with respect to such Rating Agency shall be deemed to be satisfied with respect to such matter.  It is expressly agreed and understood, however, that receipt of a Review Waiver (i) from any one Rating Agency shall not be binding or apply with respect to any other Rating Agency and (ii) with respect to one matter shall not apply or be deemed to apply to any subsequent matter for which Rating Comfort Letter is required.

**10.6     Governing Law**.

(a) THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION AND ENFORCEMENT OF THE LIENS CREATED PURSUANT TO THE LOAN DOCUMENTS SHALL BE GOVERNED BY, AND CONSTRUED ACCORDING TO, THE LAW OF THE STATE, COMMONWEALTH OR DISTRICT, AS APPLICABLE, IN WHICH THE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, COMMONWEALTH OR DISTRICT, AS APPLICABLE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND THE DEBT.  TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT AND THE NOTE, AND THIS AGREEMENT AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE

85

confidential

confidential

STATE OF NEW YORK PURSUANT TO § 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b) ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN NEW YORK COUNTY, NEW YORK  AND BORROWER WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT DAVID FLEISCHMANN AT 2233 NOSTRAND AVENUE, 3RD FLOOR, BROOKLYN, NEW YORK 11210, AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND BORROWER AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE OF BORROWER MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER (UNLESS LOCAL LAW REQUIRES ANOTHER METHOD OF SERVICE), IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK.  BORROWER (i) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (ii) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (iii) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.  NOTWITHSTANDING THE FOREGOING, LENDER SHALL HAVE THE RIGHT TO INSTITUTE ANY LEGAL SUIT, ACTION OR PROCEEDING FOR THE ENFORCEMENT OR FORECLOSURE OF ANY LIEN ON ANY COLLATERAL FOR THE LOAN IN ANY FEDERAL OR STATE COURT IN ANY JURISDICTION(S) THAT LENDER MAY ELECT IN ITS SOLE AND ABSOLUTE DISCRETION, AND BORROWER WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.

**10.7**   **Modification, Waiver in Writing**.  No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party or parties against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  Except as otherwise expressly provided herein, no notice to, or demand on, Borrower shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.  Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising

86

137342639v7

confidential

confidential

any right, power, remedy or privilege hereunder, or under any other Loan Document, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.  In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under any Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under the Loan Documents, or to declare an Event of Default for failure to effect prompt payment of any such other amount. Lender shall have the right to waive or reduce any time periods that Lender is entitled to under the Loan Documents in its sole and absolute discretion.

**10.8**    **Trial by Jury**.  BORROWER AND LENDER HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EITHER PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER.

**10.9**    **Headings/Schedules**.   The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.  The Schedules attached hereto, are hereby incorporated  by reference as a part of this Agreement with the same force and effect as if set forth in the body hereof.

**10.10**   **Severability**.   Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**10.11**   **Preferences**.   Upon the occurrence and continuance of an Event of Default, Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the Debt.  To the extent Borrower makes a payment to Lender, or Lender receives proceeds of any collateral, which is in whole or part subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Debt or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.   This provision shall survive the expiration or termination of this Agreement and the repayment of the Debt.

**10.12**   **Waiver of Notice**.  Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or any other

confidential

confidential

Loan Document specifically and expressly requires the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.  Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which no Loan Document specifically and expressly requires the giving of notice by Lender to Borrower.

**10.13   Remedies of Borrower**.  If a claim or adjudication is made that Lender or any of its agents, including Servicer, has acted unreasonably or unreasonably delayed acting in any case where by law or under any Loan Document, Lender or any such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents, including Servicer, shall be liable for any monetary damages, and Borrower's sole remedy shall be to commence an action seeking injunctive relief or declaratory judgment.  Any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.  Borrower specifically waives any claim against Lender and its agents, including Servicer, with respect to actions taken by Lender or its agents on Borrower's behalf.

**10.14   Prior Agreements**.  This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements, understandings and negotiations among or between such parties, whether oral or written, are superseded by the terms of this Agreement and the other Loan Documents.

**10.15   Offsets, Counterclaims and Defenses**.  Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents, including Servicer, or otherwise offset any obligations to make payments required under the Loan Documents.  Any assignee of Lender's interest in and to the Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which Borrower may otherwise have against any assignor of such documents, and no such offset, counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents, and any such right to interpose or assert any such offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

**10.16   Publicity**.   All news releases, publicity or advertising by Borrower or its Affiliates through any media intended to reach the general public, which refers to the Loan Documents, the Loan, Lender or any of Lender's Affiliates, a Loan purchaser, Servicer or the trustee in a Secondary Market Transaction, shall be subject to the prior written approval of Lender.  Lender shall have the right to issue any of the foregoing without Borrower's approval.

**10.17   No Usury**.  Borrower and Lender intend at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Lender to contract for, charge, take, reserve or receive a greater amount of interest than under state law) and that this Section 10.17 shall control every other agreement in the Loan Documents.  If the applicable law (state or federal) is ever judicially interpreted so as to render usurious any amount called for under the Note or any other Loan Document, or contracted for, charged, taken, reserved or received with respect to the Debt, or if Lender's exercise of the option to accelerate the maturity

confidential

confidential

of the Loan or any prepayment by Borrower results in Borrower having paid any interest in excess of that permitted by applicable law, then it is Borrower's and Lender's express intent that all excess amounts theretofore collected by Lender shall be credited against the unpaid Principal and all other Debt (or, if the Debt has been or would thereby be paid in full, refunded to Borrower), and the provisions of the Loan Documents immediately be deemed reformed and the amounts thereafter collectible thereunder reduced, without the necessity of the execution of any new document, so as to comply with applicable law, but so as to permit the recovery of the fullest amount otherwise called for thereunder.  All sums paid or agreed to be paid to Lender for the use, forbearance or detention of the Loan shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Debt does not exceed the maximum lawful rate from time to time in effect and applicable to the Debt for so long as the Debt is outstanding.  Notwithstanding anything to the contrary contained in any Loan Document, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

**10.18  Conflict; Construction of Documents; Reliance**.  In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control.  The parties hereto acknowledge that each is represented by separate counsel in connection with the negotiation, drafting, execution and delivery of the Loan Documents and that the Loan Documents shall not be subject to the principle of construing their meaning against the party that drafted them.  Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan, without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or affiliate of Lender.  Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or affiliate of Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies.  Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

**10.19  No Joint Venture or Partnership; No Third Party Beneficiaries**.

(a) Borrower and Lender intend that the relationships created under the Loan Documents be solely that of borrower and lender.  Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common or joint tenancy relationship between Borrower and Lender nor to grant Lender any interest in the Property other than that of mortgagee, beneficiary or lender.

(b) The Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in any Loan Document shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained therein.

confidential

confidential

**10.20  <u>Yield Maintenance Premium</u>**.   Borrower acknowledges that (a) Lender is making the Loan in consideration of the receipt by Lender of all interest and other benefits intended to be conferred by the Loan Documents and (b) if payments of Principal are made to Lender prior to the Stated Maturity Date, for any reason whatsoever, whether voluntary, as a result of Lender's acceleration of the Loan after an Event of Default, by operation of law or otherwise, Lender will not receive all such interest and other benefits and may, in addition, incur costs.  For these reasons, and to induce Lender to make the Loan, Borrower agrees that, except as expressly provided in <u>Article 7</u> hereof, all prepayments, if any, whether voluntary or involuntary, will be accompanied by the Yield Maintenance Premium; <u>provided</u>, <u>however</u>, that the foregoing shall not be deemed to imply that the Loan may be voluntarily prepaid in any manner or under any circumstance other than as expressly set forth in this Agreement.  Such Yield Maintenance Premium shall be required whether payment is made by Borrower, by a Person on behalf of Borrower, or by the purchaser at any foreclosure sale, and may be included in any bid by Lender at such sale.  Borrower further acknowledges that (A) it is a knowledgeable real estate developer and/or investor; (B) it fully understands the effect of the provisions of this <u>Section 10.20</u>, as well as the other provisions of the Loan Documents; (C) the making of the Loan by Lender at the Interest Rate and other terms set forth in the Loan Documents are sufficient consideration for Borrower's obligation to pay a Yield Maintenance Premium (if required); and (D) Lender would not make the Loan on the terms set forth herein without the inclusion of such provisions.  Borrower also acknowledges that the provisions of this Agreement limiting the right of prepayment and providing for the payment of the Yield Maintenance Premium and other charges specified herein were independently negotiated and bargained for, and constitute a specific material part of the consideration given by Borrower to Lender for the making of the Loan except as expressly permitted hereunder.

**10.21  <u>Assignments and Participations</u>**.   In addition to any other rights of Lender hereunder, the Loan, the Note, the Loan Documents and/or Lender's rights, title, obligations and interests therein may be sold, assigned, participated or otherwise transferred by Lender and any of its successors and assigns to any Person at any time in its sole and absolute discretion, in whole or in part, whether by operation of law (pursuant to a merger or other successor in interest) or otherwise without notice to or consent from Borrower or any other Person.  Upon such assignment, all references to Lender in this Agreement and in any Loan Document shall be deemed to refer to such assignee or successor in interest and such assignee or successor in interest shall thereafter stand in the place of Lender in all respects.  Except as expressly permitted herein, Borrower may not assign its rights, title, interests or obligations under this Agreement or under any of the Loan Documents.

**10.22  <u>Waiver of Marshalling of Assets</u>**.   To the fullest extent permitted by law, Borrower, for itself and its successors and assigns, waives all rights to a marshalling of the assets of Borrower, Borrower's members or partners, as applicable, and others with interests in Borrower, and of the Property, and shall not assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Property for the collection of the Debt without any prior or different resort for collection, or of the right of Lender to the payment of the Debt out of the net proceeds of the Property in preference to every other claimant whatsoever.

137342639v7

confidential

**10.23  Joint and Several Liability**.  If more than one Person has executed this Agreement as "*Borrower*," the representations, covenants, warranties and obligations of all such Persons hereunder shall be joint and several.

**10.24  Certain Additional Rights of Lender**.  Notwithstanding anything to the contrary which may be contained in this Agreement, Lender shall have:

(i)  the right to routinely consult with Borrower's management regarding the significant business activities and business and financial developments of Borrower, provided, however, that such consultations shall not include discussions of environmental compliance programs or disposal of hazardous substances.  Consultation meetings should occur on a regular basis (no less frequently than quarterly) with Lender having the right to call special meetings at any reasonable times;

(ii)  the right, in accordance with the terms of this Agreement, to examine the books and records of Borrower at any time upon reasonable notice;

(iii)  the right, in accordance with the terms of this Agreement, to receive monthly, quarterly and year-end financial reports, including balance sheets, statements of income, shareholder's equity and cash flow, a management report and schedules of outstanding indebtedness;

(iv)  the right, without restricting any other rights of Lender under this Agreement (including any similar right), to restrict financing to be obtained with respect to the Property so long as any portion of the Debt remains outstanding;

(v)  the right, without restricting any other right of Lender under this Agreement or the other Loan Documents (including any similar right), to restrict, upon the occurrence of an Event of Default, Borrower's payments of management, consulting, director or similar fees to Affiliates of Borrower from the Rents;

(vi)  the right, without restricting any other rights of Lender under this Agreement (including any similar right), to approve any operating budget and/or capital budget of Borrower;

(vii)  the right, without restricting any other rights of Lender under this Agreement (including any similar right), to approve any acquisition by Borrower of any other significant property (other than personal property required for the day to day operation of the Property); and

(viii)  the right, without restricting any other rights of Lender under this Agreement (including any similar right), to restrict the transfer of interests in Borrower held by its members, and the right to restrict the transfer of interests in such member, except for any transfer that is a Permitted Transfer.

The rights described above may be exercised directly or indirectly by any Person that owns substantially all of the ownership interests in Lender.  The provisions of this Section are intended

91

confidential

confidential

to satisfy the requirement of management rights for purposes of the Department of Labor "plan assets" regulation 29 C.F.R., Section 2510.3-101.

**10.25   Acknowledgement and Consent to Bail-In of EEA Financial Institutions**.

(a)     Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among the respective parties thereto, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(i)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(ii)     the effects of any Bail-in Action on any such liability, including, if applicable:

(A)     a reduction in full or in part or cancellation of any such liability;

(B)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(C)     the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

(b)     As used in this Section 10.25 the following terms have the following meanings ascribed thereto: (i) "*Bail-In Action*" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution; (ii)"*Bail-In Legislation*" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule; (iii) "*EEA Financial Institution*" means (x) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority; (y) any entity established in an EEA Member Country which is a parent of an institution described in clause (x) of this definition, or (x) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (x) or (y) of this definition and is subject to consolidated supervision with its parent; (iv) "*EEA Member Country*" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway; (v) "*EEA Resolution Authority*" means any public administrative authority or any person entrusted with public

92

confidential

confidential

administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution; (vi) "*EU Bail-In Legislation Schedule*" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time; and (vii) "*Write-Down and Conversion Powers*" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

**10.26   Set-Off**.   In addition to any rights and remedies of Lender provided by this Agreement and by law, Lender shall have the right in its sole discretion, without prior notice to Borrower, any such notice being expressly waived by Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by Borrower hereunder (whether at the stated maturity, by acceleration or otherwise), to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by Lender or any Affiliate thereof to or for the credit or the account of Borrower.  Lender agrees promptly to notify Borrower after any such set-off and application made by Lender; provided that the failure to give such notice shall not affect the validity of such set-off and application.

**10.27   Counterparts**.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

[*Remainder of Page Intentionally Left Blank; Signature Pages Follow*]

137342639v7

confidential

confidential

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER**:

**24 COMMERCE STREET LLC**, a Delaware limited liability company

By:    24 Commerce Holdings LLC, a Delaware limited liability company, its Managing Member

    By:    24 Commerce Owner Inc., a New Jersey corporation, its Managing Member

        By:    _____

        Jacob Tauber
        President

[signatures continue on following page]

confidential

confidential

**LENDER**:

**ARGENTIC REAL ESTATE FINANCE LLC,** a
Delaware limited liability company

By:    Argentic Investment Management LLC, a
        Delaware limited liability company, its
        Investment Manager

By:     _____
        Ryan Supple
        Authorized Signatory

confidential

confidential

## Schedule 1

### Required Repairs

| Required Repair Item | Estimated Cost | Reserve Deposit Amount (125%) of Estimated Cost |
|---|---|---|
| 1.  Infrared Inspections and Testing | $3,000.00 | $3,750.00 |
| 2.  Inspect Fire Sprinkler System | $1,500.00 | $1,875.00 |
| Total Reserved: | | $5,625.00 |

137342639v7

confidential

confidential

## Schedule 2

**Exceptions to Representations and Warranties**

None.

137342639v7

confidential

**Schedule 3**

Rent Roll



137342639v7

confidential



## *Realty Group LLC*

| Property: | **24 COMMERCE STREET** |
| | **NEWARK, NEW JERSEY 07102** |

| Description: | 18-STORY BUILDING WITH 167,452 RENTABLE SQ. FT. AND 67 OFFICE SPACES |

| Building Size: | 180,000 |

| Parcel ID | 145-19 |
| Neighborhood | Downtown Newark |

| *Income:* | | | |
|---|---|---|---|
| Residential | | $ | 3,347,859 |
| CAM Reimbursements | | $ | 77,400 |
| W/S Reimbursements | | $ | 2,280 |
| Electric Reimbursements | | $ | 241,338 |
| | | $ | 3,668,877 |
| | | | |
| Vacancy Allowance (Commercial) | 5% | | (167,393) |
| **TOTAL VACANCY ALLOWANCE** | | | **(167,393)** |
| | | | |
| **Effective Gross Income:** | | $ | 3,501,484 |
| | | | |
| *Estimated Expenses:* | | | |
| Real Estate Taxes (421a) | | $ | 387,765 |
| Insurance | | $ | 55,823 |
| Water/Sewer | | $ | 15,769 |
| Electricity | | $ | 220,000 |
| Trash Removal | | $ | 8,616 |
| Payroll | | $ | 45,000 |
| Elevator Contract | | $ | 24,000 |
| Security | | $ | 63,002 |
| Fuel | | $ | 48,380 |
| Repairs/Maintenance | | $ | 83,726 |
| Management | 3% | $ | 105,045 |
| | | | |
| **Total Estimated expenses:** | | | **(1,057,126)** |
| | | | |
| **Net Operating Income:** | | $ | **2,444,358** |

**RYMS Realty Group LLC | 4013 13th Avenue Brooklyn, NY 11218 T. 718.879.8230 F. 718.879.8231**

Sch. 3 - 2

confidential

confidential

| | | | | MONTHLY | ANNUAL | | LEASE | LEASE | ANNUAL REIMBURSEMENTS |
|---|---|---|---|---|---|---|---|---|---|
| **RENT ROLL** | | | | | | | | | |
| **COMMERCIAL** | | | | | | | | | |
| TENANT | SUITE # | SQ/FT | % OCCUP. | RENT | RENT | RENT PSF | START | END | Electric |
| AJ Gallagher | 1827-1827E | 2,663 | 1.59% | $4,318 | $51,812 | $19.46 | 7/1/2015 | 9/30/2020 | $4,485 |
| Law Office of Carrillo | 1823-1825 | 907 | 0.54% | $1,461 | $17,528 | $19.32 | 5/1/2014 | 5/31/2019 | $362 |
| Toni Williams | 1833-1834 | 730 | 0.44% | $1,189 | $14,271 | $19.55 | 12/1/2011 | 12/31/2021 | $1,986 |
| Vacant | 1832 | 420 | 0.25% | $700 | $8,400 | $20.00 | | | |
| Cesar Martin Estela.ESQ | 1725-1726 | 2,495 | 1.49% | $4,366 | $52,395 | $21.00 | New | | $4,366 |
| Vacant | 1729-1734 | 1,294 | 0.77% | $2,157 | $25,880 | $20.00 | | | |
| AnyMmg Asset Funding LLC | 1732-1733 | 906 | 0.54% | $1,397 | $16,761 | $18.50 | 2/1/2014 | 3/31/2020 | $1,585 |
| FDF Holdings LLC | 1600 | 6,644 | 3.97% | $13,011 | $156,134 | $23.50 | 11/1/2018 | 10/31/2028 | $2,006 |
| FDF Holdings LLC | 1500 | 6,644 | 3.97% | $13,011 | $156,134 | $23.50 | 11/1/2018 | 10/31/2028 | $2,006 |
| Ohambi new space | 1428-1429 | 1,081 | 0.65% | $1,802 | $21,820 | $20.00 | New | | $1,892 |
| Law Office Kousassi & Ohiambo | 1420-1424 | 937 | 0.56% | $1,579 | $18,946 | $20.22 | 5/1/2018 | 4/30/2021 | $714 |
| Vacant | 1434 | 442 | 0.26% | $737 | $8,840 | $20.00 | | | |
| Iloni CPA, LLC | 1427 | 548 | 0.33% | $891 | $10,686 | $19.50 | 5/1/2013 | 4/30/2021 | $959 |
| The Chad School Foundation | 1430 | 2,146 | 1.28% | $3,532 | $42,384 | $19.75 | 5/1/2017 | 7/31/2023 | $3,756 |
| Vacant | 1301 | 2,518 | 1.50% | $4,197 | $50,360 | $20.00 | *CHAD School interested in this spot | | |
| Law Offices Michelle Labayen | 1300 | 1,032 | 0.62% | $1,677 | $20,124 | $19.50 | 7/1/2018 | 6/31/2023 | $1,806 |
| Murphy Partners LLP | 1302 | 1,588 | 0.95% | $2,581 | $30,969 | $19.50 | 7/1/2018 | 6/30/2024 | $2,779 |
| One Wall Management, LLC | 1200 | 6,723 | 4.01% | $11,625 | $139,502 | $20.75 | 4/1/2016 | 3/31/2023 | $11,785 |
| Dental Kidz. LLC | 1100 | 7,420 | 4.43% | $14,397 | $172,767 | $23.28 | 10/1/2008 | 2/28/2019 | $22,321 |
| Vacant | 1000 | 944 | 0.56% | $1,573 | $18,880 | $20.00 | | | *Renewing for 10 years |
| Frank and Pollack, LLC | 1001 | 1,750 | 1.05% | $2,844 | $34,125 | $19.50 | 10/1/2014 | 12/31/2019 | $3,083 |
| Elite Financial Management | 1002 | 1,650 | 0.99% | $2,855 | $34,257 | $20.76 | 8/15/2015 | 11/14/2020 | $2,888 |
| QAS | 1003 | 1,190 | 0.71% | $1,884 | $22,610 | $19.00 | 1/1/2017 | 2/28/2020 | $2,082 |
| ACBB - Blts, LLC | 800-900 | 15,000 | 8.96% | $23,125 | $277,500 | $18.50 | 11/1/2013 | 12/31/2023 | $13,584 |
| Freeman & Bass, P.C. | 700-706 | 6,975 | 4.17% | $9,881 | $118,575 | $17.00 | 9/1/1998 | 3/31/2020 | |
| Public Partnerships LLC | 701 | 6,600 | 3.94% | $11,550 | $138,600 | $21.00 | 11/15/2017 | 2/14/2023 | $11,550 |
| Patunas Law. LLC. | 608 | 1,258 | 0.75% | $2,120 | $25,434 | $20.25 | 2/1/2016 | 4/30/2021 | $2,198 |
| Vacant | 610 | 882 | 0.53% | $1,470 | $17,640 | $20.00 | | | |
| Vacant | 632 | 546 | 0.33% | $910 | $10,920 | $20.00 | | | |
| AGS Health Inc | 612 | 2,337 | 1.40% | $4,110 | $49,320 | $21.10 | 7/15/2014 | 7/14/2019 | $4,090 |
| Brooks CPR, Inc. | 626 | 568 | 0.34% | $1,014 | $12,169 | $21.50 | 10/1/2018 | 9/14/2021 | $990 |
| ChildCare Careers | 627 | 453 | 0.27% | $755 | $9,060 | $20.00 | 6/1/2017 | 5/31/2019 | $793 |
| Vertex Global Solutions | 619 | 890 | 0.53% | $1,520 | $18,245 | $20.50 | 1/15/2018 | 1/14/2021 | $1,557 |
| Secura Home Health LLC | 607 | 1,713 | 1.02% | $3,015 | $36,174 | $21.12 | 9/1/2011 | 7/31/2019 | $3,897 |
| Seth C. Addo-Yobo | 634 | 1,185 | 0.71% | $1,890 | $22,678 | $19.14 | 5/1/2010 | 10/31/2020 | $4,086 |
| Mount Vernon Group Archite | 629 | 1,600 | 0.96% | $2,667 | $32,000 | $20.00 | 3/24/2015 | 4/30/2020 | $912 |
| Jacobson & Silverman | 628 | 608 | 0.36% | $945 | $11,339 | $18.65 | 6/1/2004 | MTM | $2,475 |
| Vacant | 500 | 1,225 | 0.73% | $2,042 | $24,500 | $20.00 | | | |
| Vacant | 527 | 427 | 0.25% | $712 | $8,540 | $20.00 | | | |
| Vacant | 529 | 537 | 0.32% | $895 | $10,740 | $20.00 | | | |
| Vacant | 530 | 847 | 0.51% | $1,412 | $16,940 | $20.00 | | | |
| Intelli Health Solutions, Inc | 510 | 4,405 | 2.63% | $7,147 | $85,765 | $19.47 | 3/1/2017 | 3/31/2022 | $20,837 |
| NobleStrategy LLC | 501 | 1,475 | 0.88% | $2,458 | $29,500 | $20.00 | 10/1/2017 | 12/31/2022 | $2,581 |
| Bright Horizon Institute, LLC | 525 | 1,594 | 0.95% | $2,790 | $33,474 | $21.00 | 1/1/2017 | 5/31/2020 | |
| Psychological Services | 528 | 551 | 0.33% | $879 | $10,545 | $19.14 | 2/3/2010 | 7/31/2021 | $1,876 |
| Medallion Funding Corp | 534 | 700 | 0.42% | $1,358 | $16,299 | $23.28 | 7/1/2013 | 7/31/2019 | $1,890 |
| David D. Ruddy. Esq | 533 | 700 | 0.42% | $1,320 | $15,837 | $22.62 | 1/1/2008 | 7/31/2019 | |
| ALM Media, LLC | 425 | 3,752 | 2.24% | $6,410 | $76,916 | $20.50 | 7/1/2015 | 9/30/2020 | $6,566 |
| First Connect Center LLC | 434 | 2,180 | 1.30% | $3,497 | $41,965 | $19.25 | 2/1/2017 | 4/30/2021 | $3,815 |
| NewEducare | 401 | 2,734 | 1.63% | $4,224 | $50,688 | $18.54 | 4/1/2012 | 6/30/2020 | $11,961 |
| Quest Diagnostics Incorporated | 410 | 1,890 | 1.13% | $3,253 | $39,032 | $20.65 | 12/1/2003 | 5/31/2020 | $5,930 |
| Ravin Greenberg LLC | 420 | 1,280 | 0.76% | $2,187 | $26,240 | $20.50 | 8/14/2017 | 8/13/2022 | $2,240 |
| Unique Home Care | 430 | 1,250 | 0.75% | $2,083 | $25,000 | $20.00 | 1/15/2016 | 3/31/2021 | $2,187 |
| AV Brown Photography LLC | 303 | 1,104 | 0.66% | $1,289 | $15,462 | $14.01 | 9/1/2015 | 6/30/2020 | $1,503 |
| Trinity Sai Inc | 302 | 1,690 | 1.01% | $3,028 | $36,335 | $21.50 | 3/15/2018 | 5/14/2023 | $2,187 |
| NJEDA | 301 | 3,339 | 1.99% | $5,565 | $66,780 | $20.00 | 2/1/2014 | 7/31/2019 | $5,843 |
| Pennoni Associates | 300 | 7,967 | 4.76% | $12,946 | $155,357 | $19.50 | 4/1/2016 | 7/31/2023 | $13,042 |
| Mccarter & English, LLP | 200 | 9,458 | 5.65% | $9,945 | $119,340 | $12.62 | 6/1/2014 | 2/28/2023 | $16,548 |
| Vacant | 201 | 880 | 0.53% | $1,467 | $17,600 | $20.00 | | | |
| American Firearms Academy LLC | 101 | 1,154 | 0.69% | $1,827 | $21,928 | $19.00 | 12/1/2013 | 11/30/2023 | $2,308 |
| Angie's-EQ Cafe | 1 News | 210 | 0.13% | $318 | $3,819 | $18.19 | 8/1/2018 | 7/31/2023 | $384 |
| Gaccione Chiropractic Center | -1ST25 | 1,900 | 1.13% | $3,800 | $45,600 | $24.00 | 7/1/2016 | 6/30/2021 | $3,324 |
| MinuteMan Press | -1ST20 | 1,700 | 1.02% | $3,369 | $40,425 | $23.78 | 9/1/2016 | 11/30/2026 | $2,975 |
| Lycatel LLC | ST 126 & 624/6 | 8,572 | 5.12% | $16,366 | $196,397 | $22.91 | 10/1/2013 | 12/31/2018 | $15,505 |
| Garry Taffet | B1 | 150 | 0.09% | $150 | $1,800 | $12.00 | 8/1/2005 | MTM | |
| Vacant | B2 (Vault Area) | 3,000 | 1.79% | $5,000 | $60,000 | $20.00 | | | |
| Vacant | B3 (Large Roo | 7,500 | 4.48% | $12,500 | $150,000 | $20.00 | | | |
| # of Units:  67 | | 167,452 | 100.00% | $278,988 | $3,347,859 | $19.99 | | | $241,338 |

Sch. 3 - 3

137342639v7

confidential

confidential

## Schedule 4

**Organization of Borrower**

**24 Commerce Street**
**Newark, NJ**



137342639v7

confidential

confidential

## Schedule 5

### Definition of Special Purpose Bankruptcy Remote Entity

(I)     A "*Special Purpose Bankruptcy Remote Entity*" means (x) a limited liability company that is a Single Member Bankruptcy Remote LLC or (y) a corporation, limited partnership or limited liability company which at all times since its formation and at all times thereafter:

(i)     was and will be organized solely for the purpose of (A) owning the Property or (B) acting as a general partner of the limited partnership that owns the Property or member of the limited liability company that owns the Property;

(ii)     has not engaged and will not engage in any business unrelated to (A) the ownership of the Property, (B) acting as general partner of the limited partnership that owns the Property or (C) acting as a member of the limited liability company that owns the Property, as applicable;

(iii)     has not had and will not have any assets other than those related to the Property or its partnership or member interest in the limited partnership or limited liability company that owns the Property, as applicable;

(iv)     (A) has not engaged, sought or consented to and will not engage in, seek or consent to any dissolution, winding up, division, liquidation, consolidation, merger, asset sale (except as expressly permitted by this Agreement), transfer of partnership or membership interests or the like, or amendment of its limited partnership agreement, articles of incorporation, articles of organization, certificate of formation or operating agreement (as applicable) and (B) has not been the product of, the subject of or otherwise involved in, in each case, any limited liability company division (whether pursuant to a plan of division or otherwise);

(v)     if such entity is a limited partnership, has and will have, as its only general partners, Special Purpose Bankruptcy Remote Entities that are corporations;

(vi)     if such entity is a corporation, has and will have at least one (1) Independent Director, and has not caused or allowed and will not cause or allow the board of directors of such entity to take any action requiring the unanimous affirmative vote of 100% of the members of its board of directors unless all of the directors and all Independent Directors shall have participated in such vote, and the organizational documents of such entity shall provide that no Independent Director may be removed or replaced without Cause and unless such entity provides Lender with not less than three (3) Business Days' prior written notice of (a) any proposed removal of an Independent Director, together with a statement as to the reasons for such removal, and (b) the identity of the proposed replacement Independent Director, together with a certification that such replacement satisfies the requirements set forth in the organizational documents for an Independent Director;

137342639v7

confidential

confidential

(vii)        if such entity is a limited liability company, has and will have at least one member that has been and will be a Special Purpose Bankruptcy Remote Entity that has been and will be a corporation and such corporation is the managing member of such limited liability company;

(viii)       if such entity is a limited liability company, has and will have articles of organization, a certificate of formation and/or an operating agreement, as applicable, providing that (A) such entity will dissolve only upon the bankruptcy of the managing member, (B) the vote of a majority-in-interest of the remaining members is sufficient to continue the life of the limited liability company in the event of such bankruptcy of the managing member, (C) if the vote of a majority-in-interest of the remaining members to continue the life of the limited liability company following the bankruptcy of the managing member is not obtained, the limited liability company may not liquidate the Property without the consent of the applicable Rating Agencies for as long as the Loan is outstanding and (D) such entity shall be prohibited from effectuating a division (whether pursuant to Section 18-217 of the Act or otherwise);

(ix)        has not, and without the unanimous consent of all of its partners, directors or members (including all Independent Directors), as applicable, will not, with respect to itself or to any other entity in which it has a direct or indirect legal or beneficial ownership interest (A) file a bankruptcy, insolvency or reorganization petition or otherwise institute insolvency proceedings or otherwise seek any relief under any laws relating to the relief from debts or the protection of debtors generally, (B) seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for such entity or for all or any portion of such entity's properties, (C) make any assignment for the benefit of such entity's creditors or (D) take any action that might cause such entity to become insolvent;

(x)        has remained and intends to remain solvent and has maintained and intends to maintain adequate capital in light of its contemplated business operations;

(xi)        has not failed and will not fail to correct any known misunderstanding regarding the separate identity of such entity;

(xii)       has maintained and will maintain its accounts, books and records separate from any other Person and will file its own tax returns;

(xiii)      has maintained and will maintain its books, records, resolutions and agreements as official records;

(xiv)      has not commingled and will not commingle its funds or assets with those of any other Person;

(xv)       has held and will hold its assets in its own name;

(xvi)      has conducted and will conduct its business in its name;

137342639v7

confidential

confidential

(xvii)      has maintained and will maintain its financial statements, accounting records and other entity documents separate from any other Person;

(xviii)      has paid and will pay its own liabilities, including the salaries of its own employees, out of its own funds and assets;

(xix)      has observed and will observe all partnership, corporate or limited liability company formalities, as applicable;

(xx)      has maintained and will maintain an arm's-length relationship with its Affiliates;

(xxi)      (a) if such entity owns the Property, has not and will not have any indebtedness other than Permitted Indebtedness, or (b) if such entity acts as the general partner of a limited partnership which owns the Property, has not and will not have any indebtedness other than unsecured trade payables in the ordinary course of business relating to acting as general partner of the limited partnership which owns the Property which (1) do not exceed, at any time, $10,000 and (2) are paid within thirty (30) days of the date incurred, or (c) if such entity acts as a managing member of a limited liability company which owns the Property, has and will have no indebtedness other than unsecured trade payables in the ordinary course of business relating to acting as a member of the limited liability company which owns the Property which (1) do not exceed, at any time, $10,000 and (2) are paid within thirty (30) days of the date incurred;

(xxii)      has not and will not assume or guarantee or become obligated for the debts of any other Person or hold out its credit as being available to satisfy the obligations of any other Person except for the Loan;

(xxiii)      has not and will not acquire obligations or securities of its partners, members or shareholders;

(xxiv)      has allocated and will allocate fairly and reasonably shared expenses, including shared office space, and uses separate stationery, invoices and checks;

(xxv)      except in connection with the Loan, has not pledged and will not pledge its assets for the benefit of any other Person;

(xxvi)      has held itself out and identified itself and will hold itself out and identify itself as a separate and distinct entity under its own name and not as a division or part of any other Person;

(xxvii)      has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xxviii)      has not made and will not make loans to any Person;

Sch. 5 - 3

137342639v7

confidential

confidential

(xxix)      has not identified and will not identify its partners, members or shareholders, or any Affiliate of any of them, as a division or part of it;

(xxx)      has not entered into or been a party to, and will not enter into or be a party to, any transaction with its partners, members, shareholders or Affiliates except in the ordinary course of its business and on terms which are intrinsically fair and are no less favorable to it than would be obtained in a comparable arm's-length transaction with an unrelated third party;

(xxxi)      has and will have no obligation to indemnify its partners, officers, directors, members or Special Members, as the case may be, or has such an obligation that is fully subordinated to the Debt and will not constitute a claim against it if cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation;

(xxxii)      has and will have an express acknowledgment in its organizational documents that Lender is an intended third-party beneficiary of the "special purpose" provisions of such organizational documents; and

(xxxiii)      will consider the interests of its creditors in connection with all corporate, partnership or limited liability company actions, as applicable.

(II)      "*Single Member Bankruptcy Remote LLC*" means a limited liability company organized under the laws of the State of Delaware which at all times since its formation and at all times thereafter:

(i)      was and will be organized solely for the purpose of owning the Property;

(ii)      has not engaged and will not engage in any business unrelated to the ownership of the Property;

(iii)      has not had and will not have any assets other than those related to the Property;

(iv)      (A) has not engaged, sought or consented to and will not engage in, seek or consent to any dissolution, winding up, division, liquidation, consolidation, merger, asset sale (except as expressly permitted by this Agreement), transfer of partnership or membership interests or the like, or amendment of its limited liability company agreement or certificate of formation and (B) has not been the product of, the subject of or otherwise involved in, in each case, any limited liability company division (whether pursuant to a plan of division or otherwise);

(v)      has not, and without the unanimous consent of all of directors (including all Independent Directors), as applicable, will not, with respect to itself or to any other entity in which it has a direct or indirect legal or beneficial ownership interest (A) file a bankruptcy, insolvency or reorganization petition or otherwise institute insolvency proceedings or otherwise seek any relief under any laws relating to the relief from debts or the protection of debtors generally, (B) seek or consent to the appointment

confidential

confidential

of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for such entity or for all or any portion of such entity's properties, (C) make any assignment for the benefit of such entity's creditors or (D) take any action that might cause such entity to become insolvent;

  (vi)    has remained and intends to remain solvent and has maintained and intends to maintain adequate capital in light of its contemplated business operations;

  (vii)    has not failed and will not fail to correct any known misunderstanding regarding the separate identity of such entity;

  (viii)    has maintained and will maintain its books, records, resolutions and agreements as official records;

  (ix)    has not commingled and will not commingle its funds or assets with those of any other Person;

  (x)    has held and will hold its assets in its own name;

  (xi)    has conducted and will conduct its business in its name;

  (xii)    has maintained and will maintain its financial statements, accounting records and other entity documents separate from any other Person;

  (xiii)    has paid and will pay its own liabilities, including the salaries of its own employees, out of its own funds and assets;

  (xiv)    has observed and will observe all limited liability company formalities;

  (xv)    has maintained and will maintain an arm's-length relationship with its Affiliates;

  (xvi)    has not and will not have any indebtedness other than Permitted Indebtedness;

  (xvii)    has not and will not assume or guarantee or become obligated for the debts of any other Person or hold out its credit as being available to satisfy the obligations of any other Person except for the Loan;

  (xviii)    has not and will not acquire obligations or securities of its partners, members or shareholders;

  (xix)    has allocated and will allocate fairly and reasonably shared expenses, including shared office space, and uses separate stationery, invoices and checks;

.

confidential

(xx)      except in connection with the Loan, has not pledged and will not pledge its assets for the benefit of any other Person;

(xxi)      has held itself out and identified itself and will hold itself out and identify itself as a separate and distinct entity under its own name and not as a division or part of any other Person;

(xxii)      has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xxiii)      has not made and will not make loans to any Person;

(xxiv)      has not identified and will not identify its members or any Affiliate of any of them, as a division or part of it;

(xxv)      has not entered into or been a party to, and will not enter into or be a party to, any transaction with its partners, members, shareholders or Affiliates except in the ordinary course of its business and on terms which are intrinsically fair and are no less favorable to it than would be obtained in a comparable arm's-length transaction with an unrelated third party;

(xxvi)      has and will have no obligation to indemnify its partners, officers, directors, members or Special Members, as the case may be, or has such an obligation that is fully subordinated to the Debt and will not constitute a claim against it if cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation;

(xxvii)      has and will have an express acknowledgment in its organizational documents that Lender is an intended third-party beneficiary of the "special purpose" provisions of such organizational documents;

(xxviii)      will consider the interests of its creditors in connection with all limited liability company actions;

(xxix)      has maintained and will maintain its accounts, books and records separate from any other person;

(xxx)      has and will have an operating agreement which provides that the business and affairs of Borrower shall be managed by or under the direction of a board of one or more directors designated by Sole Member, and at all times there shall be at least one (1) duly appointed Independent Director on the board of directors or managers, and the board of directors or managers will not take any action requiring the unanimous affirmative vote of 100% of the members of its board of directors or managers unless, at the time of such action there are at least one (1) member of the board of directors or managers who is a Independent Director, and all of the directors and all Independent Directors shall have participated in such vote;

.

confidential

confidential

(xxxi)        has and will have an operating agreement which provides that, as long as any portion of the Debt remains outstanding, (A) upon the occurrence of any event that causes Sole Member to cease to be a member of Borrower (other than (x) upon an assignment by Sole Member of all of its limited liability company interest in Borrower and the admission of the transferee, if permitted pursuant to the organizational documents of Borrower and the Loan Documents, or (y) the resignation of Sole Member and the admission of an additional member of Borrower, if permitted pursuant to the organizational documents of Borrower and the Loan Documents), the person acting as an Independent Director of Borrower shall, without any action of any Person and simultaneously with Sole Member ceasing to be a member of Borrower, automatically be admitted as the sole member of Borrower (the "**Special Member**") and shall preserve and continue the existence of Borrower without dissolution or division, (B) no Special Member may resign or transfer its rights as Special Member unless (x) a successor Special Member has been admitted to Borrower as a Special Member, and (y) such successor Special Member has also accepted its appointment as an Independent Director, (C) no Independent Director may be removed or replaced without Cause and unless the company provides Lender with not less than three (3) Business Days' prior written notice of (a) any proposed removal of an Independent Director, together with a statement as to the reasons for such removal, and (b) the identity of the proposed replacement Independent Director, together with a certification that such replacement satisfies the requirements set forth in the organizational documents for an Independent Director, and (D) except as expressly permitted pursuant to the terms of this Agreement, Sole Member may not resign and no additional member shall be admitted to Borrower; and

(xxxii)        has and will have an operating agreement which provides that, as long as any portion of the Debt remains outstanding, (A) Borrower shall be dissolved, and its affairs shall be wound up only upon the first to occur of the following: (x) the termination of the legal existence of the last remaining member of Borrower or the occurrence of any other event which terminates the continued membership of the last remaining member of Borrower in Borrower unless the business of Borrower is continued in a manner permitted by its operating agreement or the Delaware Limited Liability Company Act (as the same may be amended, modified or replaced, the "**Delaware Act**") or (y) the entry of a decree of judicial dissolution under Section 18-802 of the Delaware Act; (B) upon the occurrence of any event that causes the last remaining member of Borrower to cease to be a member of Borrower or that causes Sole Member to cease to be a member of Borrower (other than (x) upon an assignment by Sole Member of all of its limited liability company interest in Borrower and the admission of the transferee, if permitted pursuant to the organizational documents of Borrower and the Loan Documents, or (y) the resignation of Sole Member and the admission of an additional member of Borrower, if permitted pursuant to the organizational documents of Borrower and the Loan Documents), to the fullest extent permitted by law, the personal representative of such member shall be authorized to, and shall, within 90 days after the occurrence of the event that terminated the continued membership of such member in Borrower, agree in writing to continue the existence of Borrower and to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of Borrower, effective as of the occurrence of the event that terminated the continued membership of such member in Borrower; (C) the bankruptcy of Sole Member

Sch. 5 - 7

confidential

confidential

or a Special Member shall not cause such member or Special Member, respectively, to cease to be a member of Borrower and upon the occurrence of such an event, the business of Borrower shall continue without dissolution; (D) in the event of dissolution of Borrower, Borrower shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of Borrower in an orderly manner), and the assets of Borrower shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Delaware Act; (E) to the fullest extent permitted by law, each of Sole Member and the Special Members shall irrevocably waive any right or power that they might have to cause Borrower or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of Borrower, to compel any sale of all or any portion of the assets of Borrower pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, division, liquidation, winding up or termination of Borrower; and (F) Borrower shall be prohibited from effectuating a division (whether pursuant to a plan of division or otherwise).

(III)   "*Cause*" shall mean, with respect to an Independent Director or Independent Manager, (i) acts or omissions by such Independent Director or Independent Manager, as applicable, that constitute willful disregard of, or gross negligence with respect to such Independent Director's or Independent Manager's, as applicable, duties, (ii) such Independent Director or Independent Manager, as applicable, has engaged in or has been charged with or has been indicted or convicted for any crime or crimes of fraud or other acts constituting a crime under any law applicable to such Independent Director or Independent Manager, as applicable, (iii) such Independent Director or Independent Manager, as applicable, has breached its fiduciary duties of loyalty and care as and to the extent of such duties in accordance with the terms of Borrower's organizational documents, (iv) there is a material increase in the fees charged by such Independent Director or Independent Manager, as applicable, or a material change to such Independent Director's or Independent Manager's, as applicable, terms of service, (v) such Independent Director or Independent Manager, as applicable, is unable to perform his or her duties as Independent Director or Independent Manager, as applicable, due to death, disability or incapacity, or (vi) such Person no longer meets the criteria provided in the definition of Independent Director or Independent Manager, as applicable.

(IV)   "*Independent Director*" or "*Independent Manager*" means a natural person selected by Borrower (a) with prior experience as an independent director, independent manager or independent member, (b) with at least three (3) years of employment experience, (c) who is provided by a Nationally Recognized Service Company (defined below), (d) who is duly appointed as an Independent Director or Independent Manager and is not, will not be while serving as Independent Director or Independent Manager (except pursuant to an express provision in Borrower's operating agreement providing for the appointment of such Independent Director or Independent Manager to become a "special member" upon Sole Member ceasing to be a member of Borrower) and shall not have been at any time during the preceding five (5) years, any of the following:

(i)      a stockholder, director (other than as an Independent Director), officer, employee, partner, attorney or counsel of Borrower, any Affiliate of Borrower or any direct or indirect parent of Borrower;

Sch. 5 - 8

confidential

confidential

(ii)     a customer, supplier or other Person who derives any of its purchases or revenues from its activities with Borrower or any Affiliate of Borrower;

(iii)     a Person or other entity Controlling or under Common Control with any such stockholder, partner, customer, supplier or other Person; or

(iv)     a member of the immediate family of any such stockholder, director, officer, employee, partner, customer, supplier or other Person.

A natural person who otherwise satisfies the foregoing definition and satisfies subparagraph (i) by reason of being the Independent Director or Independent Manager of a "special purpose entity" affiliated with Borrower shall be qualified to serve as an Independent Director or Independent Manager of Borrower, provided that the fees that such individual earns from serving as Independent Director or Independent Manager of affiliates of Borrower in any given year constitute in the aggregate less than five percent (5%) of such individual's annual income for that year.

A natural person who satisfies the foregoing definition other than <u>clause (ii)</u> shall not be disqualified from serving as an Independent Director or Independent Manager of Borrower if such individual is an independent director, independent manager or special manager provided by a Nationally Recognized Service Company that provides professional independent directors, independent managers and special managers and also provides other corporate services in the ordinary course of its business.

(V)     "***Nationally Recognized Service Company***" means any of CT Corporation, Corporation Service Company, National Registered Agents, Inc., National Corporate Research, Ltd., Wilmington Trust Company or such other nationally recognized company that provides independent director, independent manager or independent member services and that is reasonably satisfactory to Lender, in each case that is not an Affiliate of Borrower and that provides professional independent directors and other corporate services in the ordinary course of                                    its                                    business.

137342639v7

confidential

confidential

## Schedule 6

### Secondary Market Transaction Information

(A)     Any proposed program for the renovation, improvement or development of the Property, or any part thereof, including the estimated cost thereof and the method of financing to be used.

(B)     The general competitive conditions to which the Property is or may be subject.

(C)     Management of the Property.

(D)     Occupancy rate expressed as a percentage for each of the last five years.

(E)     Principal business, occupations and professions carried on in, or from the Property.

(F)     Number of tenants occupying 10% or more of the total rentable square footage of the Property and principal nature of business of such tenant, and the principal provisions of the Leases with those tenants including, but not limited to: rental per annum, expiration date, and renewal options.

(G)     The average effective annual rental per square foot or unit for each of the last three years prior to the date of filing.

(H)     Schedule of the Lease expirations for each of the ten years starting with the year in which the registration statement is filed (or the year in which the prospectus supplement is dated, as applicable), stating:

      (1)     The number of tenants whose Leases will expire.

      (2)     The total area in square feet covered by such Leases.

      (3)     The annual rental represented by such Leases.

      (4)     The percentage of gross annual rental represented by such Leases.

137342639v7

confidential

## Schedule 7

### Intellectual Property/Websites

None.

137342639v7

confidential

## Schedule 8

**REA**

N/A

137342639v7

confidential

confidential

**Schedule 9**

**Project**

THE PROPERTY DESCRIBED HEREON IS THE SAME AS THE PROPERTY DESCRIBED IN MEISTER ABSTRACT CORP COMMITMENT NO. MACJ7360 WITH AN EFFECTIVE DATE OF 12/05/2018 AND THAT ALL THE EASEMENTS, COVENANTS AND RESTRICTIONS REFERENCED IN SAID TITLE COMMITMENT OR APPARENT FROM A PHYSICAL INSPECTION OF THE SITE OR OTHERWISE KNOWN TO ME HAVE BEEN PLOTTED HEREON OR OTHERWISE NOTED AS TO THEIR EFFECT ON THE SUBJECT PROPERTY.

TAX MAP SHEET 51 (SCALE: N.T.S.)

EASEMENT NOTES:
1) DB:3609/329 - NON PLOTTABLE.
2) DB:4329/364 - NON PLOTTABLE.

ZONING TABLE - ZONE RDV/SD - REDEVELOPMENT / SPECIAL DISTRICTS

| | REQUIREMENTS | EXISTING LOT 19 |
|---|---|---|
| MIN. LOT AREA | 3,500 S.F. | 17,638 S.F. / 0.405 ACRES |
| MIN. LOT WIDTH | 35 FEET | 100.00 FEET |
| MIN. FRONT YARD (COMMERCE STREET) | NONE | 0.0 FT (FACADE IS OVER R.O.W. LINE BY 0.3 FT) |
| MIN. FRONT YARD (CLINTON STREET) | NONE | 0.0 FT (FACADE IS OVER R.O.W. LINE BY 0.8 FT) |
| MIN. SIDE YARD | NONE | 0.0 FT |
| MIN. REAR YARD | NONE | N/A |
| MAX. BUILDING HEIGHT | NOT RESTRICTED | 19 FLOORS |

ZONING INFORMATION PROVIDED BY:
THE PLANNING & ZONING RESOURCE CORPORATION
1300 SOUTH MERIDIAN AVENUE
SUITE 400
OKLAHOMA CITY, OKLAHOMA 73108
DATED 01/14/2019

LEGAL DESCRIPTION

BEGINNING AT A POINT IN THE SOUTHERLY SIDELINE OF COMMERCE STREET DISTANT 242.82 FEET EASTERLY FROM ITS INTERSECTION WITH THE EASTERLY SIDELINE OF BROAD STREET AND RUNNING, THENCE;
1) ALONG THE SOUTHERLY LINE OF COMMERCE STREET, S57° 57' 00"E 104.55' TO A POINT, THENCE;
2) S32° 01' 00"W 88.38' TO A POINT, THENCE;
3) N65° 19' 32"W 1.02' TO A POINT, THENCE;
4) S30° 04' 00"W 81.06' TO A POINT IN THE NORTHERLY SIDELINE OF CLINTON STREET, THENCE;
5) ALONG SAID NORTHERLY SIDELINE OF CLINTON STREET, N60° 57' 00"W 100.00' TO A POINT, THENCE;
6) N29° 52' 00"E 87.04' TO A POINT, THENCE;
7) N60° 02' 00"W 3.32' TO A POINT, THENCE;
8) N32° 07' 00"E 87.90' TO A POINT IN THE SOUTHERLY LINE OF COMMERCE STREET AND THE POINT AND PLACE OF BEGINNING.

TO ARGENTIC REAL ESTATE FINANCE LLC AND ITS SUCCESSORS AND ASSIGNS, 24 COMMERCE LLC, OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY, MEISTER ABSTRACT CORP AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS.
THIS IS TO CERTIFY THAT THIS MAP OR PLAT AND SURVEY ON WHICH IT IS BASED WERE MADE IN ACCORDANCE WITH THE 2016 MINIMUM STANDARD DETAIL REQUIREMENTS FOR ALTA/NSPS LAND TITLE SURVEYS, JOINTLY ESTABLISHED AND ADOPTED BY ALTA AND NSPS AND INCLUDES ITEMS 1, 2, 3, 4, 6(a), 6(b), 7(a), 7(b)(1), 7(c), 8, 9, 13, 14, 16, 17 AND 20 OF TABLE A THEREOF.
THE FIELD WORK WAS COMPLETED ON SEPTEMBER 08, 2018.
DATE OF PLAT OR MAP: SEPTEMBER 08, 2018 AND LAST REVISED JANUARY 30, 2019.

DOUGLAS B. SMITH, II
LICENSE NO: NJPLS#43234
DATE: JAN. 30, 2019

NOTES:
1) VERTICAL DATUM: NAVD1988 (RAPID STATIC GPS OBSERVATIONS)
2) PROPERTY IS LOCATED IN ZONE X AS SHOWN ON THE FLOOD INSURANCE RATE MAP (FIRM) NO. 34013C0156F PANEL 156 OF 200 LOCATED IN ESSEX COUNTY, NEW JERSEY. EFFECTIVE JUNE 04, 2007. THERE IS NO BASE FLOOD ELEVATION THAT CAN BE MAPPED.
3) THERE ARE NO PARKING SPACES LOCATED ON SITE.
4) ABOVE GROUND VISIBLE UTILITIES HAVE BEEN SHOWN.. NO UNDERGROUND MAPPING WAS SUPPLIED AT TIME OF SURVEY.
5) NO EVIDENCE OF RECENT EARTH MOVING OR VISIBLE CONSTRUCTION WAS BEING PERFORMED AT TIME OF SURVEY.
6) THERE ARE NO KNOWN PROPOSED CHANGES IN THE STREET RIGHT OF WAY LINES AT TIME OF SURVEY.
7) THERE ARE NO ENCROACHMENTS WITH ADJOINING LAND OWNERS.

LEGEND
⊽ - STAND PIPE

20 0 20 40 60
SCALE 1" = 20'

| DATE | REVISION |
|---|---|
| | |
| | |
| JAN. 30, 2019 | ADDED ADDITIONAL ITEMS AS REQUESTED. |
| JAN. 25, 2019 | ADDED ITEMS AS REQUESTED FROM THE ALTA TABLE A LIST. |
| OCT. 04, 2018 | ADDED CERTIFICATIONS. |

Subject to any easements or restrictions that may affect the subject property. Boundary line determinations to be made by using the property corners as staked only. A written Waiver and Directions Not to Set Corner Markers has been obtained from the ultimate user pursuant to NJAC 13:40-5.1(d). Certifications are not transferable to subsequent owners or additional institutions. Subject to such data as an accurate search may reveal.
COPYRIGHT, 2018 D.A.B. SURVEYING, INC.

# ALTA/NSPS LAND TITLE SURVEY

24-30 COMMERCE STREET
BLOCK 145 ~ LOT 19
CITY OF NEWARK
ESSEX COUNTY, NEW JERSEY

SCALE: 1"=20' | SEPT. 08, 2018 | REFERENCES: DEEDS OF RECORD; AND EVIDENCE IN THE FIELD.

973-638-4792 FAX 283-1655

DAB SURVEYING INC.
170 KINNELON ROAD
SUITE 25
KINNELON, NJ 07405
CERTIFICATION OF AUTHORIZATION
24GA27953100

CERTIFIED TO: 24 COMMERCE LLC; ARGENTIC REAL ESTATE FINANCE LLC, ITS SUCCESSORS AND/OR ASSIGNS; OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY; AND MEISTER ABSTRACT CORP

EMAIL: DOUG@DABSURVEYINGINC.COM
PROJECT NUMBER 2018 08 0333

DOUGLAS B. SMITH PROFESSIONAL LAND SURVEYOR N.J. LIC.43234

Sch. 9 - 1

13734263 9v7

confidential

## RECORDED MORTGAGE



# Essex County Register Document Summary Sheet

| **Transaction Identification Number** | 3795864 | 3340830 |
|---|---|---|

ESSEX COUNTY REGISTER OF DEEDS & MORTGAGES

HALL OF RECORDS - ROOM 130

465 DR. MARTIN LUTHER KING BLVD

NEWARK NJ 07102

**Recorded Document to be Returned by Submitter to:**

MEISTER ABSTRACT CORP

11 NORTH AIRMONT ROAD

SUITE 12
SUFFERN, NY 10901

| **Official Use Only** | | |
|---|---|---|

DANA RONE
REG. OF DEEDS & MORTGAGES
ESSEX COUNTY
New Jersey

DOCUMENT TYPE
2
INSTRUMENT NUMBER
2019034219
RECORDED ON
Apr 15, 2019
8:10:57 AM
Total Pages: 21

NJ PRESERVATION       $100.00
ACCOUNT
REGISTER RECORDING FEE $110.00
HOMELESSNESS TRUST FUND  $3.00
TOTAL PAID            $213.00
INV: 274567 USER: NT

| **Submission Date** *(mm/dd/yyyy)* | 04/10/2019 |
|---|---|
| **No. of Pages** *(excluding Summary Sheet)* | 19 |
| **Recording Fee** *(excluding transfer tax)* | $213.00 |
| **Realty Transfer Tax** | $0.00 |
| **Total Amount** | $213.00 |

| **Document Type** | MORTGAGE |
|---|---|

| **Electronic Recordation Level** | L2 - Level 2 (With Images) |
|---|---|

**Municipal Codes**

| ESSEX COUNTY | 99 |
|---|---|

298475

**Not Certified Copy**

| **Additional Information (Official Use Only)** |
|---|

*** DO NOT REMOVE THIS PAGE.**
*COVER SHEET [DOCUMENT SUMMARY FORM] IS PART OF ESSEX COUNTY REGISTER FILING RECORD.*
*RETAIN THIS PAGE FOR FUTURE REFERENCE.*

Inst. # 2019034219 - Page 2 of 21

 **Essex County Register Document Summary Sheet**

| Type | MORTGAGE |
|---|---|
| Consideration | $14,500,000.00 |
| Submitted By | SIMPLIFILE, LLC. (SIMPLIFILE) |
| Document Date | 04/04/2019 |
| Reference Info | |

| | Book ID | Book | Beginning Page | Instrument No. | Recorded/File Date |
|---|---|---|---|---|---|
| | | | | | |

| MORTGAGOR | Name | | | Address | |
|---|---|---|---|---|---|
| | 24 COMMERCE STREET LLC | | | | |

| MORTGAGEE | Name | | | Address | |
|---|---|---|---|---|---|
| | ARGENTIC REAL ESTATE FINANCE LLC | | | | |

| Parcel Info | | | | | |
|---|---|---|---|---|---|
| Property Type | Tax Dist. | Block | Lot | Qualifier | Municipality |
| | | | | | |

*MORTGAGE*

*** DO NOT REMOVE THIS PAGE.**
*COVER SHEET [DOCUMENT SUMMARY FORM] IS PART OF ESSEX COUNTY REGISTER FILING RECORD.*
*RETAIN THIS PAGE FOR FUTURE REFERENCE.*

0DC43DB1-61B1-DE08-0518-05B01A862A8E/3795864 3340830

*Not Certified Copy*

Inst. # 2019034219 - Page 3 of 21

**24 COMMERCE STREET LLC**
(Mortgagor)

to

**ARGENTIC REAL ESTATE FINANCE LLC**
(Mortgagee)

**MORTGAGE, ASSIGNMENT OF LEASES AND RENTS
AND SECURITY AGREEMENT**

Dated:   As of April 4, 2019

Property Location:   24 Commerce Street
Newark, New Jersey

County:   Essex

DOCUMENT PREPARED BY AND WHEN RECORDED, RETURN TO:

Katten Muchin Rosenman LLP
550 South Tryon Street, Suite 2900
Charlotte, North Carolina 28202
Attention:  Karen M. Nelson, Esq.

137342852v4

Inst. # 2019034219   Page 4 of 21

**THIS MORTGAGE, ASSIGNMENT OF LEASES AND RENTS AND SECURITY AGREEMENT** (this "*Mortgage*"), made as of April 4, 2019 made by **24 COMMERCE STREET LLC**, a Delaware limited liability company, having an office at 24 Commerce Street, Suite 101, Newark, New Jersey 07102, Attention: Jacob Tauber ("*Mortgagor*"), to **ARGENTIC REAL ESTATE FINANCE LLC** (together with its successors and assigns, hereinafter referred to as "*Mortgagee*"), having an address at 40 West 57th Street, 29th Floor, New York, New York 10019.

Mortgagor and Mortgagee have entered into a Loan Agreement dated as of the date hereof (as amended, modified, restated, consolidated or supplemented from time to time, the "*Loan Agreement*") pursuant to which Mortgagee is making a secured loan to Mortgagor in the aggregate original principal amount of $14,500,000.00 (the "*Loan*"). Capitalized terms used herein without definition are used as defined in the Loan Agreement. The Loan is evidenced by a Note dated the date hereof made by Mortgagor to Mortgagee in such principal amount (as the same may be amended, modified, restated, severed, consolidated, renewed, replaced, or supplemented from time to time, the "*Note*").

To secure the payment of the Note and all sums which may or shall become due thereunder or under any of the other documents evidencing, securing or executed in connection with the Loan (the Note, this Mortgage, the Loan Agreement and such other documents, as any of the same may, from time to time, be modified, amended or supplemented, being hereinafter collectively referred to as the "*Loan Documents*"), including (i) the payment of interest and other amounts which would accrue and become due but for the filing of a petition in bankruptcy (whether or not a claim is allowed against Mortgagor for such interest or other amounts in any such bankruptcy proceeding) or the operation of the automatic stay under Section 362(a) of Title 11 of the United States Code (the "*Bankruptcy Code*"), and (ii) the costs and expenses of enforcing any provision of any Loan Document (all such sums being hereinafter collectively referred to as the "*Debt*"), Mortgagor hereby irrevocably mortgages, grants, bargains, sells, conveys, transfers, pledges, sets over and assigns, and grants a security interest, to and in favor of Mortgagee, all of Mortgagor's right, title and interest in and to the land described in Exhibit A (the "*Premises*"), and the buildings, structures, fixtures and other improvements now or hereafter located thereon (the "*Improvements*");

**TOGETHER WITH:**  all right, title, interest and estate of Mortgagor now owned, or hereafter acquired, in and to the following property, rights, interests and estates (the Premises, the Improvements, and the property, rights, interests and estates hereinafter described are collectively referred to herein as the "*Mortgaged Property*"):

(a)  all easements, rights-of-way, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, rights to oil, gas, minerals, coal and other substances of any kind or character, and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments and appurtenances of any nature whatsoever, in any way belonging, relating or pertaining to the Premises and the Improvements; and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road, highway, alley or avenue, opened, vacated or proposed, in front of or adjoining the Premises, to the center line thereof; and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possession, claim and demand

137342852v4

whatsoever, both at law and in equity, of Mortgagor of, in and to the Premises and the Improvements and every part and parcel thereof, with the appurtenances thereto;

(b)     all machinery, furniture, furnishings, equipment, computer software and hardware, fixtures (including all heating, air conditioning, plumbing, lighting, communications and elevator fixtures), inventory, materials, supplies and other articles of personal property and accessions thereof, renewals and replacements thereof and substitutions therefor, and other property of every kind and nature, tangible or intangible, owned by Mortgagor, or in which Mortgagor has or shall have an interest, now or hereafter located upon the Premises or the Improvements, or appurtenant thereto, and usable in connection with the present or future operation and occupancy of the Premises and the Improvements (hereinafter collectively referred to as the "*Equipment*"), including any leases of, deposits in connection with, and proceeds of any sale or transfer of any of the foregoing, and the right, title and interest of Mortgagor in and to any of the Equipment that may be subject to any "security interest" as defined in the Uniform Commercial Code, as in effect in the State where the Mortgaged Property is located (the "*UCC*"), superior in lien to the lien of this Mortgage;

(c)     all awards or payments, including interest thereon, that may heretofore or hereafter be made with respect to the Premises or the Improvements, whether from the exercise of the right of eminent domain or condemnation (including any transfer made in lieu of or in anticipation of the exercise of such right), or for a change of grade, or for any other injury to or decrease in the value of the Premises or Improvements;

(d)     all leases, subleases and other agreements or arrangements heretofore or hereafter entered into affecting the use, enjoyment or occupancy of, or the conduct of any activity upon or in, the Premises or the Improvements, including any extensions, renewals, modifications or amendments thereof (hereinafter collectively referred to as the "*Leases*") and all rents, rent equivalents, moneys payable as damages (including payments by reason of the rejection of a Lease in a Bankruptcy Proceeding or in lieu of rent or rent equivalents), royalties (including all oil and gas or other mineral royalties and bonuses), income, fees, receivables, receipts, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Mortgagor or its agents or employees from any and all sources arising from or attributable to the Premises and the Improvements, including all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of the Premises or the Improvements, or rendering of services by Mortgagor or any of its agents or employees, and proceeds, if any, from business interruption or other loss of income insurance (hereinafter collectively referred to as the "*Rents*"), together with all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt;

(e)     all proceeds of and any unearned premiums on any insurance policies covering the Mortgaged Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Mortgaged Property;

2

137342852v4

Inst. # 2019034219 Page 6 of 21

(f)     the right, in the name and on behalf of Mortgagor, to appear in and defend any action or proceeding brought with respect to the Mortgaged Property and to commence any action or proceeding to protect the interest of Mortgagee in the Mortgaged Property;

(g)     all accounts (including reserve accounts), escrows, documents, instruments, chattel paper, claims, deposits and general intangibles, as the foregoing terms are defined in the UCC, and all franchises, trade names, trademarks, symbols, service marks, books, records, plans, specifications, designs, drawings, surveys, title insurance policies, permits, consents, licenses, management agreements, contract rights (including any contract with any architect or engineer or with any other provider of goods or services for or in connection with any construction, repair or other work upon the Mortgaged Property), approvals, actions, refunds of real estate taxes and assessments (and any other governmental impositions related to the Mortgaged Property) and causes of action that now or hereafter relate to, are derived from or are used in connection with the Mortgaged Property, or the use, operation, maintenance, occupancy or enjoyment thereof or the conduct of any business or activities thereon (hereinafter collectively referred to as the "*Intangibles*"); and

(h)     all proceeds, products, offspring, rents and profits from any of the foregoing, including those from sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

Without limiting the generality of any of the foregoing, in the event that a case under the Bankruptcy Code is commenced by or against Mortgagor, pursuant to Section 552(b)(2) of the Bankruptcy Code, the security interest granted by this Mortgage shall automatically extend to all Rents acquired by the Mortgagor after the commencement of the case and shall constitute cash collateral under Section 363(a) of the Bankruptcy Code.

**TO HAVE AND TO HOLD** the Mortgaged Property unto Mortgagee and its successors and assigns, forever;

**PROVIDED, HOWEVER,** these presents are upon the express condition that, if Mortgagor shall well and truly pay to Mortgagee the Debt at the time and in the manner provided in the Loan Documents and shall well and truly abide by and comply with each and every covenant and condition set forth in the Loan Documents in a timely manner, these presents and the estate hereby granted shall cease, terminate and be void;

**AND** Mortgagor represents and warrants to and covenants and agrees with Mortgagee as follows:

## PART I - GENERAL PROVISIONS

1.     <u>**Payment of Debt and Incorporation of Covenants, Conditions and Agreements**</u>.  Mortgagor shall pay the Debt at the time and in the manner provided in the Loan Documents.  All the covenants, conditions and agreements contained in the Loan Documents are hereby made a part of this Mortgage to the same extent and with the same force as if fully set forth herein.  Without limiting the generality of the foregoing, Mortgagor (i) agrees to insure, repair, maintain and restore damage to the Mortgaged Property, pay Taxes and Other Charges, and comply with Legal Requirements, in accordance with the Loan Agreement, and (ii) agrees

3

that the Proceeds of Insurance and Awards for Condemnation shall be settled, held and applied in accordance with the Loan Agreement.

2.     **Leases and Rents**.

(a)     Mortgagor does hereby absolutely and unconditionally assign to Mortgagee all of Mortgagor's right, title and interest in all current and future Leases and Rents, it being intended by Mortgagor that this assignment constitutes a present, absolute assignment, and not an assignment for additional security only. Such assignment shall not be construed to bind Mortgagee to the performance of any of the covenants or provisions contained in any Lease or otherwise impose any obligation upon Mortgagee. Nevertheless, subject to the terms of this paragraph, Mortgagee grants to Mortgagor a revocable license to operate and manage the Mortgaged Property and to collect the Rents subject to the requirements of the Loan Agreement (including the deposit of Rents into the Clearing Account). Upon an Event of Default, without the need for notice or demand, the license granted to Mortgagor herein shall automatically be revoked, and Mortgagee shall immediately be entitled to possession of all Rents in the Clearing Account, the Deposit Account (including all Subaccounts thereof) and all Rents collected thereafter (including Rents past due and unpaid), whether or not Mortgagee enters upon or takes control of the Mortgaged Property. Mortgagor hereby grants and assigns to Mortgagee the right, at its option, upon revocation of the license granted herein, to enter upon the Mortgaged Property in person, by agent or by court-appointed receiver to collect the Rents. Any Rents collected after the revocation of such license may be applied toward payment of the Debt in such priority and proportions as Mortgagee in its sole discretion shall deem proper.

(b)     Mortgagor shall not enter into, modify, amend, cancel, terminate or renew any Lease except as provided in Section 5.10 of the Loan Agreement.

3.     **Use of Mortgaged Property**. Mortgagor shall not initiate, join in, acquiesce in or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Mortgaged Property. If under applicable zoning provisions the use of the Mortgaged Property is or shall become a nonconforming use, Mortgagor shall not cause or permit such nonconforming use to be discontinued or abandoned without the consent of Mortgagee. Mortgagor shall not (i) change the use of the Mortgaged Property, (ii) permit or suffer to occur any waste on or to the Mortgaged Property or (iii) take any steps to convert the Mortgaged Property to a condominium or cooperative form of ownership.

4.     **Transfer or Encumbrance of the Mortgaged Property**.

(a)     Mortgagor acknowledges that (i) Mortgagee has examined and relied on the creditworthiness and experience of the principals of Mortgagor in owning and operating properties such as the Mortgaged Property in agreeing to make the Loan, (ii) Mortgagee will continue to rely on Mortgagor's ownership of the Mortgaged Property as a means of maintaining the value of the Mortgaged Property as security for the Debt, and (iii) Mortgagee has a valid interest in maintaining the value of the Mortgaged Property so as to ensure that, should Mortgagor default in the repayment of the Debt, Mortgagee can recover the Debt by a sale of the Mortgaged Property. Mortgagor shall not sell, convey, alienate, mortgage, encumber, pledge or

4

otherwise transfer the Mortgaged Property or any part thereof, or suffer or permit any Transfer to occur, other than a Permitted Transfer.

(b)    Mortgagee shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon Transfer in violation of this Paragraph 4. This provision shall apply to every sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Mortgaged Property (and every other Transfer) regardless of whether voluntary or not. Any Transfer made in contravention of this Paragraph 4 shall be null and void and of no force and effect. Mortgagor agrees to bear and shall pay or reimburse Mortgagee on demand for all reasonable expenses (including reasonable attorneys' fees and disbursements, title search costs and title insurance endorsement premiums) incurred by Mortgagee in connection with the review, approval and documentation of any Permitted Transfer.

5.    **Changes in Laws Regarding Taxation**. If any law is enacted or adopted or amended after the date of this Mortgage which deducts the Debt from the value of the Mortgaged Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Mortgagee's interest in the Mortgaged Property, Mortgagor will pay such tax, with interest and penalties thereon, if any. If Mortgagee is advised by its counsel that the payment of such tax or interest and penalties by Mortgagor would be unlawful, taxable to Mortgagee or unenforceable, or would provide the basis for a defense of usury, then Mortgagee shall have the option, by notice of not less than 90 days, to declare the Debt immediately due and payable.

6.    **No Credits on Account of the Debt**. Mortgagor shall not claim or demand or be entitled to any credit on account of the Debt for any part of the Taxes or Other Charges assessed against the Mortgaged Property, and no deduction shall otherwise be made or claimed from the assessed value of the Mortgaged Property for real estate tax purposes by reason of this Mortgage or the Debt. If such claim, credit or deduction shall be required by law, Mortgagee shall have the option, by notice of not less than 90 days, to declare the Debt immediately due and payable.

7.    **Further Acts, Etc**. Mortgagor shall, at its sole cost, perform, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignment, transfers and assurances as Mortgagee shall, from time to time, require, for the better assuring, conveying, assigning, transferring, and confirming unto Mortgagee the property and rights hereby mortgaged, given, granted, bargained, sold, alienated, enfeoffed, conveyed, confirmed, pledged, assigned and hypothecated or intended now or hereafter so to be, or which Mortgagor may be or may hereafter become bound to convey or assign to Mortgagee, or for carrying out the intention or facilitating the performance of the terms of this Mortgage, or for filing, registering or recording this Mortgage or for facilitating the sale and transfer of the Loan (or any portion thereof) and the Loan Documents in connection with a "Secondary Market Transaction" as described in Section 9.1 of the Loan Agreement. Upon foreclosure, the appointment of a receiver or any other relevant action, Mortgagor shall, at its sole cost, cooperate fully and completely to effect the assignment or transfer of any license, permit, agreement or any other right necessary or useful to the operation of the Mortgaged Property. Mortgagor grants to Mortgagee an irrevocable power of attorney coupled with an

interest for the purpose of exercising and perfecting any and all rights and remedies available to Mortgagee at law and in equity, including such rights and remedies available to Mortgagee pursuant to this paragraph. Notwithstanding anything to the contrary in the immediately preceding sentence, Mortgagee shall not execute any document as attorney-in-fact of Mortgagor unless (x) Mortgagor shall have failed or refused to execute the same within five (5) Business Days after Mortgagee's request therefor, or (y) in Mortgagee's good faith determination it would be materially prejudiced by the delay involved in making such a request. Mortgagee shall give prompt notice to Mortgagor of any exercise of the power of attorney as provided for in this Paragraph 7, along with copies of all documents executed in connection therewith.

8. **Recording of Mortgage, Etc.** Mortgagor forthwith upon the execution and delivery of this Mortgage and thereafter, from time to time, shall cause this Mortgage, and any security instrument creating a lien or security interest or evidencing the lien hereof upon the Mortgaged Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect the lien or security interest hereof upon, and the interest of Mortgagee in, the Mortgaged Property. Mortgagor shall pay all filing, registration or recording fees, all expenses incident to the preparation, execution and acknowledgment of and all federal, state, county and municipal, taxes, duties, imposts, documentary stamps, assessments and charges arising out of or in connection with the execution and delivery of, this Mortgage, any Mortgage supplemental hereto, any security instrument with respect to the Mortgaged Property or any instrument of further assurance, except where prohibited by law so to do. Mortgagor shall hold harmless and indemnify Mortgagee, its successors and assigns, against any liability incurred by reason of the imposition of any tax on the making or recording of this Mortgage.

9. **Right to Cure Defaults**. Upon the occurrence of any Event of Default, Mortgagee may, but without any obligation to do so and without notice to or demand on Mortgagor and without releasing Mortgagor from any obligation hereunder, perform the obligations in Default in such manner and to such extent as Mortgagee may deem necessary to protect the security hereof. Mortgagee is authorized to enter upon the Mortgaged Property for such purposes or appear in, defend or bring any action or proceeding to protect its interest in the Mortgaged Property or to foreclose this Mortgage or collect the Debt, and the cost and expense thereof (including reasonable attorneys' fees and disbursements to the extent permitted by law), with interest thereon at the Default Rate for the period after notice from Mortgagee that such cost or expense was incurred to the date of payment to Mortgagee, shall constitute a portion of the Debt, shall be secured by this Mortgage and the other Loan Documents and shall be due and payable to Mortgagee upon demand.

10. **Remedies**.

(a) Upon the occurrence of any Event of Default, Mortgagee may take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Mortgagor and in and to the Mortgaged Property, by Mortgagee itself or otherwise, including the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Mortgagee may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Mortgagee:

6

137342852v4

(i)     declare the entire Debt to be immediately due and payable;

(ii)     institute a proceeding or proceedings, judicial or nonjudicial, to the extent permitted by law, by advertisement or otherwise, for the complete foreclosure of this Mortgage, in which case the Mortgaged Property may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner;

(iii)     with or without entry, to the extent permitted and pursuant to the procedures provided by applicable law, institute proceedings for the partial foreclosure of this Mortgage for the portion of the Debt then due and payable, subject to the continuing lien of this Mortgage for the balance of the Debt not then due;

(iv)     sell for cash or upon credit the Mortgaged Property and all estate, claim, demand, right, title and interest of Mortgagor therein and rights of redemption thereof, pursuant to any power of sale, to the extent permitted by law, or otherwise, at one or more sales, as an entirety or in parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law;

(v)     institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein or in any other Loan Document;

(vi)     recover judgment on the Note either before, during or after any proceeding for the enforcement of this Mortgage;

(vii)     apply for the appointment of a trustee, receiver, liquidator or conservator of the Mortgaged Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of the Mortgagor or of any person, firm or other entity liable for the payment of the Debt;

(viii)     enforce Mortgagee's interest in the Leases and Rents and enter into or upon the Mortgaged Property, either personally or by its agents, nominees or attorneys and dispossess Mortgagor and its agents and employees therefrom, and thereupon Mortgagee may (A) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with the Mortgaged Property and conduct the business thereat; (B) complete any construction on the Mortgaged Property in such manner and form as Mortgagee deems advisable; (C) make alterations, additions, renewals, replacements and improvements to or on the Mortgaged Property; (D) exercise all rights and powers of Mortgagor with respect to the Mortgaged Property, whether in the name of Mortgagor or otherwise, including the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive Rents; and (E) apply the receipts from the Mortgaged Property to the payment of the Debt, after deducting therefrom all expenses (including reasonable attorneys' fees and disbursements) incurred in connection with the aforesaid operations and all amounts necessary to pay the Taxes, insurance and other charges in connection with the Mortgaged Property, as well as just and reasonable compensation for the services of Mortgagee, and its counsel, agents and employees;

(ix)    require Mortgagor to pay monthly in advance to Mortgagee, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of any portion of the Mortgaged Property occupied by Mortgagor, and require Mortgagor to vacate and surrender possession of the Mortgaged Property to Mortgagee or to such receiver, and, in default thereof, evict Mortgagor by summary proceedings or otherwise; or

(x)    pursue such other rights and remedies as may be available at law or in equity or under the UCC, including the right to receive and/or establish a lock box for all Rents and proceeds from the Intangibles and any other receivables or rights to payments of Mortgagor relating to the Mortgaged Property.

In the event of a sale, by foreclosure or otherwise, of less than all of the Mortgaged Property, this Mortgage shall continue as a lien on the remaining portion of the Mortgaged Property.

(b)    The proceeds of any sale made under or by virtue of this Paragraph 10, together with any other sums which then may be held by Mortgagee under this Mortgage, whether under the provisions of this paragraph or otherwise, shall be applied by Mortgagee to the payment of the Debt in such priority and proportion as Mortgagee in its sole discretion shall deem proper.

(c)    Mortgagee may adjourn from time to time any sale by it to be made under or by virtue of this Mortgage by announcement at the time and place appointed for such sale or for such adjourned sale or sales; and, except as otherwise provided by any applicable law, Mortgagee, without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned.

(d)    Upon the completion of any sale or sales pursuant hereto, Mortgagee, or an officer of any court empowered to do so, shall execute and deliver to the accepted purchaser or purchasers a good and sufficient instrument, or good and sufficient instruments, conveying, assigning and transferring all estate, right, title and interest in and to the property and rights sold. Mortgagee is hereby irrevocably appointed the true and lawful attorney of Mortgagor, in its name and stead, to make all necessary conveyances, assignments, transfers and deliveries of the Mortgaged Property and rights so sold and for that purpose Mortgagee may execute all necessary instruments of conveyance, assignment and transfer, and may substitute one or more persons with like power, Mortgagor hereby ratifying and confirming all that its said attorney or such substitute or substitutes shall lawfully do by virtue hereof.  Any sale or sales made under or by virtue of this Paragraph 10, shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law or in equity, of Mortgagor in and to the properties and rights so sold, and shall be a perpetual bar both at law and in equity against Mortgagor and against any and all persons claiming or who may claim the same, or any part thereof, from, through or under Mortgagor.

(e)    Upon any sale made under or by virtue of this Paragraph 10, Mortgagee may bid for and acquire the Mortgaged Property or any part thereof and in lieu of paying cash therefor may make settlement for the purchase price by crediting upon the Debt the net sales price after deducting therefrom the expenses of the sale and costs of the action and any other

8

sums which Mortgagee is authorized to deduct under this Mortgage or any other Loan Document.

(f)     No recovery of any judgment by Mortgagee and no levy of an execution under any judgment upon the Mortgaged Property or upon any other property of Mortgagor shall affect in any manner or to any extent the lien of this Mortgage upon the Mortgaged Property or any part thereof, or any liens, rights, powers or remedies of Mortgagee hereunder, but such liens, rights, powers and remedies of Mortgagee shall continue unimpaired as before.

(g)     Mortgagee may terminate or rescind any proceeding or other action brought in connection with its exercise of the remedies provided in this Paragraph 10 at any time before the conclusion thereof, as determined in Mortgagee's sole discretion and without prejudice to Mortgagee.

(h)     Mortgagee may resort to any remedies and the security given by this Mortgage or in any other Loan Document in whole or in part, and in such portions and in such order as determined by Mortgagee's sole discretion. No such action shall in any way be considered a waiver of any rights, benefits or remedies evidenced or provided by any Loan Document. The failure of Mortgagee to exercise any right, remedy or option provided in any Loan Document shall not be deemed a waiver of such right, remedy or option or of any covenant or obligation secured by any Loan Document. No acceptance by Mortgagee of any payment after the occurrence of any Event of Default and no payment by Mortgagee of any obligation for which Mortgagor is liable hereunder shall be deemed to waive or cure any Event of Default, or Mortgagor's liability to pay such obligation. No sale of all or any portion of the Mortgaged Property, no forbearance on the part of Mortgagee, and no extension of time for the payment of the whole or any portion of the Debt or any other indulgence given by Mortgagee to Mortgagor, shall operate to release or in any manner affect the interest of Mortgagee in the remaining Mortgaged Property or the liability of Mortgagor to pay the Debt. No waiver by Mortgagee shall be effective unless it is in writing and then only to the extent specifically stated. All costs and expenses of Mortgagee in exercising its rights and remedies under this Paragraph 10 (including reasonable attorneys' fees and disbursements to the extent permitted by law), shall be paid by Mortgagor immediately upon notice from Mortgagee, with interest at the Default Rate for the period after notice from Mortgagee, and such costs and expenses shall constitute a portion of the Debt and shall be secured by this Mortgage.

(i)     The interests and rights of Mortgagee under the Loan Documents shall not be impaired by any indulgence, including (x) any renewal, extension or modification which Mortgagee may grant with respect to any of the Debt, (y) any surrender, compromise, release, renewal, extension, exchange or substitution which Mortgagee may grant with respect to the Mortgaged Property or any portion thereof or (z) any release or indulgence granted to any maker, endorser, guarantor or surety of any of the Debt.

11.     **Right of Entry**. In addition to any other rights or remedies granted under this Mortgage, Mortgagee and its agents shall have the right to enter and inspect the Mortgaged Property at any reasonable time during the term of this Mortgage. The cost of such inspections or audits shall be borne by Mortgagor should Mortgagee determine that an Event of Default exists, including the cost of all follow up or additional investigations or inquiries deemed

9

reasonably necessary by Mortgagee. The cost of such inspections, if not paid for by Mortgagor following demand, may be added to the principal balance of the sums due under the Note and this Mortgage and shall bear interest thereafter until paid at the Default Rate.

12. **Security Agreement**. This Mortgage is both a real property mortgage and a "security agreement" within the meaning of the UCC. The Mortgaged Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Mortgagor in the Mortgaged Property. Mortgagor by executing and delivering this Mortgage has granted and hereby grants to Mortgagee, as security for the Debt, a security interest in the Mortgaged Property to the full extent that the Mortgaged Property may be subject to the UCC (such portion of the Mortgaged Property so subject to the UCC being called in this paragraph the "*Collateral*"). The foregoing sentence is intended to grant in favor of Mortgagee a first priority continuing lien and security interest in all of Mortgagor's assets. Mortgagor authorizes Mortgagee and its counsel to file UCC financing statements in form and substance satisfactory to Mortgagee, describing the collateral as "all assets of Mortgagor, whether now owned or existing or hereafter acquired or arising and wheresoever located, and all proceeds and products thereof, including, without limitation, all fixtures on the Premises" or words to that effect, and any limitations on such collateral description, notwithstanding that such collateral description may be broader in scope than the Collateral described in this Mortgage. This Mortgage shall also constitute a "fixture filing" for the purposes of the UCC. As such, this Mortgage covers all items of the Collateral that are or are to become fixtures. Information concerning the security interest herein granted may be obtained from the parties at the addresses of the parties set forth in the first paragraph of this Mortgage. If an Event of Default shall occur, Mortgagee, in addition to any other rights and remedies which it may have, shall have and may exercise immediately and without demand, any and all rights and remedies granted to a secured party upon default under the UCC, including, without limiting the generality of the foregoing, the right to take possession of the Collateral or any part thereof, and to take such other measures as Mortgagee may deem necessary for the care, protection and preservation of the Collateral. Upon request or demand of Mortgagee, Mortgagor shall at its expense assemble the Collateral and make it available to Mortgagee at a convenient place acceptable to Mortgagee. Mortgagor shall pay to Mortgagee on demand any and all expenses, including reasonable attorneys' fees and disbursements, incurred or paid by Mortgagee in protecting the interest in the Collateral and in enforcing the rights hereunder with respect to the Collateral. Any notice of sale, disposition or other intended action by Mortgagee with respect to the Collateral, sent to Mortgagor in accordance with the provisions hereof at least ten days prior to such action, shall constitute commercially reasonable notice to Mortgagor. The proceeds of any disposition of the Collateral, or any part thereof, may be applied by Mortgagee to the payment of the Debt in such priority and proportions as Mortgagee in its sole discretion shall deem proper. In the event of any change in name, identity or structure of Mortgagor, Mortgagor shall notify Mortgagee thereof and promptly after request shall execute, file and record such UCC forms as are necessary to maintain the priority of Mortgagee's lien upon and security interest in the Collateral, and shall pay all expenses and fees in connection with the filing and recording thereof. If Mortgagee shall require the filing or recording of additional UCC forms or continuation statements, Mortgagor shall, promptly after request, execute, file and record such UCC forms or continuation statements as Mortgagee shall deem necessary, and shall pay all expenses and fees in connection with the filing and recording thereof, it being understood and agreed, however, that no such additional documents shall increase Mortgagor's obligations under the Loan Documents.

137342852v4

**13.   Actions and Proceedings.**   Mortgagee has the right to appear in and defend any action or proceeding brought with respect to the Mortgaged Property and to bring any action or proceeding, in the name and on behalf of Mortgagor, which Mortgagee, in its sole discretion, decides should be brought to protect its or their interest in the Mortgaged Property. Mortgagee shall, at its option, be subrogated to the lien of any mortgage or other security instrument discharged in whole or in part by the Debt, and any such subrogation rights shall constitute additional security for the payment of the Debt.

**14.   Marshalling and Other Matters.**   Mortgagor hereby waives, to the extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Mortgaged Property or any part thereof or any interest therein.   Further, Mortgagor hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Mortgage on behalf of Mortgagor, and on behalf of each and every person acquiring any interest in or title to the Mortgaged Property subsequent to the date of this Mortgage and on behalf of all persons to the extent permitted by applicable law. The lien of this Mortgage shall be absolute and unconditional and shall not in any manner be affected or impaired by any acts or omissions whatsoever of Mortgagee and, without limiting the generality of the foregoing, the lien hereof shall not be impaired by (i) any acceptance by Mortgagee of any other security for any portion of the Debt, (ii) any failure, neglect or omission on the part of Mortgagee to realize upon or protect any portion of the Debt or any collateral security therefor or (iii) any release (except as to the property released), sale, pledge, surrender, compromise, settlement, renewal, extension, indulgence, alteration, changing, modification or disposition of any portion of the Debt or of any of the collateral security therefor; and Mortgagee may foreclose, or exercise any other remedy available to Mortgagee under other Loan Documents without first exercising or enforcing any of its remedies under this Mortgage, and any exercise of the rights and remedies of Mortgagee hereunder shall not in any manner impair the Debt or the liens of any other Loan Document or any of Mortgagee's rights and remedies thereunder.

**15.   Notices.**   All notices, consents, approvals and requests required or permitted hereunder shall be in writing, and shall be sent, and shall be deemed effective, as provided in the Loan Agreement.

**16.   Inapplicable Provisions.**   If any term, covenant or condition of this Mortgage is held to be invalid, illegal or unenforceable in any respect, this Mortgage shall be construed without such provision.

**17.   Headings.**   The paragraph headings in this Mortgage are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

**18.   Duplicate Originals.**   This Mortgage may be executed in any number of duplicate originals and each such duplicate original shall be deemed to be an original.

**19.   Definitions.**   Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Mortgage may be used interchangeably in singular or plural form; and the word "*Mortgagor*" shall mean "each

11

Mortgagor and any subsequent owner or owners of the Mortgaged Property or any part thereof or any interest therein," the word "*Mortgagee*" shall mean "Mortgagee and any subsequent holder of the Note," the words "*Mortgaged Property*" shall include any portion of the Mortgaged Property and any interest therein, the word "*including*" means "including but not limited to" and the words "*attorneys' fees*" shall include any and all attorneys' fees, paralegal and law clerk fees, including fees at the pre-trial, trial and appellate levels incurred or paid by Mortgagee in protecting its interest in the Mortgaged Property and Collateral and enforcing its rights hereunder.

     20.   **Homestead**.  Mortgagor hereby waives and renounces all homestead and exemption rights provided by the Constitution and the laws of the United States and of any state, in and to the Mortgaged Property as against the collection of the Debt, or any part thereof.

     21.   **Assignments**.  Mortgagee shall have the right to assign or transfer its rights under this Mortgage without limitation.  Any assignee or transferee shall be entitled to all the benefits afforded Mortgagee under this Mortgage.

     22.   **Waiver of Jury Trial**.  MORTGAGOR HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS MORTGAGE OR ANY OTHER LOAN DOCUMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY MORTGAGOR, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  MORTGAGEE IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY MORTGAGOR.

     23.   **Consents**.  Any consent or approval by Mortgagee in any single instance shall not be deemed or construed to be Mortgagee's consent or approval in any like matter arising at a subsequent date, and the failure of Mortgagee to promptly exercise any right, power, remedy, consent or approval provided herein or at law or in equity shall not constitute or be construed as a waiver of the same nor shall Mortgagee be estopped from exercising such right, power, remedy, consent or approval at a later date.  Any consent or approval requested of and granted by Mortgagee pursuant hereto shall be narrowly construed to be applicable only to Mortgagor and the matter identified in such consent or approval and no third party shall claim any benefit by reason thereof, and any such consent or approval shall not be deemed to constitute Mortgagee a venturer or partner with Mortgagor nor shall privity of contract be presumed to have been established with any such third party.  If Mortgagee deems it to be in its best interest to retain assistance of persons, firms or corporations (including attorneys, title insurance companies, appraisers, engineers and surveyors) with respect to a request for consent or approval, Mortgagor shall reimburse Mortgagee for all costs reasonably incurred in connection with the employment of such persons, firms or corporations.

137342852v4

24.    **Loan Repayment and Defeasance**.  Provided no Event of Default exists, this Mortgage will be satisfied and discharged of record by Mortgagee prior to the Maturity Date only in accordance with the terms and provisions set forth in the Loan Agreement.

25.    **Intentionally Omitted**.

26.    **Governing Law**.  WITH RESPECT TO MATTERS RELATING TO THE CREATION, PERFECTION AND PROCEDURES RELATING TO THE ENFORCEMENT OF THIS MORTGAGE, THIS MORTGAGE SHALL BE GOVERNED BY, AND BE CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE IN WHICH THE MORTGAGED PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, EXCEPT AS EXPRESSLY SET FORTH ABOVE IN THIS PARAGRAPH AND TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES SHALL GOVERN ALL MATTERS RELATING TO THIS MORTGAGE AND THE OTHER LOAN DOCUMENTS AND ALL OF THE INDEBTEDNESS OR OBLIGATIONS ARISING HEREUNDER OR THEREUNDER. ALL PROVISIONS OF THE LOAN AGREEMENT INCORPORATED HEREIN BY REFERENCE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES, AS SET FORTH IN THE GOVERNING LAW PROVISION OF THE LOAN AGREEMENT.

27.    **Exculpation**.  The liability of Mortgagor hereunder is limited pursuant to Section 10.1 of the Loan Agreement.

## PART II

## STATE-SPECIFIC PROVISIONS

28.    **Conflicts With Part I**.  In the event of any conflict between the provisions of this Part II and any provision of Part I, then the provisions of this Part II shall control.

29.    **Non-Judicial Foreclosure and Power of Sale**.  All references in this Mortgage to non-judicial foreclosure and power of sale shall be deemed to apply to the Mortgaged Property only to if and to the extent permitted by New Jersey law.  If any provision of this Mortgage is inconsistent with any applicable provision of New Jersey law, the provision of New Jersey law shall take precedence over the provisions of this Mortgage, but shall not invalidate or render unenforceable any other provision of this Mortgage that can fairly be construed in a manner consistent with New Jersey law.

30.    **ISRA Filings in New Jersey**.  Upon the occurrence of any event or condition, voluntary or involuntary, triggering a requirement to comply with the notification requirements of the New Jersey Industrial Site Recovery Act, N.J.S.A. 13:1K-6 et seq. and the accompanying regulations, and regardless of whether triggered by Mortgagor, Mortgagee or by a user or other occupant, as between Mortgagor and Mortgagee, Mortgagor shall promptly take all

137342852v4

required steps to effectuate compliance with said Act as promptly as possible at Mortgagor's sole cost and expense.

      31.   **Future Advances**. This Mortgage is given for the purpose of creating a lien on real property in order to secure existing Debt, but also future advances, whether made before or after default or maturity or other similar events, to the same extent as if such future advances were made on the date of the execution hereof, although there may be no advance made at the time of the execution hereof and although there may be no indebtedness outstanding at the time any advance is made. The types of future advances secured by and having priority under this Mortgage shall include, without limitation, (i) advances and re-advances of principal under the Loan Agreement or other Loan Documents and (ii) disbursements and other advances for the payment of taxes, assessments, maintenance charges, insurance premiums or costs relating to the Mortgaged Property, for the discharge of liens having priority over the lien of this Mortgage, for the curing of waste of the Mortgaged Property and for the payment of service charges and expenses incurred by reason of default and including late charges, attorney's fees and court costs, together with interest thereon. The lien of this Mortgage, as to third persons with or without actual knowledge thereof, shall be valid as to all such indebtedness and future advances, from the date of recordation hereof. The total amount of the indebtedness secured by this Mortgage may decrease or increase from time to time, but the total unpaid principal balance at any one time shall not exceed the maximum principal amount of the Obligations.

      32.   **No Merger**. The rights of Mortgagee set forth herein shall, to the extent not prohibited by law, extend to the period from and after the filing of any suit to foreclose the lien of this Mortgage, the entry of judgment and any subsequent period including any period allowed by law for the redemption of the Mortgaged Property after any foreclosure sale, and interest shall accrue on the judgment in the same manner and at the same rate as provided in the Loan Agreement, subject only to the usury savings clauses of the Loan Agreement and this Mortgage, until Mortgagee has received irrevocable payment in full of all Obligations.

      33.   **Certain Waivers**. To the extent not prohibited by applicable Legal Requirements, Mortgagor hereby waives and releases all benefit that might accrue to Mortgagor by virtue of any present or future law exempting the Mortgaged Property, or any part of the proceeds arising from any sale thereof, from attachment, levy or sale on execution, or providing for any stay of execution, exemption from civil process or extension of time for payment, or any right of marshalling in the event of any sale hereunder of the Mortgaged Property, and, unless specifically required herein, all notices of Mortgagor's default or of Mortgagee's election to exercise, or Mortgagee's actual exercise of any option under this Mortgage or any other Loan Documents. Mortgagor waives all rights or defenses arising by reason of any "one action" and any law prohibiting Mortgagee from making a claim for deficiency, to the extent Mortgagee is otherwise entitled to a claim for deficiency, whether before or after Mortgagee's commencement or completion of any foreclosure action or any other action to exercise its remedies hereunder or otherwise available at a law or in equity.

      34.   **JURY TRIAL WAIVER**. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, MORTGAGOR AND MORTGAGEE EACH HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY ACTION, CLAIM, SUIT OR PROCEEDING RELATING TO THIS MORTGAGE AND FOR ANY

137342852v4

COUNTERCLAIM BROUGHT THEREIN. EXCEPT FOR COMPULSORY COUNTERCLAIMS, MORTGAGOR HEREBY WAIVES ALL RIGHTS TO INTERPOSE ANY COUNTERCLAIM IN ANY SUIT BROUGHT BY MORTGAGEE HEREUNDER AND ALL RIGHTS TO HAVE ANY SUCH SUIT CONSOLIDATED WITH ANY SEPARATE SUIT, ACTION OR PROCEEDING.

**35.** **Interest Rate Not Reduced on Judgment**. In the event Mortgagee obtains any judgment against Mortgagor on this Mortgage, the Note, the Loan Agreement or on the other Loan Documents, interest shall accrue on the judgment in the same manner and at the same rate as provided in the Loan Agreement, notwithstanding any law, custom or legal presumption to the contrary, subject only to the usury savings clauses of the Loan Agreement and this Mortgage, until Mortgagee has received payment in full of all amounts due pursuant to this Mortgage, the Note, the Loan Agreement and the other Loan Documents secured hereby.

**36.** **No Deduction**. Mortgagor will not make deduction from or claim credit on the principal or interest secured by this Mortgage by reason of any governmental taxes, assessments or charges imposed against the Mortgaged Property. Mortgagor will not claim any deduction from the taxable value of the Mortgaged Property by reason of this Mortgage.

**37.** **COPY OF MORTGAGE**. MORTGAGOR REPRESENTS AND WARRANTS THAT IT HAS RECEIVED A TRUE COPY OF THIS MORTGAGE WITHOUT CHARGE.

**38.** **Hazardous Substances**. Mortgagor shall not conduct or cause or permit to be conducted on the Mortgaged Property any activity which constitutes an Industrial Establishment (as such term is defined in the New Jersey Industrial Site Recovery Act, as amended ("*ISRA*")) without the prior written consent of Mortgagee. In the event that the provisions of ISRA become applicable to the Mortgaged Property subsequent to the date hereof, Mortgagor shall take prompt requisite action to insure compliance with ISRA and, in the event such action is required to insure compliance with ISRA, Mortgagor shall give prompt written notice thereof to Mortgagee. Mortgagor shall deliver to Mortgagee copies of all written correspondence, notices and submissions that it sends to or receives from the New Jersey Department of Environmental Protection in connection with such ISRA compliance. Mortgagor's obligation to comply with ISRA shall, notwithstanding its general applicability, also specifically apply to sale, transfer, closure or termination of operations associated with any foreclosure action respecting the Mortgaged Property, including, without limitation, a foreclosure action brought with respect to this Mortgage.

**39.** **Continuing Enforcement of Mortgage**. If, after receipt of any payment of all or any part of the obligations under the Note, this Mortgage, and the other Loan Documents, Mortgagee is compelled or agrees, for settlement purposes, to surrender such payment to any Person for any reason (including, without limitation, a determination that such payment is void or voidable as a preference or fraudulent conveyance, an impermissible setoff, or a diversion of trust funds), then this Mortgage and the other Loan Documents shall continue in full force and effect, and Mortgagor shall be liable for, and shall indemnify, defend and hold harmless Mortgagee with respect to the full amount so surrendered. The provisions of this Section shall survive the cancellation or discharge of this Mortgage and shall remain effective

137342852v4

notwithstanding the payment of the obligations, under the Note, this Mortgage and the other Loan Documents, the cancellation of the Note, the release of any security interest, lien or encumbrance securing the obligations under the Note, this Mortgage and the other Loan Documents, or any other action which Mortgagee may have taken in reliance upon its receipt of such payment.  Any cancellation, release or other such action by Mortgagee shall be deemed to have been conditioned upon any payment of the obligations under the Note, this Mortgage and the other Loan Documents, having become final and irrevocable.

      **40.**  __Modification of Security Instrument__.   This Mortgage is subject to "modification" as such term is defined in P.L. 1985 c.353 (N.J.S.A. 46:9-8.1 et. seq.) and shall be subject to the priority provisions thereof.

<p align="center">**[NO FURTHER TEXT ON THIS PAGE]**</p>

<p align="center">16</p>

137342852v4

**IN WITNESS WHEREOF**, Mortgagor has executed this instrument as of the day and year first above written.

MORTGAGOR:

**24 COMMERCE STREET LLC**, a Delaware limited liability company

By:    24 Commerce Holdings LLC, a Delaware limited liability company, its Managing Member

        By:    24 Commerce Owner Inc., a New Jersey corporation, its Managing Member

            By: _____
                Jacob Tauber
                President

<u>**ACKNOWLEDGMENT**</u>

STATE OF NEW JERSEY     )
                          )  ss:
COUNTY OF ~~OCEAN~~ Essex    )

I CERTIFY that on April __, 2019, Jacob Tauber, personally came before me and stated to my satisfaction he is authorized to and did execute this instrument as President of 24 Commerce Owner Inc., a New Jersey corporation, the Managing Member of 24 Commerce Holdings LLC, a Delaware limited liability company, the Managing Member of 24 Commerce Street LLC, a Delaware limited liability company, personally the entity named in this instrument, and that he executed this instrument as the act of said entity named in this instrument.

_____
Notary Public
My commission expires:

KIMARA G HANKS
Notary Public, State of New Jersey
My Commission Expires
May 01, 2023

AREF – 24 Commerce – Mortgage

## EXHIBIT A

### Legal Description

All that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the City of Newark, County of Essex, and State of New Jersey:

BEGINNING at a point in the southerly sideline of Commerce Street distant 242.82 feet easterly from its intersection with the easterly sideline of Broad Street and running thence

(1) Along said southerly line of Commerce Street, South 57 degrees 57 minutes 00 seconds East, 104.55 feet to a point; thence

(2) South 32 degrees 01 minute 00 seconds West 88.38 feet to a point; thence

(3) North 65 degrees 19 minutes 32 seconds West, 1.02 feet to a point; thence

(4) South 30 degrees 04 minutes 00 seconds West 81.06 feet to a point in the northerly sideline of Clinton Street: thence

(5) Along said northerly sideline of Clinton Street, North 60 degrees 57 minutes 00 seconds West, 100.00 feet to a point; thence

(6) North 29 degrees 52 minutes 00 seconds East, 87.04 feet to a point; thence

(7) North 60 degrees 02 minutes West, 3.32 feet to a point; thence

(8) North 32 degrees 07 minutes 00 seconds East, 87.90 feet to a point in the southerly line of Commerce Street and the point and place of BEGINNING.

BEING in accordance with a survey made by DAB Surveying Inc. dated September 8, 2018.

NOTE FOR INFORMATION ONLY:

Premises being known as and by 24-30 Commerce St, Newark, New Jersey;

Block: 145; Lot: 19

Premises being known as and by 24-30 Commerce St, Newark, New Jersey;

Block: 145; Lot: 19; Qualifier: B01

Not Certified Copy

## RELEVANT EXCERPTS FROM POOLING AND SERVICING AGREEMENT

**EXECUTION VERSION**

WELLS FARGO COMMERCIAL MORTGAGE SECURITIES, INC.,
as Depositor

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Master Servicer

RIALTO CAPITAL ADVISORS, LLC,
as Special Servicer

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Certificate Administrator

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as Trustee,

and

PARK BRIDGE LENDER SERVICES LLC,
as Operating Advisor and as Asset Representations Reviewer

POOLING AND SERVICING AGREEMENT

Commercial Mortgage Pass Through Certificates
Series 2019-C50

Dated as of May 1, 2019

"Legal Fee Reserve Account":  The account created and maintained by the Certificate Administrator pursuant to Section 3.04(b), in the name of the "Legal Fee Reserve Account", into which the amounts set forth in Section 3.04(b) shall be deposited directly and which must be an Eligible Account.

"Liquidation Event":  With respect to any Mortgage Loan or with respect to any REO Property (and the related REO Loan), any of the following events:  (i) such Mortgage Loan is paid in full; (ii) a Final Recovery Determination is made with respect to such Mortgage Loan; (iii) such Mortgage Loan is repurchased by the applicable Mortgage Loan Seller pursuant to Section 5 of the related Mortgage Loan Purchase Agreement; (iv) such Mortgage Loan is purchased by the Special Servicer, or by any Companion Holder or any mezzanine lender (as applicable) pursuant to Section 3.16 (and the related Intercreditor Agreement, as applicable); (v) such Mortgage Loan is purchased by the Special Servicer, the Master Servicer, the Holders of the majority of the Controlling Class or the Holders of the Class R Certificates pursuant to Section 9.01 or acquired by the Sole Certificateholder in exchange for its Certificates pursuant to Section 9.01; or (vi) such Mortgage Loan is sold by the Special Servicer pursuant to the terms of this Agreement.

"Liquidation Expenses":  All customary, reasonable and necessary "out of pocket" costs and expenses incurred by the Special Servicer in connection with a liquidation of any Specially Serviced Loan or REO Property (except with respect to a Non-Serviced Mortgaged Property) pursuant to Section 3.16 (including, without limitation, legal fees and expenses, committee or referee fees and, if applicable, brokerage commissions and conveyance taxes).

"Liquidation Fee":  A fee payable to the Special Servicer with respect to (a) each Specially Serviced Loan or REO Property (except with respect to a Non-Serviced Mortgaged Property) as to which the Special Servicer obtains (i) a full, partial or discounted payoff from the related Mortgagor or (ii) any Liquidation Proceeds or Insurance and Condemnation Proceeds (including with respect to the related Companion Loan, if applicable) (in any case, other than amounts for which a Workout Fee has been paid, or will be payable) or (b) Loss of Value Payment or Purchase Price paid by the responsible party under the related Mortgage Loan Purchase Agreement with respect to any Mortgage Loan (and any related Companion Loan, if applicable) (except if such responsible party under the related Mortgage Loan Purchase Agreement makes such Loss of Value Payment in connection with a breach or document defect within the 90-day initial cure period or, if applicable, within the subsequent 90-day extended cure period), equal to the product of the Liquidation Fee Rate and the proceeds of (i) such full, partial or discounted payoff or other partial payment or the Liquidation Proceeds or Insurance and Condemnation Proceeds (net of the related costs and expenses associated with the related liquidation) related to such liquidated Specially Serviced Loan or REO Property or (ii) such Loss of Value Payment or Purchase Price; provided, however, that no Liquidation Fee shall be payable with respect to (a) the purchase of any Specially Serviced Loan by the Special Servicer or any Affiliate thereof (except if such Affiliate purchaser is the Directing Certificateholder or any Affiliate thereof; provided, however, that prior to a Control Termination Event, if the Directing Certificateholder or an Affiliate thereof purchases any Specially Serviced Loan within ninety (90) days after the Special Servicer delivers to the Directing Certificateholder for its approval the initial Asset Status Report with respect to such Specially Serviced Loan, the Special Servicer will not be entitled to a Liquidation Fee in connection with such purchase by the

Directing Certificateholder or its Affiliates), (b) any event described in <u>clause (iv)</u> of the definition of "Liquidation Proceeds" (or any substitution in lieu of a repurchase) so long as such repurchase or substitution occurs prior to the termination of the Extended Cure Period, (c) any event described in <u>clauses (v)</u>, <u>(vi)</u> and <u>(vii)</u> of the definition of "Liquidation Proceeds", as long as, with respect to a purchase pursuant to <u>clause (vi)</u> of the definition of "Liquidation Proceeds", a purchase occurs within ninety (90) days of such holder's purchase option first becoming exercisable during that period prior to such Mortgage Loan becoming a Corrected Loan pursuant to the related Intercreditor Agreement, (d)  a Serviced Companion Loan, (x) a repurchase of such Serviced Companion Loan by the applicable Mortgage Loan Seller for a breach of a representation or warranty or for a defective or deficient mortgage loan documentation under an Other Pooling and Servicing Agreement within the time period (or extension thereof) provided for such repurchase or such repurchase occurs prior to the termination of the extended resolution period provided therein or (y) a purchase of such Serviced Companion Loan by any applicable party to the Other Pooling and Servicing Agreement pursuant to a clean-up call or similar liquidation of the Other Securitization, or (e) if a Mortgage Loan or Serviced Whole Loan becomes a Specially Serviced Loan solely because of a Servicing Transfer Event described in <u>clause (i)</u> of the definition of "Servicing Transfer Event", Liquidation Proceeds are received within ninety (90) days following the related Maturity Date as a result of such Mortgage Loan or Serviced Whole Loan being refinanced or otherwise repaid in full (but, in the event that a Liquidation Fee is not payable due to the application of any of <u>clauses (a)</u> through <u>(e)</u> above, the Special Servicer may still collect and retain a Liquidation Fee and similar fees from the related Mortgagor to the extent provided for in, or not prohibited by, the related loan documents); <u>provided</u> that the Liquidation Fee with respect to any Specially Serviced Loan will be reduced by the amount of any Excess Modification Fees paid by or on behalf of the related Mortgagor with respect to the related Mortgage Loan and any related Companion Loan, as applicable, or REO Property and received by the Special Servicer as compensation within the prior twelve (12) months, but only to the extent those fees have not previously been deducted from a Workout Fee or Liquidation Fee.  No Liquidation Fee shall be payable in connection with a Loss of Value Payment by a Mortgage Loan Seller, if the applicable Mortgage Loan Seller makes such Loss of Value Payment within 90 days of receipt of notice of a breach (and giving effect to an extension period of 90 days).

"<u>Liquidation Fee Rate</u>":  A rate equal to 1.00% with respect to any Specially Serviced Loan (and each related Serviced Companion Loan) or REO Property or Loss of Value Payment or Purchase Price; <u>provided</u> that if such rate would result in an aggregate Liquidation Fee less than $25,000, then the Liquidation Fee Rate will be equal to the lesser of (i) 3.00% and (ii) such lower rate as would result in an aggregate Liquidation Fee equal to $25,000.

"<u>Liquidation Proceeds</u>":  Cash amounts received by or paid to the Master Servicer or the Special Servicer in connection with:  (i) the liquidation (including a payment in full) of a Mortgaged Property or other collateral constituting security for a Defaulted Loan or defaulted Companion Loan, if applicable, through a trustee's sale, foreclosure sale, REO Disposition or otherwise, exclusive of any portion thereof required to be released to the related Mortgagor in accordance with applicable law and the terms and conditions of the related Mortgage Note and Mortgage; (ii) the realization upon any deficiency judgment obtained against a Mortgagor; (iii) any sale of (A) a Specially Serviced Loan pursuant to <u>Section 3.16(a)</u> or (B) any REO Property pursuant to <u>Section 3.16(b)</u>; (iv) the repurchase of a Mortgage Loan by the applicable

Mortgage Loan Seller pursuant to Section 5 of the related Mortgage Loan Purchase Agreement; (v) the purchase of a Specially Serviced Loan or REO Property by the Holders of the majority of the Controlling Class, the Special Servicer, the Master Servicer or the Holders of the Class R Certificates pursuant to Section 9.01; (vi) the purchase of a Mortgage Loan or an REO Property by (a) the applicable Subordinate Companion Holder or (b) the related mezzanine lender pursuant to Section 3.16 and the related Intercreditor Agreement; or (vii) the transfer of any Loss of Value Payments from the Loss of Value Reserve Fund to the Collection Account in accordance with Section 3.05(g) of this Agreement (provided that, for the purpose of determining the amount of the Liquidation Fee (if any) payable to the Special Servicer in connection with such Loss of Value Payment, the full amount of such Loss of Value Payment shall be deemed to constitute "Liquidation Proceeds" from which the Liquidation Fee (if any) is payable as of such time such Loss of Value Payment is made by the applicable Mortgage Loan Seller). With respect to any Whole Loan, as used in this Agreement, Liquidation Proceeds shall refer to such portion of Liquidation Proceeds to the extent allocable to the related Mortgage Loan or related Companion Loan, as applicable, pursuant to the terms of the related Intercreditor Agreement.

"Litigation Control":  As defined in Section 3.32.

"Loan-Specific Directing Certificateholder":  With respect to a Servicing Shift Whole Loan, the "Controlling Holder", the "Directing Certificateholder", the "Directing Holder", the "Directing Lender" or any analogous concept set forth under the related Intercreditor Agreement. Prior to the applicable Servicing Shift Date, a Loan-Specific Directing Certificateholder with respect to the related Servicing Shift Whole Loan will be the holder of the related Servicing Shift Control Note. With respect to each Servicing Shift Whole Loan, on and after the applicable Servicing Shift Date, there will be no Loan-Specific Directing Certificateholder under this Agreement. As of the Closing Date, Barclays is the Loan-Specific Directing Certificateholder with respect to the Inland Devon Self Storage Portfolio Whole Loan and UBS AG is the Loan-Specific Directing Certificateholder with respect to the Wolverine Portfolio Whole Loan.

"Loss of Value Payment":  As defined in Section 2.03(b) of this Agreement.

"Loss of Value Reserve Fund":  The "outside reserve fund" (within the meaning of Treasury Regulations Section 1.860G-2(h)) designated as such pursuant to Section 3.04(i) of this Agreement. The Loss of Value Reserve Fund will be part of the Trust Fund but not part of the Grantor Trust or any Trust REMIC.

"Lower-Tier Distribution Amount":  As defined in Section 4.01(c).

"Lower-Tier Principal Amount":  With respect to any Class of Lower-Tier Regular Interests, (i) on or prior to the first Distribution Date, an amount equal to the Original Lower-Tier Principal Amount of such Class as specified in the Preliminary Statement hereto, and (ii) as of any date of determination after the first Distribution Date, an amount equal to the Certificate Balance of the Class of Related Certificates on the Distribution Date immediately prior to such date of determination (determined as adjusted pursuant to Section 1.02(iii)), and as set forth in Section 4.01(c)).

Release signed by a Servicing Officer.  Upon receipt of the foregoing, the Custodian shall deliver the Mortgage File or any document therein to the Master Servicer or the Special Servicer (or a designee), as the case may be.  Upon return of such Mortgage File or such document to the Custodian, or the delivery to the Trustee and the Custodian of a certificate of a Servicing Officer of the Master Servicer or the Special Servicer, as the case may be, stating that such Mortgage Loan (and, in the case of a Serviced Whole Loan, the related Companion Loan), was liquidated and that all amounts received or to be received in connection with such liquidation which are required to be deposited into the Collection Account (including amounts related to the related Companion Loan, if applicable) pursuant to Section 3.04(a) have been or will be so deposited, or that such Mortgage Loan has become an REO Property, a copy of the Request for Release shall be released by the Custodian to the Master Servicer or the Special Servicer (or a designee), as the case may be, with the original being released upon termination of the Trust.

(c)     Within seven (7) Business Days (or within such shorter period as delivery can reasonably be accomplished if the Special Servicer notifies the Trustee of an exigency) of receipt thereof, the Trustee shall execute and deliver to the Special Servicer any court pleadings, requests for trustee's sale or other documents necessary to the foreclosure or trustee's sale in respect of a Mortgaged Property or to any legal action brought to obtain judgment against any Mortgagor on the Mortgage Note (including any note evidencing a related Companion Loan) or Mortgage or to obtain a deficiency judgment, or to enforce any other remedies or rights provided by the Mortgage Note or Mortgage or otherwise available at law or in equity.  The Special Servicer shall be responsible for the preparation of all such documents and pleadings.  When submitted to the Trustee for signature, such documents or pleadings shall be accompanied by a certificate of a Servicing Officer requesting that such pleadings or documents be executed by the Trustee and certifying as to the reason such documents or pleadings are required and that the execution and delivery thereof by the Trustee will not invalidate or otherwise affect the lien of the Mortgage, except for the termination of such a lien upon completion of the foreclosure or trustee's sale.  The Trustee shall not be required to review such documents for their sufficiency or enforceability.

(d)     If, from time to time, pursuant to the terms of the applicable Non-Serviced Intercreditor Agreement and the applicable Non-Serviced PSA, and as appropriate for enforcing the terms of a Non-Serviced Mortgage Loan, the applicable Non-Serviced Master Servicer requests delivery to it of the original Mortgage Note for a Non-Serviced Mortgage Loan, then the Custodian shall release or cause the release of such original Mortgage Note to such Non-Serviced Master Servicer or its designee.

Section 3.11   Servicing Compensation.  (a) As compensation for its activities hereunder, the Master Servicer shall be entitled to receive the Servicing Fee with respect to each Mortgage Loan, Serviced Companion Loan and REO Loan (other than the portion of any REO Loan related to any Non-Serviced Companion Loan) (including Specially Serviced Loans and any Non-Serviced Mortgage Loan constituting a "specially serviced loan" under any related Non-Serviced PSA).  As to each Mortgage Loan, Companion Loan and REO Loan, the Servicing Fee shall accrue from time to time at the Servicing Fee Rate and shall be computed on the basis of the Stated Principal Balance of such Mortgage Loan, Companion Loan or REO Loan, as the case may be, and in the same manner as interest is calculated on such Mortgage Loan, Companion Loan or REO Loan, as the case may be, and, in connection with any partial month

interest payment, for the same period respecting which any related interest payment due on such Mortgage Loan or Companion Loan or deemed to be due on such REO Loan is computed.  The Servicing Fee with respect to any Mortgage Loan, Companion Loan or REO Loan shall cease to accrue if a Liquidation Event occurs with respect to the related Mortgage Loan, except that if such Mortgage Loan is part of a Serviced Whole Loan and such Serviced Whole Loan continues to be serviced and administered under this Agreement notwithstanding such Liquidation Event, then the applicable Servicing Fee shall continue to accrue and be payable as if such Liquidation Event did not occur.  The Servicing Fee shall be payable monthly, on a loan-by-loan basis, from payments of interest on each Mortgage Loan, Companion Loan and REO Revenues allocable as interest on each REO Loan, and as otherwise provided by Section 3.05(a).  The Master Servicer shall be entitled to recover unpaid Servicing Fees in respect of any Mortgage Loan, Companion Loan or REO Loan out of that portion of related payments, Insurance and Condemnation Proceeds, Liquidation Proceeds and REO Revenues (in the case of an REO Loan) allocable as recoveries of interest, to the extent permitted by Section 3.05(a).

Except as set forth in the following sentence, the fourth paragraph of this Section 3.11(a), Section 6.03, Section 6.05 and Section 7.01(c), the right to receive the Servicing Fee may not be transferred in whole or in part (except in connection with a transfer of all of the Master Servicer's duties and obligations hereunder to a successor servicer in accordance with the terms hereof).  With respect to each Serviced Pari Passu Companion Loan, the Servicing Fee shall be payable to the Master Servicer from amounts payable in respect of such Serviced Pari Passu Companion Loan, subject to the terms of the related Intercreditor Agreement.

The Master Servicer shall be entitled to retain, and shall not be required to deposit in the Collection Account pursuant to Section 3.04(a), additional servicing compensation (other than with respect to a Non-Serviced Mortgage Loan) in the form of the following amounts to the extent collected from the related Mortgagor: (i) 100% of Excess Modification Fees related to any modifications, waivers, extensions or amendments of any Non-Specially Serviced Loans (including any related Serviced Companion Loan, to the extent not prohibited by the related Intercreditor Agreement) that are Master Servicer Decisions, and for any matter for a Mortgage Loan (including any related Companion Loan) that is not a Specially Serviced Loan which matter involves a Major Decision or a Special Servicer Decision, then the Master Servicer will be entitled to 50% of such Excess Modification Fees, (ii) 100% of all assumption application fees and other similar items received on any Mortgage Loans (other than a Non-Serviced Mortgage Loan) that are Non-Specially Serviced Loans (including any related Serviced Companion Loan, to the extent not prohibited by the related Intercreditor Agreement) to the extent the Master Servicer is processing the underlying transaction and 100% of all defeasance fees (provided that for the avoidance of doubt, any such defeasance fee shall not include any Modification Fees in connection with a defeasance that the Special Servicer is entitled to under this Agreement); and (iii) 100% of assumption, waiver, consent and earnout fees, and other similar fees (other than assumption application and defeasance fees) pursuant to Section 3.08 and Section 3.18 or other actions performed in connection with this Agreement on the Non-Specially Serviced Loans (including any related Serviced Companion Loan, to the extent not prohibited by the related Intercreditor Agreement) relating to Master Servicer Decisions, and for any matter for a Mortgage Loan (including any related Companion Loan) that is not a Specially Serviced Loan which matter involves a Major Decision or a Special Servicer Decision, then the Master Servicer shall be entitled to 50% of such assumption, waiver, consent and earnout fees and other similar

fees.   In addition, the Master Servicer shall be entitled to charge and retain as additional servicing compensation (other than with respect to any Non-Serviced Mortgage Loan or Specially Serviced Loan) any charges for beneficiary statements or demands and other customary charges, amounts collected for checks returned for insufficient funds and reasonable review fees in connection with any Mortgagor request to the extent such review fees are not prohibited under the related Mortgage Loan documents, in each case only to the extent actually paid by or on behalf of the related Mortgagor and shall not be required to deposit such amounts in the Collection Account or the Companion Distribution Account pursuant to Section 3.04(a) or Section 3.04(b), respectively.   Subject to Section 3.11(d), the Master Servicer shall also be entitled to additional servicing compensation in the form of:  (i) Penalty Charges to the extent provided in Section 3.11(d), (ii) interest or other income earned on deposits relating to the Trust Fund in the Collection Account or the Companion Distribution Account in accordance with Section 3.06(b) (but only to the extent of the Net Investment Earnings, if any, with respect to such account for the period from and including the prior Distribution Date to and including the P&I Advance Date related to the current Distribution Date), (iii) interest or other income earned on deposits in its Servicing Accounts which are not required by applicable law or the related Mortgage Loan to be paid to the Mortgagor, and (iv) the difference, if positive, between Prepayment Interest Excesses and Prepayment Interest Shortfalls collected on the Mortgage Loans and any Serviced Companion Loan, during the related Collection Period to the extent not required to be paid as Compensating Interest Payments.  The Master Servicer shall be required to pay out of its own funds all expenses incurred by it in connection with its servicing activities hereunder (including, without limitation, payment of any amounts due and owing to any of its Sub-Servicers and the premiums for any blanket Insurance Policy insuring against hazard losses pursuant to Section 3.07), if and to the extent such expenses are not payable directly out of the Collection Account and the Master Servicer shall not be entitled to reimbursement therefor except as expressly provided in this Agreement.

Notwithstanding anything herein to the contrary, Wells Fargo Bank, National Association may, at its option, assign or pledge to any third party or retain for itself the Transferable Servicing Interest with respect to any Mortgage Loan and any Serviced Companion Loan (and any successor REO Loan); provided, however, that in the event of any resignation or termination of Wells Fargo Bank, National Association as the Master Servicer, all or any portion of the Transferable Servicing Interest may be reduced by the Trustee to the extent reasonably necessary (in the sole discretion of the Trustee) for the Trustee to obtain a qualified successor master servicer that meets the requirements of Section 6.05 and who requires market-rate servicing compensation that accrues at a *per annum* rate in excess of the Retained Fee Rate, and any such assignment of the Transferable Servicing Interest shall, by its terms be expressly subject to the terms of this Agreement and such reduction.  The Master Servicer shall pay the Transferable Servicing Interest to the holder of the Transferable Servicing Interest at such time and to the extent the Master Servicer is entitled to receive payment of its Servicing Fees hereunder, notwithstanding any resignation or termination of Wells Fargo Bank, National Association as Master Servicer hereunder (subject to reduction pursuant to the preceding sentence).

(b)      As compensation for its activities hereunder, the Special Servicer shall be entitled to receive the Special Servicing Fee with respect to each Specially Serviced Loan and REO Loan (other than a Non-Serviced Mortgage Loan and any REO Loan relating to a

Non-Serviced Mortgaged Property).  As to each Specially Serviced Loan and REO Loan, the Special Servicing Fee shall accrue from time to time at the Special Servicing Fee Rate and shall be computed on the basis of the Stated Principal Balance of such Specially Serviced Loan or REO Loan, as the case may be, and in the same manner as interest is calculated on the Specially Serviced Loans or REO Loans, as the case may be, and, in connection with any partial month interest payment, for the same period respecting which any related interest payment due on such Specially Serviced Loan or deemed to be due on such REO Loan is computed.  The Special Servicing Fee with respect to any Specially Serviced Loan or REO Loan shall cease to accrue if a Liquidation Event occurs with respect to the related Mortgage Loan.  The Special Servicing Fee shall be payable monthly, on a loan-by-loan basis, in accordance with the provisions of Section 3.05(a).  The right to receive the Special Servicing Fee may not be transferred in whole or in part except in connection with the transfer of all of the Special Servicer's responsibilities and obligations under this Agreement. The Special Servicer shall not be entitled to any Special Servicing Fees with respect to a Non-Serviced Mortgage Loan.

(c)       The Special Servicer shall be entitled to additional servicing compensation in the form of (i) 100% of all Excess Modification Fees related to modifications, waivers, extensions or amendments of any Specially Serviced Loans, (ii) 100% of all assumption application fees and other similar items received with respect to Specially Serviced Loans and 100% of all assumption application fees and other similar items received with respect to Mortgage Loans (other than Non-Serviced Mortgage Loans) and Serviced Companion Loans that are Non-Specially Serviced Loans to the extent such Special Servicer processes the underlying transaction, (iii) 100% of waiver, consent and earnout fees, or other actions performed in connection with this Agreement on the Specially Serviced Loans or certain other similar fees paid by the related Mortgagor on Specially Serviced Loans, (iv) 100% of assumption fees and other similar fees received with respect to Specially Serviced Loans, (v) 50% of all Excess Modification Fees and assumption, waiver, consent and earnout and other similar fees (other than assumption application fees and defeasance fees) pursuant to Section 3.08 or Section 3.18 received with respect to any Mortgage Loans (other than Non-Serviced Mortgage Loans, but including any related Serviced Pari Passu Companion Loan(s)) that are Non-Specially Serviced Loans to the extent that the matter involves a Major Decision or a Special Servicer Decision, and shall be promptly paid to the Special Servicer by the Master Servicer (or directly from the related Mortgagor) to the extent such fees are paid by the Mortgagor and shall not be required to be deposited in the Collection Account pursuant to Section 3.04(a).  Subject to Section 3.11(d), the Special Servicer shall also be entitled to additional servicing compensation in the form of: (i) Penalty Charges to the extent provided in Section 3.11(d) and (ii) interest or other income earned on deposits relating to the Trust Fund in the REO Account and the Loss of Value Reserve Fund in accordance with Section 3.06(b) (but only to the extent of the Net Investment Earnings, if any, with respect to such account for the period from and including the prior Distribution Date to and including the P&I Advance Date related to such Distribution Date).  In addition, the Special Servicer shall be entitled to charge any Mortgagor for and retain as additional servicing compensation (other than with respect to any Non-Serviced Mortgage Loan) reasonable review fees in connection with any Mortgagor request to the extent such review fees are not prohibited under the related Mortgage Loan documents, and only to the extent actually paid by or on behalf of the related Mortgagor.  The Special Servicer shall also be entitled to additional servicing compensation in the form of a Workout Fee with respect to each Corrected Loan at the Workout Fee Rate on such Corrected Loan for so long as it remains a Corrected Loan; provided, however,

that after receipt by the Special Servicer of Workout Fees with respect to such Corrected Loan in an amount equal to $25,000, any Workout Fees in excess of such amount shall be reduced by the Excess Modification Fee Amount; provided, further, however, that in the event the Workout Fee collected over the course of such workout calculated at the Workout Fee Rate is less than $25,000, then the Special Servicer shall be entitled to an amount from the final payment on the related Corrected Loan (including any related Serviced Companion Loan) that would result in the total Workout Fees payable to the Special Servicer in respect of that Corrected Loan (including any related Serviced Companion Loan) equal to $25,000.  The Workout Fee shall be reduced (but not below zero) with respect to each collection on such Corrected Loan from which fee would otherwise be payable until an amount equal to the Excess Modification Fee Amount has been deducted in full.  The Workout Fee with respect to any Corrected Loan will cease to be payable if such loan again becomes a Specially Serviced Loan; provided that a new Workout Fee will become payable if and when such Specially Serviced Loan again becomes a Corrected Loan. The Special Servicer shall not be entitled to any Workout Fee with respect to a Non-Serviced Mortgage Loan.  If the Special Servicer is terminated (other than for cause) or resigns, it shall retain the right to receive any and all Workout Fees payable in respect of Mortgage Loans or any related Companion Loan that became Corrected Loans prior to the time of that termination or resignation except the Workout Fees will no longer be payable if the Corrected Loan subsequently becomes a Specially Serviced Loan.  If the Special Servicer resigns or is terminated (other than for cause), it will receive any Workout Fees payable on Specially Serviced Loans for which the resigning or terminated Special Servicer had determined to grant a forbearance or cured the event of default through a modification, restructuring or workout negotiated by the Special Servicer and evidenced by a signed writing, but which had not as of the time the Special Servicer resigned or was terminated become a Corrected Loan solely because the Mortgagor had not had sufficient time to make three consecutive timely Periodic Payments and which subsequently becomes a Corrected Loan as a result of the Mortgagor making such three consecutive timely Periodic Payments.  The successor special servicer shall not be entitled to any portion of such Workout Fees.  The Special Servicer shall not be entitled to receive any Workout Fees after termination for cause.  A Liquidation Fee will be payable with respect to (a) each Specially Serviced Loan (other than a Non-Serviced Mortgage Loan) or REO Property (other than a Non-Serviced Mortgaged Property) as to which the Special Servicer receives any Liquidation Proceeds or Insurance and Condemnation Proceeds and (b) each Mortgaged Loan repurchased by a Mortgage Loan Seller or for which a Loss of Value Payment was paid, in each case, subject to the exceptions set forth in the definition of Liquidation Fee (such Liquidation Fee to be paid out of such Liquidation Proceeds, Insurance and Condemnation Proceeds).  If, however, Liquidation Proceeds or Insurance and Condemnation Proceeds are received with respect to any Corrected Loan and the Special Servicer is properly entitled to a Workout Fee, such Workout Fee will be payable based on and out of the portion of such Liquidation Proceeds and Insurance and Condemnation Proceeds that constitute principal and/or interest on such Mortgage Loan.  Notwithstanding anything herein to the contrary, the Special Servicer shall only be entitled to receive a Liquidation Fee or a Workout Fee, but not both, with respect to proceeds on any Mortgage Loan.  Notwithstanding the foregoing, with respect to any Companion Loan, the Liquidation Fee, Workout Fee and Special Servicing Fees, if any, will be computed as provided in the related Intercreditor Agreement or to the extent such Intercreditor Agreement is silent or refers to this Agreement or indicates such fees are paid in accordance with this Agreement, as provided herein as though such Companion Loan were a Mortgage Loan.  Subject

to Section 3.11(d), the Special Servicer will also be entitled to additional fees in the form of Penalty Charges.  The Special Servicer shall be required to pay out of its own funds all expenses incurred by it in connection with its servicing activities hereunder (including, without limitation, payment of any amounts, other than management fees in respect of REO Properties, due and owing to any of its Sub-Servicers and the premiums for any blanket Insurance Policy obtained by it insuring against hazard losses pursuant to Section 3.07), if and to the extent such expenses are not expressly payable directly out of the Collection Account or the REO Account, and the Special Servicer shall not be entitled to reimbursement therefor except as expressly provided in this Agreement.

With respect to any of the preceding fees as to which both the Master Servicer and the Special Servicer are entitled to receive a portion thereof (other than a fee split with respect to Penalty Charges), the Master Servicer and the Special Servicer shall each have the right in their sole discretion, but not any obligation, to reduce or elect not to charge its respective portion of such fee; provided, that (A) neither the Master Servicer nor the Special Servicer will have the right to reduce or elect not to charge the portion of any such fee due to the other and (B) to the extent either the Master Servicer or the Special Servicer exercises its right to reduce or elect not to charge its respective portion in any such fee, the party that reduced or elected not to charge its respective portion of such fee will not have any right to share in any part of the other party's portion of such fee.  If the Master Servicer decides not to charge any fee (other than Penalty Charges), the Special Servicer shall nevertheless be entitled to charge its portion of the related fee to which the Special Servicer would have been entitled if the Master Servicer had charged a fee and the Master Servicer will not be entitled to any of such fee charged by the Special Servicer. Similarly, if the Special Servicer decides not to charge any fee (other than Penalty Charges), the Master Servicer shall nevertheless be entitled to charge its portion of the related fee to which the Master Servicer would have been entitled if the Special Servicer had charged a fee and the Special Servicer shall not be entitled to any portion of such fee charged by the Master Servicer.

(d)      In determining the compensation of the Master Servicer or the Special Servicer, as applicable, with respect to Penalty Charges, on any Distribution Date, the aggregate Penalty Charges collected on any Mortgage Loan (other than a Non-Serviced Mortgage Loan) and any related Companion Loan since the prior Distribution Date shall be applied (in such order) to reimburse (i) the Master Servicer, the Special Servicer or the Trustee for interest on Advances on such Mortgage Loan or related Companion Loan, if applicable (and, in connection with a Non-Serviced Mortgage Loan, the applicable Non-Serviced Master Servicer, the applicable Non-Serviced Special Servicer or the applicable Non-Serviced Trustee for interest on the servicing advances made by any such party with respect to a Non-Serviced Whole Loan pursuant to the applicable Non-Serviced PSA, to the extent not prohibited by the applicable Non-Serviced Intercreditor Agreement) due on such Distribution Date, (ii) the Trust for all interest on Advances previously paid to the Master Servicer or the Trustee pursuant to Section 3.05(a)(vi) (and, in connection with a Non-Serviced Mortgage Loan, the related trust for all interest on servicing advances reimbursed by such trust to any party under the applicable Non-Serviced PSA, which resulted in an additional expense for the Trust, to the extent not prohibited by the applicable Non-Serviced Intercreditor Agreement) with respect to such Mortgage Loan or related Companion Loan, if applicable and (iii) the Trust for all additional expenses of the Trust (other than Special Servicing Fees, Workout Fees and Liquidation Fees), including without limitation,

inspections by the Special Servicer and all unpaid Advances incurred since the Closing Date with respect to such Mortgage Loan. Penalty Charges (other than with respect to a Non-Serviced Mortgage Loan, which shall be payable as additional servicing compensation under the related Non-Serviced PSA) remaining thereafter shall be distributed to the Master Servicer, if and to the extent accrued while such Mortgage Loan and any related Companion Loan was a Non-Specially Serviced Loan, and to the Special Servicer, if and to the extent accrued on such Mortgage Loan during the period such Mortgage Loan was a Specially Serviced Loan or REO Loan. Any Penalty Charges paid or payable as additional servicing compensation to the Master Servicer and the Special Servicer shall be distributed between the Master Servicer and the Special Servicer, on a *pro rata* basis, based on the Master Servicer's and the Special Servicer's respective entitlements to such compensation described in the previous sentence. If the Special Servicer has partially waived any Penalty Charge (part of which accrued prior to the related Servicing Transfer Event), any collections in respect of such Penalty Charge shall be shared *pro rata* by the Master Servicer and the Special Servicer based on the respective portions of such Penalty Charge to which each would otherwise have been entitled. If the Master Servicer has partially waived any Penalty Charge (part of which accrued subsequent to the occurrence of a Servicing Transfer Event and prior to the date such Mortgage Loan or Serviced Whole Loan became a Corrected Loan), any collections in respect of such Penalty Charge shall be shared *pro rata* by the Master Servicer and the Special Servicer based on the respective portions of such Penalty Charge to which each would otherwise have been entitled. Notwithstanding the foregoing or anything else herein to the contrary, Penalty Charges with respect to any Companion Loan will be allocated pursuant to the applicable Intercreditor Agreement after payment of all related Advances and interest thereon and additional expenses of the Trust in accordance with this Section 3.11(d).

If a Servicing Shift Whole Loan becomes a Specially Serviced Loan prior to the applicable Servicing Shift Date, the Special Servicer shall service and administer such Servicing Shift Whole Loan and any related Serviced REO Property in the same manner as any other Specially Serviced Loan or Serviced REO Property and shall be entitled to all rights and compensation earned with respect to such Serviced Whole Loan as the Special Servicer of such Serviced Whole Loan. With respect to a Servicing Shift Mortgage Loan, prior to the applicable Servicing Shift Date, no other special servicer will be entitled to any such compensation or have such rights and obligations. If a Servicing Shift Whole Loan is still a Specially Serviced Loan on the applicable Servicing Shift Date, the Non-Serviced Special Servicer and the Special Servicer shall be entitled to compensation with respect to such Servicing Shift Whole Loan as if the Special Servicer were being terminated as the Special Servicer with respect to such Servicing Shift Whole Loan and the Non-Serviced Special Servicer were replacing the Special Servicer as the successor Special Servicer with respect to such Servicing Shift Whole Loan.

(e)     With respect to each Distribution Date, the Special Servicer shall deliver or cause to be delivered to the Master Servicer within two (2) Business Day following the Determination Date, and the Master Servicer shall deliver, to the extent it has received, to the Certificate Administrator, without charge and on the related Remittance Date, an electronic report (which may include HTML, Word or Excel compatible format, clean and searchable PDF format or such other format as mutually agreeable between the Certificate Administrator and the Special Servicer) that discloses and contains an itemized listing of any Disclosable Special Servicer Fees received by the Special Servicer or any of its Affiliates, if any, with respect to such

Distribution Date; <u>provided</u> that no such report shall be due in any month during which no Disclosable Special Servicer Fees were received.

(f)    The Special Servicer and its Affiliates shall be prohibited from receiving or retaining any compensation or any other remuneration (including, without limitation, in the form of commissions, brokerage fees, rebates, or as a result of any other fee-sharing arrangement) from any Person (including, without limitation, the Trust, any Mortgagor, any property manager, any guarantor or indemnitor in respect of a Mortgage Loan and any purchaser of any Mortgage Loan or REO Property) in connection with the disposition, workout or foreclosure of any Mortgage Loan, the management or disposition of any REO Property, or the performance of any other special servicing duties under this Agreement, other than as expressly provided in this <u>Section 3.11</u>; <u>provided</u> that such prohibition shall not apply to Permitted Special Servicer/Affiliate Fees.

(g)    Pursuant to the CREFC® License Agreement, CREFC® shall be paid (according to the payment instructions set forth on <u>Exhibit JJ</u> hereto or such other payment instructions as CREFC® may provide to the Master Servicer in writing at least two Business Days prior to the Remittance Date) the CREFC® Intellectual Property Royalty License Fee on a monthly basis.  The Master Servicer shall withdraw from the Collection Account and, to the extent sufficient funds are on deposit therein, pay the CREFC® Intellectual Property Royalty License Fee to CREFC® in accordance with <u>Section 3.05(a)(xii)</u> on a monthly basis, from funds on deposit in the Collection Account.

Section 3.12    <u>Inspections; Collection of Financial Statements; Delivery of Reports</u>.  (a) The Master Servicer shall perform (at its own expense), or shall cause to be performed (at its own expense), a physical inspection of each Mortgaged Property relating to a Mortgage Loan (other than a Non-Serviced Mortgage Loan, a Specially Serviced Loan or an REO Loan) with a Stated Principal Balance of (i) $2,000,000 or more at least once every twelve (12) months and (ii) less than $2,000,000 at least once every twenty-four (24) months, in each case, commencing in the calendar year 2020 (and each Mortgaged Property shall be inspected on or prior to December 31, 2021); <u>provided</u>, <u>however</u>, that if a physical inspection has been performed by the Special Servicer in the previous twelve (12) months, the Master Servicer will not be required to perform, or cause to be performed, such physical inspection; <u>provided</u>, <u>further</u>, that if any scheduled payment becomes more than sixty (60) days delinquent on the related Mortgage Loan, the Special Servicer shall inspect or cause to be inspected the related Mortgaged Property as soon as practicable after such Mortgage Loan becomes a Specially Serviced Loan or REO Loan and annually thereafter for so long as such Mortgage Loan remains a Specially Serviced Loan or REO Loan.  The cost of such inspection by the Special Servicer pursuant to the second proviso of the immediately preceding sentence shall be an expense of the Trust, and, to the extent not paid by the related Mortgagor, reimbursed *first* from Penalty Charges actually received from the related Mortgagor and then from the Collection Account pursuant to <u>Section 3.05(a)(ii)</u>, <u>provided</u> that, in the case of such reimbursement relating to a Serviced Whole Loan, such reimbursement shall be made, subject to the terms of the related Intercreditor Agreement, with respect to a Serviced Whole Loan, *first*, from any related AB Subordinate Companion Loan (if any) and *then*, *pro rata* and *pari passu*, from the related Serviced Pari Passu Mortgage Loan and any related Serviced Pari Passu Companion Loan in accordance with their respective outstanding principal balances (<u>provided</u> that, with respect to any AB Subordinate